**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CHRISTMAS TREE SHOPS, LLC, *et al.*,[1] | Case No. 23-10576 (TMH) |
| Debtors | Joint Administration Requested |

## DECLARATION OF MARC SALKOVITZ, EXECUTIVE CHAIRMAN, IN SUPPORT OF FIRST DAY RELIEF

I, Marc Salkovitz, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1.      I am the Executive Chairman of Christmas Tree Shops, LLC, ("CTS") and Handil Holdings, LLC ("Handil Holdings") and Chief Executive Officer of Salkovitz Family Trust 2, LLC (the "Salkovitz Trust"), Handil, LLC ("Handil"), and Nantucket Distributing Co., LLC ("Nantucket Distributing"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). My wife, Pamela Salkovitz, is the Chief Executive Officer of CTS and Handil Holdings and together we own all or substantially all of the membership interests in the Debtors. As an officer of the Debtors since November 2020, I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and restructuring efforts.

2.      Prior to becoming owner and officer of the Debtors, I was involved as owner and/or partner in a number of retail and wholesale businesses including, Viabella Holding, The

---

[1]      The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Christmas Tree Shops, LLC (1207), Handil, LLC (1150), Handil Holdings, LLC (2891), Salkovitz Family Trust 2, LLC (8773), and Nantucket Distributing Co., LLC (1640). The notice address for the Debtors is 64 Leona Drive, Middleboro, Massachusetts 02346.

154773041v1

Superstore, and Polliwalks.  My wife, Pamela Salkovitz, was previously an executive at Nine West and President of Stride Rite.

3.      Handil and Handil Holdings are not operating entities.  Handil was formed to hold the membership interests of Handil Holdings and the Salkovitz Trust.  Handil Holdings was, in turn, formed to hold the membership interests of CTS.

4.      As described in greater detail herein, CTS operates a chain of brick-and-mortar home goods retail stores that specializes in year-round seasonal goods at value pricing.  CTS stores offer a variety of products including home décor, bed and bath products, kitchen and dining products, furniture, food and seasonal products.  As of the date hereof (the "Petition Date"), CTS operates 82 CTS stores in 20 states.

5.      CTS owns the membership interests in Nantucket Distributing and Christmas Tree Shops of Massachusetts, LLC ("CTS MA").[2]  Nantucket Distributing purchases certain products from Asian vendors and distributes them to CTS.

6.      As discussed herein, the Salkovitz Trust owned an inventory distribution center in Middleboro, Massachusetts used by CTS.  The distribution center was sold in February 2023 to an unaffiliated entity, and CTS entered into a lease for the facility with that entity.

7.      A chart detailing the organizational structure of the Debtors and their non-debtor affiliates as of the Petition Date is attached hereto as **Exhibit 1** (the "Org Chart").

8.      I submit this Declaration to assist the Court and parties-in-interest in understanding the Debtors, their operations, their capital structure, the circumstances related to the commencement of these chapter 11 cases, and in support of (a) the Debtors' petitions for relief

---

[2]      CTS MA has no assets.  CTS MA was formed to hold liquor licenses for use in Massachusetts stores but never conducted any business, nor acquired any liquor licenses.

2

under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and (b) the relief requested by the Debtors pursuant to the pleadings described herein (collectively, the "<u>First Day Motions</u>").

9.      I believe that the relief sought in each of the First Day Motions is necessary to facilitate an effective transition into chapter 11.  I further believe that the Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing, utilize cash collateral, make certain essential payments, conduct certain store closing sales, and otherwise continue the Debtors' operations as sought in the First Day Motions.  In my opinion, approval of the relief requested in the First Day Motions will minimize disruptions to the Debtors' business operations and customers and is critical to preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a speedy and successful reorganization.

10.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.      <u>Corporate History and Operations</u>

11.      CTS was originally founded in 1950 as a seasonal gift shop near Cape Cod, Massachusetts.  In 1970, the store was purchased by Charles and Doreen Belzekian, and they began to specialize in closeouts, off-price goods, and bargains.  In 1977, CTS opened a big box retail location in Hyannis, Massachusetts and began importing goods from Asia.  CTS further

3

expanded in the 1980's, opening stores in Pembroke, Massachusetts, Sagamore, Massachusetts, and Newport, Rhode Island.  In order to facilitate further growth of its business, in 1996, CTS opened a large distribution center in Middleboro, Massachusetts (the "Middleboro Distribution Center").

12.     By 2003, CTS had grown to 23 stores, at which time it was purchased by Bed, Bath and Beyond, Inc. ("BBBY") for approximately $200 million.  Over the next decade, CTS experienced rapid growth, expanding to over 80 stores and opening a second distribution center.

13.     In November 2020, Handil Holdings, an entity formed by me and my wife, purchased BBBY's interest in CTS for the assumption of CTS's indebtedness and obligations and additional consideration of approximately $137 million, inclusive of closing costs and other costs of approximately $8 million.  In connection with the purchase of CTS, the Salkovitz Trust purchased the Middleboro Distribution Center from BBBY for $50 million.

14.     The acquisitions were funded by a Credit Agreement, dated as of November 12, 2020, between and among (a) CTS and the Salkovitz Trust, as borrowers (collectively, the "Borrowers"), (b) Handil Holdings, Handil, Nantucket Distributing and CTS MA, as guarantors (collectively, the "Guarantors"), (c) Pathlight Capital, LP ("Pathlight"), as collateral and security agent (in such capacity, the "Prepetition Agent"), (d) Pathlight as the term lender, (e) Eclipse Business Capital LLC ("EBC"), as the syndication agent for the revolving commitments and revolving agent, (f) Eclipse Business Capital SPV, LLC ("Eclipse SPV" and together with EBC, "Eclipse"), as revolving lender, and (g) any other "Lender" from time to time party thereto (as amended by that certain First Amendment to Credit Agreement, dated as of December 30, 2020, as further amended by that certain Second Amendment to Credit Agreement, dated as of August 3, 2021, as further amended by that certain Third Amendment to Credit Agreement, dated

as of April 14, 2022, as further amended by that certain Fourth Amendment to Credit Agreement, dated as of July 25, 2022, as further amended by that certain Fifth Amendment to Credit Agreement, dated as of November 1, 2022 but effective as of October 26, 2022, as further amended by that certain Sixth Amendment to Credit Agreement, made effective as of December 15, 2022, as further amended by that certain Seventh Amendment to Credit Agreement, made effective as of January 11, 2023 (as same was amended by those certain letter agreements dated January 26, 2023, February 2, 2023 and February 10, 2023), as further amended, modified, supplemented or restated prior to February 16, 2023, the, the "Original Credit Agreement").

15.     Pursuant to the Original Credit Agreement and documents executed in connection therewith, (a) Eclipse was secured by (i) a first-priority lien on all or substantially all of the Borrowers' and the Guarantors' assets, including accounts, inventory and cash, and (ii) a second-priority lien on intellectual property, real property (including the mortgage on the Middleboro Distribution Center), and (b) Pathlight was secured by (i) a first-priority lien on intellectual property, real property (including the mortgage on the Middleboro Distribution Center) and FF&E, and (ii) a second-priority lien on all or substantially all of the Borrowers' and Guarantors' assets, including accounts, inventory and cash.

16.     At the time of the 2020 acquisition, CTS's business was fully integrated into BBBY including BBBY's retail operations and the operations of its subsidiaries, World Market, Buy Buy Baby, and Harmon Face Values.  Accordingly, CTS and BBBY executed a one-year transition services agreement so as to provide sufficient time for CTS to develop its own standalone systems and human resources and finance functions.  The separation of CTS's systems from BBBY and matters related to the transition were more expensive than forecasted and at times, contentious.  Ultimately, CTS was able to complete the separation by late 2021, but at a

cost of $22 million:  more than twice the estimated expense.  The Salkovitz Trust also provided a guaranty of CTS's performance under certain leaseholds subleased by CTS from BBBY or leaseholds guaranteed by BBBY, and granted BBBY a mortgage on the Middleboro Distribution Center junior to the mortgage provided under the Original Credit Agreement.[3]

17.    Following the sale, CTS was rebranded in order to better reflect an everyday shopping experience and de-emphasize the prior focus on the Christmas holiday season.  CTS invested in improving the shopping experience for its customers, refreshing signage and other elements of its stores, and made efforts to improve the product mix.  CTS also consolidated distribution to operate solely out of the Middleboro Distribution Center and used process improvement methods to increase distribution efficiencies.

18.    These investments allowed CTS to improve its ability to efficiently stock its stores with an abundance and variety of inventory, which proved to be a key element to improving performance.  CTS is able to quickly process and deliver product to its stores through the Middleboro Distribution Center and, as a result, its stores routinely carry approximately 30,000 unique stock keeping units ("SKUs") at any time.

19.    These efforts paid immediate dividends.  In the 10-month period from February 28, 2021 to December 31, 2021, CTS's revenue was approximately $597 million and its EBITDA totaled approximately $16 million, the highest in the business's history, generating a net income of almost $6 million.

20.    Beginning in 2022, certain outside factors negatively affected CTS's business. Rising interest rates, oil prices, and the continuing effects of the COVID-19 pandemic reduced

---

[3]    Other than the Debtors' relationships, none of I, my wife, Pamela Salkovitz, or any of the entities that we own or control have any connection to or affiliation with Eclipse, Pathlight, BBBY, or CTS's landlords.

6

store traffic and sales in the Spring of 2022.  Since May 2022, customer traffic in CTS's stores decreased by approximately 35% and CTS's average basket size (i.e., units per purchase) decreased by 25%.  In 2022, CTS's revenue was approximately $544 million and its EBITDA was negative $45 million.

21.     On account of the foregoing, in 2022 the Salkovitz Trust borrowed an additional approximately $35 million from Pathlight pursuant to the Original Credit Agreement to provide to CTS for working capital.  In addition, in January 2023, CTS downsized corporate staff overhead and eliminated overnight inventory staffing in all stores resulting in over $2 million in annual savings.  Sales continue to be significantly lower than 2021 levels, in part because of the constraints on CTS's ability to maintain inventory levels.

22.     In February 2023, the Salkovitz Trust sold the Middleboro Distribution Center to an unaffiliated third party for approximately $105 million.  CTS entered into a lease with the third party for the Middleboro Distribution Center, pursuant to which CTS pays rent, common area maintenance charges, and taxes of approximately $857,000 per month.  From the proceeds of the sale of the Middleboro Distribution Center, Pathlight was paid approximately $90,000,000 on account of its term loans, including the funds provided to CTS for additional working capital.

23.     On February 16, 2023, the obligations under the Original Credit Agreement were restructured and refinanced.  CTS and its affiliates entered into that certain Eighth Amendment to the Original Credit Agreement, dated as of February 16, 2023, pursuant to which the revolving line of credit was replaced with the Revolving Credit Agreement (as defined below) and modified the credit agreement with Pathlight (the "A&R Credit Agreement") to secure payment of approximately $16,100,000, the amount asserted to be due under the make-whole interest provision of Pathlight's 2020 term loan, and also entered into that certain Revolving Credit

Agreement, dated as of February 16, 2023, with EBC, as the administrative and collateral agent, EBC SPV, as revolving lender, and ReStore Capital, LLC, as revolving lender (the "Revolving Credit Agreement"). The Salkovitz Trust also loaned additional amounts to CTS from the proceeds of the sale including, without limitation, $6,770,625 to purchase a letter of credit to secure CTS's obligations under its new lease of the Middleboro Distribution Center, an additional $2,000,000 to fund working capital, and other amounts for interest, costs, and fees associated with the sale.

24.     Lacking liquidity and with substantial overdue obligations to creditors, CTS has not been able to purchase the unique, large assortment of inventory SKUs it typically offers. As a result, "impulse items" are unavailable to consumers and "basket size" remains smaller than usual.

25.     The Debtors have filed these chapter 11 cases to restructure their obligations to their creditors and hope to propose a plan of reorganization to achieve that goal. The Debtors are mindful of the expense and distraction to business operations that results from a chapter 11 case. To emerge as a healthy and competitive enterprise, it is important for the Debtors to move swiftly through their chapter 11 cases and address the issues related to their overleveraged capital structure in a focused and constructive manner with as little disruption to operations as possible.

## II.     The Debtors' Assets.

26.     CTS's assets consist principally of (a) credit card receivables in the amount of $2,500,000, (b) inventory with a cost value of $43,000,000, and (c) the furniture, fixtures, and equipment at its stores, as well as certain intellectual property, including, without limitation, certain trademarks and copyrights that it uses in the operation of its business with a value of approximately $9 million (based upon a recent valuation).

27.     Approximately 93% of CTS's inventory is located in CTS's stores or the Middleboro Distribution Center.  The remaining approximately 7% of CTS's inventory is in-transit inventory, which, pursuant to its agreements with its vendors, CTS takes title to when it is shipped by the vendor.  CTS's listed inventory does not include any inventory held on consignment as described further below.

28.     CTS holds leasehold interests as a tenant under approximately 83 leases (the "CTS Leases").  The CTS Leases are of varying terms, and certain of CTS's landlords hold security deposits, in which CTS has an interest.  Eleven (11) of the CTS Leases are subleases pursuant to which CTS leases space from BBBY (the "BBBY Subleases").  BBBY commenced a jointly administered chapter 11 case in the United States Bankruptcy Court for the District of New Jersey on April 23, 2023 (Case No. 23-13359-VFP).  On April 24, 2023, BBBY filed a motion to reject certain of its leases, including the leases for properties which are subleased to CTS pursuant to the BBBY Subleases.

29.     The other Debtors have no assets other than the membership interests described herein.

## III.   **The Debtors' Liabilities**

### a.     **Secured Debt**

30.     As noted, on February 16, 2023, in connection with the Salkovitz Trust's sale of the Middleboro Distribution Center and repayment of a portion of the Pathlight term loans, CTS and the Salkovitz Trust, as borrowers, Handil Holdings, Handil, Nantucket Distributing, and CTS MA, as guarantors entered into the Revolving Credit Agreement.  As security for the Revolving Credit Agreement, CTS and affiliates granted to EBC, as agent for the benefit of itself and the revolving lenders, a first-priority lien on their working capital assets and a junior lien on their

general intangibles and furniture, fixtures, and equipment (junior to Pathlight under the terms of the Original Credit Agreement and the parties' Intercreditor Agreement).

31.     On the same date, CTS and the Salkovitz Trust entered into that certain A&R Credit Agreement pursuant to which the Borrowers were obligated to pay, only under certain specified circumstances, $16,106,183 to Pathlight on account of the make-whole interest asserted to be due to Pathlight under the Original Credit Agreement.  As security for the A&R Credit Agreement, CTS granted Pathlight a first-priority lien on its general intangibles and furniture, fixtures, and equipment and a junior lien on its working capital assets.  The A&R Credit Agrrement is guaranteed by Nantucket Distributing, Handil Holdings, Handil, and CTS MA.

32.     EBC declared one or more financial covenant defaults under the Revolving Credit Agreement and on May 4, 2023, EBC accelerated the obligations under the Revolving Credit Agreement and made demand for payment.  The A&R Credit Agreement contains a cross-default provision making a default under the Revolving Credit Agreement a default under the A&R Credit Agreement.

33.     The Prepetition ABL Secured Parties assert that the Debtors are obligated to them in the aggregate amount of $25,916,275 consisting of: (a) principal of $22,149,275, (b) Letter of Credit balance of $2,100,000, and (c) a Revolving Credit Early Termination Fee of $1,667,000 (the "**Early Termination Fee**").  The Early Termination Fee was calculated on the basis of 1.67% of the aggregate revolving commitment of $100,000,000 for the period from May 4, 2023 to November 12, 2023 and 0.67% for the period from November 13, 2023 to November 12, 2024.

### b.     Other Secured Debt

34.     On or about January 6, 2023, CTS entered into that certain *Agreement for Consignment of Memo Merchandise* (the "Consignment Agreement") with ReStore Capital

10

(CTS), LLC ("Restore CTS"), pursuant to which Restore CTS provides on consignment certain inventory stocked in CTS's stores (the "Consigned Inventory"). When the Consigned Inventory is sold, CTS pays Restore CTS an amount equal to the cost of the Consigned Inventory plus a 10% commission. In connection with the Consignment Agreement, CTS granted Restore CTS a first-priority security interest in the Consigned Inventory and the proceeds thereof. Amounts payable to Restore CTS on account of sales of Consigned Inventory (Consigned Inventory cost plus commissions) are paid weekly in arrears, and, as of the Petition Date, CTS owes Restore CTS approximately $900,000 under the Consignment Agreement.

35.    BBBY holds a junior lien on the Debtors' assets, subordinate to the security interests of Eclipse and Pathlight, to secure CTS's obligations under the BBBY Subleases. The Debtors do not believe that they owe any amounts to BBBY because BBBY has filed a motion to reject the leases which are the subject of the BBBY Subleases.

36.    Various other parties assert liens or other security interests in certain delineated personal property of the Debtors based upon leases or sales of such property to the Debtors. As of the Petition Date, the Debtors estimate that these various other parties are owed approximately $1,600,000.

### c.    Unsecured Debt

37.    CTS estimates that its outstanding unsecured debt, excluding any inter-company debts and related party indebtedness, totals approximately $58.4 million.

38.    Nantucket Distributing estimates that its outstanding unsecured debt, excluding any inter-company debts and related party indebtedness, totals approximately $22.6 million.

## IV.    The First Day Motions[4]

39.      To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and to promote a smooth transition to operations in chapter 11, the Debtors have requested various relief in their First Day Motions. The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  I believe that the relief requested in the First Day Motions is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 and that the First Day Motions should be approved.  The First Day Motions include the following:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

- *Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date* (the "KCC Retention Application");

- *Motion by Debtors for Entry of an Order Authorizing the Debtors to Redact from the Creditor Matrix and Certain Pleadings Certain Personally Identifiable Information and Granting Related Relief* (the "Matrix Motion");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* (the "Wage Motion");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, Establishing Procedures for Determining Adequate Assurance of Payment, Authorizing the Payment of Prepetition Administrative Fees Relating to Utility Services, and (V) Granting Related*

---

[4]      Capitalized terms used in this section but not defined shall having the meanings ascribed to them in the applicable First Day Motion.

*Relief* (the "Utility Motion");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief* (the "Motion to Approve Customer Programs");

- *Motion of the Debtors for Interim and Final Orders Authorizing the Payment of Prepetition Insurance Obligations* (the "Insurance Motion");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion"); and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms; and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and Granting Related Relief* (the "Cash Management Motion").

40.    **Motion for Joint Administration.** The Debtors have filed a motion for the entry of an order directing the joint administration of their Chapter 11 Cases for procedural purposes only. I believe that joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications and orders. It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought therein is solely procedural, and not intended to affect substantive rights.

41.    **KCC Retention Application.** The Debtors have filed an application (the "KCC Retention Application") for approval of the Debtors' retention and employment of Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent for the Debtors. The relief requested in the KCC Retention Application will ease the administrative burden on the Clerk of the Court in connection with the prosecution of these Chapter 11 Cases. In addition, I have been advised by counsel that KCC's retention is required by the Local Rules in light of the anticipated

number of creditors in these Chapter 11 Cases.

42.     **Matrix Motion.**   The Debtors have filed a motion to redact certain personally identifiable information from the Debtors' matrix of creditors and their schedules and statement of financial affairs.  Cause exists to authorize the Debtors to redact address information of individual creditors and interest holders, many of whom are the Debtors' employees, because such information is sensitive and could be used for improper purposes.

43.     **The Wage Motion**.   Pursuant to the Wage Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay all prepetition wages, salaries, reimbursable expenses, and other obligations incurred on account of the Employee Compensation and Employee Benefits Programs (as defined in the Wage Motion) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Employee Benefits Programs in the ordinary course of business during these chapter 11 cases and (b) granting related relief.

44.     The Debtors seek authority, but not direction, to continue their Employee Compensation and Employee Benefits Programs in the ordinary course of business and to pay the aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs set forth in the Wage Motion.

45.     The payments proposed in the Wage Motion do not exceed the priority caps set forth in Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

46.     As of the Petition Date, the Debtors employ approximately 3,643 Employees, approximately 1,039 of whom are employed on a full-time basis and approximately 2,606 of whom are employed on a part-time basis. Approximately, 259 Employees earn a salary and approximately 3,384 are paid on an hourly basis. In addition to the Employees, the Debtors have

14

historically sourced critical labor support from various agencies and periodically retain specialized individuals as Independent Contractors to complete discrete projects. At this time, the Debtors retain approximately 4-6 Independent Contractors.

47.     The Debtors' Employees and Independent Contractors perform a wide variety of functions critical to the Debtors' operations at the Debtors' offices, distribution and fulfillment centers, and stores. Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' businesses that cannot be easily replaced. The remainder of the Employees and Independent Contractors provide services necessary to continue the Debtors' operations and maximize the value of the Debtors' estates. Without the continued, uninterrupted services of their Employees and Independent Contractors, I believe the Debtors' ability to efficiently conduct their business operations during the pendency of these chapter 11 cases will be threatened, and the Debtors' reorganization efforts will be severely hampered.

48.     The vast majority of Employees rely exclusively or primarily on the Employee Compensation and Benefits Programs to pay their daily living expenses and support themselves and their families. Thus, Employees will face significant financial consequences and hardship if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. Consequently, I believe the relief requested in the Wages Motion is necessary and appropriate.

49.     **The Utilities Motion**.   Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to approve the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Additional Assurance Requests (as such terms are defined in

the Utilities Motion); and (d) granting related relief.

50.     In connection with the operation of their business and management of its approximately 82 stores, CTS obtains necessary electricity, telephone, internet, natural gas, water, waste management, and other similar services (collectively, the "Utility Services") from a number of utility companies and brokers (collectively the "Utility Companies").

51.     On average, the Debtors pay approximately $1,000,000 each month for Utility Services, calculated as a historical average payment for the twelve-month period ended December 2022.   To provide additional assurance of payment, the Debtors propose to deposit into a segregated account (the "Adequate Assurance Deposit"), an amount equal to one-half of one month of the Debtors' average monthly cost of Utility Services, and which amount excludes Utility Services billed directly to the Debtors' landlords.  The Adequate Assurance Deposit will be made into a separate, segregated, interest-bearing account, that, to the extent not already in existence, will be established and funded within twenty (20) business days after the Petition Date.

52.     The Debtors are conducting store closing sales for certain retail locations. After these stores are closed and utility accounts associated therewith are settled, the Debtors will reduce the amount of the Adequate Assurance Deposit to reflect Utility Services that are no longer being provided.  Additionally, the Debtors seek approval of their proposed adequate assurance procedures, which set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

53.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and hence, the efficient administration of these chapter 11 cases. The Debtors' retail locations, distribution centers, and corporate offices require electricity,

telecommunications, heat, water, waste management, and other Utility Services to operate. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations may be severely disrupted, and such disruption would jeopardize the Debtors' ability to orderly effectuate the chapter 11 process. Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

54. **The Motion to Approve Customer Programs**.   The Debtors have determined, in the sound exercise of their business judgment, that the continuation of their Customer Programs in the ordinary course of business, including authority to satisfy prepetition obligations incurred by the Debtors related to these Customer Programs, is critical to their continuing operations as they seek to maximize value in their chapter 11 cases.   Maintaining the loyalty, support, and goodwill of their customers is critical to the Debtors' restructuring efforts.   The Debtors' failure to honor the Customer Programs in the ordinary course likely would cause the Debtors to lose the support and confidence of their customers.   As a result, the continuation of the Customer Programs is necessary in order for the Debtors to maximize the value of their estates for the benefit of all stakeholders.   Additionally, the Debtors submit that the substantial benefit conferred on the Debtors' estates by the Customer Programs warrants granting the Debtors the ability to honor the Customer Programs and any customer obligations relating thereto, whether arising prepetition or postpetition.

55. **The Insurance Motion**.  The Insurance Motion seeks authority for the Debtors to pay the Prepetition Insurance Obligations and the Immediate Post-Petition Insurance Obligations.

56. The nature of the Debtors' assets makes it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.   The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in one

17

or more of the Insurance Carriers terminating their existing policies, declining to renew the policies that are part of the Insurance Programs or refusing to enter into new insurance agreements with the Debtors in the future.

57.     The *Operating Guidelines for Chapter 11 Cases* (the "UST Guidelines") of the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") require debtors to maintain insurance coverage throughout the pendency of their chapter 11 cases. Should any insurance policy lapse during the pendency of the Debtors' chapter 11 cases, the U.S. Trustee Guidelines mandate that the Debtors forward proof of policy renewal of that policy to the U.S. Trustee.   Therefore, the continuation and renewal of the Insurance Programs, on an uninterrupted basis, and the payment of all prepetition and post-petition Insurance Obligations arising under the Insurance Programs, is not only essential to preserve the Debtors' assets and the value of the Debtors' estates for all creditors, but also compulsory pursuant to the U.S. Trustee Guidelines.

58.     **The Taxes Motion**.   In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, and property taxes, as well as other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").   Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to negotiate, remit and pay (or use tax credits to offset) certain accrued and outstanding prepetition obligations and other obligation accrued in the ordinary course of business on account of the Taxes and Fees and Assessments (each as defined below); (b) authorizing, but not directing, the Debtors to continue negotiating and paying the Taxes and Fees and Assessments accrued in the ordinary course of business on a postpetition basis; and (c) granting related relief.

59.     The Debtors believe that any failure to pay the Taxes and Fees could materially

disrupt the Debtors' business operations in several ways, including that: (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract them from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in fines and penalties, the accrual of interest, or both. Lastly, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and such funds may not constitute property of the Debtors' estates.

60.    **The Cash Management Motion**.  The Debtors receive all revenues and make all payments through their Cash Management System. If the Debtors are unable to maintain their Cash Management System, the Debtors' operations will be severely impeded. Requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. Any disruption of the Cash Management System could have severe adverse effects on the Debtors' restructuring efforts, the cost of which would ultimately be borne by the Debtors' creditors and other stakeholders. Maintaining the current Cash Management System will facilitate the Debtors' smooth transition into and operation in chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising postpetition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) will be paid by the Debtors.

19

I have reviewed each of the First Day Motions, the underlying operative documents and company records, the facts stated therein and the descriptions of the relief they request. I have reviewed same with the Debtors' executives and employees; together with the Debtors' counsel and advisors and based on such review believe that the contents of the First Day Motions and this Declaration are true and correct to the best of my information and belief. Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Dated: May 5, 2023                                    /s/ Marc Salkovitz
                                                      Marc Salkovitz

# Exhibit 1

# Debtors' Organizational Chart



Note: Chapter 11 Debtor entities are denoted in blue.