# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHRISTMAS TREE SHOPS, LLC, *et al.*,[1] | ) | Case No. 23-10576 (TMH) |
| | ) | |
| Debtors | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE SECURED LENDERS, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The debtors and debtors-in-possession (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby move the Court (the "**Motion**") for entry of an interim order on an expedited basis (the "**Interim Order**")[2] substantially in the form attached hereto as **Exhibit A**, and following a final hearing to be set by the Court, entry of a final order (the "**Final Order**" and, with the Interim Order, the "**DIP Orders**"), pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), authorizing the Debtors, among other things, to obtain senior

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Christmas Tree Shops, LLC (1207), Handil, LLC (1150), Handil Holdings, LLC (2891), Salkovitz Family Trust 2, LLC (8773), and Nantucket Distributing Co., LLC (1640). The notice address for the Debtors is 64 Leona Drive, Middleboro, Massachusetts 02346.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Order.

1

secured postpetition financing and use cash collateral on an interim and final basis pursuant to the terms and conditions of that certain senior secured super-priority asset-based revolving credit facility, by and among the Debtors, as Borrowers, and Eclipse Business Capital LLC, as administrative agent, for and on behalf of itself and the other lenders party thereto (such lenders, collectively with the DIP Agent, the "**DIP Lenders**"), substantially in the form attached to the Interim Order as Exhibit A . In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Marc Salkovitz, Executive Chairman, In Support of First Day Relief*, filed with the Court concurrently herewith (the "**First Day Declaration**").[3]  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

**OVERVIEW**

1.      By this Motion, the Debtors seek entry of the DIP Orders, and initially the Interim Order,:

    a.      authorization for the Borrowers (as defined in the DIP Loan Agreement (defined below)) to obtain postpetition financing pursuant to the DIP Facility (defined below) and for each of the Guarantors (as defined in the DIP Loan Agreement) to guarantee unconditionally on a joint and several basis, and subject in all respects to the terms and limitations set forth in the DIP Loan Documents (defined below), the applicable Borrowers' obligations under the DIP Facility, consisting of a senior secured super-priority asset-based revolving credit facility (the "**DIP Facility**"), on the terms and conditions of the Senior Secured Super-Priority Debtor-in-Possession Revolving Credit Agreement substantially in the form annexed to the Interim Order as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended or otherwise modified from time to time, the "DIP Loan Agreement;" and, together with any other related agreements, documents, security agreements, or pledge agreements, including this Interim Order and the Final Order (each as defined below), collectively, the "**DIP Loan Documents**"), by and among the Borrowers and the Guarantors (each as defined in the DIP Loan Agreement), Eclipse Business Capital LLC ("**EBC**"), as administrative agent (in such capacity, together with its successors and assigns in such capacities, the "**DIP Agent**"), Eclipse Business Capital SPV, LLC ("**EBC SPV**" and together with EBC,

---

[3] Except as set forth in the Concise Statement of Relief Requested below, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

"**Eclipse**") and ReStore Capital, LLC ("**ReStore**"), as Lenders (as defined in the DIP Loan Agreement; the Lenders and Agent, collectively, the "**DIP Secured Parties**"), in an aggregate principal amount (subject to availability) of $45 million in revolving commitments available for borrowing by the Borrowers (such commitments, the "**DIP Revolving Commitments**", and the loans outstanding under any of the DIP Revolving Commitments from time to time, collectively, the "**DIP Revolving Loans**");

b. authorization for the Debtors to execute, deliver and enter into the DIP Loan Documents to which they are in each respective instance a party and to perform all of the Debtors' respective obligations (including, without limitation, any obligations in respect of indemnity claims) thereunder and such other and further acts as may be required in connection with the DIP Loan Documents;

c. authorization for the Debtors to pay the principal, interest, fees, expenses and other amounts payable to the DIP Secured Parties pursuant to the applicable DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, facility fees, or other fees, costs, expenses, charges and disbursements of the DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' respective attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case, to the extent constituting Debtor, Borrower and/or Guarantor obligations of any kind under the DIP Loan Documents (such obligations, the "**DIP Obligations**");

d. authorization for the Debtors, immediately upon entry of this Interim Order and thereafter, to use proceeds of the DIP Facility (collectively the "DIP Loan Proceeds") as provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents): (A) to pay costs, premiums, fees and expenses related to the above-captioned cases and in connection with the DIP Facility; (B) as set forth in this Interim Order and the DIP Loan Documents, to repay the Prepetition ABL Obligations (defined below) with the proceeds of the DIP Revolving Loans; (C) to make permitted adequate protection payments in respect of the Prepetition Obligations; and (D) to provide financing for working capital and for other general corporate purposes of the Debtors;

e. the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations;

f. granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (defined below) in all DIP Collateral (defined below), including, without limitation, all property constituting Prepetition Collateral

(defined below) and further including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code and further defined below), to secure the repayment of the DIP Obligations, which DIP Liens shall have the relative rankings and priorities set forth in the DIP Orders (as applicable) and, as between the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties, subject to the terms of the Prepetition Intercreditor Agreement (defined below) and, to the extent applicable, the BBBy Intercreditor Agreement (defined below) (together with the Prepetition Intercreditor Agreement, the "**Intercreditor Agreements**");

g.   authorization for the Debtors to use, among other things, solely in accordance with the applicable Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the limitations provided in the DIP Orders (as applicable) and in the DIP Loan Documents, any Cash Collateral in which any of the Prepetition Secured Parties (defined below) and BBBy (defined below) have an interest and the granting of adequate protection solely to the extent of any postpetition diminution in the value of the Prepetition Secured Parties' and BBBy's respective interests in the Prepetition Collateral, which collateral also secures the BBBy Obligation (defined below), including, without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral, (iii) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (iv) the subordination of the Prepetition ABL Obligations (defined below) and BBBy Obligations to the Carve Out (defined below), (v) in the case of the Prepetition Term Loan Secured Parties (defined below), the priming of the Prepetition Term Loan Liens (defined below) on the Prepetition ABL Priority Collateral (defined below) by the Carve Out, the DIP Liens, and Prepetition ABL Adequate Protection Liens (defined below), (vi) in the case of the Prepetition ABL Secured Parties, the priming of the Prepetition ABL Liens (defined below) (A) on the Prepetition ABL Priority Collateral by the Carve Out and DIP Liens, and (B) on the Prepetition Term Priority Collateral (defined below) by the Carve Out, the Prepetition Term Loan Adequate Protection Liens (defined below) and DIP Liens; (vii) in the case of BBBy, the priming of the BBBy Liens (defined below) on the Prepetition Collateral by the Carve Out, the DIP Liens, and the Prepetition Secured Parties' Adequate Protection Liens (defined below); and (viii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "**Diminution in Value**");

h.   the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of in the DIP Orders (as applicable) and the other DIP Loan Documents;

i.   subject to entry of a Final Order, a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and Prepetition Collateral and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to the DIP Collateral and Prepetition Collateral;

j.      this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

k.      the scheduling of a final hearing on the Motion (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

l.      granting the Debtors such other and further relief as is just and proper.

## JURISDICTION

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these Chapter 11 Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

## BACKGROUND

5.      On May 5, 2023 (the "**Petition Date**"), each of the Debtors commenced the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.      No creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee. No trustee or examiner has been appointed in any of these Chapter 11 Cases.

7.      A detailed description of the Debtors, including their business operations, their corporate and capital structure, the events leading to the commencement of these Chapter 11 Cases, and the facts and circumstances supporting this Motion, are set forth in greater detail in the First Day Declaration and incorporated by reference herein.

8.      As is more fully set forth in the First Day Declaration, through the Chapter 11 proceedings, the Debtors intend to restructure their obligations to creditors. Toward that end, the Debtors have entered into the DIP Facility, pursuant to which, subject to Court approval, the Debtors will receive a senior secured debtor-in-possession credit facility that should provide them with sufficient runway to operate the business and navigate through the chapter 11 process. The relief sought in this Motion is intended to preserve and maximize value and facilitate the Debtors' operations through these Chapter 11 Cases.

## I.      **Prepetition Capital Structure and Secured Indebtedness**

### A.      **Original Prepetition Credit Agreement**

9.      Christmas Tree Shops, LLC ("CTS") and certain of its affiliates designated therein as "Borrowers" and "Guarantors", Pathlight Capital LP ("Pathlight"), as "Agent", EBC, as the "Revolving Agent", and each "Lender" from time to time party thereto, were parties to that certain Credit Agreement, dated as of November 12, 2020 (as amended by that certain First Amendment to Credit Agreement, dated as of December 30, 2020, as further amended by that certain Second Amendment to Credit Agreement, dated as of August 3, 2021, as further amended by that certain Third Amendment to Credit Agreement, dated as of April 14, 2022, as further amended by that certain Fourth Amendment to Credit Agreement, dated as of July 25, 2022, as further amended by

that certain Fifth Amendment to Credit Agreement, dated as of November 1, 2022 but effective as of October 26, 2022, as further amended by that certain Sixth Amendment to Credit Agreement, made effective as of December 15, 2022, as further amended by that certain Seventh Amendment to Credit Agreement, made effective as of January 11, 2023 (as same was amended by those certain letter agreements dated January 26, 2023, February 2, 2023 and February 10, 2023), as further amended, modified, supplemented or restated prior to February 16, 2023, the "Original Prepetition Credit Agreement").

10.     On February 16, 2023, the obligations under the Original Prepetition Credit Agreement were restructured and refinanced pursuant to which, among other things, (A) the Revolving Agent and Revolving Lenders (each, as defined in the Original Prepetition Credit Agreement) refinanced all of the Revolving Obligations (as defined in the Original Prepetition Credit Agreement) pursuant to the terms of the Prepetition ABL Credit Agreement (defined below), (B) the Loan Parties (as defined in the Original Prepetition Credit Agreement) prepaid the principal amount of the Term Loans (as defined in the Original Prepetition Credit Agreement) outstanding as of February 16, 2023 with proceeds from the Middleborough Property Sale (as defined in the Original Prepetition Credit Agreement) in an amount equal to $84,184,981.91 and (C) the Original Prepetition Credit agreement was amended and restated pursuant to that certain Eighth Amendment to Credit Agreement, made effective as of February 16, 2023 by the Prepetition A&R Term Loan Agreement (defined below).

### B.     Prepetition ABL Secured Credit Facility

11.     On February 16, 2023, CTS and certain of its affiliates designated as "Borrowers" and "Guarantors" (such parties, collectively, the "Prepetition ABL Obligors"), EBC SPV and ReStore, as lenders (collectively, in such capacities, together with each of its successors and

assigns in such capacities, the "<u>Prepetition ABL Lenders</u>"), and EBC, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, the "<u>Prepetition ABL Agent</u>") entered into that certain *Revolving Credit Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL Credit Agreement</u>" and, together with all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Agent and the Prepetition ABL Lenders, including, without limitation, all security agreements, deposit account control agreements, control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, collectively, the "<u>Prepetition ABL Loan Documents</u>"). CTS and Salkovitz Family Trust 2, LLC (the "**<u>Salkovitz Trust</u>**") are the borrowers under the Prepetition ABL Credit Facility. The Prepetition ABL Credit Facility is guaranteed by Handil Holdings, LLC ("**<u>Handil Holdings</u>**"), Handil, LLC ("**<u>Handil</u>**"), Nantucket Distributing Co., LLC ("**<u>Nantucket Distributing</u>**") and Christmas Tree Shops of Massachusetts, LLC ("**<u>CTS MA</u>**").

12.     The Prepetition ABL Credit Agreement provided the Prepetition ABL Obligors with an asset-based revolving credit facility (the "<u>Prepetition ABL Facility</u>") in a maximum principal amount of $100 million, subject to a borrowing base (as reduced by reserves and, effectively, by a minimum availability covenant), as set forth in the Prepetition ABL Credit Agreement.

13.     As of the Petition Date, approximately $23,194,389.77 in principal was outstanding under the Prepetition ABL Facility in the form of "Revolving Loans" (as defined under the Prepetition ABL Credit Agreement), plus an outstanding letter of credit in the stated amount of

$2,100,000, plus interest accrued and accruing at the rates set forth in the Prepetition ABL Credit Agreement (together with any other amounts outstanding and other obligations under the Prepetition ABL Loan Documents, including, without, limitation in respect of fees, expenses (including attorneys' fees) and indemnities, the "Prepetition ABL Obligations").

14.    The Prepetition ABL Agent and the Prepetition ABL Lenders are referred to herein, collectively, as the "Prepetition ABL Secured Parties".

15.    On May 4, 2023, the Prepetition ABL Secured Parties declared a default under the Prepetition ABL Credit Agreement, accelerated the obligations, and demanded payment. The Prepetition ABL Secured Parties asserted that the Debtors were obligated to them in the aggregate amount of $25,916,275 consisting of, among other things, the principal and letter of credit balance and a Revolving Credit Early Termination Fee of $1,667,000. The fee was calculated on the basis of 1.67% of the aggregate revolving commitment of $100,000,000 for the period from May 4, 2023 to November 12, 2023 and 0.67% of such amount for the period from November 13, 2023 to November 12, 2024.

16.    The Prepetition ABL Facility is secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition ABL Loan Documents) on the ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement (defined below)), and (b) second priority security interests in and liens on the Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement (all as set forth in the Prepetition Collateral Documents (as defined in the Interim Order), the "Prepetition ABL Collateral").

**C.    Pathlight Credit Facility**

17.    On February 16, 2023, CTS and certain of its affiliates designated as "Borrowers" and "Guarantors" (such parties, collectively, the "Prepetition Term Loan Obligors" and, together

with the Prepetition ABL Obligors, collectively, the "Prepetition Obligors"), each "Lender" from time to time party thereto (the "Prepetition Term Loan Lenders" and, together with the Prepetition ABL Lenders, collectively, the "Prepetition Lenders"), and Pathlight Capital LP, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, the "Prepetition Term Loan Agent" and, together with the Prepetition ABL Agent, collectively, the "Prepetition Agents" and, the Prepetition Term Loan Agent together with the Prepetition Term Loan Lenders, collectively, the "Prepetition Term Loan Secured Parties" and, together with the Prepetition ABL Secured Parties, collectively, the "Prepetition Secured Parties"), entered into that certain *Amended and Restated Credit Agreement*, dated as of February 16, 2023 (the "Prepetition A&R Term Loan Agreement" and, together with all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Term Loan Secured Parties, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, collectively, the "Prepetition Term Loan Documents" and, together with the Prepetition ABL Loan Documents, collectively, the "Prepetition Documents").

18.     CTS and the Salkovitz Trust are the borrowers under the Prepetition A&R Term Loan Agreement; Nantucket Distributing, Handil Holdings, Handil, and CTS MA are guarantors thereunder.

19.     The obligations under the Prepetition A&R Term Loan Agreement are secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition Term Loan Documents) on the Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement), and (b) second priority security interests in and liens on the

ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement (all as set forth in the Prepetition Collateral Documents (as defined in the Interim Order), the "<u>Prepetition Term Collateral</u>" " and, together with the Prepetition ABL Priority Collateral, the "<u>Prepetition Collateral</u>").

20.     As of the Petition Date, there is approximately $16 million due under the Prepetition A&R Term Loan Agreement.

21.     The maturity date under the Prepetition A&R Term Loan Agreement is February 16, 2026. By virtue of the commencement of the cases, pursuant to the terms of the Prepetition Term Loan Documents, the maturity date under the Prepetition A&R Term Loan Agreement automatically accelerated, and thus the term loans thereunder are due and owing.

**D.     <u>Other Secured Claims</u>**

22.     On or about January 6, 2023, CTS entered into that certain *Agreement for Consignment of Memo Merchandise* (the "**<u>Consignment Agreement</u>**") with ReStore Capital (CTS), LLC ("**<u>Restore CTS</u>**"), pursuant to which Restore CTS purchases inventory which is stocked in CTS's stores (the "**<u>Consigned Inventory</u>**").  When the Consigned Inventory is sold, CTS pays to Restore CTS an amount equal to the cost of the Consigned Inventory plus a 10% commission.  In connection with the Consignment Agreement, CTS granted to Restore CTS a first-priority security interest in the Consigned Inventory and the proceeds thereof.  As of the Petition Date, CTS owes Restore CTS approximately $900,000 under the Consignment Agreement, which is paid weekly, in arrears.

23.     Bed Bath and Beyond, Inc. ("**<u>BBBY</u>**") holds a junior lien on CTS's assets, subordinate to the security interests of the Prepetition Secured Parties, to secure CTS's obligations under the subleases, pursuant to which CTS leases space from BBBY.  CTS does not

believe that it owes BBBY any money to BBBY because on April 24, 2023, BBBY filed in its chapter 11 case in the United States Bankruptcy Court for the District of New Jersey on April 23, 2023 (Case No. 23-13359-VFP) a motion to reject the leases for all of the properties which are subleased to CTS.

24.     Various other parties assert liens or other security interests in certain delineated personal property of the Debtors based upon leases or sales of such property to the Debtors.

### E.     **Intercreditor Agreements**

25.     The Debtors' prepetition indebtedness to EBC, Pathlight, and BBBY is subject to two intercreditor agreements, the first between the Prepetition ABL Agent and Prepetition Term Loan Agent (the "Prepetition Intercreditor Agreement"), and the second between Pathlight and BBBY, and the second between Pathlight and BBBYy (the "BBBy Intercreditor Agreement, and together with the Prepetition Intercreditor Agreement, the "**Prepetition Intercreditor Agreements**"). The Prepetition Intercreditor Agreements govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties (among themselves) and BBBY (between BBBY and the Prepetition Secured Parties).

### F.     **General Unsecured Claims**

26.     CTS estimates that its outstanding unsecured debt, excluding any inter-company debts and related party indebtedness, totals approximately $58.4 million.

27.     Nantucket Distributing estimates that its outstanding unsecured debt, excluding any inter-company debts and related party indebtedness, totals approximately $22.6 million

### G.     **Events Leading Up to the DIP Facility and Negotiation of the DIP Facility**

28.     In early April 2023, the Debtors, with the assistance of their advisors began to negotiate the terms of DIP financing for the Debtors and related adequate protection arrangements

in respect of the Debtors' credit facilities. In exploring their options, the Debtors recognized that the obligations owed to the Prepetition ABL Secured Parties are secured by substantially all of the Debtors' assets, such that either (a) one or more of the Prepetition ABL Secured Parties' liens would have to be primed to obtain postpetition financing, (b) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition ABL Secured Parties, or (c) a lender would have had to been willing to provide sufficient financing to satisfy the Debtors' prepetition secured indebtedness. The foregoing applies in equal force with respect to the Prepetition Term Loan Secured Parties.

29. Considering the Debtors' financial condition and the amount of its prepetition secured indebtedness, along with the factors above, obtaining timely, let alone any, postpetition financing from any party other than one or more of its Prepetition ABL Secured Parties would have been unachievable.

30. The DIP Lenders indicated a willingness to negotiate the terms of a postpetition financing facility on the terms described herein. As set forth in the First-Day Declaration, given the Debtors' 2023 performance, their overall financial condition, and pressures applied by their creditors to pay outstanding and past due balances, the Debtors have had minimal opportunity to explore alternative debtor-in-possession financing proposals.

31. The Debtors (with the assistance of their advisors) and the DIP Lenders engaged in extensive, arm's length negotiations with respect to the terms and conditions of the DIP Facility. The Debtors agreed to the DIP Facility based upon, among other factors, the Debtors' familiarity with the DIP Lenders' personnel, practices, and procedures, and the Debtors' belief that the terms of the DIP Facility are consistent with the market for such facilities.

32.     The material terms and conditions of the DIP Facility are summarized below. The Debtors, the DIP Agent, and the DIP Lenders have agreed upon an initial budget, which is attached to the Interim Order as Exhibit B, projecting cash flow for the first 13 weeks of these Chapter 11 Cases (as it may be updated in accordance with the DIP Facility, and DIP Orders, the "**Budget**"). The DIP Facility permits to make any disbursement specifically provided for in the Budget (subject to certain permitted variances) to fund operations, purchase inventory, and make payments to creditors in the ordinary course following the Petition Date.

**H.      Need for the DIP Facility and Continued Use of Cash Collateral**

33.     The Debtors have an urgent and immediate need to obtain postpetition financing. The Debtors do not have sufficient cash from their business or under their existing prepetition debt facilities to fund operations. Without the postpetition financing and the use of cash collateral that will be provided under the DIP Facility and the proposed DIP Orders, the Debtors would not be able to maintain operations through the pendency of the Chapter 11 Cases.

34.     Without the proposed DIP Facility and access to cash collateral, the Debtors will not have any liquidity to, among other things, operate their business, fund their ordinary course expenditures, including paying their employees, or pay the expenses necessary to administer these Chapter 11 Cases. Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Facility and the use of cash collateral on the terms set forth in the proposed DIP Orders.

35.     The DIP Facility provides for, upon entry of the Interim Order, a "creeping" roll-up of the Prepetition ABL Obligations due under the Prepetition ABL Credit Facility and a full roll-up upon entry of the Final Order, all as more fully set forth in the DIP Orders and described below.

36. In connection with the DIP Facility, the Debtors are required to provide the customary stipulations with respect to, among other things, the Prepetition Secured Parties, the Prepetition Obligations (as defined in the Interim Order), and the Prepetition Liens (as defined in the Interim Order), all of which are subject to customary third-party challenge rights.

## CONCISE STATEMENT OF RELIEF REQUESTED

37. In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of the terms of the DIP Facility and Interim Order:[4]

| Term | Summary of Material Terms | Location |
|---|---|---|
| Lead Borrower | Christmas Tree Shops LLC | DIP Facility Preamble Interim Order Pg. 1 |
| Other Borrowers | Salkovitz Family Trust 2 LLC | DIP Facility Preamble Interim Order Pg. 1 |
| Guarantors | Handil LLC<br>Handil Holdings LLC<br>Nantucket Distributing Co. LLC<br>Christmas Tree Shops of Massachusetts LLC | DIP Facility Preamble<br><br>Interim Order Pg. 1 |
| DIP Lenders<br>Bankruptcy Rule 4001(c)(1)(B) | Eclipse Business Capital LLC, as Agent<br>Eclipse Business Capital SPV, LLC, as Revolving Lender<br>Restore Capital LLC, as Revolving Lender | DIP Facility Preamble<br>Interim Order Pg. 2 |

| Type of Amount of DIP/Rollup Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(A), (E), (O) | The DIP Lender agrees to make pursuant to Senior Secured Superpriority Debtor-in-Possession Revolving Credit Agreement (DIP Facility) loans to Borrower not to exceed at any time the aggregate principal commitment of up to $45,000,000 subject to availability and reserve. | Interim Order ¶ 1.2(a)<br><br><br><br>Interim Order ¶ 1.4 |

---

[4] The summary is intended solely for information al purposes and is qualified in its entirety by the DIP Facility and Interim Order. In the event there is a conflict between this Motion and the DIP Orders, the DIP Orders shall control. Capitalized terms used in the following chart, but not defined in this Motion shall have the meanings ascribed to them in the DIP Facility and the Interim Order, as applicable.

Repayment of Prepetition ABL Obligations. Upon the entry of the Interim Order, the Debtors are authorized and directed to repay Prepetition ABL Obligations by remitting to the Prepetition ABL Agent any and all proceeds of DIP Collateral and Prepetition Collateral constituting ABL Priority Collateral, including, without limitation and in each event, (i) Cash Collateral; (ii) in the case of accounts receivable (including, without limitation, any and all accounts receivable arising from the disposition of inventory the proceeds of which are applied as set forth in the Interim Order), cash proceeds and as further set forth below in the Interim Order; and (iii) in the case of inventory, cash proceeds as set forth below in the Interim Order, for application of such proceeds to the Prepetition ABL Obligations (to the extent applicable, in accordance with the Prepetition Intercreditor Agreement) consisting of the outstanding principal balance of advances under the Prepetition ABL Facility, any interest due and payable thereon (the "Subject Prepetition ABL Obligations").

Prior to the repayment in full in cash of the Subject Prepetition ABL Obligations, in addition to remitting the proceeds of accounts receivable and inventory to the Prepetition ABL Agent for application to the Subject Prepetition ABL Obligations, the Debtors shall also pay to the Prepetition ABL Agent for application to the Subject Prepetition ABL Obligations concurrently with the remittance of the proceeds of accounts receivable and inventory two dollars for each dollar of proceeds so remitted. The DIP Secured Parties are authorized to make DIP Revolving Loans in amounts sufficient to satisfy the Debtors' payment obligations as to each such matched dollars of the proceeds of accounts receivable and inventory to disburse such DIP Revolving Loans directly to the

| | | |
|---|---|---|
| | Prepetition ABL Agent for application to the Subject Prepetition ABL Obligations. | |
| | Upon the entry of a Final Order, the remaining Prepetition ABL Obligations, if any, shall be automatically substituted and exchanged for (and repaid by) the DIP Revolving Loans under the DIP Facility (the "<u>Roll-Up</u>"), which shall be deemed funded on the entry of the Final Order. | |
| | The Debtors' repayment of the Prepetition ABL Obligations (including the Subject Prepetition ABL Obligations) and the Prepetition ABL Agent's application of funds to the Prepetition ABL Obligations are subject to third-party challenge rights as set forth in the Interim Order. | |
| Borrowing Base<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(B), (E) | At any time of calculation, an amount equal to the (i) the sum of (x) the Cost of Eligible Inventory of Borrowers, multiplied by the product of ninety percent (90.0%) multiplied by the Appraised Value of Eligible Inventory; <u>plus</u> (y) the lesser of (A) the Cost of Eligible In-Transit Inventory of Borrowers, multiplied by the product of ninety percent (90.0%) multiplied by the Appraised Value of Eligible In-Transit Inventory and (B) $3,000,000 through July 31, 2023, and (ii) $10,000,000 from and after August 1, 2023; <u>plus</u> ninety percent (90.0%) of the aggregate amount of Eligible Credit Card Receivables; <u>minus</u> the amount of all Reserves as of the time of such calculation | DIP Facility Pg. 9 |
| Interest Rate<br>Bankruptcy Rule 4001(c)(1)(B) | SOFR plus 7.75% | DIP Facility Pg. 4 |
| Other Fees<br><br>Bankruptcy Rule 4001(c)(1)(B) | • Closing Fee: 1.0% of the aggregate DIP Facility Commitment of $45,000,000;<br>• Commitment Fee: 0.5% of the unused amount of the aggregate DIP Facility Commitment of $45,000,000;<br>• Administrative Fee: $7,000 per month<br>• Exit Fee: 0.5% of the aggregate DIP | DIP Facility: Fee letter |

| | | |
|---|---|---|
| | Facility Commitment of $45,000,000; and<br>• ReStore Exit Fee: $250,000 | |
| Priority of DIP Collateral<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Liens on (I) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject solely to the Carve Out and Permitted Liens; (II) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject solely to the Permitted Liens, the Carve Out, the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (III) assets of the Debtors (the "Non-Lender Encumbered Assets") that were subject to validly perfected liens or security interests as of the Petition Date in favor of parties other than the Prepetition Secured Parties and BBBy (if any, the "Non-Lender Existing Liens") shall be (A) with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject solely to such Non-Lender Existing Liens and the Carve Out and (B) with respect to assets constituting Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject solely to such Non-Lender Existing Liens, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, and the Carve Out; and (IV) any other assets of the Debtors ("Unencumbered Assets") that were not subject to any validly | Interim Order ¶ 2.1(b),<br><br>Ex. D to Interim Order |

| | | |
|---|---|---|
| | perfected liens or security interest as of the Petition Date (including, subject to the entry of a Final Order, Avoidance Proceeds) shall be (A) with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject solely to the Carve Out and (B) with respect to assets constituting Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject solely to the Prepetition Term Loan Adequate Protection Liens and Carve Out, in each case as such priorities are set forth in **Exhibit D** to the Interim Order. | |
| Permitted Liens | Any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens, including, for the avoidance of doubt, any lien of ReStore Capital (CTS), LLC arising under or related to the *Agreement for Consignment of Memo Merchandise*, dated as of January 6, 2023, between Christmas Tree Shops, LLC and ReStore Capital (CTS), LLC. | Interim Order ¶ 2.1(b) at footnote 7. |
| Budget Cumulative Period and Testing<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | Debtor shall deliver to the DIP Lender a weekly budget for the 13-week period commencing on the Petition Date which shall be approved by the DIP Agent and DIP Lenders and shall set forth, among other things, the projected cash receipts and disbursements (the "**Approved Budget**")<br><br>"**Cumulative Period**" means (i) for the initial Approved Budget testing for the first two weeks following the Petition Date, the two-week period up to and including the Saturday of the most recent week then ended, (ii) for the second Approved Budget testing for the first three weeks following the Petition Date, the three-week period up to and including the | DIP Facility Definition Pg. 5 and 15 Sec. 5.29 Pg. 82 |

154838579v1

| | | |
|---|---|---|
| | Saturday of the most recent week then ended, (iii) for the third Approved Budget testing for the first four weeks following the Petition Date, the four-week period up to and including the Saturday of the most recent week then ended and (iv) for each Approved Budget testing thereafter, the rolling four week period up to and including the Saturday of the most recent week then ended. | |
| Variance | For the initial three (3) Cumulative Periods, the Borrowers shall not permit Actual Cash Receipts for the most recently ended Cumulative Period to be less than 85.0% of the Budgeted Total Receipts for such Cumulative Period. For each subsequent Cumulative Periods, the Borrowers shall not permit Actual Cash Receipts for such Cumulative Period to be less than 90.0% of the Budgeted Total Receipts. For each Cumulative Period, the Borrowers shall not permit Actual Cash Disbursements to be greater than 110.0% of the Budgeted Total Disbursements, not including Unbudgeted Credit Party Expenses. | DIP Facility Sec. 6.22 Pg. 95-96 |
| Closing Date  Bankruptcy Rule 4001(c)(1)(B) | Date at which the Conditions Precedent shall have been satisfied or waived. | DIP Facility Definition Pg. 12 |
| Conditions Precedent  Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(i)(E) | The obligations of the DIP Lenders to make the Interim Advances pursuant to the DIP Loan will be subject to satisfaction, or written waiver, by the DIP Lender of the following conditions precedent in connection with each draw request:  a. The DIP Lenders shall have received and approved the Approved Budget or any update thereto;  b. Debtors shall have delivered to the DIP Lenders a Borrowing Certificate;  c. Debtors shall have delivered to the | DIP Facility Sec. 4.01 Pg. 67-69 |

DIP Lenders a Closing Certificate, duly executed by the chief executive officer, president or chief financial officer of the Debtors, delivered to the DIP Lenders, certifying that all of the conditions precedent in the DIP Credit Facility have been satisfied (the, "**Closing Certificate**");

d. The Interim Order with respect to this Motion (in form and substance acceptable to the DIP Agent and the DIP Lenders) shall have been entered by the Bankruptcy Court (after a hearing with notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Agent and the DIP Lenders, and the Debtors shall be in compliance in all respects with the Interim Order;

e. The liens on DIP Collateral shall have been perfected by the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to Prepetition Permitted Liens and, solely in respect of the Prepetition Term Loan Priority Collateral);

f. Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral;

g. Subject to Bankruptcy Court

<table>
<tr>
<td></td>
<td>approval, (i) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under the DIP Facility and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of the DIP Facility and the Interim Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

h.  Substantially concurrently with the Interim Closing Date, all fees and out-of-pocket expenses of the DIP Lenders and each of the DIP Lenders relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim Order DIP Loan draw) to the extent an invoice has been delivered to the Borrowers at least 24 hours in advance.</td>
<td></td>
</tr>
<tr>
<td>Maturity Date

Bankruptcy Rule 4001(c)(1)(B)</td>
<td>The earlier of (i) November 5, 2023, or (ii) the occurrence of a Termination Event.</td>
<td>DIP Facility Definition Pg. 31</td>
</tr>
<tr>
<td>Super Priority</td>
<td>Subject to the priorities set forth on</td>
<td>Interim Order ¶ 2.2</td>
</tr>
</table>

| | | |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | **Exhibit D** to the Interim Order (and on the terms set forth therein and subject to the Prepetition Intercreditor Agreement) and the Carve Out, on account of all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 507(a), 507(b), 546(c), 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim, the "DIP Superpriority Claim") | |
| Milestones<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(H) | May 5, 2023:<br>• CTS to hire a nationally recognized liquidator that is acceptable to Required DIP Lenders<br>• Store Closing Sales Motion will include authority to liquidate those stores that CTS is looking to exit, as well as all stores in the event of a Milestone breach (or any other EOD under the DIP).<br>May 8, 2023<br>• File Motion to Approve Store Closing | DIP Facility Schedule 6.23<br><br>DIP Order, Ex. C |

| | | |
|---|---|---|
| | Sales and Consulting Agreement<br><br>• File Motion to Assume Inventory Agreement<br><br>May 9, 2023:<br>• Entry of Interim DIP Order acceptable to Required DIP Lenders<br>June 2, 2023:<br>• File proposed Disclosure Statement and Plan acceptable to Required DIP Lenders<br>• Entry of Final DIP Order acceptable to Required DIP Lenders<br>• Entry of Order approving the Store Closing Sales Motion<br>• Entry of Order approving the Inventory Agreement Motion<br>July 7, 2023:<br>• Entry of an Order approving the Disclosure Statement and solicitation of the Plan<br>• Entry of an Order approving extension of the § 365(d)(4) period to 210 days<br>August 16, 2023:<br>• Entry of Confirmation Order acceptable to Required DIP Lenders<br>August 31, 2023:<br>• Effective Date of Plan | |
| Events of Default<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(M) | Each of following shall constitute an "Event of Default":<br><br>• Any "Event of Default" as such term is defined in the DIP Facility;<br><br>• Any failure to meet or satisfy any Milestone in accordance with the DIP Loan Documents (other than solely by reason of the unavailability of the Bankruptcy Court on any applicable date requiring entry of an order or approval of a motion or any other matter by the | Interim Order ¶ 3.1<br>Interim Order ¶ 3.2 |

Bankruptcy Court);

- The occurrence of the "Maturity Date" as defined in the DIP Loan Agreement;

- Any material violation, breach, or default by any Debtor with respect to any of its obligations under this Interim Order or the DIP Loan Documents,

- The termination of the DIP Loan Agreement, or the modification of any of the DIP Loan Documents or this Interim Order in a manner adverse to any of the DIP Secured Parties or the Prepetition ABL Secured Parties without the prior written consent of such party;

- Subject to any Challenge Proceeding brought in the Challenge Period, prior to full, final and indefeasible repayment in cash of all DIP Obligations and Prepetition ABL Obligations, entry of any order authorizing any party in interest to reclaim any of the DIP Collateral, granting any party in interest relief from the automatic stay with respect to the DIP Collateral, or requiring that Debtors turn over any of the DIP Collateral;

- Conversion of any of the Debtor's bankruptcy cases to a case under chapter 7 of the Bankruptcy Code;

- The appointment or election of a trustee, or examiner with the power to operate the Debtors' businesses is in any of the Debtor's bankruptcy cases;

- Commencement of an adversary proceeding or contested matter by the Debtors objecting to the extent, validity or priority of any Prepetition Obligations and/or the Prepetition Liens and (B) subject to any Challenge Proceeding brought in the Challenge Period, with

| | | |
|---|---|---|
| | respect to any party in interest with standing (other than the Debtors), commencement of such proceeding or matter to the extent such proceeding or matter is not denied by the Court or dismissed within thirty (30) days; (x) the date that is thirty (30) calendar days following the entry of this Interim Order if a Final Order is not entered in form and substance acceptable to the DIP Secured Parties and the Prepetition ABL Secured Parties by such date;<br><br>• Modification of the Interim Order at the Final Hearing in a manner not acceptable to the DIP Secured Parties or the Prepetition Secured Parties;<br><br>• Modification, amendment, vacatur or stay of this Interim Order in any manner not consented to in writing by the DIP Agent and the Prepetition ABL Agent; and<br><br>• Failure to comply with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents). | |
| Adequate Protection For the Prepetition Secured Parties<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) 4001(c)(1)(B)(cc) | The Prepetition Secured Parties are receiving adequate protection in the form of: (1) superpriority claims for the Diminution in Value of their respective interests in the Prepetition Collateral, in the priorities set forth in Paragraph 2.4 and Exhibit D of the Order, (2) liens on the DIP Collateral, in the priorities set forth in Paragraph 2.4 and Exhibit D of the Order, (3) reporting obligations from the Debtors; and (4) payment of fees and expenses, including for their respective professionals.<br><br>Furthermore, subject to the Approved Budget, the Debtors are authorized and directed to pay to the Prepetition ABL Secured Parties on the last business day of each calendar month after the entry of this | Interim Order ¶¶ 2.4(a)(i), (ii), (v); 2.4(b); and 2.4(c)<br><br><br><br><br><br><br><br><br><br>Interim Order ¶ 2.4(a)(iv) |

| | | |
|---|---|---|
| | Interim Order, in each case, an amount equal to all accrued and unpaid prepetition and postpetition interest (at the default rate), fees and costs under the Prepetition ABL Loan Documents.<br><br>BBBY is receiving adequate protection in the form of: (1) superpriority claims for the Diminution in Value of their respective interests in the Prepetition Collateral, in the priorities set forth in Paragraph 2.4 and Exhibit D of the Order, and (2) liens on the DIP Collateral, in the priorities set forth in Paragraph 2.4 and Exhibit D of the Order. | Interim Order ¶ 2.4(a)(iii), (vi) |
| Carve-out and Carve-out Reserve<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | (i) Statutory Fees; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise, subject to the professional fees and disbursements reflected in the Approved Budget on a line item basis for unpaid fees (excluding any success or transaction fees), costs, disbursements and expenses incurred or earned by professionals retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code and the Committee pursuant to sections 327, 328 or 1103 of the Bankruptcy Code at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (defined below); (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $100,000 incurred after the first day following delivery by DIP Lender of the Carve Out Trigger Notice; and (v) all fees and expenses incurred or earned by Hilco Merchant Resources, LLC, as the Debtors' store closing agent under the terms of the Letter Agreement Governing Inventory Disposition as approved by the Court on an interim or final basis. | Interim Order ¶ 2.3<br><br>DIP Facility Pg. 10 |

| | | |
|---|---|---|
| | The Carve Out shall be senior to all liens and claims of the DIP Secured Parties and the Prepetition ABL Secured Parties (including adequate protection afforded to the Prepetition ABL Secured Parties) all as set forth in the Interim Order and as further reflected on **Exhibit D** to the Interim Order.<br><br>The Interim Order includes a customary Professional Fee Reserve that is funded weekly in the amounts set forth in the Approved Budget until delivery Carve Out Trigger Notice.<br><br>"**Carve Out Reserve**" (which is applied against the borrowing base) means a reserve to be established by the DIP Lenders and calculated on a weekly basis in an amount equal to (but not in excess of) the difference between the amount of professional fees budgeted to be deposited into the Professional Fee Reserve (as defined in the Interim Orders) during such week in accordance with the Approved Budget minus the amount professional fees actually deposited into the Professional Fee Reserve for such week. | |
| Modification of Automatic Stay<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | The automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to the extent necessary to permit the Debtors, the DIP Lenders and the Prepetition Secured Parties to implement the transactions contemplated by the Interim Order and Final Order and to exercise all rights and remedies under the DIP Facility, the other loan documents or applicable law without further notice, motion or application to hearing or order from the Bankruptcy Court. | Interim Order ¶¶ 3.3, 3.4<br><br>DIP Facility<br><br>Sec. 8.02 Pg. 107 |
| Indemnification<br><br>Bankruptcy Rule | The Debtors shall indemnify and hold harmless each of DIP Lenders their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling | Interim Order ¶ 1.6<br><br>DIP Facility |

| | | |
|---|---|---|
| 4001(c)(1)(B)(ix) | persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's gross negligence, actual fraud, or willful misconduct as determined in a final order by a court of competent jurisdiction. | Sec. 10.04 Pg. 118 |
| Use of Proceeds

Bankruptcy Rule 4001(c)(1)(B)

Local Bankr. R. 4001- 2(a)(i)(L) | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, (b) for bankruptcy related costs and expenses, (c) to repay the Prepetition ABL Obligations, (d) costs and expenses related to the DIP Credit Facility, and (e) any other purposes agreed upon in the DIP Loan Documents, in each case, solely in accordance with the Approved Budget. | DIP Facility
Sec. 7.11 Pg. 101 |
| | The DIP Loans (or any DIP Collateral (or proceeds thereof), Prepetition Collateral (or proceeds thereof) of Carve Out) shall not be used for payments of fees, costs, or expense in connection with (a) objecting, contesting or raising any defense to the validity, perfection, priority, or enforceability of, or any amount due under, the DIP Loan Documents or the Prepetition Documents or any security interests, liens or claims granted under this Interim Order, the DIP Loan Documents, or the Prepetition Documents to secure such amounts; (b) asserting any Challenges, claims, actions or causes of action against any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering or otherwise delaying enforcement or | Interim Order ¶ 5.4 |

| | | |
|---|---|---|
| | realization on the DIP Collateral or the Prepetition Collateral; (d) seeking to amend or modify any of the rights granted to the DIP Secured Parties, the Prepetition Secured Parties under the Interim Order, the DIP Loan Documents or the Prepetition Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; or (e) contesting the Prepetition Liens or Prepetition Obligations; _provided_ that no more than $30,000 in the aggregate of the proceeds of the DIP Facility shall be used to investigate the liens of the Prepetition Secured Parties. | |
| Lien on Avoidance Actions<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Local Rule 4001-2(a)(ii)(G) | Subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall constitute DIP Collateral. | Interim Order Sec. F(vi) Pg. 18 |
| Marshalling and Waiver of 506(c) and 552(b) Claims<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii)<br><br>Local Rule 4001-2(a)(i)(C),(V), (W), (X) | Subject to the provisions of the Carve-Out and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Facility (and the prior written consent of the DIP Lenders to the payment of the Carve-Out to the extent provided in the DIP Facility and the prior written consent of the Prepetition Secured Parties and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Secured Parties with respect to the DIP Collateral or the Prepetition Senior Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lenders or the Prepetition Secured Parties, as applicable and (b) no such consent shall be | Interim Order Sec. F(viii) Pg. 19 Sec. 5.4 Pg. 57 |

| | | |
|---|---|---|
| | implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Secured Parties.

The DIP Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Senior Collateral, as applicable.

The DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the DIP Collateral or Prepetition Senior Collateral, as applicable. | |
| Releases and Challenge Period: Fed. R. Bankr. P. 4001(c)(1)(B)(iii)

Fed. R. Bankr. P. 4001(c)(1)(B)(viii)

Local Bankruptcy Rule 4001-2(a)(i)(Q) | The Debtors' Stipulations contained in paragraph E and releases in paragraph E (ix) of the Interim Order shall be binding in all circumstances upon the Debtors upon entry of the Interim Order, and upon their Estates and any successor thereto in all circumstances for all purposes immediately upon entry of the Final Order.

The Debtors' Stipulations shall be binding upon all other parties-in-interest, including the Committee (if any), except to the extent a party-in-interest first obtains standing no later than either the earlier of (i) with respect to parties-in-interest other than the Committee 75 calendar days after the entry of the Interim Order or (2) with respect to the Committee 60 calendar days after the appointment of the Committee or such later date as may be agreed brings a challenge proceeding. | Interim Order Sec. E (i)-(vii) Pg. 6-13

Interim Order Sec. 5.17 Pg. 59-60

Interim Order Sec. 4.1 Pg. 46-49 |

<u>**LOCAL RULE 4001-2 DISCLOSURES**</u>

38.     The Debtors believe that the following financing terms are required to be highlighted pursuant to Local Rule 4001-2 and, as discussed herein, are necessary and justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

<u>**Provisions Regarding the Amount of Financing or Cash Collateral Usage.**</u> Local Rule 4001-2(a)(i)(A) requires disclosure of the amount of credit or cash collateral the Debtors seek to use. See the chart above for these disclosures.

<u>**Provisions Regarding Budget.**</u>     Local Rule 4001-2(iii) requires disclosure regarding whether the amounts in the Approved Budget will be adequate.  The Debtors believe that the amounts in the Approved Budget are sufficient to operate their business and fund their Chapter 11 Cases.

<u>**Provisions Regarding the Pricing and Economic Terms.**</u> Local Rule 4001-2(a)(i)(B) requires the disclosure of the pricing and economic terms of the proposed financing and cash collateral usage. See the chart above for these disclosures.

<u>**Provisions Limiting Court Authority.**</u> Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that limit the Court's power or discretion to enter future orders in the case. The Debtors believe that neither the Interim Order nor the DIP Facility contain such terms.

<u>**Provisions Regarding Non-Debtor Affiliates.**</u>  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for the funding of non-debtor affiliates with proceeds of the loans.  The DIP Facility does not provide for any such funding.

<u>**Provisions Regarding Material Conditions to Closing and Borrowing.**</u> Local Rule 4001-2(a)(i)(E) requires the disclose of material conditions to closing and borrowing, including budget provisions. See the chart above for these disclosures.

<u>**Provisions Regarding Carve-Out.**</u> Local Rule 4001-2(a)(i)(F) requires disclosure of any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out. See the chart above for disclosures regarding the carve-out terms.

<u>**Provisions Regarding Liens on Unencumbered Assets.**</u> Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for postpetition liens on unencumbered assets. See the chart above for these disclosures.

<u>**Milestones.**</u> Local Rule 4001-2(a)(i)(H) requires disclosure of provisions

establishing any plan or sale milestones. See the chart above for disclosures related thereto.

**Prepayment Penalties.** Local Rule 4001-2(a)(i)(I) requires disclosure of provisions that provide for any prepayment penalty or other provision that affects the Debtors' right to repay the financing in full. The DIP Facility does not contain and prepayment penalties.

**Provisions Regarding Joint Liability.** Local Rule 4001-2(a)(i)(J) requires disclosure of provisions that provide for a jointly administered debtor to be liable on the prepetition debt of another debtor for which it was not previously subject. Neither the Interim Order nor the DIP Facility contain such terms.

**Payment of Lenders' Professionals.** Local Rule 4001-2(a)(i)(K) requires disclosure of provisions that provide for the payment of expenses of the DIP Lenders without notice to the United States Trustee or any Committee. The DIP Facility contemplates monthly reimbursement payments of the reasonable and documented fees and expenses of the Prepetition Secured Parties and DIP Secured Parties.

**Lien Investigation Cap.** Local Rule 4001-2(a)(i)(L) requires disclosure of provisions that provide for a restriction on the use of estate funds to investigate the liens of the prepetition lender. The Interim Order provides for $30,000 to investigate the liens of the Prepetition Secured Parties.

**Provisions Regarding Termination or Default Provisions.** Local Rule 4001-2(a)(i)(M) requires disclosure of any termination or default provisions concerning the use of cash collateral or the availability of credit. See the chart above for these disclosures.

**Provisions Regarding Cross-Collateralization.** Local Rule 4001-2(a)(i)(N) requires disclosure of provisions that provide for cross-collateralization or the elevation of prepetition debt to administrative or secured status. See the chart above for these disclosures.

**Roll-up of Prepetition Obligations.** Local Rule 4001-2(a)(i)(O) requires disclosure of provisions that use postpetition loans from a party to repay its own prepetition debt. See the chart above for these disclosures.

**Priming Liens.** Local Rule 4001-2(a)(i)(P) requires disclosure of provisions that prime any secured liens without the consent of the lienholder. The Debtors believes that priming liens are consensual.

**Provisions Regarding Claim Stipulations and Challenges.** Local Rule 4001-2(a)(i)(Q) requires the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount

of the secured creditor's prepetition lien or waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from entry of the initial interim order to investigate such matters or (ii) limit the Court's ability to grant relief in the event of a successful challenge. See the chart above for these disclosures.

**Provisions Regarding Immediate Approval of Financing Agreement.** Local Rule 4001-2(a)(i)(R) requires disclosure of provisions that immediately approve all terms and conditions of the underlying loan agreement. The Interim Order seeks approval of the DIP Facility.

**Provisions Regarding Modification of Automatic Stay.** Local Rule 4001-2(a)(i)(S) and (T) requires disclosure of provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or debtor in possession, the Office of the United States Trustee and any official committee and any provision that seeks to limit what parties in interest may raise at a hearing following such notice. See the chart above for these disclosures. The sole issue to be heard during the Remedies Notice Period is whether a DIP Termination Event had occurred.

**Liens on Avoidance Actions.** Local Rule 4001-2(a)(i)(U) requires disclosure of provisions that immediately grant a prepetition secured creditor liens on avoidance actions. The Motion seeks relief pursuant to the Final Order to grant DIP Liens on recoveries of the Debtors arising from claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code. See the chart above for these disclosures.

**Provisions Regarding 506(c) and 552(b) Waivers.** Local Rule 4001-2(a)(i)(V) and (W) require disclosure of provisions that would immediately waive the Debtors' rights under section 506(c) or the Court's power to consider the equities of the case doctrine under section 552(b)(1). See the chart above for these disclosures.

**Provisions Regarding Waiver of the Equitable Doctrine of Marshalling.** Local Rule 4001-2(a)(i)(X) requires the disclosure of any provisions that immediately shield the lender from the equitable doctrine of marshalling. See the chart above for these disclosures.

23. The Motion does not seek to prime, non-consensually, the Prepetition Secured Parties with respect to Prepetition Collateral and believe they are consensual as to BBBY.

24. In addition, the Motion seeks relief to grant DIP Liens on recoveries of the Debtors

arising from claims and causes of action to which the Debtors may be entitled to assert by reason

of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors

under chapter 5 of the Bankruptcy Code.

25.     These terms are justified because the Debtors are in immediate and critical need of

the DIP Facility and the use of cash collateral. As discussed in the First Day Declaration, given

the Debtors' 2023 performance, their overall financial condition, and pressures applied by their

creditors to pay outstanding and past due balances, the Debtors have had limited opportunity to

explore alternative debtor-in-possession financing proposals. The only actionable proposal that

would provide the critical liquidity to the Debtors was provided after extensive negotiations with

the DIP Secured Parties on the terms set forth in the DIP Facility and the proposed DIP Orders.

Without this financing, the Debtors would not be able to pay their employees or vendors, or fund

its reorganization efforts in these Chapter 11 Cases.

## **BASIS FOR RELIEF**

**I.**     **The Debtors Should Be Permitted to Obtain Postpetition Financing pursuant to Section 364(c) and (d) of the Bankruptcy Code**

26.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a

hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain

unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative

expense " 11 U.S.C. § 364(c).

27.     Section 364(d) of the Bankruptcy Code requires a finding, made after notice and a

hearing, that the debtors seeking postpetition financing on a secured basis senior or equal in priority

to existing secured debt cannot "obtain such credit otherwise [and] there is adequate protection of

the interest of the holder of the lien on the property of the estate on which such senior or equal lien

is proposed to be granted." 11 U.S.C. § 364(d)(1).

28.     In evaluating proposed postpetition financing under section 364(c) and (d) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.     the credit transactions are necessary to preserve assets of the estate;

c.     the terms of the credit agreement are fair, reasonable, and adequate;

d.     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e.     the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the

first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the

first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71

B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-

14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

29.     For the reasons discussed below, the Debtors satisfy the standards required to obtain

postpetition financing under section 364(c) and (d) of the Bankruptcy Code.

**II.     The Debtors Would be Unable to Obtain Financing on More Favorable Terms**

30.     Whether debtors were unable to obtain unsecured credit is determined by

application of a good faith effort standard, and debtors must make a good faith effort to

demonstrate that credit was not available without granting a security interest. *See In re YL West*

*87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred

to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

31.     Given the Debtors' liquidity needs and the fact that substantially all of the Debtors' material assets are encumbered, it is unlikely than a lender other than the DIP Lenders would be willing to provide postpetition financing.  The Debtors assert that the terms of the DIP Loans are consistent with the market for similar loans and that they would have been unable to procure alternative financing on more favorable terms and conditions.

32.     The Debtors respectfully submit that their efforts to obtain alternative postpetition financing opportunities would have been futile and therefore the standards required under section 364(c) and (d) of the Bankruptcy Code are satisfied.  *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

III.     **The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates**

33.     As described above, the Debtors intend to operate their business in the ordinary course while they navigate through the chapter 11 process. The Debtors require the proposed financing and use of cash collateral to provide the necessary capital with which to operate their business, including funding the Debtors' obligations to employees, and to preserve their business for the benefit of their estates and creditors pending the outcome of these Chapter 11 Cases.

34.     The funding is necessary for working capital, operating costs, and expenses incurred during these Chapter 11 Cases, including funding payroll. The Debtors do not have sufficient sources of working capital, financing, or cash collateral to carry on the operation of their business without additional financing. The Debtors' ability to maintain their business pending the outcome of these Chapter 11 Cases is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for postpetition rent, payroll, goods, services and other operating expenses. The DIP Facility is thus essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to preserve their business.

35.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require postpetition financing and the use of cash collateral under the terms of the DIP Facility and proposed DIP Orders to continue their operations pending the outcome of these Chapter 11 Cases.

**IV.     The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate**

36.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank &*

*Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

37.     The terms of the DIP Facility and the proposed DIP Orders were negotiated between the Debtors and the DIP Agent (including their respective counsel and other advisors), resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through an orderly sale process. The DIP Facility will provide critically needed liquidity to the Debtors in order to run a process that the Debtors and their advisors believe will maximize value and is on terms and conditions that are fair and reasonable and consistent with the market given the circumstances of this case.

38.     Subject to entry of the Interim Order, the Debtors have agreed to pay certain fees to the DIP Agent and the DIP Lenders in connection with the DIP Facility. The fees payable to the DIP Agent and other obligations under the DIP Documents are reasonable and appropriate and give the Debtors access to DIP financing on the most favorable terms on which the DIP Lenders would agree to make the DIP Facility available. The Debtors considered these fees when determining in the exercise of their sound business judgment that the DIP Facility constitutes the best terms on which the Debtors could obtain postpetition financing necessary to continue operating their business in these Chapter 11 Cases. Consequently, paying these fees to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.

39.     The DIP Facility also contemplates the roll-up of certain prepetition obligations. The Debtors believe this is warranted and proper under the circumstances and this Court has previously approved similar debtor-in-possession financing agreements, with roll-ups, where the debtors were not able to obtain postpetition financing under other conditions. *See, e.g.*, *In re Indep. Pet Partners Holdings, LLC*, Case No. 23-10153 (LSS) (Bankr. D. Del. Mar. 3, 2023*); In re EYP*

*Grp. Holdings, Inc.*, Case No. 22-10367 (MFW) (Bankr. D. Del. May 25, 2022). Indeed, rolling up prepetition obligations is a fairly common feature in DIP financing, particularly ABL financing, and its importance has been repeatedly recognized by courts in this district. *See, e.g.*, *In re Extraction Oil & Gas, Inc.*, Case No. 20-11548 (CSS) (authorizing an approximately $50 million DIP facility including a $20 million roll-up); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) (authorizing an approximately $240 million DIP facility, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order); *In re Remington Outdoor Co., Inc.*, Case No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order).

40.     As further described above, the DIP Facility also contains certain case milestones and other bankruptcy-related terms, and the Debtors believe that these terms provide adequate time for the Debtors to maximize the value of their operations and assets. The terms of the DIP Documents are fair, reasonable and appropriate under the circumstances, and should be approved.

## V.     <u>Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment</u>

41.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World*

*Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

42.     Here, the Debtors' sound business judgment clearly supports entry into the DIP Facility to gain access to needed funding and maximize value for all constituents. Courts in this jurisdiction have regularly approved similar relief. *See, e.g.*, *In re Clovis Oncology, Inc.* et al., No. 22-11292 (JKS) (Bankr. D. Del. Dec. 16, 2022); *In re Medly Health, Inc.*, et al., No. 22-11257 (KBO) (Bankr. D. Del. Dec. 13, 2022); *In re Vesta Holdings, LLC*, et al., No. 22-11019 (LSS) (Bankr. D. Del. Dec. 2, 2022); *In re Nine Point Energy Holdings, Inc., et al.*, No. 21-10570 (MFW) (Bankr. D. Del. March 17, 2021); *In re JAB Energy Solutions II, LLC*, 21-11226 (CTG) (Bankr. D. Del. Oct. 1, 2021); *In re Novum Pharma, LLC*, No. 19-10209 (BLS) (Bankr. D. Del. July 25, 2019); *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) (Bankr. D. Del. Jan. 31, 2019); *In re Ver Technologies Holdco LLC*, et al., No. 18-10834 (KG) (Bankr. D. Del. Apr. 6, 2018); *In re California Proton Treatment Center, LLC*, No. 17-10477 (LSS) (Bankr. D. Del. March 3, 2017); *Restora Healthcare Holdings, LLC*, et al., No. 14-10367 (PJW) (Bankr. D. Del. Feb. 27,

2014).

## VI. The DIP Lenders Are Extending Credit in Good Faith

43.     Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

44.     As set forth in the First Day Declaration, the Debtors and the DIP Secured Parties negotiated the DIP Facility and Interim Order at arm's length and good faith. The terms and conditions of the DIP Facility are fair and reasonable and the Debtors believe they are consistent with the market for such facilities.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Court's orders and the Bankruptcy Code. Accordingly, the Court should find that the DIP Agent and DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## VII. Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral

45.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor-in-possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).

46.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor-in-possession], the

court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

47.     Section 361 of the Bankruptcy Code provides that:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
>    1.  requiring the [debtor-in-possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>    2.  providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>    3.  granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a factspecific inquiry . . . left to the vagaries of each case        "); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

48.     Additionally, courts have found a secured creditor to be adequately protected where

either a sufficient equity cushion in the collateral exists, or the level of collateral was not decreasing over time. *See In re May*, 169 B.R. 462 (Bankr. S.D. Ga. 1994); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.J. 1993); *In re S.W. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).

49.     Here, the interests of the Prepetition Secured Parties and BBBY are adequately protected by, among other things, the replacement liens and claims. Further, the Prepetition Secured Parties have consented to the adequate protection being afforded to them in the DIP Orders. Accordingly, the Debtors respectfully submit that the use of Cash Collateral on the terms set forth herein be approved as a sound and reasonable exercise of the Debtors' business judgment.

**VIII.    The Section 506(c) and "Equities of the Case" Waivers are Appropriate**

50.     In connection with consenting to priming liens or the use of cash collateral, secured parties commonly request a waiver of (i) section 506(c) of the Bankruptcy Code, which permits the Debtors to surcharge collateral and (ii) the "equities of the case" exception from the general rule of section 552 of the Bankruptcy Code that prepetition liens that attach to proceeds of collateral will continue to attach to postpetition proceeds.

51.     The DIP Secured Parties and Prepetition Secured Parties are each entitled to waivers of the "equities of the case" exception under section 552(b) and the provisions of section 506(c) of the Bankruptcy Code in light of (i) the DIP Secured Parties' agreement that their liens and superpriority claims shall be subject the Carve Out, (ii) the parties' consent to the use of Cash Collateral, and (iii) the payment of expenses set forth in the Budget in accordance with and subject to the terms and conditions of the Interim Order and the DIP Documents.

**IX.    The Automatic Stay Should be Vacated or Modified to the Extent Necessary**

52.     The DIP Documents and the Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent

necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, but subject to any applicable notice requirements in the Interim Order, all rights and remedies provided for in the DIP Documents, without further order of or application to the Court.

53.     Stay modification provisions of this sort are ordinary features of debtor-in-possession financing and, in the Debtors' sound business judgment, are reasonable under the circumstances. *See, e.g.*, *In re Hoyos Integrity Corp.*, Case No. 22-10365 (MFW) (Bankr. D. Del. Jun. 24, 2022); *In re Gulf Coast Health Care LLC*, Case No. 21-11336 (KBO) (Bankr. D. Del. Dec. 2, 2021); *In re Agspring Mississippi Region, LLC*, Case No. 21-11238 (CTG) (Bankr. D. Del. Nov. 4, 2021); *In re Alpha Latam Mgmt., LLC*, Case No. 21-11109 (JKS) (Bankr. D. Del. Sept. 13, 2021); *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del. Jun. 19, 2020).

## INTERIM ORDER AND FINAL HEARING

54.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final Hearing with respect to the relief requested herein approximately 21 days from the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

55.     The urgent need to preserve the Debtors' business, and thereby avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain postpetition financing and use cash collateral as soon as possible, pending the Final Hearing. Without the ability to obtain access to such funding and use cash collateral, the Debtors would be unable to meet their postpetition obligations, including payroll obligations, and otherwise would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and ending the Debtors' efforts to maintain operations through an orderly sale

process.

56.     Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## IMMEDIATE RELIEF IS NECESSARY

57.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF ANY APPLICABLE STAY

58.     The Debtors also request that the Court waive any applicable stay of the DIP Orders, including any stay that may be imposed by Bankruptcy Rule 4001(a)(3) and Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates. The exigent nature of the relief sought herein justifies immediate relief.[5]

## NOTICE

59.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) the United States Department of Justice; (d) the attorneys general for the 20 states in which the

---

[5]     The Debtors also seek waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent applicable.

Debtors conduct business; (e) the Internal Revenue Service; (f) counsel for the DIP Agent; (g) counsel to Eclipse Business Capital LLC; (h) counsel to Pathlight Capital, LP; (i) counsel for Bed, Bath and Beyond, Inc.; (j) counsel for ReStore Capital (CTS), LLC; (k) those parties asserting liens or other security interests in certain delineated personal property of the Debtors based upon leases or sales of such property to the Debtor (the "Other Secured Parties"); (l) the creditors listed on the Debtors' consolidated list of thirty creditors holding the largest unsecured claims; and (m) all parties entitled to notice pursuant to Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

60.     Due to the volume of the exhibits attached to this Motion and any interim or final orders approving this Motion, the Debtors do not intend to serve such exhibits, but will note in the orders approving this Motion and any related notices that such exhibits are available, free of charge, on the website maintained by the Debtors' proposed Claims and Noticing Agent, KCC, at www.kccllc.net/christmastreeshops. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein and in the First Day Declaration, the Debtors request entry of the DIP Orders granting the relief requested herein and such other relief the Court deems just and proper.

154838579v1

Dated: May 7, 2023
    Wilmington, Delaware

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

By: */s/ Evelyn J. Meltzer*
Evelyn J. Meltzer (Del. Bar No. 4581)
Marcy J. McLaughlin Smith (Del. Bar No. 6184)
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, Delaware 19801
Tel: (302) 777-6500
Fax: (302) 421-8390
Email: evelyn.meltzer@troutman.com
      marcy.smith@troutman.com

-and-

**MURPHY & KING, PROFESSIONAL CORPORATION**
Harold B. Murphy (*pro hac vice* pending)
Christopher M. Condon (*pro hac vice* pending)
28 State Street, Suite 3101
Boston, Massachusetts, 02109
Tel: (617) 423-0400
Email: hmurphy@murphyking.com
      ccondon@murphyking.com

*Proposed Attorneys for Debtors and Debtors in Possession*

154838579v1

# **EXHIBIT A**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CHRISTMAS TREE SHOPS, LLC, *et al.*,[1] | Case No. 23-10576 (TMH) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket Nos. ___ |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**[2]

Upon the motion (the "<u>Motion</u>") of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) 364(c)(3), 364(d), 364(e), 503 and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Rules (the "<u>Local Rules</u>") for the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>") requesting, among other things:

(1)     authorization for the Borrowers (as defined in the DIP Loan Agreement (defined below)) to obtain postpetition financing pursuant to the DIP Facility (defined below) and for each of the Guarantors (as defined in the DIP Loan Agreement) to guarantee unconditionally on a joint and several basis, and subject in all respects to the terms and limitations set forth in the DIP Loan Documents (defined below), the applicable Borrowers' obligations under the DIP Facility, consisting of a senior secured super-priority asset-based revolving credit facility (the "<u>DIP</u>

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Christmas Tree Shops, LLC (1207), Handil, LLC (1150), Handil Holdings, LLC (2891), Salkovitz Family Trust 2, LLC (8773), and Nantucket Distributing Co., LLC (1640). The notice address for the Debtors is 64 Leona Drive, Middleboro, Massachusetts 02346.

[2]     Each capitalized term used but not defined herein shall have the meaning ascribed to it in the DIP Loan Documents (defined below) or the DIP Motion, as applicable.

154838586v1

Facility"), on the terms and conditions of the Senior Secured, Super-Priority Debtor-in-Possession Revolving Credit Agreement substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended or otherwise modified from time to time, the "DIP Loan Agreement;" and, together with any other related agreements, documents, security agreements, or pledge agreements, including this Interim Order and the Final Order (each as defined below), collectively, the "DIP Loan Documents"), by among the Borrowers and the Guarantors (each as defined in the DIP Loan Agreement), Eclipse Business Capital LLC ("EBC"), as administrative agent (in such capacity, together with its successors and assigns in such capacities, the "DIP Agent"), Eclipse Business Capital SPV, LLC ("EBC SPV" and together with EBC, "Eclipse") and ReStore Capital, LLC ("ReStore"), as Lenders (as defined in the DIP Loan Agreement; the Lenders and Agent, collectively, the "DIP Secured Parties"), in an aggregate principal amount (subject to availability) of $45 million in revolving commitments available for borrowing by the Borrowers (such commitments, the "DIP Revolving Commitments", and the loans outstanding under any of the DIP Revolving Commitments from time to time, collectively, the "DIP Revolving Loans");

(2)      authorization for the Debtors to execute, deliver and enter into the DIP Loan Documents to which they are in each respective instance a party and to perform all of the Debtors' respective obligations (including, without limitation, any obligations in respect of indemnity claims) thereunder and such other and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorization for the Debtors to pay the principal, interest, fees, expenses and other amounts payable to the DIP Secured Parties pursuant to the applicable DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, facility fees, or other fees, costs, expenses, charges and disbursements of the DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' respective attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case, to the extent constituting Debtor, Borrower and/or Guarantor obligations of any kind under the DIP Loan Documents (such obligations, the "DIP Obligations");

(4)      authorization for the Debtors, immediately upon entry of this Interim Order and thereafter, to use proceeds of the DIP Facility (collectively the "DIP Loan Proceeds") as provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents): (A) to pay costs, premiums, fees and expenses related to the above-captioned cases (collectively, the "Cases") and in connection with the DIP Facility; (B) as set forth in this Interim Order and the DIP Loan Documents, to repay the Prepetition ABL Obligations (defined below) with the proceeds of the DIP Revolving Loans; (C) to make permitted adequate protection payments in respect of the Prepetition Obligations; and (D) to provide financing for working capital and for other general corporate purposes of the Debtors;

(5)      the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations;

(6)     granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (defined below) in all DIP Collateral (defined below), including, without limitation, all property constituting Prepetition Collateral (defined below) and further including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code and further defined below), to secure the repayment of the DIP Obligations, which DIP Liens shall have the relative rankings and priorities set forth herein and, as between the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties, subject to the terms of the Prepetition Intercreditor Agreement (defined below) and, to the extent applicable, the BBBy Intercreditor Agreement (defined below) (together with the Prepetition Intercreditor Agreement, the "Intercreditor Agreements");

(7)     authorization for the Debtors to use, among other things, solely in accordance with the applicable Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the limitations provided herein and in the DIP Loan Documents, any Cash Collateral in which any of the Prepetition Secured Parties (defined below) and BBBy (defined below) have an interest and the granting of adequate protection solely to the extent of any postpetition diminution in the value of the Prepetition Secured Parties' and BBBy's respective interests in the Prepetition Collateral, which collateral also secures the BBBy Obligation (defined below), including, without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral, (iii) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (iv) the subordination of the Prepetition ABL Obligations (defined below) and BBBy Obligations to the Carve Out (defined below), (v) in the case of the Prepetition Term Loan Secured Parties (defined below), the priming of the Prepetition Term Loan Liens (defined below) on the Prepetition ABL Priority Collateral (defined below) by the Carve Out, the DIP Liens, and Prepetition ABL Adequate Protection Liens (defined below), (vi) in the case of the Prepetition ABL Secured Parties, the priming of the Prepetition ABL Liens (defined below) (A) on the Prepetition ABL Priority Collateral by the Carve Out and DIP Liens, and (B) on the Prepetition Term Priority Collateral (defined below) by the Carve Out, the Prepetition Term Loan Adequate Protection Liens (defined below) and DIP Liens; (vii) in the case of BBBy, the priming of the BBBy Liens (defined below) on the Prepetition Collateral by the Carve Out, the DIP Liens, and the Prepetition Secured Parties' Adequate Protection Liens (defined below); and (viii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

(8)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(9)     subject to entry of a final order granting the relief requested in the Motion on a final basis (the "Final Order"), a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and Prepetition Collateral and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to the DIP Collateral and Prepetition Collateral;

(10)    this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

154838586v1

(11)     the scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(12)     granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on May 9, 2023 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration of Marc Salkovitz, Executive Chairman, in Support of First Day Relief* [Docket No. 12] (the "First Day Declaration"); any exhibits in connection with the foregoing, and the filings and pleadings in these Cases, the Court having found that the interim relief requested in the Motion is fair and reasonable under the facts and circumstances and is in the best interests of the Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation and maintenance of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and notice of the Motion, the interim relief requested therein and the Interim Hearing (the "Notice") having been given; and the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on: (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis) (the "30 Largest Unsecured Creditors"); (c) Greenberg Traurig LLP, as counsel to Eclipse; (d) Ropes & Gray LLP, as counsel to ReStore; (e) Riemer Braunstein LLP and Ashby & Geddes, P.A., as primary and Delaware counsel to Prepetition Term Loan Parties (defined below); (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) any other notice

4

parties required under any Prepetition Document; (j) all parties which, to the best of the Debtors' knowledge, information and belief, have asserted or may assert a lien in the Debtors' assets; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

(A)   Petition Date. On May 5, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief (each, a "Petition") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate and maintain their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No chapter 11 trustee or examiner has been appointed in any of the Cases.

(B)   Jurisdiction and Venue. This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

154838586v1

herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rules 4001-2 and 9013-1.

(C)     Committee Formation. As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "Committee") or any other statutory committee has been appointed in the Cases.

(D)     Notice. The Notice was given in the manner described in the Motion.

(E)     Parties' Acknowledgments, Agreements and Stipulations. In requesting the DIP Facility and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Secured Parties and the Prepetition Secured Parties to agree to provide and consent to, the DIP Facility, access to the Cash Collateral and subordination of the Prepetition Liens (defined below) to the Carve Out, as provided herein, and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral as set forth herein, subject to the rights of the parties in interest (other than the Debtors) set forth in Paragraph 4.1 of this Interim Order, the Debtors permanently and irrevocably admit, stipulate, acknowledge and agree, as follows:

(i)     Original Prepetition Credit Agreement. Christmas Tree Shops, LLC ("CTS") and certain of its affiliates designated therein as "Borrowers" and "Guarantors", Pathlight, as "Agent", EBC, as the "Revolving Agent", and each "Lender" from time to time party thereto, were parties to that certain Credit Agreement, dated as of November 12, 2020 (as amended by that certain First Amendment to Credit Agreement, dated as of December 30, 2020, as further amended by that certain Second Amendment to Credit Agreement, dated as of August 3, 2021, as further amended by that certain Third Amendment to Credit Agreement, dated as of April 14, 2022, as further amended by that certain Fourth Amendment to Credit Agreement, dated as of July 25, 2022, as further amended by that certain Fifth Amendment to Credit Agreement, dated as of

November 1, 2022 but effective as of October 26, 2022, as further amended by that certain Sixth Amendment to Credit Agreement, made effective as of December 15, 2022, as further amended by that certain Seventh Amendment to Credit Agreement, made effective as of January 11, 2023 (as same was amended by those certain letter agreements dated January 26, 2023, February 2, 2023 and February 10, 2023), as further amended, modified, supplemented or restated prior to February 16, 2023, the "Original Prepetition Credit Agreement"). On February 16, 2023, the obligations under the Original Prepetition Credit Agreement were restructured and refinanced pursuant to which, among other things, (A) the Revolving Agent and Revolving Lenders (each, as defined in the Original Prepetition Credit Agreement) refinanced all of the Revolving Obligations (as defined in the Original Prepetition Credit Agreement) pursuant to the terms of the Prepetition ABL Credit Agreement (defined below), (B) the Loan Parties (as defined in the Original Prepetition Credit Agreement) prepaid the principal amount of the Term Loans (as defined in the Original Prepetition Credit Agreement) outstanding as of February 16, 2023 with proceeds from the Middleborough Property Sale (as defined in the Original Prepetition Credit Agreement) in an amount equal to $84,184,981.91 and (C) the Original Prepetition Credit agreement was amended and restated pursuant to that certain Eighth Amendment to Credit Agreement, made effective as of February 16, 2023 by the Prepetition A&R Term Loan Agreement (defined below).

(ii)     Prepetition ABL Facility. CTS and certain of its affiliates designated therein as "Borrowers" and "Guarantors" (such parties, collectively, the "Prepetition ABL Obligors"), EBC SPV and ReStore, as lenders (collectively, in such capacities, together with each of its successors and assigns in such capacities, the "Prepetition ABL Lenders"), and EBC, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, the "Prepetition ABL Agent"), are parties to that certain Revolving

Credit Agreement, dated as of February 16, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement" and, together with all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Agent and the Prepetition ABL Lenders, including, without limitation, all security agreements, deposit account control agreements, control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, collectively, the "Prepetition ABL Loan Documents"). The Prepetition ABL Credit Agreement provided the Prepetition ABL Obligors with an asset-based revolving credit facility (the "Prepetition ABL Facility") in a maximum principal amount of $100 million, subject to a borrowing base (as reduced by reserves and, effectively, by a minimum availability covenant), as set forth in the Prepetition ABL Credit Agreement. As of the Petition Date, approximately $23,194,389.77 in principal was outstanding under the Prepetition ABL Facility in the form of "Revolving Loans" (as defined under the Prepetition ABL Credit Agreement), plus an outstanding letter of credit in the stated amount of $2,100,000, plus interest accrued and accruing at the rates set forth in the Prepetition ABL Credit Agreement (together with any other amounts outstanding and other obligations under the Prepetition ABL Loan Documents, including, without limitation in respect of fees, expenses (including attorneys' fees) and indemnities, the "Prepetition ABL Obligations"[4]). The Prepetition ABL Agent and the Prepetition ABL Lenders are referred to

---

[4] The defined term "Obligations" in the Prepetition ABL Credit Agreement means "all advances to, and debts (including principal, interest, fees, Prepayment Premium, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or any Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in

154838586v1

herein, collectively, as the "Prepetition ABL Secured Parties". The Prepetition ABL Facility is secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition ABL Loan Documents) on certain of the Debtors' property, including (without limitation):[5] (1) all Accounts (other than Accounts which constitute identifiable Proceeds of Term Priority Collateral); (2) (a) all ABL Deposit Accounts and Security Accounts and Money therein and all cash, checks, other negotiable instruments, funds and other evidences of payments, and (b) all Securities (to the extent constituting cash or Cash Equivalents or representing a claim to Cash Equivalents), Security Entitlements (to the extent constituting cash or Cash Equivalents or representing a claim to Cash Equivalents), and Securities Accounts, in each case other than (x) Equity Interests of the direct and indirect Subsidiaries of the Lead Borrower and (y) identifiable Proceeds of Term Priority Collateral; (3) all Inventory; (4) General Intangibles (including data processing software but excluding Intellectual Property and Equity Interests of the direct and indirect Subsidiaries of the Lead Borrower), (6) Chattel Paper; (7) Intercompany Loans; (8) Letter-of-Credit Rights; (9) Commercial Tort Claims; (10) Supporting Obligations; (11) all books and records; and (12) all Proceeds (including, without limitation, insurance proceeds) of the items referred to in items (1) through (11) and any other Prepetition ABL Priority Collateral (such property, whether now existing or hereafter arising or acquired, and further including any other property of the Grantors constituting "ABL Priority Collateral" under and as defined in the Prepetition Intercreditor Agreement and the Proceeds thereof, collectively, the "Prepetition ABL

---

such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding."

[5] Capitalized terms used but not defined in this Paragraph E shall have the meanings ascribed to them in that certain Intercreditor Agreement, dated as of February 16, 2023, between the Prepetition ABL Agent and Prepetition Term Loan Agent (defined below) (the "Prepetition Intercreditor Agreement"). The foregoing description summarizes the ABL Priority Collateral and Term Priority Collateral (as such terms are defined in the Prepetition Intercreditor Agreement), and the definitions of ABL Priority Collateral and Term Priority Collateral in the Prepetition Intercreditor Agreement control to the extent of an inconsistency.

Priority Collateral"); and (b) second priority security interests in and liens on certain of the Debtors' property that is not Prepetition ABL Priority Collateral, including all Real Property, Equipment, Intellectual Property and Equity Interests of any direct or indirect Subsidiaries of the Lead Borrower, collateral security and guarantees with respect to any Term Priority Collateral and all cash, Money, Instruments, Securities, Financial Assets and Deposit Accounts directly received as Proceeds of any Term Priority Collateral (such property, whether now existing or hereafter arising or acquired, and further including any other property of the Grantors constituting "Term Priority Collateral" under and as defined in the Prepetition Intercreditor Agreement, collectively, the "Prepetition Term Priority Collateral" and, together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral" and, such liens and security interests in clauses (a) and (b), collectively, the "Prepetition ABL Liens").

(iii)     Prepetition Term Facility. CTS and certain of its affiliates designated therein as "Borrowers" and "Guarantors" (such parties, collectively, the "Prepetition Term Loan Obligors" and, together with the Prepetition ABL Obligors, collectively, the "Prepetition Obligors"), each "Lender" from time to time party thereto (the "Prepetition Term Loan Lenders" and, together with the Prepetition ABL Lenders, collectively, the "Prepetition Lenders"), and Pathlight Capital LP, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, the "Prepetition Term Loan Agent" and, together with the Prepetition ABL Agent, collectively, the "Prepetition Agents" and, the Prepetition Term Loan Agent together with the Prepetition Term Loan Lenders, collectively, the "Prepetition Term Loan Secured Parties" and, together with the Prepetition ABL Secured Parties, collectively, the "Prepetition Secured Parties"), are parties to that certain Amended and Restated Credit Agreement, dated as of February 16, 2023 (the "Prepetition A&R Term Loan Agreement" and, together with

all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Term Loan Secured Parties, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, collectively, the "Prepetition Term Loan Documents" and, together with the Prepetition ABL Loan Documents, collectively, the "Prepetition Documents"). Pursuant to the Prepetition A&R Term Loan Agreement, the Prepetition Term Loan Secured Parties are indebted to the Prepetition Term Loan Lenders in respect of senior secured term loans (the "Prepetition Term Loans"). As of the Petition Date, not less than $16,071,116.29 in principal was outstanding under the Prepetition A&R Term Loan Agreement, plus interest accrued and accruing at the rates set forth in the Prepetition Term Loan Documents (together with any other amounts outstanding and obligations under the Prepetition Term Loan Documents, including, without limitation, in respect of fees, expenses, and indemnities, the "Prepetition Term Loan Obligations"[6] and, together with the Prepetition ABL Obligations, collectively, the "Prepetition Obligations"). The Prepetition Term Loans are secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition Term Loan Documents) on the Prepetition Term Priority Collateral and (b) second priority security interests in and liens on the Prepetition ABL

---

[6] The defined term "Obligations" in the Prepetition A&R Term Loan Agreement means "all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, and indemnities are allowed claims in such proceeding. For the avoidance of doubt, any obligations of the Loan Parties under or in respect of the Warrant Documents shall not constitute "Obligations" under this Agreement."

Priority Collateral (such liens and security interests in clauses (a) and (b), the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the "Prepetition Liens").

(iv)　Prepetition Intercreditor Agreement. The Prepetition ABL Agent and the Prepetition Term Loan Agent acknowledge and agree that the Prepetition Intercreditor Agreement is a valid and enforceable "subordination agreement" under section 510(a) of the Bankruptcy Code and other applicable non-bankruptcy law and is, as of and after the Petition Date, binding on all parties thereto. The Prepetition Intercreditor Agreement shall apply *mutatis mutandis* to the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall constitute any finding, ruling, or determination under the Prepetition Intercreditor Agreement.

(v)　Prepetition Collateral. To secure the Prepetition Obligations, the Debtors and certain of their affiliates entered into certain guaranty and collateral agreements and certain other security documents governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral (such agreements, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "Prepetition Collateral Documents"). Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein and subject to the Intercreditor Agreements, the Debtors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition Collateral.

(vi)　Prepetition Obligations. The Prepetition Obligations owing to the Prepetition Secured Parties constitute legal, valid and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Obligations owing to the Prepetition Secured Parties is subject to

12

avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases (defined below).

(vii)    <u>Prepetition Liens</u>. The Prepetition Liens granted to the Prepetition Secured Parties constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and perfected security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the respective Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(viii)    <u>No Challenges/Claims</u>. No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action and/or choses in action against any of the Prepetition Secured Parties, in any capacity, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees with respect to the Prepetition Documents, the Prepetition Obligations, the Prepetition Liens or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction or other claims

arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents. The Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix) <u>Indemnity</u>. The DIP Agent, the DIP Lenders and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Prepetition Secured Parties' Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence, fraud, or willful misconduct. No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this <u>Paragraph E(ix)</u>, in the Prepetition Documents or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, as the case may be.

(x) <u>Release</u>. Subject to <u>Paragraph 4.1</u> of this Interim Order, each of the Debtors, their Estates and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries and assigns have agreed to provide

154838586v1

releases to each of the Released Parties (defined below) as provided in <u>Paragraph 5.17</u> of this Interim Order.

(xi)    <u>Cash Collateral</u>. The Debtors admit, stipulate, acknowledge and agree that all of the cash of the Debtors, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors, whether as Prepetition ABL Priority Collateral or Prepetition Term Priority Collateral, as income, proceeds, products, rents or profits of other Prepetition ABL Priority Collateral or Prepetition Term Priority Collateral, or otherwise, constitutes "<u>cash collateral</u>" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

(F)    <u>Findings Regarding the Postpetition Financing and Use of Cash Collateral</u>.

(i)    <u>Request for Postpetition Financing</u>. The Debtors have requested from each of the DIP Secured Parties, and each of the DIP Secured Parties is willing, subject to the terms of this Interim Order and satisfaction of the conditions set forth in the DIP Loan Agreement, to extend the DIP Revolving Loans on the terms and conditions set forth in this Interim Order and the DIP Loan Documents, respectively.

(ii)    <u>Need for Postpetition Financing and Use of Cash Collateral</u>. The Debtors do not have sufficient liquidity, including Cash Collateral, to conduct these Cases as contemplated by the Debtors without the financing requested in the Motion. The Debtors' ability to manage their relationships with their vendors, suppliers and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their efforts and activities is essential to the viability of these Cases as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP

154838586v1

Secured Parties and the use of Cash Collateral as set forth in this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents, as applicable, is vital to the preservation and maintenance and maximization of the value of each Debtor, its Estate and assets. Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in this Interim Order to, among other things, permit the orderly conduct of their affairs and initiatives as contemplated in these Cases, minimize the disruption of their relationships with essential constituents as they undertake efforts and activities to preserve and maximize the value of the assets of the Debtors' Estates and, in turn, to maximize the recovery to all creditors of the Estates.

(iii)    <u>DIP Facility Constitutes the Best Financing Available</u>. The Debtors have been unable to obtain (a) adequate unsecured credit allowable either (i) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (ii) under section 364(c)(1) of the Bankruptcy Code, (b) adequate credit secured by (i) a senior lien on unencumbered assets of their Estates under section 364(c)(2) of the Bankruptcy Code, or (ii) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (c) secured credit under section 364(d)(1) of the Bankruptcy Code from sources on terms more favorable than the terms of the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order to satisfy their postpetition liquidity needs. Accordingly, the financing offered by the DIP Secured Parties pursuant to the DIP Loan Documents, which financing affords the consensual priming of the Prepetition Secured Parties, represents the best financing available to the Debtors at this time and is in the best interests of the Debtors, their Estates and all of their stakeholders.

154838586v1

(iv)     Budget. The Debtors have prepared and delivered to the DIP Agent an initial budget (the "Initial Budget"), a copy of which is attached hereto as **Exhibit B**. The Initial Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved in writing by the DIP Agent (acting at the direction of the DIP Lenders) in the manner contemplated by the DIP Loan Agreement, in each case, an "Approved Budget"). The Debtors believe that the Initial Budget is reasonable under the facts and circumstances. In entering into the postpetition financing arrangements provided for herein and to consent to the Debtors' use of Cash Collateral as set forth herein, the DIP Secured Parties and the Prepetition Secured Parties are relying upon the Debtors' agreement to comply with the terms set forth in the DIP Loan Agreement, the other DIP Loan Documents and this Interim Order, and to comply, subject to permitted variances in such budget(s), with the Approved Budget.

(v)     Case Milestones. The DIP Lenders' willingness to make the DIP Revolving Loans and the Prepetition Secured Parties' willingness to consent to the use of Cash Collateral (each on the terms and subject to the conditions set forth in the DIP Loan Documents and this Interim Order) is predicated upon progress in the Debtors' process to confirm a chapter 11 plan of reorganization, to consummate a sale of all or substantially all of their assets, or, in the alternative, to provide for an orderly liquidation of their inventory and exit from their retail store locations, as set forth in the Milestones (defined below). Absent the transactions and other activities contemplated with respect to the foregoing (including, without limitation, the authorization of store closing sales), the DIP Lenders and the Prepetition Secured Parties would not have agreed to make

the DIP Revolving Loans or consent to the use of Cash Collateral as provided in the DIP Loan Documents and this Interim Order.

(vi)     Certain Conditions to DIP Facility. The DIP Lenders' willingness to make the DIP Revolving Loans is conditioned upon, among other things: (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers and remedies thereunder, in each case as modified by this Interim Order; (b) the Debtors' obtaining Court approval of and compliance with the "Milestones" set forth on **Exhibit C**, which are hereby approved in all respects; (c) the provision of adequate protection of the respective Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) pursuant to sections 361, 363 and 364 of the Bankruptcy Code; and (d) the DIP Agent, for the ratable benefit of the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents, subject to the priorities described in **Exhibit D** annexed hereto (including with respect to the Carve Out), superpriority perfected security interests in and liens upon all property and assets of the Debtors, including, but not limited to, a valid and perfected security interest in and lien upon all of the following now existing or hereafter arising or acquired property and assets of the Debtors: (i) all property and assets comprising Prepetition Collateral and (ii) except for the Professional Fee Reserve, <u>provided</u>, that any funds remaining in the Professional Fee Reserve after payment of amounts included in the Carve Out up to the Carve Out Cap shall be returned to the DIP Agent or Prepetition Agents (as applicable) in accordance with <u>Paragraph 2.3(b)</u> of this Interim Order (the property described in the foregoing clause (ii), the "<u>DIP Excluded Property</u>"), all property and assets of the Debtors that, as of the Petition Date, were not otherwise subject to valid, perfected, enforceable and unavoidable

154838586v1

security interests, including any property (other than DIP Excluded Property) or assets consisting of "Excluded Property" under (and as defined in) any of the Prepetition Documents (collectively hereinafter referred to as the "DIP Collateral" (including any proceeds thereof), which shall include all Commercial Tort Claims existing as of the Petition Date or hereafter arising and the proceeds thereof and, subject to the entry of the Final Order, the proceeds (the "Avoidance Proceeds") of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions")). Notwithstanding anything to the contrary herein and for the avoidance of doubt, the DIP Liens, the Prepetition Secured Parties' Adequate Protection Liens, and the BBBy Adequate Protection Liens (defined below) granted pursuant to this Interim Order shall not attach to the Debtors' real property leaseholds, but shall attach solely to the proceeds of such leases.

(vii)    Business Judgment and Good Faith Pursuant to Section 364(e). Any credit extended, loans made, and other financial accommodations provided to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued, made, or provided, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facility, the DIP Liens and the DIP Superpriority Claim (defined below) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(viii)    Sections 506(c) and 552(b). As a condition to obtaining financing under the DIP Facility and the use of Cash Collateral as set forth in this Interim Order and as a material inducement to the DIP Secured Parties' agreement to provide the DIP Facility and the Prepetition

Secured Parties' consent to the use of Cash Collateral as set forth in this Interim Order, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Secured Parties' and the Prepetition ABL Secured Parties' agreement to subordinate their respective liens and superpriority claims to the Carve Out, and (c) the consensual use of Cash Collateral, subject to the Approved Budget, the terms of the DIP Loan Agreement and the terms of this Interim Order, the Debtors have agreed that, subject to entry of the Final Order, each of the DIP Secured Parties and Prepetition Secured Parties are entitled to receive (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral and Prepetition Collateral.

(ix)     <u>Good Cause</u>. Good cause has been shown for the entry of this Interim Order. The relief requested in the Motion is necessary, essential and appropriate and is in the best interests of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' remaining operations and business affairs and other applicable activities and efforts, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors and other stakeholders, their businesses, their employees and their assets. The terms of the DIP Facility and this Interim Order are fair and reasonable under the facts and circumstances, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration. The DIP Facility and this Interim Order are the product of reasonable, arm's length, good faith negotiations between the Debtors, the DIP Secured Parties and the Prepetition Secured Parties.

154838586v1

(x) <u>Repayment of Prepetition ABL Obligations</u>. The repayment of the Prepetition ABL Obligations in accordance with the DIP Loan Agreement and this Interim Order (but subject to the provisions of <u>Paragraph 4.1</u> hereof) is necessary as the Prepetition ABL Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out, the DIP Liens, and the Prepetition Term Loan Adequate Protection Liens (defined below), in each case as provided in this Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Facility. Moreover, in light of the aggregate net availability to the Debtors under the DIP Facility, and a variety of agreements by the Prepetition ABL Agent, the Prepetition ABL Lenders and the DIP Secured Parties for the use of the proceeds of the ABL Priority Collateral and/or the DIP Collateral as expressly set forth in this Interim Order, the availability of the DIP Facility confers a material benefit to the Debtors

(xi) <u>Adequate Protection</u>. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), as set forth in this Interim Order.

(G) <u>BBBy Security Agreement, BBBy Obligations, and BBBy Intercreditor Agreement</u>. Pursuant to that (a) certain Security Agreement, dated as of February 3, 2023 (as amended, the "<u>BBBy Security Agreement</u>"), between Bed Bath & Beyond, Inc. ("<u>BBBy</u>") and CTS, CTS pledged substantially all its assets to secure its Obligations (as defined in the BBBy Security Agreement, the "<u>BBBy Obligations</u>", and such liens and security interests granted to BBBy, the "<u>BBBy Liens</u>") and (b) that certain Amended & Restated Intercreditor Agreement between BBBy and Pathlight (the "<u>BBBy Intercreditor Agreement</u>"), BBBy subordinated the BBBy Liens to those of the Prepetition Liens granted in favor of the Prepetition Secured Parties

154838586v1

(all as more fully set forth in the BBBy Intercreditor Agreement). Pursuant to the BBBy Intercreditor Agreement, BBBy agreed and consented to the use of Cash Collateral and not to object to DIP Financing (as defined in the BBBy Intercreditor Agreement) that subordinates the BBBy Liens to those of the liens securing the DIP Financing if the First Lien Lenders (as defined in the BBBy Intercreditor Agreement) consents to the use of Cash Collateral or permits the Debtors to incur such DIP Financing, all as more fully set forth in the BBBy Intercreditor Agreement.

(H)     <u>Immediate Entry</u>. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

(I)     <u>Interim Hearing</u>. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to the Notice Parties.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

Section 1.     <u>Authorization and Conditions to Financing and Use of Cash Collateral</u>.

1.1     <u>Motion Granted</u>. The Motion is granted solely to the extent provided in this Interim Order. Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

1.2     <u>Authorization of DIP Financing and Use of Cash Collateral</u>.

(a)     The Debtors are hereby authorized to execute and deliver the DIP Loan Documents and to immediately borrow, incur and guarantee (as applicable), loans under the DIP

Facility, pursuant to the terms and conditions of the DIP Loan Documents, this Interim Order and the Approved Budget, up to an aggregate principal amount of $45 million in DIP Revolving Commitments (inclusive of repayments of the Subject Prepetition ABL Obligations (defined below), and upon, entry of a Final Order, the Roll-Up (defined below).

(b)     The Debtors are hereby authorized to (i) borrow under the DIP Facility and use Cash Collateral during the period (the "Interim Financing Period") commencing on the date of this Interim Order through and including the earlier to occur of (x) the date of entry of the Final Order (in which case, the borrowing under the DIP Facility and use of Cash Collateral will be pursuant to the terms of the Final Order) and (y) the occurrence of a DIP Termination Event (defined below) solely in accordance with, and for the purposes permitted by, the DIP Loan Documents, this Interim Order and the Approved Budget, (ii) pay all interest, costs, fees and other amounts and obligations accrued or accruing under the DIP Loan Agreement and other DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order, the Approved Budget, the DIP Loan Agreement and the other DIP Loan Documents and (iii) repay the Prepetition ABL Obligations pursuant to this Interim Order. The Initial Budget is hereby approved in all respects.

1.3     Financing Documents.

(a)     Authorization. The Debtors are hereby authorized to enter into, execute, deliver and perform all obligations under the DIP Loan Documents. No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable state, federal or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or foreign law) or be subject to any

defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims or any other challenge under the Bankruptcy Code or any applicable law, rule or regulation by any person or entity.

(b)     Approval; Evidence of Borrowing Arrangements. The DIP Loan Documents and DIP Obligations shall be valid, binding and enforceable against the Debtors, their Estates and any successors thereto, including, without limitation, any trustee appointed in any of these Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases (collectively, the "Successor Cases") and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(c)     Payment of DIP Fees and Other Expenses. Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "DIP Fees") are hereby approved and the Debtors are hereby authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket costs, disbursements and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Interim Order in accordance with Paragraph 5.15 hereof. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

(d)     Amendments to DIP Loan Documents. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the DIP Secured Parties may make amendments, modifications or supplements to any DIP Loan Document, and the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Loan Documents) if so required by the DIP Loan Documents) and the DIP Lenders may waive any provisions in the DIP Loan Documents without further approval of the Court; provided that any amendments, modifications

or supplements to any DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder or existing fees or add new fees thereunder (excluding any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "Material DIP Amendments") shall be filed with the Court, and the Debtors shall provide prior written notice of any Material DIP Amendment to: (i) counsel to the DIP Agent, and (ii) (A) counsel to the Prepetition Term Loan Agent, (B) counsel to any Committee, or, in the event no such Committee is appointed at the time of such Material DIP Amendment, the 30 Largest Unsecured Creditors of the Debtors on a consolidated basis, and (C) the U.S. Trustee; provided, further, that the consent of the parties set forth in clause (ii) will not be necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment that is subject to an objection filed within five (5) business days following receipt of such Material DIP Amendment must be approved by the Court. The Debtors must receive written consent as to any Material DIP Amendment prior to filing notice thereof with the Court (1) from the DIP Secured Parties (as set forth in the DIP Loan Documents) and (2) from the applicable Prepetition Agents for any amendment, modification, supplement or waiver that materially adversely affects any rights of any Prepetition Secured Parties solely if required under the Prepetition Intercreditor Agreement.

1.4    Repayment of Prepetition ABL Obligations.

(a)    Upon the entry of this Interim Order, without any further action by the Debtors, the Court or any other party, the Debtors are authorized and directed to repay Prepetition ABL Obligations by remitting to the Prepetition ABL Agent any and all proceeds of DIP Collateral and Prepetition Collateral constituting ABL Priority Collateral, including, without limitation and in each event, (i) Cash Collateral; (ii) in the case of accounts receivable (including, without

limitation, any and all accounts receivable arising from the disposition of inventory the proceeds of which are applied as set forth below in this Paragraph 1.4(a)), cash proceeds and as further set forth below in this Paragraph 1.4(a); and (iii) in the case of inventory, cash proceeds as set forth below in this Paragraph 1.4(a)), for application of such proceeds to the Prepetition ABL Obligations (to the extent applicable, in accordance with the Prepetition Intercreditor Agreement) consisting of the outstanding principal balance of advances under the Prepetition ABL Facility, any interest due and payable thereon (the "Subject Prepetition ABL Obligations"). Prior to the repayment in full in cash of the Subject Prepetition ABL Obligations, in addition to remitting the proceeds of accounts receivable and inventory to the Prepetition ABL Agent for application to the Subject Prepetition ABL Obligations, the Debtors shall also pay to the Prepetition ABL Agent for application to the Subject Prepetition ABL Obligations concurrently with the remittance of the proceeds of accounts receivable and inventory two dollars for each dollar of proceeds so remitted. The DIP Secured Parties are authorized to make DIP Revolving Loans in amounts sufficient to satisfy the Debtors' payment obligations as to each such matched dollars of the proceeds of accounts receivable and inventory to disburse such DIP Revolving Loans directly to the Prepetition ABL Agent for application to the Subject Prepetition ABL Obligations. The Prepetition ABL Agent shall continue to so apply such proceeds upon receipt until such time as the Subject Prepetition ABL Obligations are repaid in full in cash. From and after the repayment in full in cash of the Subject Prepetition ABL Obligations, the Debtors shall remit such proceeds to the DIP Agent for application of such proceeds to the outstanding balance of the DIP Revolving Loans and the DIP Obligations in accordance with this Interim Order and the terms and conditions of the DIP Loan Documents. Upon entry of this Interim Order, all Prepetition ABL Obligations that are not Subject Prepetition ABL Obligations, including, without limitation, those Prepetition ABL

Obligations as to or under Letters of Credit, shall continue in place, and all obligations under or in connection therewith shall be subject to the DIP Loan Documents, shall constitute DIP Obligations and shall neither constitute nor be eligible for repayment as Subject Prepetition ABL Obligations in accordance with this Interim Order.

(b)     Upon the entry of a Final Order, the remaining Prepetition ABL Obligations, if any, shall be automatically substituted and exchanged for (and repaid by) the DIP Revolving Loans under the DIP Facility (the "Roll-Up"), and such Roll-Up shall be deemed funded on the entry of the Final Order without any further action by the Debtors, the Court or any other party, and shall constitute and be deemed to be DIP Revolving Loans under the DIP Facility as of such date.

(c)     **The Debtors' repayment of the Prepetition ABL Obligations (including the Subject Prepetition ABL Obligations) and the Prepetition ABL Agent's application of funds to the Prepetition ABL Obligations are subject to Paragraph 4.1 hereof**. Until (i) the payment in full in cash of all DIP Obligations and Prepetition ABL Obligations, (ii) the termination of the DIP Revolving Commitments, (iii) all objections and challenges (including, without limitation, any Challenge Proceeding (as defined in Paragraph 4.1 hereof)) to (A) the liens, security interests and claims of the Prepetition ABL Agent (including, without limitation, liens granted for adequate protection purposes) and/or (B) the Prepetition ABL Obligations have been waived, denied or barred, and (iv) all of the Debtors' Stipulations (as defined in Paragraph 4.1 hereof) have become binding on their Estates and parties in interest in accordance with Paragraph 4.1 hereof, all liens, security interests and claims of the Prepetition ABL Agent (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein and the Prepetition ABL

Loan Documents shall remain in full force and effect; provided, however, that, subject to the results of any applicable Challenge Proceeding properly commenced prior to the expiration of the Challenge Period, to the extent that Prepetition ABL Obligations (including Subject Prepetition ABL Obligations) have been repaid pursuant to this Interim Order, such Prepetition ABL Obligations shall not be due or owing separately under the Prepetition ABL Loan Documents; provided, further, however, that nothing in the foregoing proviso shall alter or diminish, or be deemed to alter or diminish, the Adequate Protection (as defined herein) of the Prepetition ABL Agent and the Prepetition ABL Lenders.

1.5     Continuation of Prepetition Procedures. Except to the extent expressly set forth in the Prepetition Documents, DIP Loan Documents, or in other "first day" orders, all prepetition practices and procedures for the payment, collection and application of proceeds of the Prepetition Collateral, sweeping, the turnover of cash, the delivery of property to the Prepetition Agents and the Prepetition Lenders, including any and all deposit account control agreements and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption, and all such practices and procedures for the payment, collection and application of proceeds of the Collateral, sweeping, the turnover of cash, and the delivery of property shall apply with respect to the DIP Facility, subject to the terms of the Prepetition Intercreditor Agreement (to the extent applicable).

1.6     Indemnification. The Debtors shall indemnify and hold harmless the DIP Agent, each DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs,

predecessors, successors and assigns (each, an "Indemnified Party" and, collectively, the "Indemnified Parties"), in accordance with, and subject to, the DIP Loan Documents (such indemnification obligations constituting a portion of the DIP Obligations and secured by all of the DIP Collateral). In furtherance of the performance of the DIP Obligations owing to the Indemnified Parties, the Debtors are authorized in any payoff letter or similar agreement into which they enter upon payment in full in cash of any DIP Obligations to fund a reserve to be held by the applicable DIP Secured Parties to secure the payment of such DIP Obligations to Indemnified Parties arising prior to or after the date of such payoff letter or similar agreement.

Section 2.    Postpetition Liens; Superpriority Administrative Claim Status.

2.1    Postpetition Liens.

(a)    Granting of Postpetition DIP Liens. To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and are hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests and liens (such security interests and liens, the "DIP Liens") in and upon all DIP Collateral, subject to the rankings and priority set forth in Paragraph 2.1(b) below and as set forth on **Exhibit D** hereto.

(b)    DIP Lien Priority. The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided,

29

*however*, that the DIP Liens on (I) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject solely to the Carve Out and Permitted Liens[7]; (II) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject solely to the Permitted Liens, the Carve Out, the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (III) assets of the Debtors (the "Non-Lender Encumbered Assets") that were subject to validly perfected liens or security interests as of the Petition Date in favor of parties other than the Prepetition Secured Parties and BBBy (if any, the "Non-Lender Existing Liens") shall be (A) with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject solely to such Non-Lender Existing Liens and the Carve Out and (B) with respect to assets constituting Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject solely to such Non-Lender Existing Liens, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, and the Carve Out; and (IV) any other assets of the Debtors ("Unencumbered Assets") that were not subject to any validly perfected liens or security interest as of the Petition Date (including, subject to the entry of a Final Order, Avoidance Proceeds) shall be (A) with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject solely to the Carve Out and (B) with respect to assets constituting Term Priority Collateral (whether in existence on the Petition

---

[7] For purposes of this Interim Order, "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens, including, for the avoidance of doubt, any lien of ReStore Capital (CTS), LLC arising under or related to the *Agreement for Consignment of Memo Merchandise*, dated as of January 6, 2023, between Christmas Tree Shops, LLC and ReStore Capital (CTS), LLC (as amended, the "Consignment Agreement").

Date or hereafter arising), subject solely to the Prepetition Term Loan Adequate Protection Liens and Carve Out, in each case as such priorities are set forth in **Exhibit D**.

(c) <u>Postpetition Lien Perfection</u>. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the DIP Liens, the Prepetition Secured Parties' Adequate Protection Liens, and BBBy Adequate Protection Liens and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral (including, where perfection of a lien may be accomplished only by possession or control by a secured party), or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (in each case, a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if the DIP Agent, any Prepetition Agent or BBBy shall, in each of its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then the DIP Agent, such Prepetition Agent or BBBy, as applicable, is authorized to perform such act, and the Debtors are authorized to perform such act to the extent necessary or required by the DIP Loan Documents and this Interim Order, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law. The DIP Agent, any Prepetition Agent, BBBy, as applicable, may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which filing, recordation or presentation shall be tantamount to a Perfection Act, and, in such event, the subject

31

filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should the DIP Agent, any Prepetition Agent or BBBy, as applicable, so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, priority or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens, the Prepetition Secured Parties' Adequate Protection Liens, and BBBy Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; provided, however, that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens.

(e)     By virtue of the terms of this Interim Order, to the extent that the DIP Agent, any Prepetition Agent or BBBy, as applicable, has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including any Guarantor), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Interim Order and any DIP Loan Document without further action by the DIP Agent, any Prepetition Agent or BBBy, as applicable. To the extent that the Prepetition ABL Agent or the Prepetition Term Loan Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card

processor notices or agreements, bailee letters, custom broker agreements, financing statement, deposit account control agreements, deposit account instruction agreements or any other collateral documents or relevant Prepetition Documents then automatically and without further action, (i) the DIP Agent shall be deemed to be a secured party under such documents, (ii) the DIP Facility, together with any refinancings or replacements thereof, shall be deemed to be secured obligations under the applicable documents, and (iii) the applicable provisions of such documents shall apply to the DIP Facility; all as fully and completely as if the DIP Agent was an original secured party in such documents and the DIP Facility, as applicable, was an original secured obligation in such documents; provided, however, that the foregoing provision shall not have the effect of relating back the attachment or perfection of the DIP Liens to any date or time prior to the Petition Date. To the extent the Prepetition ABL Agent or the Prepetition Term Loan Agent is listed as loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent shall also be deemed to be the secured party under such documents or to be the loss payee or additional insured, as applicable. The foregoing shall be subject to the terms of the Intercreditor Agreements (as, and to the extent, applicable).

(f)     Except as provided in this Interim Order, the DIP Liens, the DIP Superpriority Claim, the Prepetition Secured Parties' Adequate Protection Liens, the BBBy Adequate Protection Liens, the Prepetition Secured Parties' Adequate Protection Claims (defined below), and BBBy Adequate Protection Claim (defined below): (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of these Cases or any Successor Cases (except in respect of the Carve Out as set forth herein) and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or elected in these Cases or any Successor Cases and/or upon the

dismissal of any of these Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code.

2.2 <u>Superpriority Administrative Expenses</u>. Subject to the priorities set forth on **<u>Exhibit D</u>** (and on the terms set forth therein and subject to the Prepetition Intercreditor Agreement) and the Carve Out, on account of all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 507(a), 507(b), 546(c), 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim, the "<u>DIP Superpriority Claim</u>").

2.3 <u>Carve Out Provisions</u>.

(a) <u>Definitions; No Independent Obligation</u>. For purposes of this Interim Order, "<u>Carve Out</u>" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the

statutory rate (collectively, the "Statutory Fees"); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (iii) to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise, subject to the professional fees and disbursements reflected in the Approved Budget on a line item basis for unpaid fees (excluding any success or transaction fees), costs, disbursements and expenses (the "Allowed Professional Fees") incurred or earned by professionals retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (defined below) (the "Pre-Trigger Carve Out Cap"); (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $100,000 incurred after the first day following delivery by DIP Agent of the Carve Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"); and (v) all fees and expenses incurred or earned by Hilco Merchant Resources, LLC, as the Debtors' store closing agent under the terms of the Letter Agreement Governing Inventory Disposition as approved by the Court on an interim or final basis (all such amounts set forth in clauses (i) through (v), collectively, the "Carve Out Cap"); provided that nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email by the DIP Agent to the Debtors, their lead restructuring counsel, counsel to the Prepetition

Agents, the U.S. Trustee and counsel to the Committee, if any (collectively, the "Carve Out Trigger Notice Parties"), which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event, and shall describe in reasonable detail such DIP Termination Event that is alleged to have occurred and be continuing and stating that the Post-Carve Out Trigger Notice Cap has been invoked. None of the DIP Secured Parties or the Prepetition Secured Parties or BBBy shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code, other than payment or reimbursement of any fees or disbursements from proceeds of DIP Collateral to the extent of the Carve Out, including as provided in Paragraph 2.3(b) below. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties or BBBy, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(b)     Carve Out Reserves; Carve Out Funding. On the last business day of each week, commencing with the week that the Court approves this Interim Order, the Debtors shall fund into a segregated account maintained by or on behalf of the Debtors in trust for the Professional Persons (the "Professional Fee Reserve"), an amount equal to the professional fees as set forth in the Approved Budget for the week then ended for such Professional Persons in accordance with the DIP Loan Documents; provided, further, that the amounts set forth for the Professional Persons in the Approved Budget shall be net of the retainer amounts held by Professional Persons. If the Debtors fund the Professional Fee Reserve in an amount less that the amount set forth in the applicable week under the Approved Budget, the DIP Agent shall establish a reserve in the amount of the difference between the budgeted amount and the amount drawn and

funded to the Professional Fee Reserve. The Debtors shall be permitted at a later date to fund such Professional Fees in the Professional Fee Reserve and the amount of the reserve described in the immediately preceding sentence shall be decreased on a dollar-for-dollar basis for the amounts deposited into the Professional Fee Reserve. On the first business day of each week, the Debtors shall advise the DIP Agent of the amount which they funded into the Professional Fee Reserve with respect to the preceding week and whether such amount was equal to or less than the amount of professional fees as set forth in the Approved Budget for the applicable week. All funds in the Professional Fee Reserve shall be used first to pay the Carve Out (whether such fees are allowed on an interim or final basis). If, after payment in full of all amounts included in the Carve Out Cap, the Professional Fee Reserve has not been reduced to zero, all remaining funds shall be returned to the DIP Agent, for application to the outstanding balance of the DIP Facility, or to hold as Cash Collateral for the obligations of the Debtors under the DIP Facility; provided, further, that after payment in full of the DIP Obligations and the termination of the DIP Revolving Commitments, the remaining funds shall be transferred to the Prepetition ABL Agent for application to the Prepetition ABL Obligations; provided, further, that after payment in full of the DIP Obligations and the termination of the DIP Revolving Commitments and payment in full of the Prepetition ABL Obligations, the remaining funds shall be transferred to the Prepetition Term Loan Agent for application to the Prepetition Term Loan Obligations. Notwithstanding anything to the contrary in this Interim Order, the DIP Lenders' obligation to fund the Professional Fee Reserve shall not exceed the Pre-Trigger Carve Out Cap and the DIP Lenders shall have no obligation to fund the Professional Fee Reserve if the Debtors have exhausted their ability to access the DIP Facility. In addition, there shall be no obligation under this Interim Order to fund the Professional Fee Reserve

154838586v1

in an amount greater than the amount set forth in the Initial Budget for the period commencing on the Petition Date through the Trigger Date.

(c)     Carve Out Priority. Notwithstanding anything to the contrary in this Interim Order, the Final Order, any DIP Loan Document, any document governing the Prepetition ABL Facility, or the Prepetition Term Loan Facility, the Carve Out shall be senior as to the DIP Liens as set forth on the priorities chart annexed hereto as **Exhibit D**. The Carve Out shall not reduce the amounts payable to the DIP Agent or the DIP Lenders under the DIP Facility.

(d)     Reservation of Rights. The DIP Agent and DIP Lenders reserve their rights to object to the allowance of any fees and expenses, including any fees and expenses sought that are not provided for in the Approved Budget. The payment of any fees or expenses of the Professional Persons pursuant to the Carve Out shall not, and shall not be deemed to, (i) reduce any Debtor's obligations owed to any of the DIP Lenders, Prepetition Secured Parties, BBBy or to any holder of a Permitted Prior Lien, or (ii) modify, alter, or otherwise affect any of the liens and security interests of such parties in the DIP Collateral or Prepetition Collateral (or their respective claims against the Debtors). The DIP Lenders and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons, the U.S. Trustee, Clerk of the Bankruptcy Court, any chapter 7 trustee, or any professional retained by the chapter 7 trustee (or of any other entity) incurred in connection with Cases or any Successor Case, and nothing in this Interim Order or otherwise shall be construed to obligate such parties in any way to pay such compensation to or to reimburse such expenses. The Approved Budget and the Carve Out shall not be construed as a cap or limitation on the amount of the allowed fees and expenses of Professional Persons payable by the Debtors after the DIP Obligations and Prepetition ABL Obligations are indefeasibly paid in full and all DIP

Revolving Commitments under the DIP Loan Agreement terminated; provided, however, that until the DIP Obligations and Prepetition ABL Obligations are indefeasibly paid in full and the DIP Revolving Commitments under the DIP Loan Agreement terminated, the Debtors shall not be permitted to use the DIP Facility proceeds, the DIP Collateral (including proceeds of the DIP Collateral), and Prepetition Collateral (including Cash Collateral and the proceeds of the Prepetition Collateral) to pay any allowed fees and expenses of Professional Persons in excess of what was provided for in the Approved Budget, nor shall the DIP Lenders be required to fund such amounts into the Professional Fee Reserve.

2.4    Prepetition Secured Parties' Adequate Protection.

(a)    Adequate Protection Claims and Liens. The Prepetition Secured Parties and BBBy are entitled, pursuant to sections 361, 363(e), 364(d)(1), 503(b), 507(a) and 507(b) of the Bankruptcy Code and effective as of the Petition Date, to adequate protection of their respective interests in the Prepetition Collateral, including any Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Secured Parties' and BBBy's respective interests in the Prepetition Collateral from and after the Petition Date. On account of such adequate protection, the Prepetition Secured Parties and BBBy are hereby granted the following, in each case subject to the priorities set forth on **Exhibit D** and the Carve Out (collectively, the "Adequate Protection"):

(i)    Prepetition ABL Adequate Protection Liens. The Prepetition ABL Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition ABL Adequate Protection Liens"), which liens shall be, with respect to: (A) the Prepetition ABL

Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to Permitted Liens, the Carve Out, the DIP Liens and the Prepetition ABL Liens; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to Permitted Liens, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, the Carve Out, the DIP Liens, and the Prepetition ABL Liens; (C) the Non-Lender Encumbered Assets, (I) with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to such Non-Lender Existing Liens, the Carve Out and the DIP Liens, and (II) with respect to assets constituting Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to such Non-Lender Existing Liens, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, the Carve Out, and the DIP Liens; and (D) Unencumbered Assets, (I) with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out and the DIP Liens, and (II) with respect to assets constituting Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Prepetition Term Loan Adequate Protection Liens, the Carve Out, and the DIP Liens, in each case as such priorities are set forth in **Exhibit D**.

(ii)     _Prepetition Term Loan Adequate Protection Liens_. The Prepetition Term Loan Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the

"Prepetition Term Loan Adequate Protection Liens" and, together with the Prepetition ABL Adequate Protection Liens, collectively, the "Prepetition Secured Parties' Adequate Protection Liens"), which liens shall be, with respect to: (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to Permitted Liens, the Carve Out, the DIP Liens, the Prepetition ABL Liens, Prepetition ABL Adequate Protection Liens, and the Prepetition Term Loan Liens; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to Permitted Liens and the Prepetition Term Loan Liens; (C) the Non-Lender Encumbered Assets, (I) with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to such Non-Lender Existing Liens, the Carve Out, the DIP Liens, the Prepetition ABL Liens, and the Prepetition ABL Adequate Protection Liens (II) with respect to assets constituting Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to such Non-Lender Existing Liens and the Prepetition Term Loan Liens,; and (D) Unencumbered Assets, with respect to assets constituting ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out, the DIP Liens, and the Prepetition ABL Adequate Protection Liens, in each case as such priorities are set forth in **Exhibit D**.

(iii)     BBBy Adequate Protection Liens. BBBy is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "BBBy Adequate Protection Liens"), which liens shall

be, with respect to all DIP Collateral and Prepetition Collateral be subject and subordinate to the Permitted Liens, the Carve Out, the DIP Liens, the Prepetition Liens, and the Prepetition Secured Parties' Adequate Protection Liens, in each case as such priorities are set forth in **Exhibit D**.

(iv) <u>Adequate Protection Payments</u>. Subject to the Approved Budget, the Debtors are authorized and directed to pay to the Prepetition ABL Secured Parties on the last business day of each calendar month after the entry of this Interim Order, in each case, an amount equal to all accrued and unpaid prepetition and postpetition interest (at the default rate), fees and costs under the Prepetition ABL Loan Documents.

(v) <u>Prepetition Secured Parties' Adequate Protection Claims</u>. The Prepetition Secured Parties are each hereby granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a) and 507(b) of the Bankruptcy Code (the "<u>Prepetition Secured Parties' Adequate Protection Claims</u>" (such superpriority administrative expense claim as to the Prepetition ABL Secured Parties, the "<u>Prepetition ABL Adequate Protection Claim</u>" and, as to such superpriority administrative expense claim as to the Prepetition Term Loan Secured Parties, and collectively, the "<u>Prepetition Term Loan Adequate Protection Claim</u>"), which shall be allowed claims against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 365, 503(b), 507(a), 507(b) or 1114 of the Bankruptcy Code, whether or not

such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment. The Prepetition Secured Parties' Adequate Protection Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors, in each case as such priorities are set forth in **Exhibit D**.

(vi)     BBBy' Adequate Protection Claim. BBBy is hereby granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a) and 507(b) of the Bankruptcy Code (the "BBBy Adequate Protection Claim"), which shall be allowed claims against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 365, 503(b), 507(a), 507(b) or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, and payable from and have recourse to all pre- and post-petition property of the Debtors, in each case as such priorities are set forth in **Exhibit D**.

(b)     Reporting. The Debtors shall timely provide the Prepetition Secured Parties with (x) reasonable access during business hours to the Debtors' facilities, management, books and records required under the Prepetition Loan Documents and (y) copies of all financial and sale process reporting provided to the DIP Agent and DIP Lenders pursuant to the DIP Loan Documents substantially concurrently with such delivery to the DIP Lenders. The Debtors are also directed to allow the Prepetition Secured Parties (and their representatives and advisors),

reasonable access during business hours to all of the Debtors' premises, information systems, facilities, management, books and records for the purpose of enabling Prepetition Secured Parties to inspect, appraise and audit the DIP Collateral as required by the Prepetition Loan Documents.

(c)  Fees and Expenses. The Debtors are authorized and directed to pay: (i) on the date of the first advance under the DIP Facility, all accrued and unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Agent and the Prepetition ABL Lenders that are required to be paid by the Debtors under the Prepetition ABL Loan Documents as set forth on the Approved Budget, including such fees and expenses of counsel and financial advisors to the Prepetition ABL Agent and Prepetition ABL Lenders; and (ii) on an ongoing basis, from time to time after the Petition Date, and without duplication, all reasonable and documented fees and out-of-pocket expenses incurred by Prepetition Agents and the Prepetition Lenders required to be paid by the Debtors under the Prepetition Documents and as set forth on the Approved Budget, including without limitation the reasonable and documented fees and out-of-pocket expenses of:  (A) Greenberg Traurig LLP, counsel to Eclipse, (B) Ropes & Gray, LLP, counsel to ReStore, and (C) each of Riemer & Braunstein LLP and Ashby & Geddes, P.A., counsel to Pathlight (such professionals referred to in the foregoing clauses (A), (B) and (C), collectively, the "Adequate Protection Professionals" and, such fees and expenses incurred by them, collectively, the "Adequate Protection Professional Fees and Expenses"). Any limitation to the Approved Budget in this Interim Order of the Debtors' current payment obligations with respect to the Adequate Protection Professional Fees and Expenses shall not limit in any way whatsoever the Debtors' reimbursement obligations as to the Adequate Protection Professional Fees and Expenses and/or the Prepetition Secured Parties' rights, liens or claims with respect thereto; the Prepetition Secured Parties reserve any and all such rights, liens and claims (including,

without limitation, their respective right to receive payment of and reimbursement for the Adequate Protection Professional Fees and Expenses from the Collateral and/or the DIP Collateral).

(d)     With respect to Adequate Protection Professional Fees and Expenses incurred following the Petition Date, each applicable Adequate Protection Professional shall deliver an invoice in summary form (which invoice shall not be required to include time entry detail, but shall include a general, brief description of the nature of the matters for which services were performed, and which invoice may be redacted for privileged or confidential information) to counsel for the Debtors, the U.S. Trustee and counsel to the Committee (if any), with a copy of such invoices delivered simultaneously to counsel for the DIP Secured Parties and each Prepetition Agent. If no written objection is received by 12:00 p.m. (Noon) prevailing Eastern Time, on the date that is ten (10) calendar days after delivery of such invoice and such amounts are consistent with the Approved Budget, the Debtors shall promptly pay such fees and expenses in full in cash. If an objection to a professional's invoice is timely received, the undisputed portion of any such invoice will be deemed allowed, the Debtors shall promptly pay such undisputed amount, subject to and in accordance with the Approved Budget, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Loan Agreement) all Adequate Protection Professional Fees and Expenses incurred on or prior to such date (including prior to the Petition Date), without the need for any Adequate Protection Professionals to first deliver a copy of its invoice as provided for herein. The Adequate Protection Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of

any of their fees or out-of-pocket expenses (other than with respect to disputed amounts). Subject to Paragraph 4.1 hereof, payments of any amounts set forth in this Paragraph are not subject to recharacterization, avoidance, subordination, or disgorgement.

Section 3.        Default; Waivers; Rights and Remedies; Relief from Stay.

    3.1    Events of Default. The occurrence of any of the following events shall each constitute a "DIP Termination Event" hereunder unless waived in writing by the applicable DIP Secured Parties and in accordance with the applicable DIP Loan Documents: (i) any "Event of Default" as that term is defined in the DIP Loan Agreement; (ii) any failure to meet or satisfy any Milestone in accordance with the DIP Loan Documents (other than solely by reason of the unavailability of the Bankruptcy Court on any applicable date requiring entry of an order or approval of a motion or any other matter by the Bankruptcy Court); (iii) the occurrence of the "Maturity Date" as defined in the DIP Loan Agreement; (iv) any material violation, breach, or default by any Debtor with respect to any of its obligations under this Interim Order or the DIP Loan Documents, (v) the termination of the DIP Loan Agreement, or the modification of any of the DIP Loan Documents or this Interim Order in a manner adverse to any of the DIP Secured Parties or the Prepetition ABL Secured Parties without the prior written consent of such party; (vi) subject to any Challenge Proceeding brought in the Challenge Period, prior to full, final and indefeasible repayment in cash of all DIP Obligations and Prepetition ABL Obligations, entry of any order authorizing any party in interest to reclaim any of the DIP Collateral, granting any party in interest relief from the automatic stay with respect to the DIP Collateral, or requiring that Debtors turn over any of the DIP Collateral, in each case having value in excess of $100,000; (vii) conversion of any Case to a case under chapter 7 of the Bankruptcy Code; (viii) a trustee is appointed or elected in any Case, or an examiner with the power to operate the Debtors' businesses is appointed in any Case; (ix)(A) commencement of an adversary proceeding or contested matter

46

by the Debtors objecting to the extent, validity or priority of any Prepetition Obligations and/or the Prepetition Liens and (B) subject to any Challenge Proceeding brought in the Challenge Period, with respect to any party in interest with standing (other than the Debtors), commencement of such proceeding or matter to the extent such proceeding or matter is not denied by the Court or dismissed within thirty (30) days; (x) the date that is thirty (30) calendar days following the entry of this Interim Order if a Final Order is not entered in form and substance acceptable to the DIP Secured Parties and the Prepetition ABL Secured Parties by such date; (xi) if this Interim Order is modified at the Final Hearing in a manner not acceptable to the DIP Secured Parties or the Prepetition Secured Parties; (xii) modification, amendment, vacatur or stay of this Interim Order in any manner not consented to in writing by the DIP Agent and the Prepetition ABL Agent; and (xiii) failure to comply with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents).

  3.2 <u>Debtors' Waivers</u>.

  (a) Prior to the full, final and indefeasible repayment of all Prepetition ABL Obligations and all DIP Obligations in cash, any request by the Debtors with respect to the following shall also each constitute a DIP Termination Event: (i) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that do not provide for the repayment in full in cash of all of the DIP Obligations and the Prepetition ABL Obligations in cash, other than as provided in this Interim Order or as may be otherwise permitted pursuant to the DIP Loan Documents; (ii) to challenge the application of any payments authorized by this Interim Order pursuant to section 506(b) of the Bankruptcy Code; (iii) to propose or support any challenge pursuant to <u>Paragraph 4.1</u> of this Interim Order or any challenge by any party in interest seeking to limit or prevent the DIP Secured Parties or the Prepetition

Secured Parties from exercising their credit bid rights in connection with the sale of any assets of the Debtors; provided, that the Debtors' response to any information requests, diligence, requests for production, or subpoenas by a party in interest shall not constitute "support" of a challenge; and/or (iv) to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would materially restrict or impair (A) the rights and remedies of any of the DIP Secured Parties or the Prepetition Secured Parties against the Debtors as provided in this Interim Order, any of the DIP Loan Documents or any of the Prepetition Documents, or (B) the exercise of such rights or remedies by any of the DIP Secured Parties or the Prepetition Secured Parties against the Debtors in accordance with the DIP Loan Documents, this Interim Order or the Prepetition Documents; provided, however, that the DIP Agent and the Prepetition Agents may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties and the Prepetition Secured Parties.

(b)      It shall also be a DIP Termination Event if any Debtor proposes or supports any chapter 11 plan or seeks entry of an order confirming a chapter 11 plan that is not conditioned upon the payment of the DIP Obligations, the Prepetition ABL Obligations, and the Debtors' obligations with respect to the Adequate Protection granted hereunder, in full in cash, no later than the effective date of such chapter 11 plan, without the written consent of the DIP Agent and the Prepetition Agents, as applicable.

3.3      <u>Rights and Remedies upon a DIP Termination Event</u>. Upon the occurrence of a DIP Termination Event, and in each case without further notice, motion or application to, order of, or hearing before this Court, the DIP Agent and DIP Lenders are granted leave to cease making financial accommodations to the Debtors and, subject to the immediately following sentence, the

48

Debtors shall not be permitted to use any funds on deposit in their accounts. Upon the expiration of five (5) calendar days following the delivery of a written notice by the DIP Agent or any Prepetition Agent, as applicable, to the Carve Out Trigger Notice Parties, the DIP Agent, and the Prepetition Agents of the occurrence of a DIP Termination Event (the "Remedies Notice Period"), (a) the DIP Agent shall be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any DIP Loan Document, as applicable, including, without limitation, to (i) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable; (ii) subject to the terms of the Intercreditor Agreements (as, and to the extent, applicable), to foreclose upon any or all of the DIP Collateral or otherwise enforce the DIP Obligations, the DIP Liens, and the DIP Superpriority Claim on any or all of the DIP Collateral and to exercise any other default-related remedies under the DIP Loan Documents, this Interim Order, or applicable law in seeking to recover payment of the DIP Obligations; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; and/or (iv) invoke the right to charge interest at the default rate under the DIP Loan Documents; and (b) the Prepetition Agents shall each independently (i) be entitled to terminate and/or revoke the Debtors' right, if any, under this Interim Order and the other DIP Loan Documents to use any Cash Collateral and all such authority to use Cash Collateral shall cease and (ii) each have automatic and immediate relief from the automatic stay with respect to the Prepetition Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)) and shall be entitled to exercise all rights and remedies available under the Prepetition Documents and applicable non-bankruptcy law (subject to the Intercreditor Agreements (as, and to the extent, applicable) and this Interim Order). Notwithstanding the

49

foregoing, during the Remedies Notice Period, the Debtors may use Cash Collateral solely in amounts necessary to avoid immediate and irreparable harm to the Debtors' Estates (including funding payroll and paying other necessary administrative expenses (but not fees and expenses of Professionals Persons)) all in accordance with this Interim Order and the Approved Budget, or that have otherwise been approved in writing by the DIP Secured Parties. The actions described in the foregoing clauses (a) and (b) may be taken without further order or application to this Court as the DIP Agent or respective Prepetition Agent shall, in each of their respective discretion, elect, and the automatic stay is hereby modified and vacated to the extent necessary to permit such actions, so long as no order prohibiting such action is entered by this Court during the Remedies Notice Period. The sole issue that may be raised by any party during such Remedies Notice Period shall be limited to whether a DIP Termination Event has occurred.

3.4     <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the DIP Agent and Prepetition Agents to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Loan Agreement, or the other DIP Loan Documents, as applicable, including, without limitation, (i) to implement the postpetition financing arrangements authorized by this Interim Order, (ii) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (iii) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition ABL Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs and expenses permitted under any of the DIP Loan Documents and apply such payments to the Prepetition ABL Obligations, and (iv) subject to the Remedies Notice Period, to

take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents, or applicable law.

Section 4.        Representations and Covenants.

4.1    Reservation of Third Party Challenge Rights. The stipulations, releases, agreements and admissions contained in this Interim Order, including, without limitation, Paragraph E hereof and the releases contained in clause (x) thereof (collectively, the "Debtors' Stipulations"), shall be binding on the Debtors in all circumstances, but the Debtors' Stipulations shall not include stipulations and admissions contained in Paragraph G hereof. The Debtors' Stipulations shall be binding and each other party in interest, including, without limitation, any subsequent trustee (including any chapter 7 trustee) (if any) and the Committee (if any), unless, and solely to the extent that (a) any such party in interest, including the Committee (if any), with standing and requisite authority has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations contained herein, including, inter alia, in this Paragraph 4.1) by no later than either (i) the earlier of (1) with respect to parties in interest with standing (other than a Committee), 75 calendar days after entry of this Interim Order or (2) with respect to a Committee, if any, 60 calendar days after the appointment of the Committee, or (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent (with the consent of the applicable Prepetition Secured Parties); or (iii) such later date as set by an order of the Court for cause shown prior to the expiry of the applicable time period established by clauses (i) and (ii) (such time period established by the foregoing clauses (i) through (iii), the "Challenge Period") against the Prepetition Secured Parties in connection with matters related to the Prepetition Documents, the Prepetition Obligations, the Prepetition Liens and the Prepetition Collateral, and notwithstanding the repayment of the Prepetition ABL Obligations (including the Subject Prepetition ABL Obligations and the Prepetition ABL Obligations pursuant to the Roll-Up) and in accordance with

51

this Interim Order, including by (A) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Obligations or Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses with respect to the Prepetition Obligations or Prepetition Liens or otherwise seeking affirmative relief (a "Challenge Proceeding") and (b) there is a final, non-appealable order in favor of the plaintiff sustaining any Challenge Proceeding in any such timely filed adversary proceeding or contested matter; provided that any pleadings filed in connection with any Challenge Proceeding shall set forth with specificity the basis for such Challenge Proceeding and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred; provided, further, that the Challenge Period shall be extended for a chapter 7 trustee for an additional ten (10) days if the Cases are converted prior to the expiration of the Challenge Period. A party in interest's commencement of a timely Challenge Proceeding shall preserve the Challenge Period only with respect to such party in interest commencing the Challenge Proceeding and only to the extent of the express content of such Challenge Proceeding. If no such Challenge Proceeding is timely commenced, then: (I) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in Paragraph E of this Interim Order and the releases contained in clause (x) thereof, shall be binding on all parties in interest; (II) any and all Challenge Proceedings by any party (including, without limitation, the Committee, any chapter 11 trustee, or any examiner and/or other estate representative appointed or elected in these Cases and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released and barred; (III) to

the extent not theretofore repaid, the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, for all purposes in these Cases and any subsequent chapter 7 case; (IV) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in Paragraph E hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (V) the obligations under the Prepetition Documents and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Debtors, their Estates, the Committee (if any) or any other party in interest, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto). If any Challenge Proceeding is timely commenced, the stipulations, releases, agreements and admissions contained in Paragraph E of this Interim Order, and the releases contained in clause (x) thereof, shall nonetheless remain binding and preclusive (as provided in this Paragraph) on the Debtors, their Estates, the Committee (if any) and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. In the event of a successful Challenge Proceeding in accordance with this Paragraph 4.1 with respect to the repayment of the Prepetition Obligations (including the Subject Prepetition ABL Obligations and the repayment of Prepetition ABL Obligations pursuant to the Roll-Up), the Court may fashion any appropriate remedy in accordance with applicable law. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if any), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and

defenses with respect to the Prepetition Documents or the Prepetition Liens on the Prepetition Collateral. The failure of any party, including the Committee, to obtain standing prior to the expiration of the Challenge Period shall not serve as a basis for such party to seek any extension of the Challenge Period.

Section 5.     Other Rights and DIP Obligations.

5.1     No Modification or Stay of this Interim Order. The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility and with this Interim Order, and their reliance on this Interim Order is in good faith, and the DIP Agent and the DIP Lenders are entitled to the protections of Bankruptcy Code section 364(e).

5.2     Rights of Access and Information. The Debtors shall comply with the rights of access and information afforded to the DIP Secured Parties under the DIP Loan Documents and the Prepetition Secured Parties under the Prepetition Documents.

5.3     Power to Waive Rights; Duties to Third Parties.

(a)     Subject to the terms of the DIP Loan Documents, the DIP Agent shall have the right (acting at the direction of the Required Lenders (as defined in the applicable DIP Loan Documents) if so required by the applicable DIP Loan Documents) to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lenders (as applicable, the "DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights. Any waiver by the DIP Agent of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable

any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

(b)     Each of the Prepetition ABL Agent and the Prepetition Term Loan Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties, respectively (as applicable, the "Prepetition Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Prepetition Lender Rights; provided that the Prepetition Agents shall obtain the prior written consent of the DIP Agent for any waiver that affects any rights of the DIP Secured Parties hereunder or any treatment of the DIP Obligations. Any waiver by the Prepetition Agents of any Prepetition Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein. Any delay in or failure to exercise or enforce any Prepetition Lender Right shall neither constitute a waiver of such Prepetition Lender Right, subject the Prepetition Agents or any Prepetition Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Prepetition Agents or any Prepetition Lender.

5.4     No Unauthorized Disposition of Collateral; Use of Cash Collateral.

(a)     The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral), other than (x) in the ordinary course of business and (y) pursuant to the terms of this Interim Order or otherwise as permitted by the DIP Loan Documents, and the Debtors are authorized to use Cash Collateral solely in a manner consistent with this Interim Order, the Approved Budget and the DIP

Loan Documents (including permitted variances and exclusions to the Approved Budget permitted thereunder).

(b)        Notwithstanding anything in this Interim Order to the contrary, no portion or proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve Out, and no disbursements set forth in the DIP Budget shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with: (a) objecting, contesting or raising any defense to the validity, perfection, priority, or enforceability of, or any amount due under, the DIP Loan Documents or the Prepetition Documents or any security interests, liens or claims granted under this Interim Order, the DIP Loan Documents, or the Prepetition Documents to secure such amounts; (b) asserting any Challenges, claims, actions or causes of action against any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering or otherwise delaying enforcement or realization on the DIP Collateral or the Prepetition Collateral; (d) seeking to amend or modify any of the rights granted to the DIP Secured Parties, the Prepetition Secured Parties under this Interim Order, the DIP Loan Documents or the Prepetition Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; or (e) contesting the Prepetition Liens or Prepetition Obligations; provided that no more than $30,000 in the aggregate of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may be used by any Committee for the investigation of, but not litigation, or any objection or challenge to (including, without limitation, a Challenge Proceeding or any motion for standing to commence a Challenge Proceeding), the Prepetition Liens or Prepetition Obligations.

154838586v1

5.5    No Waiver. The failure of the DIP Lenders or the Prepetition Lenders, as applicable, to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility, the Prepetition Documents or this Interim Order, as applicable, shall not constitute a waiver of any of the DIP Lenders' or Prepetition Lenders' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lenders or the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lenders and the Prepetition Lenders to: (a) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders or the Prepetition Lenders (subject to the terms of the Prepetition Intercreditor Agreement).

5.6    Maintenance of Collateral. Unless the DIP Agent, acting at the direction of the applicable Required Lenders (as defined in the DIP Loan Documents), consents in writing, until (i) the payment in full in cash or otherwise acceptable satisfaction of all DIP Obligations and Prepetition ABL Obligations and (ii) the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

154838586v1

5.7    Reservation of Rights. The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Secured Party and Prepetition Secured Party, as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, the Prepetition Documents or any other applicable agreement or law (subject to the terms of the Intercreditor Agreements (as, and to the extent, applicable)), including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or the Prepetition Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

5.8    Binding Effect.

(a)    All of the provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, all liens and claims granted hereunder in favor of each of the DIP Secured Parties and the Prepetition Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of each DIP Agent, DIP Lender and Prepetition Secured Party set forth herein, including, without limitation, the parties' acknowledgements, stipulations and agreements in Paragraph E of this Interim Order, subject to Paragraph 4.1 hereof (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the priming of the Prepetition Liens as set forth herein and use of Cash Collateral provided for hereunder) provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall: be effective and enforceable effective as of the Petition Date immediately upon entry of this Interim Order and not

154838586v1

subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure; continue in full force and effect; and survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment or replacement of the DIP Obligations, converting one or more of the Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Cases, approving any sale of any or all of the DIP Collateral or the Prepetition Collateral or vacating, terminating, reconsidering, revoking or otherwise modifying this Interim Order or any provision hereof.

(b)     Nothing in these Cases may impair the DIP Superpriority Claim, the Prepetition Secured Parties' Adequate Protection Claims, BBBy Adequate Protection Claim, or the DIP Secured Parties' and the Prepetition Secured Parties' and BBBy's respective liens on and security interests in the DIP Collateral and the Prepetition Collateral, respectively, and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order, all of which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition Obligations are indefeasibly paid and satisfied in full in cash. Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of enforcing all such claims, liens, protections and rights referenced in this Paragraph and otherwise in this Interim Order.

(c)     Except as set forth in this Interim Order, in the event this Court modifies, reverses, vacates or stays any of the provisions of this Interim Order or any of the DIP Loan Documents, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by

59

the DIP Agent or Prepetition Agents or BBBy, as applicable, of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority or enforceability of the DIP Liens, the DIP Superpriority Claim, the Prepetition Secured Parties' Adequate Protection Liens, the BBBy Adequate Protection Liens, the Prepetition Secured Parties' Adequate Protection Claims, and the BBBy Adequate Protection Claim, or (iii) rights or priorities of any DIP Secured Party, Prepetition Secured Party, or BBBy pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties, the Prepetition Secured Parties and BBBy shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein.

(d)     This Interim Order shall be binding upon the Debtors, all parties in interest in the Cases and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law. This Interim Order shall also inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties, BBBy and each of their respective successors and assigns.

5.9     _Discharge_. The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties, the Prepetition Secured Parties, and BBBy, as applicable, has otherwise agreed in writing.

5.10     No Priming of Prepetition Obligations. Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the applicable Prepetition Lenders, no Debtor shall seek authorization from this Court to obtain or incur any indebtedness or enter into an alternative financing facility other than the DIP Facility (a "Competing DIP Facility") seeking to impose liens on any Prepetition Collateral ranking on a *pari passu* or priming basis with respect to the Prepetition Liens held by the Prepetition Secured Parties; provided, however, that nothing herein shall preclude the Debtors from seeking authorization to incur any indebtedness or enter into any Competing DIP Facility that provides for the payment in full in cash of the DIP Obligations and the Prepetition Obligations at the initial closing of such Competing DIP Facility; provided further, however, that the Consignment Agreement does not constitute a Competing DIP Facility, and the Debtors are permitted to seek to assume the Consignment Agreement.

5.11     Section 506(c) Waiver. Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lenders upon the DIP Collateral, or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against any of the DIP Agent, DIP Lenders, or Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, in each case without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other

action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder).

5.12    Section 552(b) Waiver. The Debtors have agreed as a condition to obtaining financing under the DIP Facility and using Cash Collateral as provided in this Interim Order that the Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section 552(b) shall not apply to the DIP Agent, the DIP Lenders, DIP Obligations and DIP Collateral, and, subject to entry of the Final Order, the Prepetition Secured Parties, the Prepetition Obligations, and Prepetition Collateral.

5.13    No Marshaling/Application of Proceeds.

(a)    Subject to the entry of the Final Order, in no event shall the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Documents (including the Intercreditor Agreements (as, and to the extent, applicable)), as applicable.

(b)    Notwithstanding anything to the contrary in this Interim Order, but subject in all respects to the priorities set forth on **Exhibit D** hereto and the Intercreditor Agreements (as, and to the extent, applicable), the DIP Obligations shall be satisfied from the proceeds of Prepetition Collateral and/or DIP Collateral.

5.14    Relief Subject to a Final Order. Nothing in this Interim Order shall be deemed to grant or approve (a) a waiver of the Debtors' ability to surcharge against any DIP Collateral or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code; (b) any right of the

Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to any of the Prepetition Secured Parties; (c) the application of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral; or (d) a lien on or superpriority claim against the Avoidance Proceeds.

    5.15   <u>Payment of DIP Lender Fees and Expenses</u>. Subject to the Approved Budget, the Debtors shall pay (i) the reasonable and documented fees and expenses reimbursable under the DIP Facility, the DIP Loan Agreement, or the other DIP Loan Documents, as applicable, whether incurred before or after the Petition Date and (ii) all reasonable and documented out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders including, without limitation, reasonable and documented fees and disbursements of counsel in connection with the enforcement or preservation of any rights under the DIP Facility, the DIP Loan Agreement, or the other DIP Loan Documents. With respect to payment of fees and expenses incurred from and after the Petition Date, the DIP Agent and the DIP Lenders shall comply with the procedures set forth in <u>Paragraph 2.4(d)</u> hereof. Any limitation to the Approved Budget in this Interim Order of the Debtors' current payment obligations with respect to the fees and expenses to which this <u>Paragraph 5.15</u> applies shall not limit in any way whatsoever the Debtors' reimbursement obligations as to such fees and expenses and/or the DIP Agent's and/or DIP Lenders' rights, liens or claims with respect thereto; the DIP Agent and the DIP Lenders reserve any and all such rights, liens and claims (including, without limitation, their respective right to receive payment of and reimbursement for such fees and expenses from the Collateral and/or the DIP Collateral).

    5.16   <u>Limits on Lender Liability</u>.

    (a)   Solely as a result of making any loan under the DIP Loan Agreement, authorizing the use of Cash Collateral or in exercising any rights or remedies as and when

permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agent, the DIP Lenders, and, subject to entry of the Final Order, the Prepetition Secured Parties (in any capacity), shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors, so long as the such party's actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or, subject to the entry of the Final Order, the Prepetition Secured Parties (in any capacity), of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

(b)     As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

5.17    Release. Subject to Paragraph 4.1 of this Interim Order, each of the Debtors, their Estates and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge and acquit each of the DIP

Secured Parties and the Prepetition Secured Parties (in any capacity), and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future (all, in their capacitates as such), and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to (i) the Prepetition Obligations and the DIP Facility (and DIP Obligations) or (ii) the DIP Loan Documents and the Prepetition Documents, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security and perfection of any of the Prepetition Obligations and the DIP Obligations, the Prepetition Documents and the DIP Loan Documents, or the Prepetition Liens and the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Obligations

and the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order; provided, however, that nothing herein shall limit the ability of the Debtors to enforce the provisions of any DIP Loan Document, this Interim Order, or the Final Order. The Debtors are authorized in any payoff letter or similar agreement into which they enter upon payment in full in cash of any DIP Obligations (other than contingent DIP Obligations to Indemnified Parties) to provide a waiver and release substantially similar to the waiver and release set forth in this Paragraph 5.17 of the DIP Agent and the applicable DIP Lenders and their respective related parties.

5.18    Survival. The provisions of this Interim Order, the validity, priority and enforceability of the DIP Liens, the DIP Superpriority Claim, the Prepetition Secured Parties' Adequate Protection Liens, the Prepetition Secured Parties' Adequate Protection Claims, the BBBy Adequate Protection Liens, and the BBBy Adequate Protection Claim, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of these Cases, (b) converting any or all of these Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these Cases, (d) terminating the joint administration of these Cases or any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (f) pursuant to which the Court abstains from hearing any of these Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and BBBy pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of these Cases, following dismissal of any of these Cases or any

Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated, (ii) in respect of the Prepetition Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties provided for in this Interim Order have been indefeasibly paid in full in cash, and (iii) in respect of the BBBy Obligations, all of the adequate protection obligations owed to BBBy provided for in this Interim Order have been indefeasibly paid in full in cash.

5.19    Sale and Credit Bidding. In connection with any sale process or sale authorized by the Court, subject to the rights preserved in Paragraph 4.1 hereof with respect to the Prepetition Obligations, each of the DIP Secured Parties and Prepetition Secured Parties, or any assignee or designee of the foregoing, shall have the right to credit bid any or all of the outstanding DIP Loan Obligations, the Prepetition ABL Obligations, and/or Prepetition Term Loan Obligations, as applicable, in connection with any disposition of property of the Estates subject to the provisions of section 363(k) of the Bankruptcy Code, and neither the Debtors nor any Prepetition Secured Party shall oppose such right. Each of the DIP Agent and the Prepetition Agents reserves any and all rights under the Prepetition Intercreditor Agreement with respect to any credit bid by the DIP Secured Parties and Prepetition Secured Parties.

5.20    Proofs of Claim. None of the Prepetition Secured Parties shall be required to file proofs of claim in any of these Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' Stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s). Notwithstanding the

foregoing, each Prepetition Agent (on behalf of itself and the applicable Prepetition Lenders) is hereby authorized and entitled, in its discretion, but not required, to file (and amend and/or supplement, as applicable) a master proof of claim in the Debtors' lead Case (and such master proof of claim shall be also deemed filed in each of the Debtors' individual Cases) for any claims of the applicable Prepetition Secured Parties arising from the Prepetition Documents or in respect of the Prepetition Obligations; provided, however, that nothing in this Interim Order shall waive the right of any Prepetition Lender to file its own proof of claim against any of the Debtors.

5.21    No Third Party Rights. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

5.22    No Avoidance. No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable from the DIP Agent or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law, provided that nothing within this Paragraph is intended to limit or curtail the provisions of Paragraph 4.1 hereof, with respect to the Prepetition Obligations.

5.23    Reliance on Order. All postpetition advances under the DIP Loan Documents are made in reliance on this Interim Order.

5.24    Payments Free and Clear. Subject to Paragraph 4.1, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Secured Parties or any Prepetition Agent on behalf of the applicable Prepetition Secured Parties, pursuant to the provisions of this Interim Order, any subsequent order of this Court or the DIP Loan Documents, shall, subject to the terms of this Paragraph 5.24, be irrevocable, received free and clear of any claims, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based

on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

5.25    <u>Limited Effect</u>. In the event of a conflict between the terms and provisions of any of the DIP Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern.

5.26    <u>BBBY</u>.   On April 23, 2023, BBBy filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.  BBBy acknowledges and agrees that the automatic stay in its chapter 11 case does not apply to the entry of this Interim Order. Notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of BBBy's rights with respect to:  (a) the BBBy Intercreditor Agreement; and (b) the provisions of the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of BBBy to request modification of the automatic stay of Bankruptcy Code section 362.  The delay in or failure of BBBy to seek relief or otherwise exercise their rights and remedies under the BBBy Intercreditor Agreement shall not constitute a waiver of BBBy's rights and remedies. For the avoidance of doubt, the BBBy Intercreditor Agreement (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of BBBy with respect thereto; and (iii) shall not be deemed to be amended, altered or modified by the terms of this Interim Order, any Final Order, or the DIP Loan Documents, unless expressly set forth herein or therein.

5.27    Headings. Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

5.28    Bankruptcy Rules. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

5.29    General Authorization. The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

5.30    Retention of Exclusive Jurisdiction. This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents.

5.31    Final Hearing and Response Dates. The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on [_____], 2023, at [___]:[____], prevailing Eastern Time. The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or the Committee's counsel if same shall have filed a request for notice. The Debtors may serve the Motion and this Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at the Debtors' claims and noting agent's website: https://www.kccllc.net/christmastreeshops, and such notice is deemed good and sufficient and no further notice need be given. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon the Notice Parties and shall be filed with the Clerk of the Court, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Eastern Time), on [_____], 2023.

# EXHIBIT A

## DIP Loan Agreement

**SENIOR SECURED, SUPER-PRIORITY**
**DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT**

Dated as of May [___], 2023,

among

**CHRISTMAS TREE SHOPS, LLC**,
as the Lead Borrower,

for

the Borrowers named herein,

the Guarantors named herein,

the Lenders party hereto,

and

**ECLIPSE BUSINESS CAPITAL LLC,**
as Administrative Agent,

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS .................................................................. 2

    1.01    Defined Terms .................................................................................................... 2
    1.02    Other Interpretive Provisions ........................................................................ 50
    1.03    Accounting Terms .......................................................................................... 51
    1.04    Rounding ........................................................................................................ 52
    1.05    Times of Day .................................................................................................. 52
    1.06    Currency Equivalents Generally .................................................................... 52
    1.07    Divisions ........................................................................................................ 52
    1.08    Prevailing Interest Reference Rates .............................................................. 52
    1.09    Letter of Credit Amounts ............................................................................... 53

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ........................................ 53

    2.01    Loans; Reserves; Letters of Credit ............................................................... 53
    2.02    Borrowings of Revolving Loans. ................................................................... 55
    2.03    [Reserved]. ..................................................................................................... 56
    2.04    [Reserved]. ..................................................................................................... 56
    2.05    Prepayments ................................................................................................... 56
    2.06    Termination or Reduction of Commitments. ................................................. 57
    2.07    Repayment of Loans ...................................................................................... 58
    2.08    Interest. ........................................................................................................... 58
    2.09    Fees. ............................................................................................................... 59
    2.10    Computation of Interest and Fees; Term SOFR Conforming Changes ......... 59
    2.11    Evidence of Debt ........................................................................................... 59
    2.12    Payments Generally; Administrative Agent's Clawback. ............................. 59
    2.13    Sharing of Payments by Lenders ................................................................... 61
    2.14    Settlement Among Lenders. ........................................................................... 61
    2.15    Prepetition Revolving Obligations. ................................................................ 62
    2.16    Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations ........................................................................................................ 63

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD BORROWER ......................................................................................................................... 63

    3.01    Taxes. ............................................................................................................. 63
    3.02    Reserved. ........................................................................................................ 66
    3.03    Illegality ........................................................................................................ 66
    3.04    Certain Provisions Regarding SOFR Loans. ................................................. 66
    3.05    Increased Costs; Reserves ............................................................................. 68
    3.06    Reserved. ........................................................................................................ 69
    3.07    Mitigation Obligations .................................................................................. 69
    3.08    Survival ......................................................................................................... 69
    3.09    Designation of Lead Borrower as Borrowers' Agent. ................................... 69

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ............................. 70

    4.01    Conditions of Initial Credit Extension ........................................................... 70
    4.02    Conditions to all Credit Extensions; Letters of Credit. ................................. 72

ARTICLE V REPRESENTATIONS AND WARRANTIES ....................................................... 73

5.01    Existence, Qualification and Power ............................................................. 73
5.02    Authorization; No Contravention ............................................................... 73
5.03    Governmental Authorization; Other consents ........................................... 73
5.04    Binding Effect ............................................................................................ 73
5.05    Financial Statements; No Material Adverse Effect ................................... 74
5.06    Litigation .................................................................................................... 74
5.07    [Reserved .................................................................................................... 75
5.08    Ownership of Property; Liens ..................................................................... 75
5.09    Environmental Compliance ........................................................................ 75
5.10    Insurance .................................................................................................... 76
5.11    Taxes ......................................................................................................... 76
5.12    ERISA Compliance. .................................................................................... 76
5.13    Subsidiaries; Equity Interests. ................................................................... 77
5.14    Margin Regulations; Investment Company Act. ........................................ 77
5.15    Disclosure .................................................................................................. 77
5.16    Compliance with Laws .............................................................................. 78
5.17    Intellectual Property; Licenses, Etc .......................................................... 78
5.18    Labor Matters. ........................................................................................... 78
5.19    Security Documents ................................................................................... 79
5.20    [Reserved .................................................................................................... 79
5.21    Deposit Accounts; Credit Card Arrangements .......................................... 79
5.22    Brokers ....................................................................................................... 80
5.23    Customer and Trade Relations ................................................................... 80
5.24    Material Contracts ...................................................................................... 80
5.25    Casualty ...................................................................................................... 80
5.26    OFAC/Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws ............ 80
5.27    [Reserved]. ................................................................................................. 80
5.28    Ranking ...................................................................................................... 81
5.29    Credit Card Receivables. ............................................................................ 81
5.30    Approved Budget. ....................................................................................... 81
5.31    Chapter 11 Cases. ...................................................................................... 81

ARTICLE VI AFFIRMATIVE COVENANTS ................................................................. 82

6.01    Financial Statements. ................................................................................. 82
6.02    Certificates; Other Information .................................................................. 82
6.03    Notices ....................................................................................................... 84
6.04    Payment of Obligations .............................................................................. 85
6.05    Preservation of Existence, Etc. ................................................................... 86
6.06    Maintenance of Properties. ......................................................................... 86
6.07    Maintenance of Insurance. .......................................................................... 86
6.08    Compliance with Laws .............................................................................. 87
6.09    Books and Records; Accountants. .............................................................. 87
6.10    Inspection Rights; Field Examinations; Appraisals. .................................. 88
6.11    Use of Proceeds ......................................................................................... 89
6.12    Additional Loan Parties ............................................................................. 89
6.13    Cash Management. ...................................................................................... 89
6.14    Information Regarding the Collateral ......................................................... 91
6.15    Physical Inventories. .................................................................................. 91
6.16    Environmental Laws. .................................................................................. 92

| 6.17 | Further Assurances. | 92 |
| 6.18 | Lender Meetings | 93 |
| 6.19 | Material Contracts | 93 |
| 6.20 | Post-Closing Obligations | 93 |
| 6.21 | Financial Advisor Engagement | 93 |
| 6.22 | Approved Budget. | 94 |

ARTICLE VII NEGATIVE COVENANTS ........................................................... 95

| 7.01 | Liens | 95 |
| 7.02 | Investments | 96 |
| 7.03 | Indebtedness; Disqualified Stock. | 96 |
| 7.04 | Fundamental Changes | 96 |
| 7.05 | Dispositions | 96 |
| 7.06 | Restricted Payments | 96 |
| 7.07 | Prepayments of Indebtedness | 97 |
| 7.08 | Parent; Change in Nature of Business. | 97 |
| 7.09 | Transactions with Affiliates | 98 |
| 7.10 | Burdensome Agreements | 98 |
| 7.11 | Use of Proceeds | 99 |
| 7.12 | Amendment of Material Documents | 99 |
| 7.13 | Fiscal Year | 100 |
| 7.14 | Deposit Accounts; Credit Card Processors | 100 |
| 7.15 | Financial Covenants | 100 |

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ................................... 100

| 8.01 | Events of Default | 100 |
| 8.02 | Remedies Upon Event of Default | 106 |
| 8.03 | Application of Funds | 107 |

ARTICLE IX THE ADMINISTRATIVE AGENT ............................................... 108

| 9.01 | Appointment and Authority | 108 |
| 9.02 | Rights as a Lender | 108 |
| 9.03 | Exculpatory Provisions | 108 |
| 9.04 | Reliance by Administrative Agent | 109 |
| 9.05 | Delegation of Duties | 109 |
| 9.06 | Resignation | 109 |
| 9.07 | Non-Reliance on Administrative Agent and Other Lenders | 110 |
| 9.08 | [Reserved | 110 |
| 9.09 | Administrative Agent May File Proofs of Claim | 110 |
| 9.10 | Collateral and Guaranty Matters | 111 |
| 9.11 | [Reserved]. | 111 |
| 9.12 | Notice of Transfer | 111 |
| 9.13 | Reports and Financial Statements | 112 |
| 9.14 | Agency for Perfection | 112 |
| 9.15 | Indemnification of Administrative Agent | 112 |
| 9.16 | Relation among Lenders | 113 |
| 9.17 | Defaulting Lenders | 113 |
| 9.18 | [Reserved] | 114 |

ARTICLE X MISCELLANEOUS ........................................................................ 114

| 10.01 | Amendments, Etc .................................................................................................. | 114 |
| 10.02 | Notices; Effectiveness; Electronic Communications ........................................... | 116 |
| 10.03 | No Waiver; Cumulative Remedies......................................................................... | 117 |
| 10.04 | Expenses; Indemnity; Damage Waiver ................................................................ | 117 |
| 10.05 | Payments Set Aside .............................................................................................. | 119 |
| 10.06 | Successors and Assigns. ....................................................................................... | 119 |
| 10.07 | Treatment of Certain Information; Confidentiality ............................................. | 122 |
| 10.08 | Right of Setoff...................................................................................................... | 123 |
| 10.09 | Interest Rate Limitation ....................................................................................... | 123 |
| 10.10 | Counterparts; Integration; Effectiveness ............................................................ | 124 |
| 10.11 | Survival ................................................................................................................ | 124 |
| 10.12 | Severability........................................................................................................... | 124 |
| 10.13 | Replacement of Lenders ....................................................................................... | 124 |
| 10.14 | Governing Law; Jurisdiction; Etc........................................................................ | 125 |
| 10.15 | Waiver of Jury Trial ............................................................................................. | 126 |
| 10.16 | No Advisory or Fiduciary Responsibility............................................................ | 126 |
| 10.17 | Patriot Act; Due Diligence ................................................................................... | 127 |
| 10.18 | Reserved. .............................................................................................................. | 127 |
| 10.19 | Foreign Asset Control Regulations ...................................................................... | 127 |
| 10.20 | Time of the Essence ............................................................................................. | 127 |
| 10.21 | Press Releases....................................................................................................... | 127 |
| 10.22 | Additional Waivers ............................................................................................... | 128 |
| 10.23 | No Strict Construction .......................................................................................... | 129 |
| 10.24 | Attachments .......................................................................................................... | 129 |
| 10.25 | Acknowledgment and consent to Bail-In of Affected Financial Institutions ...... | 129 |
| 10.26 | Intercreditor Agreements ..................................................................................... | 130 |
| 10.27 | Erroneous Payments ............................................................................................. | 131 |
| 10.28 | Parties Including Trustees; Bankruptcy Court Proceedings ................................ | 133 |

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Guarantors |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Other Equity Investments |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Agreements |
| 5.22 | Brokers |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 6.20 | Post-Closing Obligations |
| 6.23 | Required Milestones |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Borrowing Notice |
| B | Revolving Note |
| C-1 | Budget Compliance Certificate |
| C-2 | Compliance Certificate |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |
| F-1 | DDA Notification |
| F-2 | Credit Card Notification |
| G | Intercompany Note |

## SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT (this "Agreement") is entered into as of May [__], 2023, by and among CHRISTMAS TREE SHOPS, LLC, a Massachusetts limited liability company (the "Lead Borrower"), the Persons named on Schedule 1.01 hereto (together with the Lead Borrower, each individually a "Borrower", and shall be collectively the "Borrowers"), HANDIL HOLDINGS, LLC, a Delaware limited liability company ("Holdings"), HANDIL LLC, a Delaware limited liability company ("Parent"), the Persons named on Schedule 1.02 hereto (together with Holdings and Parent, each individually a "Guarantor", and shall be collectively the "Guarantors"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and ECLIPSE BUSINESS CAPITAL LLC ("Eclipse"), as administrative agent (in such capacity, the "Administrative Agent").

### WITNESSETH:

A.      On May 5, 2023 (the "Petition Date"), the Borrowers and certain Guarantors (collectively, the "Debtors", and each individually, a "Debtor"), commenced chapter 11 Case Nos. [_____], as administratively consolidated as chapter Case No. [_____] (collectively, the "Chapter 11 Cases" and each individually, a "Chapter 11 Case"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (as defined below).

B.      Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Revolving Credit Agreement, dated as of February 16, 2023 (as amended, restated, modified or supplemented through the Petition Date, the "Prepetition Revolving Credit Agreement"), by and among the Borrowers, the Guarantors, the lenders from time to time party thereto (the "Prepetition Revolving Lenders") and Eclipse Business Credit LLC, as administrative agent (in such capacity, the "Prepetition Revolving Agent").

C.      As of the Petition Date, the Prepetition Revolving Lenders under the Prepetition Revolving Credit Agreement are owed $22,149,275.42 in outstanding principal with respect to Loans (as such term is defined in the Prepetition Revolving Credit Agreement), plus interest, fees, costs and expenses and all other Prepetition Revolving Obligations (as defined below) under the Prepetition Revolving Credit Agreement.

D.      The Prepetition Revolving Obligations are secured by a security interest in certain existing and after-acquired assets of the Loan Parties as fully set forth in the Prepetition Revolving Loan Documents (as defined below) and, subject to the terms of the Prepetition ABL Intercreditor Agreement, such security interest is perfected and has, with certain exceptions as described in the Prepetition Revolving Loan Documents, priority over other security interests.

E.      The Borrowers have requested, and, upon the terms and conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a senior secured, super-priority revolving credit facility of up to $[45,000,000.00] in the aggregate to repay in full or "roll up" all of the Prepetition Revolving Obligations and to fund the working capital requirements of the Loan Parties and the expenses of the Loan Parties Chapter 11 Cases, as more fully set forth in Section 6.11 hereof during the pendency of the Chapter 11 Cases.

F.      Each Loan Party has agreed to secure all of the Obligations under the Loan Documents by granting to the Administrative Agent, for the ratable benefit of the Administrative Agent and the Lenders,

a security interest in and lien upon substantially all of their existing and after-acquired personal and real property (subject to the limitations and priorities contained in the Loan Documents and the Orders).

G.      Each Loan Party's business is a mutual and collective enterprise and the Loan Parties believe that the loans and other financial accommodations to the Borrowers under this Agreement will enhance the borrowing power of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Loan Parties.

H.      Each Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in this Agreement.

I.      The Administrative Agent's and the Lender's willingness to extend financial accommodations to the Borrowers, as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Loan Parties and at the Loan Parties' request and in furtherance of the Loan Parties' mutual and collective enterprise.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01      Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>AAL</u>" means that certain Agreement Among Lenders dated as of Closing Date, by and among the Administrative Agent and each of the Revolving Lenders party to this Agreement, as amended, restated, supplemented, replaced, or otherwise modified from time to time.

"<u>ABL Soft</u>" means the electronic and/or internet-based system approved by the Administrative Agent for the purpose of making notices, requests, deliveries, communications and for the other purposes contemplated in this Agreement or otherwise approved by Administrative Agent, in all cases, with and to the Administrative Agent, whether such system is owned, operated or hosted by Administrative Agent, any of its Affiliates or any other Person.

"<u>Accommodation Payment</u>" has the meaning provided in <u>Section 10.22(d)</u>.

"<u>Account</u>" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes health-care-insurance receivables.

"<u>Account Debtor</u>" means an "Account Debtor" as such term is a defined in the UCC, including without limitation, any Credit Card Issuer and any Credit Card Processor.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit, division or line of business of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or of any business unit, division or line of business of another Person, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations of any Person (other than the leasing or acquisition of any one Store in the ordinary course of business) in each case in any transaction or group of transactions which are part of a common plan.

"Actual Cash Disbursements" means the sum of all cash expenditures made by the Loan Parties during the relevant period of determination which corresponds to the budgeted cash expenditures described in the line item contained in the Approved Budget across from the heading "Total Disbursements", as determined in a manner consistent with the Approved Budget.

"Actual Cash Receipts" means the sum of all Cash Receipts received by the Loan Parties (excluding any borrowings under this Agreement) during the relevant period of determination which corresponds to the budgeted Cash Receipts described in the line item contained in the Approved Budget across from the heading "Receipts", as determined in a manner consistent with the Approved Budget.

"Adequate Protection Liens" has the meaning assigned to the term "Prepetition Secured Parties Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"Adequate Protection Superpriority Claims" has the meaning assigned to the term "Prepetition Secured Parties Adequate Protection Superpriority Claims" in the Interim Order (or the Final Order, when applicable).

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Eclipse Business Capital LLC, in its capacity as administrative agent for itself and the Lenders hereunder, and any duly appointed successor thereto.

"Administrative Agent's Advisors" has the meaning provided in Section 6.26.

"Administrative Agent's Office" means the Administrative Agent's address and account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent, as may from time to time notify the Lead Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affected Financial Institution" means (i) any EEA Financial Institution or (ii) any UK Financial Institution.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person

specified, (ii) any director, senior officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (iv) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person. For the avoidance of doubt, (a) none of the Credit Parties shall be deemed to be Affiliates of the Loan Parties solely by virtue of such Persons being a Credit Party hereunder and (b) Pathlight Capital LP shall not be deemed to be an Affiliate of the Loan Parties solely by virtue of, or as a result of exercising its rights under, the Warrant Documents (as defined in the Prepetition Term Loan Credit Agreement).

"<u>Agent Parties</u>" has the meaning provided in <u>Section 10.02(c)</u>.

"<u>Aggregate Revolving Commitments</u>" means the sum of the Revolving Commitments of all Revolving Lenders. As of the Closing Date, the Aggregate Revolving Commitments are $45,000,000.00.

"<u>Agreement</u>" means this Credit Agreement.

"<u>Allocable Amount</u>" has the meaning provided in <u>Section 10.22(d)</u>.

"<u>Anti-Corruption Laws</u>" means the FCPA, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"<u>Anti-Money Laundering Laws</u>" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"<u>Applicable Lenders</u>" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"<u>Applicable Margin</u>" means, with respect to all Loans: (i) that constitute SOFR Loans, seven and three-quarters percent (7.75%) per annum and (ii) that constitute Base Rate Loans, six and three-quarters percent (6.75%) per annum.

"<u>Applicable Percentage</u>" means, in each case as the context requires, with respect to any Lender at any time, the percentage (carried out to the ninth (9th) decimal place) of the Aggregate Revolving Commitments represented by such Lender's Commitment at such time or, if the Commitment of each Lender to make Committed Revolving Loans has been terminated pursuant to <u>Sections 2.06</u> or <u>8.02</u> or if the Aggregate Revolving Commitments have expired, the percentage (carried out to the ninth (9th) decimal place) derived by dividing such Lender's Total Revolving Outstandings by the Total Revolving Outstandings of all of the Lenders. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"<u>Appraised Value</u>" means, with respect to Eligible Inventory or Eligible In-Transit Inventory, the appraised orderly liquidation values, net of costs and expenses to be incurred in connection with any such liquidation, which values are expressed as one or more percentages of Cost of Eligible Inventory or Eligible In-Transit Inventory, as applicable, as set forth in the inventory stock ledger of the Borrowers, which values shall be determined pursuant to the most recent appraisal for such inventory received by the Administrative Agent from Gordon Brothers or such other appraiser satisfactory to the Administrative Agent and ReStore, each in their respective sole discretion.

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Budget" means the budget prepared by the Lead Borrower in the form of Annex A, as the same may be updated, modified or supplemented from time to time as provided in Section 6.22, in each case to the extent approved by the Administrative Agent and the Required Lenders as set forth in Section 6.22.

"Approved Budget Variance Report" means a weekly report provided by the Lead Borrower to the Administrative Agent (i) showing, in each case, by line item the Actual Cash Receipts, the Actual Cash Disbursements, the actual operating cash flow, Inventory levels and such other items as specified therein, Availability for the last day of the Prior Week, noting therein all variances required by Section 6.22, on a line-item and cumulative basis, from the amounts set forth for such period in the Approved Budget, and shall include narrative explanations for all variances of [+/- 10%] or more, and (ii) certified by a Responsible Officer of the Lead Borrower. The Approved Budget Variance Report shall be in a form, and shall contain supporting information, reasonably satisfactory to the Required Lenders in their sole discretion.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

"Automatic Stay" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"Availability" means, as of any date of determination, the result, if a positive number, of:

      (a)     the Revolving Loan Cap,

            minus

      (b)     the Total Revolving Outstandings.

In calculating Availability at any time and for any purpose under the Loan Documents (including on the Closing Date), the Loan Parties shall certify to the Administrative Agent that all accounts payable and taxes are being paid in the ordinary course of business (except, in each case, to the extent being contested in good faith by appropriate proceedings being diligently conducted, for with adequate reserves have been provided in accordance with GAAP, and which contest effectively suspends enforcement of any applicable Lien and the collection of the contested obligation).

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Loans pursuant to Section 8.02 or the Orders, as applicable.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent from time to time determines in its Permitted Discretion, as being necessary or appropriate, including reserves (i) to reflect any impediments to the realization upon the Collateral (including, without limitation, Collateral included in the Borrowing Base) and claims and liabilities that the Administrative Agent determine(s) may need to be satisfied in connection with the realization upon such Collateral, (ii) to reflect events, conditions, contingencies or risks which may adversely affect any component of the Borrowing Base, the Collateral or the validity or enforceability of the Loan Documents or any of the rights or remedies of the Administrative Agent thereunder or the business or financial performance or financial condition of any Loan Party, (iii) in respect of accrued and unpaid interest or fees on the Obligations, (iv) in respect of charges of consignee's, warehousemen's, bailee's, shipper's or custom broker's charges, (v) in respect of volatility or contingent liabilities of any Loan Party, uninsured losses of any Loan Party, or uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation or to reflect any other Person's right or claim which is (or is capable of being) senior to, or pari passu with, the lien of the Administrative Agent in any Collateral, (vi) in respect of accrued but unpaid ad valorem, excise, and personal property tax liability and for sale, use, or similar taxes or other fees, assessments, or governmental charges, (vii) in respect of rent (limited to three (3) months' rent) for any leased location in a Landlord Lien State unless a Collateral Access Agreement has been delivered to the Administrative Agent with respect thereto, (viii) reasonably anticipated changes in the Appraised Value of Eligible Inventory or Eligible In-Transit Inventory between appraisals, (ix) in respect of Customer Credit Liabilities or (x) to reflect that a Default or Event of Default has occurred and is continuing.

"Avoidance Action" means any and all claims and causes of action of any Loan Party's estate arising under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payment" has the meaning provided in Section 2.15(b).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (i) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (ii) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their Affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. Section 101 *et seq.*) as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning provided in the Recitals.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"<u>Base Rate</u>" means, for any day, the greatest of (a) the Federal Funds Rate plus one half of one percent (0.50%); (b) Adjusted Term SOFR (which rate shall be calculated based upon a one (1) month period and shall be determined on a daily basis) plus one percent (1.00%), (c) two and one-quarter percent (2.25%), and (d) the rate of interest announced, from time to time, within Wells Fargo Bank, N.A. at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo Bank, N.A.'s base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo Bank, N.A. may designate (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as Administrative Agent may select).

"<u>Base Rate Loan</u>" shall mean any Loan that bears interest based on the Base Rate.

"<u>BBBy</u>" means Bed Bath & Beyond Inc., a New York corporation.

"<u>BBBy Intercreditor Agreement</u>" means the Amended and Restated Intercreditor Agreement, dated as of February 3, 2023, by and between the Prepetition Term Loan Agent (on behalf of itself and the other First Lien Secured Parties named therein, including the Prepetition Revolving Agent) and Bed Bath & Beyond Inc., a New York corporation.

"<u>Benchmark</u>" means, initially, the Term SOFR Reference Rate; <u>provided</u>, that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 3.04(b)</u>.

"<u>Benchmark Replacement</u>" means the sum of: (a) the alternate benchmark rate that has been selected by Administrative Agent in consultation with the Lead Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities, and (b) the related Benchmark Replacement Adjustment; <u>provided</u> that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and Lead Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

"<u>Benchmark Replacement Date</u>" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on

which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) is not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.04(b) and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.04(b).

"**Beneficial Owner**" means, with respect to any U.S. Federal withholding Tax, the beneficial owner, for U.S. Federal income tax purposes, to whom such Tax relates.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Blocked Account**" has the meaning provided in Section 6.13(a).

"**Blocked Account Agreement**" means with respect to an account established by a Loan Party, a control agreement (or notice to and acknowledgement from the relevant bank), in form and substance reasonably satisfactory to the Administrative Agent, establishing control (with either springing dominion or full dominion), pursuant to Section 9-104 of the UCC or other applicable section of the UCC, of such account by the Agent.

"**Blocked Account Bank**" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated, and in each case with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"**Borrower Materials**" has the meaning provided in Section 6.02.

"**Borrowers**" has the meaning provided in the introductory paragraph hereto.

"**Borrowing**" means a Revolving Credit Borrowing.

"**Borrowing Base**" means, at any time of calculation, an amount equal to:

(a)    the sum of (x) the Cost of Eligible Inventory of Borrowers, multiplied by the product of ninety percent (90.0%) multiplied by the Appraised Value of Eligible Inventory; plus (y) the lesser of (A) the Cost of Eligible In-Transit Inventory of Borrowers, multiplied by the product of ninety percent (90.0%) multiplied by the Appraised Value of Eligible In-Transit Inventory and (B) (i) $3,000,000 through July 31, 2023, and (ii) $10,000,000 from and after August 1, 2023; plus

(b)    ninety percent (90.0%) of the aggregate amount of Eligible Credit Card Receivables; minus

(c)    the amount of all Reserves as of the time of such calculation (including those to be established in connection with any requested Committed Revolving Loan or Letter of Credit).

"**Borrowing Base Certificate**" means a certificate substantially in the form of Exhibit E hereto (with such changes therein as may be required by the Administrative Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower or submitted through electronic submission using ABLSoft, to the extent permitted by the Administrative Agent, which shall include

appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Administrative Agent with respect to the Borrowing Base.

"<u>Borrowing Notice</u>" means a notice for a Revolving Credit Borrowing pursuant to <u>Section 2.02(b)</u>, which shall be substantially in the form of <u>Exhibit A</u>.

"<u>Budget Compliance Certificate</u>" means a certificate substantially in the form of <u>Exhibit C-1</u>.

"<u>Budget Modification</u>" has the meaning provided in <u>Section 6.22(a)</u>.

"<u>Budgeted Net Cash Flow</u>" means the line item contained in the Approved Budget across from the heading "Net Operating Cash Flow" during the relevant period of determination.

"<u>Budgeted Total Disbursements</u>" means the line item contained in the Approved Budget across from the heading "Total Disbursements" during the relevant period of determination.

"<u>Budgeted Total Receipts</u>" means the line item contained in the Approved Budget across from the heading "Receipts" during the relevant period of determination.

"<u>Business</u>" means the retail business of Lead Borrower, focusing on value-oriented seasonal, home decor, everyday home essentials, consumables, and other products which are generally consistent therewith and/or as determined as appropriate in the discretion of the Loan Parties.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which the Federal Reserve Bank of New York is closed.

"<u>Capital Lease Obligations</u>" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"<u>Carve Out</u>" has the meaning assigned to the term "Carve Out" in the Interim Order (or Final Order, when applicable).

"<u>Carve Out Reserve</u>" means a reserve to be established by the Administrative Agent and calculated on a weekly basis in an amount equal to (but not in excess of) the difference between the amount of professional fees budgeted to be deposited into the Professional Fee Reserve (as defined in the Orders) during such week in accordance with the Approved Budget minus the amount professional fees actually deposited into the Professional Fee Reserve for such week.

"<u>Cash Concentration Accounts</u>" has the meaning provided in <u>Section 6.13(c)</u>.

"<u>Cash Management Order</u>" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Prepetition ABL Credit Agreement and the Orders) or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects.

"Cash Receipts" means all available cash receipts from the sale of Inventory and other assets constituting Prepetition ABL Priority Collateral, all collections of Accounts, all Net Proceeds, and all other cash payments constituting Prepetition ABL Priority Collateral received by the Loan Parties from any Person or from any source or on account of any sale or other transaction or event.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement and with respect to any Person in particular, after the date such Person becomes a party to this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority, (c) any new, or adjustment to, requirements prescribed by the FRB for "Eurocurrency Liabilities" (as defined in Regulation D of the FRB), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by the Administrative Agent or any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or (d) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III (including CRD IV), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     Permitted Holders shall cease to own and control, legally and beneficially, either directly or indirectly, Equity Interests in each of Parent and Holdings representing more than sixty-five percent (65.00%) of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of each of Parent and Holdings on a fully-diluted basis (and taking into account all such Equity Interests that Permitted Holders shall have the right to acquire pursuant to any option right);

(b)     Parent shall cease to own, directly or indirectly, one hundred percent (100.00%) of the Equity Interests of SFT2, free and clear of all Liens (other than Permitted Encumbrances), except where such failure is as a result of a transaction permitted by the Loan Documents; or

(c)     Holdings shall cease to own, directly or indirectly, one hundred percent (100.00%) of the Equity Interests of each other Loan Party that is a Subsidiary of Holdings, free and clear of all Liens (other than Permitted Encumbrances), except where such failure is as a result of a transaction permitted by the Loan Documents.

"Chapter 11 Case" and "Chapter 11 Cases" each have the meaning provided in the Recitals.

"Closing Date" means the first date all the conditions precedent in <u>Section 4.01</u> are satisfied or waived in accordance with <u>Section 10.01</u>.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee, if any.

"Collateral" means any and all "Collateral", "Security Asset" or similar term as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Administrative Agent, for the benefit of the Lenders.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Administrative Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Administrative Agent's and Prepetition Term Loan Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Administrative Agent and Prepetition Term Loan Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Administrative Agent and Prepetition Term Loan Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements as the Administrative Agent may reasonably require.

"Commitment(s)" means, with respect to each Lender, such Lender's Revolving Commitment.

"Committed Revolving Loan" has the meaning provided in <u>Section 2.01(b)</u>.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Competitor" means a brick-and-mortar retail business focusing on value-oriented seasonal, home décor, everyday home essentials and consumables.

"Compliance Certificate" means a certificate substantially in the form of <u>Exhibit C-1</u>.

"Concentration Accounts" has the meaning provided in <u>Section 6.13(b)</u>.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) that the Administrative Agent decides (in consultation with the Lead Borrower) may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative

Agent decides (in consultation with the Lead Borrower) is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consolidated Cash Balance" means, at any time of determination, the result of (a) the aggregate amount of cash and cash equivalents (excluding any Credit Card Receivables) maintained by the Loan Parties and their Subsidiaries in their operating and disbursement accounts minus (b) the amount of cash necessary to fund expenditures of the Loan Parties and their Subsidiaries that are projected by the Lead Borrower in good faith to be made within three (3) Business Days after such time of determination.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Administrative Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"CRD IV" means (a) Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms; and (b) Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms.

"Credit Card Agreements" means all agreements now or hereafter entered into by any Borrower or for the benefit of any Borrower, in each case with any Credit Card Issuer or any Credit Card Processor with respect to sales transactions involving credit card or debit card purchases, including, but not limited to, the agreements set forth on Schedule 5.21(b) hereto.

"Credit Card Issuer" means any person (other than a Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through World Financial Network National Bank, MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., Novus Services, Inc., PayPal and other issuers approved by the Administrative Agent.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(ii).

"<u>Credit Card Processor</u>" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"<u>Credit Card Receivables</u>" means each "Account" and "Payment Intangible" (as such terms are defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by a Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"<u>Credit Extensions</u>" means any Borrowing and any L/C Credit Extension.

"<u>Credit Party</u>" or "<u>Credit Parties</u>" means (a) individually, (i) each Lender and its Affiliates, (ii) the Administrative Agent, (iii) each L/C Issuer, (iv) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (v) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vi) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"<u>Credit Party Expenses</u>" means:

(a) all reasonable and documented expenses incurred by the Administrative Agent and its Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable and documented fees, charges and disbursements (A) of counsel for the Administrative Agent, (B) of outside consultants and advisors for the Administrative Agent, (C) of appraisers or valuation services, (D) of field examinations, (E) imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (F) with respect to photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits and (G) all such documented expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the structuring of the credit facilities provided for herein (including reasonable and documented costs and expenses relative to the rating of any Loan, ABLSoft, CUSIP, DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the credit facilities), (B) the preparation, negotiation, administration (including travel, meals, and lodging), management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral, including, without limitation, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (D) third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, the Administrative Agent's Liens in and to the Collateral, or the Credit Parties' relationship with any Loan Party or any of its Subsidiaries, (E) any workout, restructuring, proceeding under any Debtor Relief Laws or negotiations in respect of any Obligations, (F) defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or (G) in taking any enforcement action or any Remedial Action with respect to the Collateral, and (iii) all customary fees and charges (as adjusted from time to time) (A) of the Administrative Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrowers (whether by wire transfer or otherwise), (B) with respect to any L/C Issuer, all out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any

demand for payment hereunder and (C) imposed or incurred by the Administrative Agent resulting from the dishonor of checks payable by or to any Loan Party,

(b) costs or expenses (including insurance premiums) required to be paid by any Loan Party or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by any Credit Party; and

(c) all reasonable and documented expenses incurred by the Credit Parties who are not the Administrative Agent, the L/C Issuer or any of their respective Affiliates, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties, plus one local counsel representing all such Credit Parties, in any material jurisdiction (and, solely in the case of an actual or perceived conflict of interest where a Credit Party affected by such conflict notifies the Lead Borrower of the existence of such conflict and thereafter retains its own counsel, by one (1) additional firm of counsel for all such similarly situated Credit Parties).

"CTS Acquisition Agreement" means that certain Equity Purchase Agreement, dated as of October 11, 2020, entered into by and among, (i) Bed Bath & Beyond Inc., a New York corporation, as the seller, (ii) the Lead Borrower and (iii) Holdings, as buyer, together with all annexes, exhibits, schedules and other attachments thereto, as amended and in effect as of November 12, 2020.

"Cumulative Period" means (i) for the initial Approved Budget testing for the first two weeks following the Petition Date, the two-week period up to and including the Saturday of the most recent week then ended, (ii) for the second Approved Budget testing for the first three weeks following the Petition Date, the three-week period up to and including the Saturday of the most recent week then ended, (iii) for the third Approved Budget testing for the first four weeks following the Petition Date, the four-week period up to and including the Saturday of the most recent week then ended and (iv) for each Approved Budget testing thereafter, the rolling four week period up to and including the Saturday of the most recent week then ended.

"Customer Credit Liabilities" means, at any time, the aggregate remaining value at such time of (a) outstanding merchandise credits, gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the credit, certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding customer deposits of the Borrowers.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Administrative Agent among a Borrower, a customs broker, freight forwarder, consolidator or carrier, the Administrative Agent and Prepetition Term Loan Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Administrative Agent and Term Loan Agent and agrees, upon notice from the Administrate Agent or Prepetition Term Loan Agent, to hold and dispose of the subject Inventory solely as directed by the Administrative Agent or the Prepetition Term Loan Agent, subject to the terms of the Prepetition ABL Intercreditor Agreement in all respects.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties, other than any Excluded Account. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Administrative Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning provided in Section 6.13(b).

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, administration or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Defaulting Lender</u>" means any Lender that (a) has failed to fund any amounts required to be funded by it under this Agreement within two (2) Business Days of the date that it is required to do so under this Agreement (including the failure to make available to the Administrative Agent amounts required pursuant to a Settlement or to make a required payment in connection with any payment made by the L/C Issuer relating to a Letter of Credit), (b) notified the Borrowers, the Administrative Agent or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by the Administrative Agent) under which it has committed to extend credit, (d) failed, within two (2) Business Days after written request by the Administrative Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it under the Agreement within two (2) Business Days of the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"<u>Defaulting Lender Rate</u>" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Committed Revolving Loans that are SOFR Loans (inclusive of the Applicable Margin applicable thereto).

"<u>Default Rate</u>" means (a) when used with respect to Obligations other than Letter of Credit Fees, an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to such Loan plus two percent (2.00%) per annum and (b) when used with respect to Letter of Credit Fees, an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to Base Rate Loans plus two percent (2.00%) per annum.

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any sale or issuance of Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, and including any transaction described in this definition that is consummated pursuant to an allocation of assets among newly divided limited liability companies pursuant to a "plan of division".

"<u>Disqualified Institutions</u>" means those Persons that are (a) identified in writing by Lead Borrower to the Administrative Agent on or prior to the Closing Date (or after the Closing Date with the Administrative Agent's consent), (b) Competitors of Parent and its Subsidiaries and identified in writing

by Lead Borrower to the Administrative Agent from time to time (it being acknowledged, as of the Closing Date, that Shoppers World has been identified as a Competitor), and (c) Affiliates of any such Persons referred to in clauses (a) and (b) to the extent (i) such Affiliate's legal name contains the same name of a Person referred to in clause (a) or (b) or is otherwise readily identifiable as an Affiliate of such Person on the basis of such Affiliate's name, or (ii) such Affiliate is identified in writing by the Lead Borrower to the Administrative Agent from time to time.

"<u>Disqualified Stock</u>" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; <u>provided</u>, <u>however</u>, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Lead Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Lead Borrower or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Lead Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"<u>Dollars</u>" and "$" mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia.

"<u>Eclipse</u>" has the meaning provided in the introductory paragraph of this Agreement.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>" means any Person that meets the requirements to be an assignee under <u>Section 10.06</u> (subject to such consents, if any, as may be required under <u>Section 10.06(b)(iii)</u>); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include (i) any Loan Party or any of the Loan Parties' Affiliates (including a Permitted Holder) or Subsidiaries or (ii) without the prior written consent of the Lead Borrower, any Disqualified Institution.

"<u>Eligible Credit Card Receivables</u>" means, at the time of any determination thereof, each Credit Card Receivable of the Borrowers that satisfies the following criteria at the time of its creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Issuer or Credit Card Processor, and in each case is originated in the ordinary course of business of a Borrower, and (ii) is acceptable to the Administrative Agent in its Permitted Discretion, and is not excluded as ineligible by virtue of one or more of the criteria set forth below as determined by the Administrative Agent in its Permitted Discretion. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)), and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable. Except as otherwise agreed by the Administrative Agent in its Permitted Discretion, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a)     Credit Card Receivables which do not constitute an Account or a Payment Intangible;

(b)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c)     Credit Card Receivables that are not subject to a perfected first-priority Lien in favor of the Administrative Agent;

(d)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset, or chargeback has been asserted (to the extent of such dispute, claim, counterclaim, offset, or chargeback);

(e)     Credit Card Receivables as to which a Credit Card Issuer or a Credit Card Processor has the right under certain circumstances to require a Borrower to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     Credit Card Receivables due from a Credit Card Issuer or a Credit Card Processor of the applicable credit card which Credit Card Issuer or Credit Card Processor is the subject of any bankruptcy or insolvency proceedings;

(g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or a Credit Card Processor with respect thereto;

(h)     Credit Card Receivables which do not conform to all representations, warranties, or other provisions in the Loan Documents relating to Credit Card Receivables;

(i)     Credit Card Receivables with respect to which the Administrative Agent shall not have received a field examination satisfactory to the Administrative Agent; or

(j)     Credit Card Receivables which the Administrative Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Administrative Agent may determine.

"Eligible In-Transit Inventory" means, at any time of determination, without duplication of other Eligible Inventory, Inventory owned by a Borrower consisting of finished goods, merchantable and readily saleable to the public in the ordinary course of such Borrowers' business and deemed by the Administrative Agent in its Permitted Discretion, to be Eligible In-Transit Inventory:

(a)     for which a Borrower has retained title or for which title has passed to a Borrower (as determined by the Administrative Agent, in accordance with documentation provided by a Borrower to the Administrative Agent);

(b)     [reserved];

(c)     which is insured to the full value thereof with loss payable to the Administrative Agent, in form, substance and amount satisfactory to the Administrative Agent;

(d)     with respect to Inventory which is in transit from a location outside the United States, (1) either (x) such Inventory is subject to a negotiable document of title, in form reasonably satisfactory to the Administrative Agent, which shall, except as otherwise agreed by the Administrative Agent in its Permitted Discretion, have been endorsed to the Administrative Agent or an agent acting on its behalf or (y) (i) such Inventory is evidenced by a non-negotiable document of title in form reasonably acceptable to the Administrative Agent, or other shipping document reasonably acceptable to the Administrative Agent, which names a Loan Party as consignee and (ii) the Administrative Agent shall have received a duly executed Customs Broker/Carrier Agreement from each applicable broker, freight forwarder, bailee or carrier for such Inventory, in form and substance satisfactory to Administrative Agent and (2) such Inventory is in-transit from the port of origin for a period not to exceed sixty (60) days to any of a Borrower's owned or leased facilities; and

(e)     which would otherwise constitute Eligible Inventory, but for clauses (c) and (d) of the definition of "Eligible Inventory".

Eligible In-Transit Inventory shall not include Inventory being acquired pursuant to a trade letter of credit to the extent such trade letter of credit for the specific Inventory being claimed as collateral remains outstanding.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, items of Inventory of the Borrowers that are finished goods, merchantable and readily saleable to the public in the ordinary course of such Borrowers' business and deemed by the Administrative Agent in its Permitted Discretion, to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Administrative Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below as determined by the Administrative Agent

in its Permitted Discretion. Except as otherwise agreed by the Administrative Agent in its Permitted Discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)     Inventory that is not solely owned by a Borrower or such Borrower does not have good and valid title thereto including pursuant to retention of title arrangements;

(b)     Inventory that is leased by or is on consignment to a Borrower or which is consigned by a Borrower;

(c)     Inventory that is not located in the United States of America (excluding territories or possessions of the United States);

(d)     (x) Inventory that is located at or allocated to a closed Store location or a Store location that is the subject of a store closing, liquidation or similar sale, or (y) Inventory that is not located at a location that is owned or leased by a Borrower, except (i) Inventory in transit between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Borrowers have furnished the Administrative Agent with (A) any UCC financing statements or other documents that the Administrative Agent may determine to be necessary to perfect the Administrative Agent's security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Administrative Agent;

(e)     Inventory that is located: (i) in a distribution center or warehouse leased by a Borrower unless the applicable lessor has delivered a Collateral Access Agreement, or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered a Collateral Access Agreement or with respect to the Borrowing Base, the Administrative Agent, has implemented Inventory Reserves for such location;

(f)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, damaged, contaminated, discontinued, repossessed, restrictive or custom items, work-in-process, raw materials, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in a Borrower's business, (iv) [reserved], (v) not in material compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, (vi) are bill and hold goods, (vii) have been returned or rejected by the Loan Parties' customers and (viii) all bags, other than bags located in states that require customers to pay for bags in an amount not to exceed the lesser of $1,200,000 and 0.05% of the Borrowers' Inventory;

(g)     Inventory that is not subject to a perfected first-priority security interest in favor of the Administrative Agent;

(h)     Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(i)     Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit;

(j)     Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Loan Party or any of its Subsidiaries has received notice of a dispute in respect of any such agreement, to the extent that the Administrative

Agent, in its Permitted Discretion, determines that such dispute could reasonably be expected to prevent or impair the disposition of such Inventory; or

(k)     Inventory manufactured pursuant to a license agreement that is not assignable to the Lenders or their transferees, unless the Borrowers deliver to the Administrative Agent a licensor agreement in form and substance acceptable to the Administrative Agent.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification to the Lead Borrower or any ERISA Affiliate that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f)

the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Loan Parties; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan, or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 or 305 of ERISA.

"Erroneous Payment" has the meaning provided in Section 10.27.

"Erroneous Payment Deficiency Assignment" has the meaning provided in Section 10.27.

"Erroneous Payment Impacted Loans" has the meaning provided in Section 10.27.

"Erroneous Payment Return Deficiency" has the meaning provided in Section 10.27.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning provided in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Account" has the meaning provided in the Security Agreement.

"Excluded Property" has the meaning provided in the Security Agreement.

"Excluded Taxes" means, with respect to any Recipient, (a) Taxes imposed on or measured by its overall net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed by the jurisdiction (or any political subdivision thereof) under the laws of which such Recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or (ii) that are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to a request by the Lead Borrower pursuant to Section 10.13) or (ii) such Lender designates a new Lending Office, in each case except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding Tax pursuant to Section 3.01(a), (c) any Taxes attributable to such Recipient's failure or inability to comply with Section 3.01(e), and (d) any withholding Taxes imposed under FATCA.

"Executive Order" has the meaning provided in Section 10.19.

"Extraordinary Receipt" means any cash or cash equivalents received by or paid to or for the account of any Loan Party not in the ordinary course of business with respect to tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments (other than any such indemnity payments applied to cover any obligations or liabilities giving rise to such indemnity payments) and any purchase price adjustments.

"F/A" has the meaning provided in Section 6.21.

"<u>Facility Guaranty</u>" means the Guaranty made by the Guarantors in favor of the Administrative Agent and the other Credit Parties, in form reasonably satisfactory to the Administrative Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and (a) any current or future regulations or official interpretations thereof, (b) any agreements entered into pursuant to Section 1471(b)(1) of the Code, and (c) any fiscal or regulatory legislation, rules, or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>FCA</u>" has the meaning provided in <u>Section 1.8</u>.

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"<u>Federal Reserve Board</u>" or "<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>Fee Letter</u>" means, that certain Fee Letter, dated as of the Closing Date, by and among the Borrowers and the Administrative Agent, as amended, restated, supplemented or as otherwise modified from time to time.

"<u>Final Order</u>" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be reasonably satisfactory in form and substance to the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Required Lenders waive such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority status of the Administrative Agent's and the Lenders' claims.

"<u>FIRREA</u>" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended from time to time.

"<u>Fiscal Month</u>" means any fiscal month of any Fiscal Year, determined in accordance with the fiscal accounting calendar of the Loan Parties.

"<u>Fiscal Quarter</u>" means any fiscal quarter of any Fiscal Year, determined in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means any period of twelve (12) consecutive Fiscal Months ending on the Saturday closest to the last day of February in any calendar year; provided that for any calendar year ending December 31, 2021 or thereafter, Fiscal Year shall mean any period of twelve (12) consecutive Fiscal Months ending on the Saturday closest to the last day of December in such calendar year.

"Floor" means a per annum rate equal to one and one-quarter percent (1.25%).

"Foreign Asset Control Regulations" has the meaning provided in Section 10.19.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Foreign Subsidiary Holdco" means any Domestic Subsidiary that has no material operations or material assets other than the Equity Interests of one or more Foreign Subsidiaries.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied; provided, that that lease liabilities and associated expenses recorded by Parent and its Subsidiaries (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Capital Lease Obligations or Indebtedness unless the corresponding leases would have been treated as Capital Lease Obligations under GAAP as in effect prior to the adoption of ASU 2016-02, Leases.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated

liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means (a) the Parent, (b) Nantucket Distributing Co., LLC, a Delaware limited liability company, (c) Christmas Tree Shops of Massachusetts, LLC, a Massachusetts limited liability company, (d) SFT2, (e) each other Domestic Subsidiary of the Parent (other than a Borrower) as of the Closing Date that is party to the Facility Guaranty, (f) each other Domestic Subsidiary of the Parent (other than a Borrower or a Foreign Subsidiary Holdco) that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12 and (g) each Foreign Subsidiary (or Foreign Subsidiary Holdco) that is a Material Subsidiary that is required to execute and deliver a Facility Guaranty pursuant to Section 6.12 of this Agreement.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Immaterial Subsidiary" means any Subsidiary designated by the Lead Borrower as an "Immaterial Subsidiary" (it being understood that, as of the Closing Date, the Lead Borrower has designated Nantucket HK as an Immaterial Subsidiary) that (a) did not, as of the last day of the Fiscal Quarter of the Parent and its Subsidiaries most recently ended for which financial statements have been (or were required to be) delivered pursuant to Section 6.01(b), have assets with a value in excess of five percent (5.00%) of the Consolidated Total Assets or revenues representing in excess of five percent (5.00%) of total revenues of the Parent and its Subsidiaries on a Consolidated basis as of such date, and (b) taken together with all Immaterial Subsidiaries as of such date, did not have assets with a value in excess of five percent (5.00%) of Consolidated Total Assets or revenues representing in excess of five percent (5.00%) of total revenues of the Parent and its Subsidiaries on a Consolidated basis as of such date; provided that (i) no Immaterial Subsidiary shall at any time own Inventory and (ii) the Lead Borrower may elect in its sole discretion to exclude as an Immaterial Subsidiary any Subsidiary that would otherwise meet the definition thereof.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

      (a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments;

      (b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

      (c)     net obligations of such Person under any Swap Contract;

      (d)     all obligations of such Person to pay the deferred purchase price of property or services (other than, in all cases, (i) trade accounts payable in the ordinary course of business and not past due for more than sixty (60) days after the date on which such trade account payable was created and excluding in any case, any trade payables disputed in good faith, (ii) accrued expenses incurred in the ordinary course of business and (iii) working capital and similar adjustments in connection with acquisitions and Dispositions permitted under this Agreement);

      (e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales

or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Indebtedness of such Person (i) in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (ii) in respect of any Synthetic Lease Obligations, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends); and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  Notwithstanding the foregoing, in no event shall operating leases constitute Indebtedness.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under the Loan Documents and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning provided Section 10.04(b).

"Information" has the meaning provided in Section 10.07.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, customer lists, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercompany Note" means an Amended and Restated Intercompany Note, substantially in the form attached hereto at Exhibit G, duly executed and delivered by Borrowers, Parent or Subsidiary, as applicable, and Agent in which Parent or any Subsidiary, as applicable, subordinate the obligations of the

Borrowers to Parent or Subsidiary, as applicable, to the Obligations of the Borrowers to the Credit Parties hereunder.

"Intercreditor Agreement" means (a) with respect to the Loans and the rights of the parties under this Agreement and the other Loan Documents, the AAL, (b) with respect to the Prepetition Revolving Credit Agreement and the other Prepetition Loan Documents, the Prepetition AAL, (c) with respect to the Prepetition Term Loan Credit Documents, the Prepetition ABL Intercreditor Agreement, (d) with respect to the Second Lien Obligations, the BBBy Intercreditor Agreement, and (e) with respect to any other Indebtedness secured by any Liens on Collateral an intercreditor agreement among the Loan Parties, the Administrative Agent and the trustee, agent, collateral agent or other representative for holders of such Permitted Indebtedness which intercreditor agreement shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable Law), together with all extensions, modifications, and amendments thereto, in form and substance reasonably satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Parent's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves with respect to the determination of the salability of the Eligible Inventory or Eligible In-Transit Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or Eligible In-Transit Inventory or which reflect claims and liabilities that the Administrative Agent determines will need to be satisfied in connection with the realization upon the Eligible Inventory or Eligible In-Transit Inventory, as applicable. Without limiting the generality of the foregoing, Inventory Reserves may, in the Administrative Agent's Permitted Discretion, include (but are not limited to) reserves based on:

    (a)  obsolescence;

    (b)  seasonality;

    (c)  Shrink;

    (d)  imbalance;

    (e)  change in Inventory character;

    (f)  change in Inventory composition;

(g) change in Inventory mix;

(h) mark-downs (both permanent and point of sale), including in connection with any store closing, liquidation or going out of business sale;

(i) retail mark-ons and mark-ups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events;

(j) reasonably anticipated changes in appraised value of Inventory between appraisals; and

(k) out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Issuer Documents" means with respect to any Letter of Credit, the letter credit application and any other document, agreement and instrument executed or delivered by the Borrower (or any Subsidiary) and relating to any such Letter of Credit.

"Joinder" means an agreement, in form reasonably satisfactory to the Administrative Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Administrative Agent may determine.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof, or the renewal thereof.

"L/C Issuer" means each of the Administrative Agent and its Affiliates who provide support for or arrange for the issuance of any Letter of Credit, together with the financial institution which issues any Letter of Credit.

"Landlord Lien State" means such state(s) or other jurisdiction in which a landlord's claim for rent may have priority over the Lien of the Administrative Agent in any of the Collateral.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lead Borrower" has the meaning provided in the introductory paragraph of this Agreement.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" means individually, a Revolving Lender, and, collectively, all such Persons.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Lead Borrower and the Agent.

"Letter of Credit" has the meaning provided in Section 2.01(b).

"Letter of Credit Balance" means, as at any date of determination, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit and (b) all interest, fees and costs due and unpaid in connection therewith. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.09.

"Letter of Credit Fee" has the meaning provided in Section 2.01(e)(ii).

"Letter of Credit Limit" means $2,100,000. The Letter of Credit Limit is part of, and not in addition to, the Aggregate Revolving Commitments. A permanent reduction of the Aggregate Revolving Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Limit; provided, that if the Aggregate Revolving Commitments are reduced to an amount less than the Letter of Credit Limit, then the Letter of Credit Limit shall be reduced to an amount not greater than the Aggregate Revolving Commitments.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Liquidation" means the exercise by the Administrative Agent of those rights and remedies accorded to the Administrative Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Administrative Agent, of any public, private or "going out of business", "store closing" or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means an extension of credit by a Lender to the Borrowers under Article II in the form of a Committed Revolving Loan.

"Loan Account" has the meaning provided in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, the Intercompany Note, the Prepetition ABL Intercreditor Agreement, the Prepetition AAL, the BBBy Intercreditor Agreement and any other Intercreditor Agreement or subordination agreements, all Borrowing Base Certificates, all Budget Compliance Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, the Facility Guaranty, each Request

for Credit Extension, the Interim Order and any Final Order, as applicable, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrowers and each Guarantor.

"LPC" means LPC Northeast, L.L.C., a Delaware limited liability company.

"LPC Agreement" means that certain Purchase and Sale Agreement, dated as of November 1, 2022 (as amended, restated, amended and restated, modified, extended and/or supplemented and in effect from time to time), by and between SFT2, as seller, and LPC.

"MAE Exceptions" means the filing, commencement, announcement, prosecution and continuation of the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Loan Documents or under the Orders and the COVID-19 pandemic.

"Margin Stock" has the meaning provided in Regulation U of the FRB as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Parent and its Subsidiaries, taken as a whole; (b) a material impairment of the ability of the Loan Parties, taken as a whole, to perform their obligations under the Loan Documents; or (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect on (i) the Collateral, (ii) the validity, perfection or priority of any Lien granted by any Loan Party in favor of the Agent or any material portion of the Collateral, or (iii) the legality, validity, binding effect or enforceability against the Loan Parties of the Loan Documents, in each case, other than arising out of the MAE Exceptions.  In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then-existing events would result in a Material Adverse Effect.

"Material Contract" means, (a) the Middleborough Property Sale Documents, and (b) with respect to any Loan Party, each contract, the absence of which would reasonably be expected to have a Material Adverse Effect.

"Material Subsidiary" means any Subsidiary other than an Immaterial Subsidiary.

"Maturity Date" means November 5, 2023.

"Maximum Rate" has the meaning provided in Section 10.09.

"Middleborough Lease" means that certain Lease Agreement, dated as of February 16, 2023, by and between 64 Leona Property Owner LLC and the Lead Borrower with respect to the Middleborough Property.

"Middleborough Property" means that certain Real Estate located at 64 Leona Drive, Middleborough, Massachusetts.

"**Middleborough Property Sale**" means the sale by SFT2 to LPC of the Middleborough Property, pursuant to the terms and conditions of the LPC Agreement and the other Middleborough Property Sale Documents.

"**Middleborough Property Sale Documents**" means, collectively, the LPC Agreement and all other material sale documents entered into in connection therewith, including without limitation, the Middleborough Lease.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgages**" means each and every fee and leasehold mortgage or deed of trust, security agreement and assignment by and between the Loan Party owning or holding the leasehold interest in the Real Estate encumbered thereby in favor of the Administrative Agent.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Nantucket HK**" means Nantucket Distributing (HK) Limited, a Hong Kong incorporated entity with the register number of 713816.

"**Net Proceeds**" means

(a)      with respect to (i) any Disposition described in clause (a) of the definition of "Prepayment Event", (ii) any casualty or similar event described in clause (b) of the definition of "Prepayment Event" and (iii) any Extraordinary Receipt described in clause (e) of the definition of 'Prepayment Event", the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by a Lien on the applicable asset permitted hereunder which is senior to the Administrative Agent's Lien on such asset (including for the avoidance of doubt the Lien of the Prepetition Term Loan Agent on any Prepetition Term Priority Collateral) and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents); (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)); (C) the amount of all taxes paid as a result of such transaction; and (D) any funded escrow established pursuant to the documents evidencing any such transaction to secure any indemnification obligations or adjustments to the purchase price or other similar obligations associated with any such transaction; provided that such funds shall constitute Net Proceeds immediately upon their release from escrow unless applied to satisfy such obligations; and

(b)      with respect to the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the sum of the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

In event that any Prepayment Event involves proceeds of both Prepetition Term Priority Collateral and Prepetition ABL Priority Collateral (or involves the Equity Interests issued by a Loan Party that has an

interest in Prepetition ABL Priority Collateral), the provisions of Section 4.1(d) of the Prepetition ABL Intercreditor Agreement shall govern the calculation of the amount of Net Proceeds.

"Non-consenting Lender" has the meaning provided in Section 10.01.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Note" means a Revolving Note, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or any Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, limited liability partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests.

"Orders" means (i) until entry of the Final Order, the Interim Order and (ii) after the entry of the Final Order, the Final Order, or the Interim Order and the Final Order as the "Orders".

"Original Closing Date" means November 12, 2020.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned any interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan

Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.13).

"Outstanding Amount" means, with respect to Committed Revolving Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of any such Committed Revolving Loans, occurring on such date.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Parent" has the meaning provided in the introductory paragraph of this Agreement.

"Participant" has the meaning provided in Section 10.06(d).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended).

"Payment Conditions" means, at the time of determination with respect to any specified transaction or payment, that (a) no Default or Event of Default then exists or would arise as a result of entering into such transaction or the making of such payment, (b) at all times during the immediately preceding two (2) Fiscal Months before and immediately after giving effect to such transaction or payment, pro forma Availability is greater than or equal to $40,000,000, and (c) after giving effect to such transaction or payment, projected Availability as of the end of each Fiscal Month during any subsequent projected six (6) Fiscal Months will be equal to or greater than $40,000,000. Prior to undertaking any transaction or payment which is subject to the Payment Conditions, the Loan Parties shall deliver to the Administrative Agent (i) an updated Borrowing Base Certificate giving effect to the payment or transaction and (ii) evidence of satisfaction of the conditions contained in clause (c) above on a basis (including, without limitation, giving due consideration to results for prior periods) reasonably satisfactory to the Administrative Agent.

"Payment Recipient" has the meaning provided in Section 10.27.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Disposition" means any of the following:

(a)     sales, transfers, leases and other Dispositions of (i) inventory or services in the ordinary course of business and (ii) cash and cash equivalents, in each case, in the ordinary course of business;

(b)        sales, transfers, leases and other Dispositions to any Loan Party;

(c)        sales, transfers and other Dispositions of accounts receivable (including write-offs, discounts, and compromises) in connection with the compromise, settlement or collection thereof, in all cases, in the ordinary course of business in an amount not to exceed $25,000 in the aggregate during the term of this Agreement;

(d)        [reserved];

(e)        [reserved];

(f)        [reserved];

(g)        [reserved];

(h)        [reserved];

(i)        Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary, excluding for purposes hereof bulk sales or other Dispositions of the Equipment or Fixtures of any Loan Party in connection with the closing of retail Store locations, locations within department or specialty stores or other locations in which a Loan Party leases or licenses a portion of the space in such store in the ordinary course of the business of such Loan Party, or any distribution center owned or leased by such Loan Party, provided that the aggregate amount of Dispositions pursuant to this clause (i) shall not exceed $25,000 during the term of this Agreement;

(j)        [reserved];

(k)        [reserved];

(l)        [reserved];

(m)        [reserved];

(n)        [reserved];

(o)        [reserved]; and

(p)        to the extent constituting Dispositions, any transactions otherwise permitted by Sections 7.01, 7.04 or 7.06 hereof;

provided, however, (a) no Dispositions of any assets included in the Borrowing Base made to any Person (other than to a Loan Party) and constituting 5% or more of the Borrowing Base at such time (on a net basis, after giving effect to all applicable advance rates and any Reserves applicable to such assets) shall constitute a Permitted Disposition unless the Loan Parties shall, contemporaneously therewith, deliver to the Administrative Agent an updated Borrowing Base Certificate, giving effect to such Disposition, and (b) no Dispositions of Related Intellectual Property made to any Person (other than a Loan Party) shall constitute a Permitted Disposition unless such Disposition is subject to a non-exclusive royalty-free license of such Related Intellectual Property in favor of the Administrative Agent for use in connection with the exercise of rights and remedies of the Credit Parties under the Loan Documents in respect of the Collateral, which

license shall be substantially similar to the license described in Section 6.1 of the Security Agreement (or otherwise reasonably satisfactory to the Administrative Agent).

"Permitted Encumbrances" means any of the following:

(a) Liens imposed by law for Taxes, assessments or other governmental charges or levies that are not yet due or are being contested in compliance with Section 6.04;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's, bailees, and other like Liens imposed by applicable Law or contract, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c) pledges and deposits of cash and cash equivalents made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d) deposits of cash and cash equivalents to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, customs bonds, landlord guarantee bonds, surety and appeal bonds, performance bonds and other obligations of a like nature (including those for secure health, safety and environmental obligations) incurred in the ordinary course of business;

(e) Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f) easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g) Liens existing on the Petition Date and listed on Schedule 7.01 and any Permitted Refinancings thereof;

(h) [reserved];

(i) Liens in favor of the Administrative Agent;

(j) statutory Liens of landlords and lessors in respect of rent not in default;

(k) possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Closing Date and Permitted Investments, provided that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l) Liens arising solely by virtue of any statutory or common law provisions or in respect of customary contractual arrangements in each case relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)      (i) Liens arising from precautionary UCC filings regarding "true" operating leases, or (ii) to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n)      [reserved];

(o)      Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods solely to the extent the following conditions are satisfied: (A) such Liens secure obligations that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(p)      Liens or rights of setoff against credit balances of Borrowers with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Loan Parties in the ordinary course of business, but not Liens on or rights of setoff against any other property or assets of Loan Parties, pursuant to the Credit Card Agreements to secure the obligations of Loan Parties to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(q)      [reserved];

(r)      [reserved];

(s)      Liens on cash equivalents described in clause (d) of the definition of "Permitted Investments";

(t)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods;

(u)      Liens (i) attaching solely to cash advances and cash earnest money deposits in connection with Permitted Investments in the ordinary course of business; and (ii) consisting of an agreement to Dispose of any property in connection with a Permitted Disposition;

(v)      Liens on insurance policies and the proceeds thereof granted to secure the financing of insurance premiums with respect thereto;

(w)      [reserved];

(x)      [reserved];

(y)      Liens that are customary contractual rights of set-off relating to cash management obligations of the Loan Parties or their Subsidiaries;

(z)      Liens on the Second Lien Collateral (as defined in the BBBy Intercreditor Agreement) securing the Second Lien Obligations, so long as such Liens are subject to the terms of the BBBy Intercreditor Agreement;

(aa)      [reserved];

(bb)      deposits of cash and cash equivalents to secure reimbursement and similar obligations in respect of letters of credit  permitted by clause (q) of the definition of "Permitted Indebtedness";

(cc)     [reserved];

(dd)     Liens in favor of the Prepetition Term Loan Agent securing the Prepetition Term Obligations (as defined in the Prepetition ABL Intercreditor Agreement), so long as such Liens are subject to the terms of the Prepetition ABL Loan Intercreditor Agreement;

(ee)     Liens on ReStore Consignment Inventory and the proceeds thereof securing amounts owing by the Loan Parties under the ReStore Consignment Agreement;

(ff)     the Carve Out; and

(gg)     the Adequate Protection Liens and Adequate Protection Superpriority Claims.

"Permitted Holders" means, collectively, Marc Salkovitz, Pamela Salkovitz and their respective Permitted Transferees.

"Permitted Indebtedness" means any of the following:

(a)     Indebtedness outstanding on the Petition Date and listed on Schedule 7.03 and any Permitted Refinancing thereof;

(b)     Indebtedness of any Loan Party to any other Loan Party;

(c)     [reserved];

(d)     [reserved];

(e)     to the extent constituting Indebtedness, reimbursement obligations of Loan Parties and their Subsidiaries to employees incurred for the benefit of, or on behalf of, such Loan Party or Subsidiary in the ordinary course of business to the extent otherwise permitted to be incurred under this Agreement;

(f)     [reserved];

(g)     [reserved];

(h)     the Obligations;

(i)     [reserved];

(j)     Guarantees of any Indebtedness otherwise constituting Permitted Indebtedness;

(k)     Indebtedness owed to any Person (including obligations in respect of letters of credit for the benefit of such Person) providing workers' compensation, health, disability or other employee benefits or property, casualty, liability insurance, self-insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(l)     Indebtedness in respect of or guarantee of customs bonds, performance bonds, bid bonds, appeal bonds, surety bonds, real estate lease guarantee bonds, performance and completion guarantees, workers' compensation claims, letters of credit, bank guarantees and banker's acceptances, warehouse receipts or similar instruments and similar obligations (other than in respect of other

Indebtedness for borrowed money) including those incurred to secure health, safety and environmental obligations, in each case provided in the ordinary course of business or consistent with past practice;

(m)     Indebtedness with respect to financial accommodations constituting cash management obligations or cash management services entered into in the ordinary course of business and other Indebtedness in respect of treasury, depositary, cash management and netting services, automatic clearinghouse arrangements, overdraft protections and similar arrangements or otherwise in connection with securities accounts and deposit accounts, in each case, in the ordinary course of business;

(n)     [reserved];

(o)     Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(p)     endorsement of instruments or other payment items for deposit in the ordinary course of business and consistent with past practice;

(q)     [reserved];

(r)     to the extent constituting Indebtedness, the obligations of SFT2 under the Guarantee Agreement (as defined in the CTS Acquisition Agreement);

(s)     [reserved];

(t)     [reserved];

(u)     Indebtedness under the ReStore Consignment Agreement;

(v)     Indebtedness of the Loan Parties incurred under the Prepetition Term Loan Credit Documents, in an aggregate outstanding principal amount not to exceed the amount of the Maximum Term Facility Amount (as defined in the Prepetition ABL Intercreditor Agreement);

(w)     Adequate Protection Superpriority Claims; and

(x)     the Carve-Out.

"Permitted Investments" means each of the following:

(a)     Investments in cash and cash equivalents consistent with the Cash Management Order;

(b)     [reserved];

(c)     [reserved];

(d)     [reserved];

(e)     [reserved];

(f)     [reserved];

(g)     Investments existing on the Petition Date and set forth on Schedule 7.02, and (ii) Investments consisting of any modification, replacement, renewal, reinvestment or extension of any such Investment; provided that the amount of any Investment permitted pursuant to this clause (f) is not increased from the original amount of such Investment on the Petition Date (determined without reducing such amount to reflect any Return received on such Investment from and after the Petition Date) except as otherwise permitted pursuant to this definition of Permitted Investments;

(h)     (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Petition Date, provided that such Subsidiary is a Debtor in the Chapter 11 Cases and such Investment in made in accordance with the Approved Budget, and (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties (other than the Parent), provided such Loan Party is a Debtor in the Chapter 11 Cases and such Investment is made in accordance with the Approved Budget;

(i)     [reserved];

(j)     [reserved];

(k)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business, or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)     advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an aggregate amount not to exceed $25,000 at any time outstanding for travel, entertainment, relocation and analogous ordinary business purposes, as well as to cover liabilities subject to indemnification in the ordinary course of business;

(m)     [reserved];

(n)     Investments consisting of cash earnest money deposits in connection with an Investment permitted hereunder;

(o)     Investments consisting of endorsements for collection or deposit in the ordinary course of business;

(p)     [reserved];

(q)     [reserved];

(r)     to the extent constituting Investments, any transactions otherwise permitted under Section 7.03 (other than pursuant to clauses (j), (k), (l), (m) or (o) of the definition of "Permitted Indebtedness"), Section 7.04 and Section 7.05 (other than pursuant to clause (p) of the definition of "Permitted Dispositions");

provided, however, (a) no Investments consisting of any assets included in the Borrowing Base made to any Person (other than in or to a Loan Party) and constituting 5% or more of the Borrowing Base at such time (on a net basis, after giving effect to all applicable advance rates and any Reserves applicable to such assets) shall constitute a Permitted Investment unless the Loan Parties shall, contemporaneously therewith, deliver to the Administrative Agent an updated Borrowing Base Certificate, giving effect to such Investment, and (b) with respect to any Permitted Investment consisting of Related Intellectual Property,

such Investment of Related Intellectual Property in any Person (other than a Loan Party) shall not constitute a Permitted Investment unless such Investment is subject to a non-exclusive royalty-free license of such Related Intellectual Property in favor of the Administrative Agent for use in connection with the exercise of rights and remedies of the Credit Parties under the Loan Documents in respect of the Collateral, which license shall be substantially similar to the license described in Section 6.1 of the Security Agreement (or otherwise reasonably satisfactory to the Administrative Agent).

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the weighted average life to maturity of such Permitted Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced, (c) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced, (d) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced, (e) such Permitted Refinancing shall be otherwise, taken as a whole, on terms not materially less favorable to the Credit Parties than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, (f) the interest rate applicable to any such Permitted Refinancing shall not exceed the then applicable market interest rate, and (g) at the time thereof, no Event of Default shall have occurred and be continuing.

"Permitted Revolving Overadvance" means (x) an Unintentional Overadvance, and (y) an Overadvance made by the Administrative Agent in its discretion, which:

(a)     is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)     is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

(c)     is made to pay any amount chargeable to any Loan Party hereunder; and

(d)     together with all other Permitted Revolving Overadvances then outstanding, shall not (i) at any time exceed five percent (5.00%) of the Borrowing Base, or (ii) unless a Liquidation is occurring, remain outstanding for more than forty-five (45) consecutive Business Days, unless in each case, the Administrative Agent, ReStore and the Required Lenders otherwise agree;

provided, however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations with respect to Letters of Credit, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Revolving Overadvances allowed hereunder, and provided, further, that in no event shall the Administrative Agent make an Overadvance, if after giving effect thereto, the principal amount of the Committed Revolving Loans would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the such Commitments, or any portion thereof, pursuant to Section 2.06 or Section 8.02 hereof).

"Permitted Term Prepayment" means (i) any mandatory prepayment applied to the Prepetition Term Loans pursuant to the applicable provisions of the Prepetition Term Loan Agreement (as in effect on the Petition Date) or (ii) any optional prepayment of the Prepetition Term Loans at any time when the Payment Conditions are satisfied, including any such optional prepayment of the Prepetition Term Loans with proceeds of (x) Affiliate Subordinated Debt, or (y) cash capital contributions made to the Parent or Equity Interests issued by Parent.

"Permitted Transferee" means, with respect to any Person, (a) any spouse or natural or adopted issue of such Person or of such Person's spouse, (b) any trust created solely for the benefit of such Person or the Permitted Transferees described in the preceding clause (a), or (c) any custodian or guardian of any property of one or more of the Permitted Transferees described in the preceding clauses (a) and (b) in her or his capacity as such custodian or guardian.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, limited liability partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the Recitals.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Platform" has the meaning provided in Section 6.02.

"Prepayment Event" means:

      (a)     any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party constituting ABL Priority Collateral with Net Proceeds, except for Dispositions permitted under clauses (a), (b), (c), (f), (g), (i) and (p) of the definition of "Permitted Dispositions", unless the proceeds therefrom are deposited into a segregated account subject to a Blocked Account Agreement and utilized (or committed to be utilized) for purposes of reinvesting such proceeds in the business of the Loan Parties within one hundred eighty (180) days of the receipt of such proceeds, and, if so committed during such initial one hundred eighty (180) day period, are thereafter utilized for such purpose within ninety (90) days after such initial one hundred eighty (180) day period;

      (b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party constituting ABL Priority Collateral unless the proceeds therefrom are deposited into a segregated account subject to a Blocked Account Agreement and utilized (or committed to be utilized) for purposes of replacing or repairing the assets in respect of which such proceeds, awards or payments were received within one hundred eighty (180) days of the occurrence of the damage to or loss of the assets being repaired or replaced, and, if so committed during such initial one hundred eighty (180) day period, are thereafter utilized for such purpose within ninety (90) days after such initial one hundred eighty (180) day period;

      (c)     [reserved];

      (d)     the incurrence by a Loan Party of any Indebtedness for borrowed money that does not constitute Permitted Indebtedness; and

(e)     the receipt by any Loan Party of any Extraordinary Receipts that constitute proceeds of ABL Priority Collateral not otherwise addressed in clauses (a) through (d) above.

"Prepetition AAL" means that certain Agreement Among Lenders, dated as of February 16, 2023, by and among the Prepetition Revolving Administrative Agent and each of the Prepetition Revolving Lenders party to the Prepetition Revolving Credit Agreement on such date, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition ABL Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of February 16, 2023, by and among the Prepetition Administrative Agent and the Prepetition Term Loan Agent, and acknowledged and agreed to by the Loan Parties, as amended, restated, supplemented, replaced, or otherwise modified from time to time in accordance with the requirements thereof and this Prepetition Revolving Credit Agreement.

"Prepetition ABL Priority Collateral" means the "ABL Priority Collateral" as such term is defined in the Prepetition ABL Intercreditor Agreement.

"Prepetition Letters of Credit" means all of the "Letters of Credit" as defined in and issued pursuant to the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Administrative Agent" has the meaning provided in the Recitals.

"Prepetition Revolving Credit Agreement" has the meaning provided in the Recitals.

"Prepetition Revolving Loan Documents" means the "Loan Documents" as defined in the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Lenders" has the meaning provided in the Recitals.

"Prepetition Revolving Obligations" means the "Obligations" as defined in the Prepetition Revolving Credit Agreement, and includes all fees set forth in the Prepetition Revolving Credit Agreement and any fee letters executed in connection therewith.

"Prepetition Term Lenders" means the "Lenders" as defined in the Prepetition Term Loan Credit Agreement.

"Prepetition Term Loan(s)" means the "Loans" as defined in the Prepetition Term Loan Credit Agreement.

"Prepetition Term Loan Agent" means Pathlight Capital, LP, a Delaware limited partnership, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Credit Agreement, and any successor in such capacity.

"Prepetition Term Loan Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of February 16, 2023, by and among the Borrowers, the Guarantors, the Prepetition Term Loan Agent and the Prepetition Term Lenders, as amended, restated, supplemented or otherwise modified through the date hereof.

"Prepetition Term Loan Credit Documents" means the Prepetition Term Loan Credit Agreement and all other documents, instruments and agreements from time to time executed or delivered in connection therewith, as amended, restated, supplemented or otherwise modified through the date hereof.

"**Prepetition Term Obligations**" means the "Obligations" as defined in the Prepetition Term Loan Credit Agreement.

"**Prepetition Term Loan Priority Collateral**" has the meaning assigned to the term "Term Loan Priority Collateral" in the Prepetition ABL Intercreditor Agreement.

"**Prior Week**" means, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"**Professional Fee Reserve**" has the meaning provided in the Interim Order (or the Final Order, when applicable).

"**Public Lender**" has the meaning provided in Section 6.02.

"**Real Estate**" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"**Recipient**" means each Agent, each L/C Issuer, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder.

"**Register**" has the meaning provided in Section 10.06(c).

"**Registered Public Accounting Firm**" has the meaning specified by the Securities Laws and shall be independent of the Parent and its Subsidiaries as prescribed by the Securities Laws.

"**Reinvestment Proceeds**" means Net Proceeds deposited and segregated in a Blocked Account and being held for reinvestment in accordance with the definition of "Prepayment Event".

"**Related Intellectual Property**" means such rights with respect to the Intellectual Property of the Loan Parties as are reasonably necessary to permit the Agent to enforce its rights and remedies under the Loan Documents with respect to the Collateral, or the disposition of which would otherwise materially adversely affect the Appraised Value of the Collateral of the Loan Parties.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Relevant Governmental Body**" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"**Remedial Action**" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"**Remedies Notice Period**" has the meaning assigned to such term in the Interim Order (or Final Order, when applicable).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the notice requirement has been waived.

"Reports" has the meaning provided in Section 9.13(a).

"Request for Credit Extension" means (a) with respect to a Borrowing of Committed Revolving Loans, an electronic notice via the ABLSoft or other Borrowing Notice, and (b) with respect to an L/C Credit Extension, the applicable Issuer Documents.

"Required Lenders" means, as of any date of determination, the Lenders having aggregate Commitments representing more than fifty percent (50%) of the total Revolving Commitments at such time, or if the Commitments have expired or been terminated, Lenders holding in the aggregate more than fifty percent (50%) of the Total Revolving Outstandings; provided the vote of ReStore Capital, LLC shall be necessary to constitute Required Lenders. The Revolving Commitments and Total Revolving Outstandings of any Defaulting Lender shall be disregarded in determining Required Lenders.

"Required Milestones" means the covenants set forth on Schedule 6.23.

"Reserves" means all Inventory Reserves, Availability Reserves and the Carve Out Reserve.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"ReStore" means ReStore Capital, LLC, a Delaware limited liability company.

"ReStore Consigned Inventory" means all "Memo Merchandise" as defined in the ReStore Consignment Agreement delivered (or caused to be delivered) by ReStore Capital (CTS), LLC to the Loan Parties pursuant to the ReStore Consignment Agreement.

"ReStore Consignment Agreement" means that certain Agreement for Consignment of Memo Merchandise dated as of January 6, 2023, by and between the Lead Borrower and ReStore Capital (CTS), LLC, as amended, restated, supplemented or otherwise modified from time to time.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment, and (b) any management, consulting, investment banking or similar fees payable by any Loan Party to any Affiliate of a Loan Party or a Subsidiary. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall

also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Return" means, with respect to any Investment, any dividend, distribution, repayment of principal, income, profit (from a disposition or otherwise) and any other amount received or realized in respect thereof in each case that represents a return of capital.

"Revolving Concentration Account" has the meaning provided in Section 6.13(b).

"Revolving Commitment" means, as to each Revolving Lender, its obligation to (a) make Committed Revolving Loans to the Borrowers pursuant to Section 2.01(b), and (b) purchase participations in Letter of Credit Balances, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01(b) or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Committed Revolving Loans of the same Type and made by each of the Revolving Lenders pursuant to Section 2.01.

"Revolving Lender" means each Lender having a Revolving Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Assumption by which such Person becomes a Revolving Lender.

"Revolving Loan Account" has the meaning provided in Section 2.11(a).

"Revolving Loan Cap" means, at any time, the lesser of (a) the Borrowing Base at such time and (b) the Aggregate Revolving Commitments at such time.

"Revolving Note" means a promissory note made by the Borrowers in favor of a Revolving Lender evidencing the Committed Revolving Loan made by such Revolving Lender, substantially in the form of Exhibit B.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time, (a) any a Person then named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any relevant Sanctions authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S.

Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) His Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over the Administrative Agent, any Lender or any Loan Party or any of their respective Subsidiaries or Affiliates.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Lien Obligations" has the meaning provided in the BBBy Intercreditor Agreement.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement, dated as of the Closing Date, among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Mortgages, and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"SEMS" means the Superfund Enterprise Management System maintained by the U.S. Environmental Protection Agency.

"SFT2" means Salkovitz Family Trust 2, LLC, a Massachusetts limited liability company.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, Consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means a Borrowing comprised of SOFR Loans.

"SOFR Loan" means a Committed Revolving Loan that bears interest at a rate determined by reference to Term SOFR (other than pursuant to clause (b) of the definition of "Base Rate").

"Specified Event of Default" means an Event of Default arising under Sections 8.01(a), (b) (solely arising as a result of a breach of (i) Section 6.02(b) by virtue of a Borrowing Base Certificate being delivered more than two (2) days late, and (ii) Section 7.15), (f), (k), or (l).

"Spot Rate" has the meaning provided in Section 1.06 hereof.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Store Closing Motion" means the [Motion for Interim and Final Orders (I) (a) Confirming, on an Interim Basis, that the Store Closing Agreement Is Operative and Effective and (B) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, and (II) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims and Encumbrances, which motion and the orders annexed thereto must be acceptable to the Required Lenders]. The Store Closing Motion shall seek, among other things, authority for the Loan Parties to commence store closing sales at certain of their store locations.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Required Lenders.

"Subordination Provisions" has the meaning provided in Section 8.01(o).

"Subsidiary" of a Person means a corporation, partnership, limited liability partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party. All references herein to a "wholly-owned" Foreign Subsidiary shall be deemed to include a Foreign Subsidiary that has issued Equity Interests in order to qualify members of any governing body of such Foreign Subsidiary if required by applicable Laws or otherwise required by applicable Laws in any foreign jurisdiction, but which Foreign Subsidiary is otherwise wholly-owned.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based

upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Tax Distributions" means distributions from the Lead Borrower and its Subsidiaries to Holdings and Parent in the aggregate amount necessary to permit Holdings and Parent to make distributions to each of its direct and indirect equity holders in the actual amount required to pay the U.S. federal, state and local income tax liabilities of such equity holders attributable to their indirect ownership of the Lead Borrower and any Subsidiary during the applicable period (net of any tax credits due to such equity holders and attributable to such indirect ownership of the Lead Borrower and any Subsidiary from prior periods (or portions thereof) beginning after the Closing Date to the extent (1) not taken into account in a prior taxable period (or portion thereof) to reduce a prior distribution under this parenthetical, and (2) such credits are permitted under applicable law to be deducted against the taxable income of such equity holder in the current taxable period), assuming (a) such equity holders are subject to tax at the highest maximum effective combined income tax rate applicable to an individual or corporation in any jurisdiction in which any such equity holder is a resident or where either Holdings or Parent has its principal place of business, (b) that all equity holders are subject to the maximum limitations on deductions applicable to individuals or corporations, and (c) gains or other income by reason of the sale-leaseback transaction in connection with the Middleborough Property Sale shall not be taken into account (other than, in the case of this clause (c), for purposes of determining the amounts in respect of state income taxes).

"Taxes" or "Tax" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Revolving Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, (iii) the termination of the Revolving Commitments in accordance with the provisions of Section 2.06(a) hereof or (iv) the occurrence of a DIP Termination Event (as defined in the Interim Order or Final Order, as applicable).

"Term SOFR" means,

(a)      for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor of three (3) months on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for such tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of three (3) months on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for such tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

For the sake of clarity, Term SOFR shall be adjusted monthly on the first (1st) day of each calendar month.

"Term SOFR Adjustment" means 11.448 basis points (0.11448%).

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Total Revolving Outstandings" means, as of any date of determination, the aggregate Outstanding Amount of (i) all Committed Revolving Loans, (ii) all Permitted Revolving Protective Advances, (iii) outstanding Letters of Credit as of such date and (iv) the outstanding balance of the Prepetition Revolving Obligations.

"Trading with the Enemy Act" has the meaning provided in Section 10.19.

"Type" means, with respect to a Committed Revolving Loan, its character as a Base Rate Loan or a SOFR Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA" has the meaning provided in Section 10.22(d).

"UFTA" has the meaning provided in Section 10.22(d).

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time)

promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unbudgeted Credit Party Expenses" means the Credit Party Expenses in excess of the amounts set forth in the Approved Budget.

"Unintentional Overadvance" means an Overadvance which, to the Administrative Agent's knowledge, as applicable, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the applicable Borrowing Base, increase in Reserves or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities; provided, that for purposes of notice requirements in Section 2.02(b), such day is also a Business Day.

"U.S. Trustee" means the United States Trustee responsible for overseeing the administration of the Chapter 11 Cases.

"Write-Down and Conversion Powers" means, (i) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (ii) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.02    Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or

modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, and (vii) any term defined by reference to such term as defined in the Prepetition Term Loan Credit Agreement shall be deemed to refer to the Prepetition Term Loan Credit Agreement as in effect on February 16, 2023, and as the Prepetition Term Loan Credit Agreement may thereafter be amended, restated, supplemented or otherwise modified from time to time, except as prohibited by the terms of the Prepetition ABL Intercreditor Agreement.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)     Any reference herein or in any other Loan Document to the "satisfaction", "repayment", "paid in full" or "payment in full" of the Obligations (including the "Guaranteed Obligations as defined in the Facility Guaranty and the "Secured Obligations" as defined in the Security Agreement) shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of any contingent reimbursement obligations with respect to Letters of Credit and Bank Products and any other contingent Obligation, including indemnification obligations, providing cash collateralization), cash collateralization of Letters of Credit as required hereunder, or other collateral and releases as may be requested by the Agent of all of the Obligations other than unasserted contingent indemnification Obligations.

**1.03     Accounting Terms**

(a)     _Generally_.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with the Loan Parties' past practice as reasonably acceptable to the Administrative Agent, except as otherwise specifically prescribed herein.

(b)     _Changes in GAAP_.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Administrative Agent and the

Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding**.  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    Currency Equivalents Generally**.  Any amount specified in this Agreement (other than in Articles II, IX and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars.  For purposes of this <u>Section 1.06</u>, the "Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the Spot Rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

**1.07    Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

**1.08    Prevailing Interest Reference Rates**.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to <u>Section 3.04</u>, will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and Lenders and their respective Affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be adverse to a Loan Party.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Loan Party, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages,

costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**1.09     Letter of Credit Amounts**.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the lesser of (x) the maximum remaining undrawn amount of such Letter of Credit as of the date of determination or (y) the Stated Amount of such Letter of Credit in effect at such time; <u>provided</u>, <u>however</u>, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the lesser of (x) the maximum remaining undrawn amount of such Letter of Credit as of the date of determination or (y) the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**2.01     Loans; Reserves; Letters of Credit**

(a)     [Reserved].

(b)     Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to (x) make loans (each such loan, a "<u>Committed Revolving Loan</u>") and (y) and make letters of credit ("<u>Letters of Credit</u>") available to the Borrowers from time to time, on any Business Day during the Availability Period, after giving effect to each such Committed Revolving Loan and Letter of Credit the aggregate amount of Committed Revolving Loans and Letters of Credit outstanding shall not at any time exceed the lesser of (x) the amount of such Lender's Revolving Commitment, or (y) such Revolving Lender's Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

(i)     after giving effect to any Revolving Credit Borrowing or issuance of a Letter of Credit, the Total Revolving Outstandings shall not exceed the Revolving Loan Cap, and

(ii)     after giving effect to any Revolving Credit Borrowing or issuance of a Letter of Credit, the aggregate Outstanding Amount of the Committed Revolving Loans of any Lender, together with the amount of outstanding obligations owed to such Lender under the Prepetition Revolving Credit Agreement, shall not exceed such Lender's Revolving Commitment.

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow Committed Revolving Loans under this <u>Section 2.01(b)</u>, prepay under <u>Section 2.05</u>, and reborrow under this <u>Section 2.01(b)</u>.  Committed Revolving Loans shall be SOFR Loans or, to the extent required under <u>Sections 3.02</u> and <u>3.04</u>, Base Rate Loans.

(c)     The Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to <u>Section 4.01(b)</u> hereof.

(d)     The Administrative Agent, shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves.

(e)     <u>Provisions Applicable to Letters of Credit</u>.

(i)     The Administrative Agent shall, on the terms and conditions set forth in this Agreement, make Letters of Credit available to Borrowers by causing other financial institutions to issue them supported by the Administrative Agent's guaranty or indemnification; provided, that after giving effect to each Letter of Credit, the Letter of Credit Balance will not exceed the Letter of Credit Limit. Borrowers agree to execute all documentation required by each applicable L/C Issuer in connection with any such Letter of Credit. Borrowers unconditionally and irrevocably agree to reimburse the Administrative Agent or the applicable L/C Issuer for each payment or disbursement made by the Administrative Agent or such L/C Issuer in respect of each draw under any Letter of Credit, in each case on the date that such payment or disbursement is made. Borrowers' reimbursement obligations hereunder shall be irrevocable and unconditional under all circumstances, including (a) any lack of validity or enforceability of any Letter of Credit, this Agreement or any other Loan Document, (b) the existence of any claim, set-off, defense or other right which any Loan Party may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), Administrative Agent, the applicable L/C Issuer under any Letter or Credit, or any other Person, whether in connection with any Letter of Credit, this Agreement, any other Loan Document, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between any Loan Party and the beneficiary named in any Letter of Credit), (c) any lack of validity, sufficiency or genuineness of any document which the Administrative Agent or the applicable L/C Issuer has determined complies on its face with the terms of the applicable Letter of Credit, even if such document should later prove to have been forged, fraudulent, invalid or insufficient in any respect or any statement therein shall have been untrue or inaccurate in any respect or (d) the surrender or impairment of any security for the performance or observance of any of the terms hereof.

(ii)     Borrowers shall pay to the Administrative Agent for the account of each Revolving Lender in accordance with its Applicable Percentage a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit equal to the Applicable Margin times the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit). For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06. Letter of Credit Fees shall be (i) due and payable on the first day after the end of each month commencing with the first such date to occur after the issuance of such Letter of Credit, and after the Letter of Credit Expiration Date, on demand, and (ii) computed on a monthly basis in arrears. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate.

(iii)     In addition to the Letter of Credit Fees, all amounts paid or incurred by Administrative Agent or L/C Issuer in respect of a Letter of Credit will, at the election of Administrative Agent, be treated for all purposes as a Committed Revolving Loan, and bear interest, and be payable, in the same manner as a Committed Revolving Loan.

(iv)     Immediately upon issuance by the applicable L/C Issuer of any Letter of Credit pursuant to this Agreement, each Revolving Lender shall be deemed to have irrevocably and unconditionally purchased and received from the Administrative Agent, without recourse or warranty, an undivided interest and participation, to the extent of such Lender's Pro Rata Share, in all obligations of the Administrative Agent with respect to such Letter of Credit (including, without limitation, all reimbursement obligations of Borrowers with respect thereto or otherwise). For the avoidance of doubt, any Letter of Credit issued or arranged by the Administrative Agent for the benefit of any Loan Party existing under the Existing Credit Agreement shall be deemed to have been issued and/or arranged in accordance with the terms and provisions of this Agreement.

(f)     Notwithstanding anything to the contrary herein or in any other Loan Document, after giving effect to entry of the Final Order, the total outstanding amount of any Prepetition Revolving Obligations shall constitute Obligations hereunder, with the (i) the remaining outstanding amount of the Prepetition Revolving Obligations as of such date (if any) being "rolled up" as Committed Revolving Loans hereunder on the date the Final Order is entered and (ii) all outstanding Prepetition Letters of Credit on such date being "rolled up" and constituting Letters of Credit hereunder and counting towards the Letter of Credit Balance on the date the Final Order is entered.

**2.02     Borrowings of Revolving Loans.**

(a)     Committed Revolving Loans and issuances of Letters of Credit shall be SOFR Loans subject to and in accordance with this Section 2.02.

(b)     Each request for a Revolving Credit Borrowing shall be made by electronic request of the Lead Borrower through a Borrowing Notice in the Administrative Agent's ABLSoft (or, if requested by the Administrative Agent, by delivering in writing to the Administrative Agent by another approved electronic method of communication), which must be received by the Administrative Agent not later than 1:00 p.m. on the requested date of any Borrowing of Committed Revolving Loans. The Borrowers hereby acknowledge and agree that any request made through ABLSoft shall be deemed made by a Responsible Officer of the Borrowers.  Each Borrowing Notice shall specify (i) the requested date of the Borrowing (which shall be a Business Day), and (ii) the principal amount of Committed Revolving Loans to be borrowed (which shall be in a principal amount of $250,000 or a whole multiple of $250,000 in excess thereof).  All Borrowing requests which are not made on-line via the Administrative Agent's ABLSoft shall be subject to (and unless the Administrative Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) the Administrative Agent's authentication process (with results satisfactory to the Administrative Agent) prior to the funding of any such requested Committed Revolving Loans.  Notwithstanding the foregoing, (x) at the beginning of each Business Day, upon the remittance to the Prepetition Revolving Agent for application to the Prepetition Revolving Obligations of the available balance in the Revolving Concentration Account as of the end of the prior Business Day in accordance with Section 6.13, the Borrowers shall be deemed to have delivered a Borrowing Notice requesting a Borrowing of Committed Revolving Loans to be made on such date in the amount of the funds remitted on such date and funded directly to the Prepetition Revolving Agent for application to the Prepetition Revolving Obligations and (y) upon any remittance of proceeds of Accounts Receivable and Inventory received by the Borrowers in the ordinary course of business, the Borrowers shall be deemed to have delivered a Borrowing Notice requesting a Borrowing of Committed Revolving Loans in the amount of two dollars for each dollar of proceeds so remitted and funded directly to the Prepetition Revolving Agent for application to the outstanding balance of the Prepetition Revolving Obligations.

(c)     The Administrative Agent shall promptly notify each Revolving Lender of the amount of its Applicable Percentage of the applicable Committed Revolving Loans (or portion thereof). In the case of a Revolving Credit Borrowing, each Revolving Lender shall make the amount of its Committed Revolving Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable notice, subject in all respect to any funding arrangements set forth in the AAL.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds available to the Borrowers in like funds by no later than 3:00 p.m. on the day of receipt by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Lead Borrower.

(d)     The Administrative Agent, without the request of the Lead Borrower, may advance as a Committed Revolving Loan, any interest, fee, service charge (including direct wire fees), Credit Party

Expenses, fees and other amounts paid by the Administrative Agent to L/C Issuers in respect of Letters of Credit, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Revolving Loan Account notwithstanding that an Overadvance may result thereby. The Administrative Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Administrative Agent shall not constitute a waiver of the Administrative Agent's respective rights and the Borrowers' obligations under Section 2.05(c). Any amount which is added to the principal balance of the Revolving Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to SOFR Loans.

(e)     The Administrative Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any SOFR Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Administrative Agent, Lead Borrower and the Lenders of any change in Wells Fargo's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(f)     The Administrative Agent and the Revolving Lenders shall have no obligation to make any Committed Revolving Loan or issue any Letter of Credit if an Overadvance would result. The Administrative Agent may make Permitted Revolving Overadvances without the consent of the Borrowers and the Revolving Lenders, and the Borrowers and each Revolving Lender shall be bound thereby. A Permitted Revolving Overadvance is for the account of the Borrowers and shall constitute a Committed Revolving Loan which is a SOFR Loan and a part of the Obligations and shall be repaid by the Borrowers in accordance with the provisions of Section 2.05(c). The making of any such Permitted Revolving Overadvance on any one occasion shall not obligate the Administrative Agent or any Revolving Lender to make or permit any Permitted Revolving Overadvance on any other occasion or to permit such Permitted Revolving Overadvances to remain outstanding. The Administrative Agent shall not have any liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Administrative Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    [Reserved].**

**2.04    [Reserved].**

**2.05    Prepayments**.

(a)     [Reserved].

(b)     [Reserved].

(c)     If for any reason, the sum of the Total Revolving Outstandings and the Letter of Credit Balance at any time exceed the Revolving Loan Cap as then in effect, the Borrowers shall immediately prepay Committed Revolving Loans in an aggregate amount equal to such excess.

(d)     At all times from and after the Closing Date, the Borrowers shall prepay the Committed Revolving Loans with the proceeds and collections received by the Loan Parties into the Cash Concentration Accounts, other than to the extent such proceeds or collateral are identifiable proceeds of Prepetition Term Priority Collateral.

(e)	Subject to the Prepetition ABL Intercreditor Agreement, the Borrowers shall prepay the Committed Revolving Loans in an amount equal to one hundred percent (100.00%) of the Net Proceeds received by a Loan Party on account of any Prepayment Event.

(f)	[Reserved].

(g)	Prepayments made pursuant to <u>Section 2.05(d)</u> or <u>2.05(e)</u> above shall be applied, <u>first</u>, to the Permitted Revolving Overadvances, if any, and <u>second</u>, ratably to the outstanding Committed Revolving Loans, until paid in full.

(h)	[Reserved].

(i)	Notwithstanding anything provided for herein, a notice of prepayment may state that such notice is conditional upon the consummation of an acquisition or sale transaction or upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness, in which case such notice of prepayment may be revoked by the Lead Borrower (by notice to the Agent and the Administrative Agent on or prior to the specified date) if such condition is not satisfied.

**2.06	Termination or Reduction of Commitments**.

(a)	The Borrowers may, upon irrevocable (subject to clause (iv) of the following proviso) notice from the Lead Borrower to the Administrative Agent, terminate the Aggregate Revolving Commitments or from time to time permanently reduce the Aggregate Revolving Commitments; <u>provided</u> that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. (x) twenty (20) days prior to the date of termination, or (y) five (5) Business Days prior to the date of reduction, (ii) any such partial reduction shall be made on a pro rata basis based on the Aggregate Revolving Commitments of each Lender, (iii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof, (iv) the Borrowers shall not terminate or reduce the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments, and (v) any such notice may state that such notice is conditioned upon the effectiveness of any other transaction, in which case such notice may be revoked or the effective date of such termination or reduction specified in such notice may be delayed by the Lead Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. If, on the date of a voluntary termination pursuant to this <u>Section 2.6(a)</u>, there are any outstanding Letters of Credit, then on such date, and as a condition precedent to such termination, Borrowers shall provide to Administrative Agent cash collateral in an amount equal to 103% of the Letter of Credit Balance to secure all of the Obligations (including estimated attorneys' fees and other expenses) relating to said Letters of Credit or such greater percentage or amount as the Administrative Agent reasonably deems appropriate, pursuant to a cash collateral agreement in form and substance satisfactory to the Administrative Agent.

(b)	[Reserved].

(c)	The Administrative Agent will promptly notify the Revolving Lenders of any termination or reduction of the Aggregate Revolving Commitments under this <u>Section 2.06</u>. Upon any reduction of the Aggregate Revolving Commitments or the Revolving Commitment of each Revolving Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees (including, without limitation, commitment fees, and Prepayment Premiums) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any such termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination, including any applicable Revolving Credit Early Termination Fee.

(d)　　　[Reserved].

**2.07　Repayment of Loans**.

(a)　　　On the Termination Date, the Borrowers shall repay to the Administrative Agent, for the benefit of the Revolving Lenders, the aggregate principal amount of Loans outstanding on such date. The Borrowers shall repay to the Administrative Agent the aggregate principal amount of any Permitted Revolving Overadvances, immediately upon the demand of the Administrative Agent. Without limiting the generality of the foregoing, if, on the Termination Date, there are any outstanding Letters of Credit, then on such date Borrowers shall provide to the Administrative Agent cash collateral in an amount equal to 103% of the Letter of Credit Balance to secure all of the Obligations (including estimated attorneys' fees and other expenses) relating to such Letters of Credit or such greater percentage or amount as Administrative Agent reasonably deems appropriate, pursuant to a cash collateral agreement in form and substance satisfactory to Administrative Agent.

(b)　　　[Reserved].

(c)　　　[Reserved].

**2.08　Interest.**

(a)　　　Subject to the provisions of <u>Section 2.08(b)</u> below, (i) each Committed Revolving Loan which is a SOFR Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to Adjusted Term SOFR <u>plus</u> the Applicable Margin; and (ii) each Committed Revolving Loan which is a Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Margin.

(b)　　　(a)(i)　　　If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, the Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)　　　If any other Event of Default exists, then Administrative Agent shall upon the request of the Required Lenders, notify the Lead Borrower that all outstanding Obligations with respect to the Total Outstandings shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(iii)　　　Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(iv)　　　Interest payments in respect of the Total Revolving Outstandings shall be made to the Administrative Agent, for the benefit of the Lenders in accordance with their respective Applicable Percentages (except as otherwise expressly set forth in the AAL).

(c)　　　Interest on each Loan shall be due and payable in arrears on the last day of each calendar month and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09**     **Fees**.   The Borrowers shall pay to the Administrative Agent for the account of the Administrative Agent and the Lenders, as applicable and in accordance with the AAL, fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10**     **Computation of Interest and Fees; Term SOFR Conforming Changes**.

(a)     All computations of fees and interest shall be made on the basis of a three hundred sixty (360) day year and actual days elapsed.  Interest shall accrue on each outstanding Loan beginning, and including the day, such Loan is made and until (but not including) the day on which such Loan (or such portion thereof) is paid.  For purposes of the calculation of the Total Outstandings and interest on the Loans, all payments made by or on account of a Borrower shall be deemed to have been applied to the Obligations two (2) Business Days after receipt of such payments by the Lender.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)     In connection with the use or administration of Term SOFR, the Administrative Agent (in consultation with the Lead Borrower) will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Lead Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

**2.11**     **Evidence of Debt**.

(a)     The Credit Extensions in respect of the Total Revolving Outstandings and Letters of Credit of the Administrative Agent and each Lender shall be evidenced by one or more accounts or records maintained by the Administrative Agent (the "<u>Revolving Loan Account</u>").  In addition, the Administrative Agent and each Lender may record in the Administrative Agent's or Lender's, as applicable, internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Committed Revolving Loans, in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)     [Reserved].

**2.12**     **Payments Generally; Administrative Agent's Clawback.**

(a)     General.  All payments to be made by the Loan Parties shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)     (i)     Funding by Revolving Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Revolving Lender prior to the proposed date of any Revolving Credit Borrowing of SOFR Loans (or in the case of any Revolving Credit Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Revolving Lender will not make available to the Administrative Agent such Revolving Lender's share of such Revolving Credit Borrowing, the Administrative Agent may assume that such Revolving Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Revolving Credit Borrowing of Base Rate Loans, that such Revolving Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Revolving Lender has not in fact made its share of the applicable Revolving Credit Borrowing available to the Administrative Agent, then the applicable Revolving Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Revolving Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Committed Revolving Loans comprising Base Rate Loans.  If the Borrowers and such Revolving Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Revolving Lender pays its share of the applicable Revolving Credit Borrowing to the Administrative Agent, then the amount so paid shall constitute such Revolving Lender's Committed Revolving Loan included in such Revolving Credit Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Revolving Lender that shall have failed to make such payment to the Agent.  Solely as between the Administrative Agent and any applicable Revolving Lender, the provisions of this Section 2.12(b)(i) are expressly subject to the terms of the AAL.

(ii)     Payments by Borrowers; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Administrative Agent for the account of any applicable Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice provided by the Administrative Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent, because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Revolving Lenders hereunder to make Committed Revolving Loans, and to fund participations in Letter of Credits, and to make payments hereunder are several and not joint.  The failure of any Revolving Lender to make any Committed Revolving Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Revolving Lender of its corresponding obligation to do so on such date, and no Revolving Lender shall be responsible for the failure of any other Revolving Lender to so make its portion of its Committed Revolving Loan, to purchase its participation or to make its payment hereunder.

(e)    Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

2.13    **Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in any Revolving Lender receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Revolving Loans greater than its pro rata share thereof as provided herein (including, in each case, as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (i) notify the Administrative Agent, in the case of Committed Revolving Loans, of such fact, and (ii) purchase (for cash at face value) participations in the Obligations of the other Revolving Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03; provided, that:

(i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement as in effect on the date hereof.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

2.14    **Settlement Among Lenders.**

(a)     The amount of each Revolving Lender's Applicable Percentage of outstanding Committed Revolving Loans shall be computed weekly (or more frequently in the Administrative Agent's discretion) and shall be adjusted upward or downward based on all Committed Revolving Loans and repayments of Committed Revolving Loans received by the Administrative Agent as of 3:00 p.m. on the first (1st) Business Day (such date, the "Settlement Date") following the end of the period specified by the Administrative Agent.

(b)     The Administrative Agent shall deliver to each of the Revolving Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Revolving Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Administrative Agent shall transfer to each Revolving Lender its Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Administrative Agent (as provided below) or the Administrative Agent shall transfer to each Revolving Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Revolving Loans made by each Revolving Lender shall be equal to such Revolving Lender's Applicable Percentage of all Committed Revolving Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Administrative Agent by the Revolving Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day.  The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent.  If and to the extent any Revolving Lender shall not have so made its transfer to the Administrative Agent, such Revolving Lender agrees to pay to the Administrative Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

(c)     Solely as between the Administrative Agent and any applicable Revolving Lender, the provisions of this Section 2.14 are expressly subject to the terms of the AAL.

**2.15    Prepetition Revolving Obligations.**

Continuation of Liens.  Subject to the terms of the Interim Order or the Final Order, as applicable, until (i) the indefeasible payment in full in cash of the Obligations (including Prepetition ABL Obligations), (ii) all objections and challenges (including, without limitation, any Challenge Proceeding (as defined in the Order)) to (A) the liens, security interests and claims of the Prepetition Revolving Agent (including, without limitation, liens granted for adequate protection purposes) and/or (B) the Prepetition Revolving Obligations have been waived, denied or barred, and (iii) all of the Debtors' Stipulations (as defined in the Order) have become binding on their estates and parties in interest in accordance with the Order, all liens, security interests and claims of the Prepetition Revolving Agent (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein and the Prepetition ABL Intercreditor Agreement and the Prepetition Revolving Loan Documents shall remain in full force and effect; provided, however, that, subject to the results of any applicable Challenge Proceeding (as defined in the Order), to the extent that Prepetition Revolving Obligations have been paid pursuant to this Agreement and have become and are Obligations, such Prepetition Revolving Obligations shall not be due or owing separately under the Prepetition Revolving Loan Documents; provided, further, however, that nothing in the foregoing proviso shall alter

or diminish, or be deemed to alter or diminish, the Adequate Protection (as defined in the Order) of the Prepetition Revolving Agent and the Prepetition Revolving Lenders.

Avoided Payments. In the event that the Prepetition Revolving Agent or any of the Prepetition Revolving Lenders are required to repay or disgorge to any Loan Party or any representatives of the Loan Parties' estates (as agents, with derivative standing or otherwise) all or any portion of the Prepetition Revolving Obligations authorized and directed to be repaid pursuant to the Interim Order or the Final Order, or any payment on account of the Prepetition Revolving Obligations made to the Prepetition Revolving Agent or any Prepetition Revolving Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or other applicable debtor relief law or any applicable state law, or any other similar provisions under any other state or federal statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, unless otherwise expressly ordered by the Bankruptcy Court, the Loan Parties shall prepay the Revolving Loans, in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by any Loan Party or any representative of the Loan Parties' estate.

**2.16**  **Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.**

(a)  The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Interim Order and Final Order, when applicable.

(b)  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Court.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

**3.01**  **Taxes.**

(a)  Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Laws. If the Loan Parties shall be required by applicable Laws (as determined in the good faith discretion of an applicable Loan Party) to deduct or withhold any Taxes from such payments, then (i) if such Tax is an Indemnified Tax, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions or withholdings, and (iii) the Loan Parties shall timely pay and remit the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws.

(b)  Payment of Other Taxes by the Loan Parties. Without limiting the provisions, but without duplication, of subsection (a) above, the Loan Parties shall timely pay and remit any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)  Indemnification.

(i)     The Loan Parties shall indemnify each Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or remitted by any Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment, remittance or liability delivered to the Lead Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Each Lender shall severally indemnify each Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Loan Parties have not already indemnified such Agent, as the case may be, for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 10.06(d)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by any Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes each Agent, as the case may be, to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by any Agent to the Lender from any other source against any amount due to such Agent under this paragraph (c)(ii).

(d)     <u>Evidence of Payments</u>.  As soon as practicable after any payment or remittance of Indemnified Taxes or Other Taxes by the Loan Parties to a Governmental Authority, the Lead Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or remittance, a copy of the return reporting such payment or remittance or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     <u>Status of Lenders</u>.  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable Law and when reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall also be provided on or before the Closing Date and on or before such documentation expires or becomes obsolete, inaccurate or otherwise after the occurrence of an event requiring a change in the documentation most recently delivered. In addition, any Lender, if requested by the Lead Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Lender shall deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Administrative Agent), whichever of the following is applicable:

(A)     If a Lender is a non-Foreign Lender, executed copies of IRS Form W-9 certifying that such Lender is exempt for U.S. federal backup withholding tax; and

(B)     If Lender is a Foreign Lender, to the extent it is legally permitted to do so:

(ii)     duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, claiming eligibility for applicable benefits of an income tax treaty to which the United States is a party,

(iii)     duly completed copies of Internal Revenue Service Form W-8ECI,

(iv)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate in a form reasonably satisfactory to the Lead Borrower and the Administrative Agent to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable,

(v)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; or

(vi)     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower to determine the withholding or deduction required to be made, except that the completion, execution and submission of the documentation under this clause (v) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(f)     FATCA. If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender granting the participation only) at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Agent (or, in the case of a Participant, the Lender granting the participation) such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent (or, in the case of a Participant, the Lender granting the participation) as may be necessary for the Administrative Agent or the Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)      Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that such indemnifying party, upon the request of such indemnified party, agrees to repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)      Survival. Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender.

**3.02      Reserved.**

**3.03      Illegality**.  If the Administrative Agent or any Lender reasonably determines that any change in market conditions or any Change in Law has made it (or in the good faith judgment of such Agent or the applicable Lender cause a substantial question as to whether it is)  unlawful, or any Governmental Authority has asserted that it is unlawful, for the Administrative Agent or any Lender or its applicable Lending Office to determine or charge interest rates based upon Term SOFR (or Base Rate Loans determined with reference to Term SOFR), in each case, first adopted, changed or asserted after the date of such Lender became a Lender, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, any obligation of any Agent or such Lender to make, maintain or fund SOFR Loans (or Base Rate Loans determined with reference to Term SOFR) shall be suspended until the Administrative Agent or such Lender notifies the Lead Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to Base Rate Loans (determined without reference to clause (b) of the definition of "Base Rate") immediately.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.04      Certain Provisions Regarding SOFR Loans.**

(a)      Inadequate or Unfair Basis.  If the Administrative Agent or any Lender reasonably determines (which determination shall be binding and conclusive on the Loan Parties) that adequate and reasonable means do not exist for ascertaining Term SOFR or that Term SOFR will not adequately and fairly reflect the cost to such Lender of the establishment or maintenance of any Loan or other advance, then such Agent or such Lender shall promptly notify Lead Borrower thereof and, so long as such circumstances shall continue, (i) the Administrative Agent and/or such Lender shall be under no obligation to make any SOFR Loans and (ii) on the last day of the current calendar month, each SOFR Loan shall,

unless then repaid in full, automatically convert to a Base Rate Loan (determined without reference to clause (b) of the definition of "Base Rate").

(b)     Benchmark Replacement Setting.

(i)     Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Lead Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Lead Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from the Lenders comprising the Required Lenders.     No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 3.04(b) will occur prior to the applicable Benchmark Transition Start Date.

(ii)     Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right (in consultation with the Lead Borrower) to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)     Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Lead Borrower and the Lenders of (1) the implementation of any Benchmark Replacement, and (2) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Lead Borrower of the commencement or conclusion of any Benchmark Unavailability Period; provided, however, for the avoidance of doubt, until such time as the Administrative Agent delivers a notice as contemplated by this Section 3.04(c)(iii), Term SOFR or the then-current Benchmark, as applicable, shall remain in full force and effect.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.04, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.04.

(iv)     Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may reinstate such previously removed tenor.

(v)     Benchmark Unavailability Period.  Upon the Lead Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Lead Borrower may revoke any request for a Revolving Credit Borrowing based upon Term SOFR or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Lead Borrowing will be deemed to have converted any such request into a request for a Revolving Credit Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of the Base Rate based upon the then-current Benchmark will not be used in any determination of the Base Rate.

**3.05     Increased Costs; Reserves**.

(a)     Increased Costs Generally.  If any (i) Change in Law, or (ii) compliance by any Lender with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority (including Regulation D of the FRB), shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any tax of any kind whatsoever with respect to this Agreement, or on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto (except in each case for Indemnified Taxes, Other Taxes, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and Connection Income Taxes); or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or SOFR Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any SOFR Loan (or any Base Rate Loan determined with reference to Term SOFR) (or of maintaining its obligation to make any such SOFR Loan or Base Rate Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrowers will pay to such Lender, such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.06    Reserved**.

**3.07    Mitigation Obligations**.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.05, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.03, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.05, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.03, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.08    Survival**.  All of the Loan Parties' obligations under this Article III shall survive termination of the Aggregate Revolving Commitments and repayment of the Committed Revolving Loans and all other Obligations hereunder.

**3.09    Designation of Lead Borrower as Borrowers' Agent.**

(a)     Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)     Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)     The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension.  Neither the Administrative Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**4.01    Conditions of Initial Credit Extension**.  The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent except to the extent such condition may be satisfied after the Closing Date pursuant to <u>Section 6.20</u>:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Administrative Agent:

(i)    executed counterparts of this Agreement sufficient in number for distribution to each Agent, each Lender and the Lead Borrower;

(ii)    a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)    such certificates of resolutions, minutes, or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)    copies of each Loan Party's Organization Documents and such other documents and certifications to evidence that each Loan Party is duly organized, incorporated or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each respective jurisdiction of formation or organization, as applicable;

(v)    [reserved];

(vi)    a certificate signed by a Responsible Officer of the Lead Borrower certifying that the conditions specified in <u>Sections 4.01(h)</u> have been satisfied;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Administrative Agent required under the Loan Documents have been obtained and are in effect;

(viii)    [reserved];

(ix)    [reserved];

(x)    the Security Documents and certificates evidencing any stock or shares being pledged thereunder, together with undated stock powers or stock transfer forms executed in blank, each duly executed by the applicable Loan Parties;

(xi)     all other Loan Documents, each duly executed by the applicable Loan Parties and other Persons party thereto;

(xii)     [reserved];

(xiii)     results of customary searches indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements reasonably satisfactory to the Administrative Agent are being tendered concurrently with such extension of credit or other arrangements reasonably satisfactory to the Administrative Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made; and

(xiv)     [reserved];

(xv)     [reserved]; and

(xvi)     all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded (or made available for filing, registration or recordation).

(b)     The Administrative Agent shall have received a Borrowing Base Certificate, dated as of the Closing Date and duly executed by the Chief Financial Officer (or, if, as of such date, there is no Chief Financial Officer, the Chief Executive Officer) of the Lead Borrower presenting the Lead Borrower's computation of the Revolving Credit Borrowing Base and Availability (in each case, determined as of the Closing Date, with asset values determined as of the end of the most recent month ended not less than fifteen (15) days prior to the date of determination, or, such other date as agreed to by the Administrative Agent in its discretion).

(c)     The Administrative Agent shall have received and approved the Approved Budget.

(d)     The Bankruptcy Court shall have entered (i) the Interim Order, among other things, approving this Agreement and the transactions contemplated hereby, including the "roll up" of the Prepetition ABL Obligations into Obligations under this Agreement, approving the Prepetition ABL Lenders Adequate Protection, as set forth therein, and such other matters required by the Administrative Agent and the Lenders, and (ii) all "first day" orders, including (x) the Cash Management Order, (y) an Order approving the Loan Parties' assumption of the [ReStore Consignment Agreement], and (z) the [Store Closing Order], in each case, in form and substance satisfactory to the Administrative Agent and the Lenders in their sole discretion.

(e)     Since the Petition Date, other than events or circumstances arising from the MAE Exceptions, there has not been any Material Adverse Effect.

(f)     All fees required to be paid on the Closing Date (including pursuant to the Fee Letter) shall be paid on the Closing Date, and all out-of-pocket expenses and disbursements required to be paid to the Administrative Agent and the Lenders on the Closing Date (including the legal fees and expenses of Greenberg Traurig, LLP and Ropes & Gray, LLP) in accordance with the definition of Credit Party Expenses on the Closing Date shall have been paid or will be paid on the Closing Date.

(g)     The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to all Credit Extensions; Letters of Credit.**

On and after the Closing Date, the obligation of each Lender to honor any Request for Credit Extension, and requests that the Administrative Agent arrange for the issuance of a Letter of Credit, is subject to the following conditions precedent:

(a)     the representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension or issuance of a Letter of Credit, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (iii) for purposes of this Section 4.02, the representations and warranties contained in Section 5.05(b) shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01;

(b)     no Default or Event of Default shall exist, or would result from such proposed Credit Extension or issuance of any Letter of Credit, or from the application of the proceeds thereof;

(c)     the Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof;

(d)     no Overadvance shall result from such Credit Extension; and

(e)     The Interim Order or the Final Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended without the Required Lenders' prior written consent and shall otherwise be in full force and effect and no motion for reconsideration of the Interim Order or the Final Order, as applicable, shall have been timely filed by a Debtor of any of its Subsidiaries.

Each Request for Credit Extension or issuance of a Letter of Credit submitted by the Lead Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Administrative Agent to cease making Committed Revolving Loans, the Revolving Lenders will fund their respective Applicable Percentage of all Committed Revolving Loans and participate in all Letter of Credit Balances whenever made or issued, which are requested by the Lead Borrower and

which, notwithstanding the failure of the Loan Parties to comply with the provisions of this <u>Article IV</u>, agreed to by the Administrative Agent, provided, however, the making of any such Loans or issuance of any such Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

To induce the Credit Parties to enter into this Agreement and to make Loans and issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power**.  Each Loan Party (a) is a corporation, company, limited liability company, partnership, limited liability partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. <u>Schedule 5.01</u> annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization or company number, if any, issued by its state of incorporation or organization, and its federal employer identification number. No Loan Party is an Affected Financial Institution.

**5.02    Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Loan Party is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Loan Party's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract of such Loan Party or (ii) any material order, injunction, writ or decree of any Governmental Authority or any material arbitral award to which such Loan Party or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Laws applicable to such Loan Party.

**5.03    Governmental Authorization; Other consents**.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the priority set forth therein and to release any existing Lien (if applicable)), (b) such as have been obtained or made and are in full force and effect (or, solely to the extent related to enforcement, contemplated to be made or obtained).

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party hereto or that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in

accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law and subject to the need for filings and registrations necessary to create or perfect the Liens of the Collateral granted by the Loan Parties in favor of the Agent.

**5.05    Financial Statements; No Material Adverse Effect**.

(a)    [Reserved].

(b)    [Reserved].

(c)    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect other than arising out of the MAE Exceptions.

(d)    To the knowledge of the Lead Borrower, as of the Closing Date, no Internal Control Event exists or has occurred since November 26, 2022 that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) of any financial information delivered or to be delivered to any Agent or the Lenders, (ii) of the Borrowing Base, (iii) of covenant compliance calculations provided hereunder or (iv) of the assets, liabilities, financial condition or results of operations of the Parent and its Subsidiaries on a Consolidated basis.

(e)    The Consolidated balance sheet of the Parent and its Subsidiaries as at [November 26, 2022], and the related Consolidated statements of income and cash flows of the Parent and its Subsidiaries for the eleven (11) Fiscal Months then ended, certified by the chief executive officer, chief financial officer, or treasurer of the Lead Borrower, copies of which have been furnished to each Lender, fairly present, in all material respects, the Consolidated financial condition of the Parent and its Subsidiaries as at such date and the Consolidated results of operations of the Parent and its Subsidiaries for the period ended on such date, all in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes).

(f)    The Consolidated forecasted balance sheet and statements of income and cash flows of the Parent and its Subsidiaries most recently delivered pursuant to Sections 6.01(d) and (e) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were reasonable in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, and based on the information available to the Parent, the Loan Parties' reasonable estimate of their future financial performance.

(g)    As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

**5.06    Litigation**.   There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in Schedule 5.06 and the Chapter 11 Cases, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect. Since the Closing Date, except for the Chapter 11 Cases, there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on Schedule 5.06.

**5.07** **[Reserved]**.

**5.08** **Ownership of Property; Liens**.

(a)      Each of the Loan Parties and each Subsidiary thereof has, subject to Permitted Encumbrances, good record and marketable title in fee simple (or its equivalent in the applicable jurisdiction) to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and each Subsidiary has, subject to Permitted Encumbrances, good and marketable title to, valid leasehold interests in, or valid licenses to use all of such Loan Party's or such Subsidiary's personal property and assets except to the extent such failure to hold title thereto could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date.  Each Loan Party and each of its Subsidiaries has, subject to Permitted Encumbrances, good, marketable and insurable fee simple title (or its equivalent in the applicable jurisdiction) to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances.  Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date.  Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof as of the Closing Date in any material respect, except any defaults set forth on Schedule 5.08(b)(2).

(c)      Schedule 7.01 sets forth a complete and accurate list of all registered Liens on the property or assets of each Loan Party as of the Closing Date, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party subject thereto.  The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)      Schedule 7.02 sets forth a complete and accurate list of all Investments described in clauses (a) and (b) of the definition thereof held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date (other than equity Investment held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date in their respective Subsidiaries), showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(e)      Schedule 7.03 sets forth a complete and accurate list of all Indebtedness for borrowed money of each Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09** **Environmental Compliance**.

(a)      Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law applicable to that Loan Party that Subsidiary or to any Real Estate or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law applicable to that Loan Party or that Subsidiary or any Real Estate, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)        Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or SEMS or any analogous foreign, state or local list or is adjacent to any such property; except in compliance, in all material respects, with Environmental Laws, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; except in compliance, in all material respects with Environmental Law, there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof.

(c)        Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

5.10        **Insurance**.  The properties of the Loan Parties are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts (after giving effect to any self-insurance), with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operate.  Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect, or replaced by insurance policies in accordance with Section 6.07, and all premiums in respect thereof that are due and payable have been paid.

5.11        **Taxes**.  The Loan Parties and their Subsidiaries have filed all Federal, state income tax returns and other material tax returns and reports required to be filed, and have paid all taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, and which contest effectively suspends enforcement of any such Lien and the collection of the contested obligation, (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect or (c) to the extent excused or enforcement in respect of which is stayed as a result of the Chapter 11 Cases.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

5.12        **ERISA Compliance.**

(a)        Each Pension Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Pension Plan and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430

of the Code has been made with respect to any Pension Plan. No Lien imposed under the Code or ERISA exists on account of any Plan or Multiemployer Plan.

(b)     There are no pending or, to the knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would result in a Material Adverse Effect.

(c)     (i) No ERISA Event has occurred or is reasonably expected to occur that would result in a Material Adverse Effect; and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction subject to Sections 4069 or 4212(c) of ERISA that would result in a Material Adverse Effect.

**5.13    Subsidiaries; Equity Interests.**

The Loan Parties have no Subsidiaries as of the Closing Date other than those specifically disclosed in Part (a) of <u>Schedule 5.13</u>, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and, to the extent applicable, non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of <u>Schedule 5.13</u> free and clear of all Liens except for Permitted Encumbrances and those created under the Security Documents. Except as set forth in <u>Schedule 5.13</u>, there are no outstanding rights to purchase any Equity Interests in any Subsidiary. The Loan Parties have no equity investments in any other corporation or entity as of the Closing Date other than those specifically disclosed in Part (b) of <u>Schedule 5.13</u>. All of the outstanding Equity Interests of the Loan Parties have been validly issued, and are fully paid and, to the extent applicable, non-assessable and are owned in the amounts specified on Part (c) of <u>Schedule 5.13</u> free and clear of all Liens except for Permitted Encumbrances and those created under the Security Documents. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to <u>Section 4.01</u> are true and correct copies of each such document, each of which is valid and in full force and effect as of the Closing Date.

**5.14    Margin Regulations; Investment Company Act.**

(a)     Neither any Loan Party nor any of its Subsidiaries owns any Margin Stock or is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any Margin Stock, for the purpose of extending credit to others for the purpose of purchasing or carrying any Margin Stock, or for any purpose that violates the provisions of Regulation T, U or X of the FRB. Neither any Loan Party nor any of its Subsidiaries expects to acquire any Margin Stock.

(b)     None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**. No reports, financial statements, certificates or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished), taken as a whole, contain any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made,

not materially misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such assumptions were made. The Beneficial Ownership Certification executed and delivered to the Agent and Lenders for each Loan Party on or before the Closing Date, as updated form time to time in accordance with this Agreement, is accurate, complete, and correct as of the date hereof and as of the date any such update is delivered. The Loan Parties acknowledge and agree that the Beneficial Ownership Certification is one of the Loan Documents.

**5.16    Compliance with Laws**. Except as excused by the Bankruptcy Code, each of the Loan Parties and each Subsidiary is in compliance (A) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect and (B) in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended) (the "Patriot Act").

**5.17    Intellectual Property; Licenses, Etc**. The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are material to the operation of their respective businesses, without conflict with the rights of any other Person. To the knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Lead Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters.**

There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. Except as alleged on Schedule 5.06, the hours worked by and payments made to employees of the Loan Parties comply in all material respects with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters. No Loan Party or any of its Subsidiaries has incurred any material liability or material obligation under the Worker Adjustment and Retraining Act or similar state Law. Except as alleged on Schedule 5.06, all material payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have, to the knowledge of the Loan Parties, been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, as of the Closing Date, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. Except as alleged on Schedule 5.06, there are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based

on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19    Security Documents**.

(a)      Subject to the entry of the Orders, the Security Agreement creates in favor of the Agent, for the benefit of the Credit Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.   The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement.  Upon such filings and/or the obtaining of "control," (as defined in the UCC) the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person, extent to the extent permitted under the Loan Documents.

(b)      When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified in Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

(c)      To the extent applicable, the Mortgages create in favor of the Agent, for the benefit of the Credit Parties, a legal, valid, continuing and enforceable Lien in the Mortgaged Property (as defined in the Mortgages, such term "Mortgaged Property" as used herein to include Trust Property, as such term is defined in the Mortgages that are deeds of trust), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Upon the filing or recording of the Mortgages with the appropriate Governmental Authorities, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Mortgaged Property that may be perfected by such filing (including without limitation the proceeds of such Mortgaged Property), in each case prior and superior in right to any other Person, except to the extent permitted under the Loan Documents.

**5.20    [Reserved]**.

**5.21    Deposit Accounts; Credit Card Arrangements**.

(a)     Annexed hereto as <u>Schedule 5.21(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) whether a DDA Notification will be delivered, or a Blocked Account Agreement (with either springing dominion or full dominion) will be obtained, with respect to such DDA.

(b)     Annexed hereto as <u>Schedule 5.21(b)</u> is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22     Brokers**.  Except as set forth in <u>Schedule 5.22</u>, no broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23     Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations, except for any such termination, cancellation, modification or change, that could not reasonably be expected to have a Material Adverse Effect.

**5.24     Material Contracts**.  <u>Schedule 5.24</u> sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  The Material Contracts are in full force and effect and the Loan Parties have not received any notice of the intention of any other party thereto to terminate any Material Contract, except for any expiration or non-renewal in accordance with their terms.

**5.25     Casualty**.  Neither the businesses nor the properties of any Loan Party are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26     OFAC/Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  No Loan Party or any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, and, in all material respects, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Credit Party or other individual or entity participating in any transaction).

**5.27     [Reserved]**.

**5.28    Ranking**.  Each Loan Party's payment obligations under the Loan Documents to which it is a party rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

**5.29    Credit Card Receivables**.    As of the time when each of its Accounts is included in the Borrowing Base as an Eligible Credit Card Receivable, such Account and all records, papers and documents relating thereto (a) are genuine and correct in all material respects, (b) represent the legal, valid and binding obligation of the Account Debtor, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, evidencing indebtedness unpaid and owed by such Account Debtor, arising out of the performance of labor or services or the sale, lease, license, assignment or other disposition and delivery of the goods or other property listed therein or out of an advance or a loan, and (c) are in all material respects in compliance and conform with all applicable material federal, state, provincial and/or local Laws and applicable Laws of any relevant foreign jurisdiction.

**5.30    Approved Budget**. The initial Approved Budget, in the form attached hereto as <u>Annex A</u>, which was delivered to the Administrative Agent on or prior to the Closing Date, and each additional Approved Budget prepared and delivered after the Closing Date was prepared in good faith upon assumptions the Lead Borrower believed to be reasonable on the date of delivery of the then-applicable Approved Budget or update thereto.  To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) would result in any material change in the then-applicable Approved Budget.

**5.31    Chapter 11 Cases**.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable Law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents, the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order.  The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) such other exceptions, if any, set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, and (ii) such other exceptions set forth in the Interim Order and the Final Order, as applicable.

(d)    The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended.  The Loan Parties are in compliance in all material respects with the applicable Order.

(e)     Notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable Law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no claim has been asserted), the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01     Financial Statements**.  Deliver to the Administrative Agent for distribution to each Lender, in form and detail reasonably satisfactory to the Administrative Agent:

(a)     [reserved];

(b)     as soon as available, but in any event within forty-five (45) days after the end of each Fiscal Quarter of the Parent, a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter and for the portion of the Parent's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) the corresponding Fiscal Quarter of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, to be certified by a Responsible Officer of the Lead Borrower as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)     within thirty (30) days after the end of each Fiscal Month of the Parent, a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Month, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month and for the portion of the Parent's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, to be certified by a Responsible Officer of the Lead Borrower as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(d)     [reserved]; and

(e)     [reserved].

**6.02     Certificates; Other Information**.  Deliver to the Administrative Agent for distribution to each Lender, in form and detail reasonably satisfactory to the Administrative Agent:

(a)     concurrently with the delivery of the financial statements referred to in <u>Section 6.01(b)</u> and <u>(c)</u>, a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, and in the event of any material change in generally accepted accounting principles used in the preparation of such financial statements, a statement of reconciliation conforming such financial statements to GAAP and a copy of management's discussion and analysis with respect to such financial statements;

(b)     a Borrowing Base Certificate on Wednesday of each week (or, if later, the third (3rd) Business Day of each week), showing the Borrowing Base as of the close of business as of the last day of the immediately preceding weekly period. Each Borrowing Base Certificate delivered to the Administrative Agent shall be certified as complete and correct by a Responsible Officer of the Lead Borrower;

(c)     promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(d)     the financial and collateral reports described on <u>Schedule 6.02</u> hereto, at the times set forth in such Schedule;

(e)     [reserved];

(f)     [reserved];

(g)     promptly after the Agent's request therefor, copies of all Material Contracts;

(h)     promptly following any request therefor, information and documentation reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation;

(i)     promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which could reasonably expected to have a Material Adverse Effect; and

(j)     promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as any Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to <u>Section 6.01(b)</u> or <u>(c)</u> or <u>Section 6.02(c)</u> may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on <u>Schedule 10.02</u>; or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); <u>provided</u> that: (i) the Lead Borrower shall deliver paper copies of such documents to the

Administrative Agent or any Lender that requests the Lead Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Lead Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have any obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized each Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) each Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

**6.03    Notices**.    Promptly, but in any event within two (2) Business Days, notify the Administrative Agent for distribution to each Lender:

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of (x) any material breach or non-performance of, or any material default under, a Material Contract of any Loan Party or any Subsidiary thereof (y) any termination of any Material Contract or other material notice with respect to any Material Contract, together with a copy of any such notice;

(d)    of any material dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any such litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(e)    of the occurrence of any ERISA Event that would reasonably be expected to have a Material Adverse Effect;

(f)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)      of any change in any Loan Party's Chief Executive Officer or Chief Financial Officer;

(h)      of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(i)      of any new collective bargaining agreement or other new labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)      of the filing of any Lien for unpaid Taxes against any Loan Party in excess of $250,000;

(k)      of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)      Disposition of any assets (including the sale of any Equity Interests), incurrence of Indebtedness, in each case, to the extent the Loan Parties or their Subsidiaries would be required to make a mandatory prepayment under this Agreement as a result of such transaction (without regard to any reinvestment rights); and

(m)      of the delivery or receipt of any notice of default under the Prepetition Term Loan Agreement or any other material notice sent or received under the Prepetition Term Loan Credit Documents (together with a copy of such notice).

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

      **6.04**    **Payment of Obligations**. Subject to the Orders and the terms thereof, pay and discharge as the same shall become due and prior to becoming delinquent, all its obligations and liabilities, including (a) all income tax and other material liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (iii) such contest effectively suspends collection of the contested obligation and enforcement of any obligation and any Lien securing such obligation, (b) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect or (c) such payment or discharge is subject to the Automatic Stay imposed as a result of the Chapter 11 Cases. Nothing contained herein shall be deemed to limit the rights of the Administrative Agent with respect to determining Reserves pursuant to this Agreement.

### 6.05 Preservation of Existence, Etc.

(a) As to each of the Loan Parties, preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

### 6.06 Maintenance of Properties.

(a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear and casualty excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

### 6.07 Maintenance of Insurance.

(a) Maintain with financially sound and reputable insurance companies with an A.M. Best Rating of at least A- (or otherwise reasonably acceptable to the Administrative Agent) and not with Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Administrative Agent.

(b) Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgagee clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Administrative Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Administrative Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c) Cause commercial general liability policies to be endorsed to name the Administrative Agent, as an additional insured.

(d) Cause business interruption policies to name the Administrative Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), (ii) a provision to the effect that none of the Loan Parties, the Administrative Agent or any other party shall be a co-insurer and (iii) such other provisions as the Administrative Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e) Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent (giving the

Administrative Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Administrative Agent.

(f)     Deliver to the Administrative Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent, including an insurance binder) together with evidence satisfactory to the Administrative Agent of payment of the premium therefor.

(g)     [Reserved].

(h)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(i)     Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08     Compliance with Laws**.  Comply (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (ii) such contest effectively suspends enforcement of the contested Laws, (iii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect or (iv) such company is stayed by the Chapter 11 Cases, (b) with all applicable Sanctions, and, in all material respects, Anti-Corruption Laws and Anti-Money Laundering Laws and (c) the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Bankruptcy Court in all material respects. Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Sanctions, and, in all material respects, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties shall and shall cause their respective Subsidiaries to comply with all Sanctions, and, in all material respects, Anti-Corruption Laws and Anti-Money Laundering Laws.

**6.09     Books and Records; Accountants.**

(a)     Books and Records.  Maintain proper books of record and account, in which full, true and correct entries, in all material respects, in conformity with GAAP shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)     Accountants. At all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Administrative Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Administrative Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Administrative Agent.

**6.10     Inspection Rights; Field Examinations; Appraisals.**

(a)     Permit representatives and independent contractors of the Administrative Agent or ReStore to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Administrative Agent, ReStore or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Administrative Agent or ReStore to conduct evaluations of the Loan Parties' business plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower and at the expense of the Loan Parties; provided, however, that when an Event of Default exists the Administrative Agent (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice. The Administrative Agent and ReStore shall provide the Borrower with the opportunity to participate in any discussion with any Registered Public Accounting Firm.  Notwithstanding anything to the contrary in this Section 6.10, neither any Loan Party nor any of its Subsidiaries will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Credit Party (or their representatives or contractors) is prohibited by applicable Law, Governmental Authority or any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product, in all cases, as determined in good faith by a Loan Party.

(b)     Subject to the following two sentences, upon the request of the Administrative Agent or ReStore after reasonable prior notice, permit the Administrative Agent, ReStore or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Administrative Agent or ReStore to conduct field examinations and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves.  The Loan Parties agree that the Administrative Agent and ReStore may, in their Permitted Discretion, undertake up to two (2) field examinations in each twelve (12) month period at the Loan Parties' expense; provided that, the Administrative Agent and ReStore may, undertake up to three (3) field examinations at the Loan Parties' expense in any twelve (12) month period where, at any time, Availability falls below thirty percent (30.00%) of the Revolving Loan Cap during such twelve (12) month period.     Notwithstanding the foregoing, the Administrative Agent may conduct additional field examinations (i) as it in its Permitted Discretion deems necessary or appropriate, at the expense of the Lenders, or (ii) if an Event of Default shall have occurred and be continuing, at the expense of the Loan Parties and without advance notice.

(c)     Subject to the following two sentences, upon the request of the Administrative Agent after reasonable prior notice, permit the Administrative Agent or professionals (including appraisers) retained by the Administrative Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base.  The Loan Parties agree that the Administrative Agent may, in its Permitted Discretion, undertake up to two (2) inventory appraisals during each twelve (12) month period at the Loan Parties' expense; provided that, the Administrative Agent may undertake up to three (3) inventory appraisals at the Loan Parties' expense in any twelve (12) month period where, at any time, Availability falls below thirty percent (30.00%) of the Revolving Loan Cap during such twelve (12) month period.  Notwithstanding the foregoing, the Administrative Agent may cause additional appraisals to be undertaken (i) as it in its Permitted Discretion deems necessary or appropriate, at the expense of the Lenders, or (ii) if an Event of Default shall have occurred and be continuing, at the expense of the Loan Parties and without advance notice.

(d)     [Reserved].

**6.11     Use of Proceeds**.  Use the proceeds of the Credit Extensions and Letters of Credit, (a) on the Closing Date, to repay in full all of the Prepetition Revolving Obligations,  (b) to fund the Chapter 11 Cases in accordance with the Approved Budget (subject to variances permitted under Section 6.22), (c) for the financing of the Loan Parties' ordinary working capital and other general corporate needs including certain fees and expenses of professionals retained by the Loan Parties, subject to the Carve Out, in each case, to the extent permitted under this Agreement and in accordance with the Approved Budget and (d) for certain other Prepetition and pre-filing expenses and payments that are approved by the Bankruptcy Court and permitted by the Approved Budget.  The Loan Parties shall not be permitted to use the proceeds of the Credit Extensions in contravention of the provisions of the applicable Order or the Bankruptcy Code, including any restrictions or limitations on the use of proceeds contained therein.

**6.12     Additional Loan Parties**.  Notify the Administrative Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within thirty (30) days), (a) cause any such Person (other than a Foreign Subsidiary or a Foreign Subsidiary Holdco, in each case, that is not a Material Subsidiary) to (i) become a Loan Party by executing and delivering to the Administrative Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Administrative Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Administrative Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations (in a form which is suitable and customary for the relevant jurisdiction), and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, if such Subsidiary is a Foreign Subsidiary or a Foreign Subsidiary Holdco that is not joined as a Loan Party, the Equity Interests of such Subsidiary to be pledged may be limited to sixty-five percent (65.00%) of the outstanding voting Equity Interests of such Subsidiary and one hundred percent (100.00%) of the non-voting Equity Interests of such Subsidiary and such time period may be extended based on local law or practice), in each case in form, content and scope reasonably satisfactory to the Agent.  In no event shall compliance with this Section 6.12 waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

**6.13     Cash Management**.

(a)     [Reserved].

(b)     [Reserved].

(c)     If requested by the Administrative Agent, , each Loan Party shall use commercially reasonable efforts to cause each depository bank party to a Blocked Account Agreement with the Prepetition Term Agent pursuant to the Prepetition Term Loan Credit Agreement to execute and deliver a replacement Blocked Account Agreement with the Administrative Agent and the Prepetition Term Loan Agent (and naming the Administrative Agent as "controlling agent" thereunder), in form substantially similar to such existing Blocked Account Agreements and in any event in form and substance reasonably acceptable to the Administrative Agent (the "Replacement Blocked Account Agreements").

(d)     The Loan Parties (i) shall deposit all Cash Receipts into a DDA and (ii) shall ACH or wire transfer no less frequently than daily (whether or not there are then any outstanding Obligations) to one or more DDAs subject to Blocked Account Agreements as to which the Prepetition Term Agent and, following the execution and delivery of the Replacement Blocked Account Agreements (if applicable), the Administrative Agent, has exclusive access (each such account, a "Blocked Account"), all Cash Receipts (other than Reinvestment Proceeds) on deposit in each such DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained) (each such Blocked Account, a "Cash Concentration Account").

(e)     Each Blocked Account Agreement with respect to the Cash Concentration Accounts shall require the ACH or wire transfer no less frequently than daily (whether or not there are then any outstanding Obligations) of the contents of such Cash Concentration Accounts (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Cash Concentration Account by the depository institution at which such account is maintained) to the concentration account maintained by the Administrative Agent or an Affiliate thereof at Wells Fargo (or as otherwise instructed in writing to the Lead Borrower by the Administrative Agent) (the "ABL Agent Concentration Account") or, at the election of the Administrative Agent, into another intermediate Blocked Account for application pursuant to Section 2.05(d) and 2.05(e) and, following the occurrence and during the continuance of an Event of Default, as provided in Section 8.03.

(f)     At all times during the existence of an Event of Default, each Loan Party shall cause all funds in DDAs (other than Cash Receipts, which shall continue to be governed by clauses (d) and (e) of this Section 6.13, as applicable) to ACH or wire transfer such funds no less frequently than daily (whether or not there are then any outstanding Obligations) to a concentration account maintained by the Prepetition Term Loan Agent designated from time to time (the "Term Loan Agent Concentration Account"; together with the ABL Agent Concentration Account, the "Concentration Accounts"). With respect to any Borrower deposit accounts that do not constitute Cash Concentration Accounts or the ABL Agent Concentration Account, each applicable Blocked Account Agreement shall require, upon notice from the Administrative Agent, which notice shall be delivered only after the occurrence and during the continuance of an Event of Default, the ACH or wire transfer no less frequently than daily (whether or not there are then any outstanding Obligations) to the ABL Agent Concentration Account, of all cash receipts and collections received by each Loan Party from all sources (for the avoidance of doubt, other than amounts required to be deposited into a DDA or Blocked Account for sweep into a Cash Concentration Account and the ABL Agent Concentration Account, as required herein), including, without limitation,

(i)     all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source on account of any Disposition (excluding proceeds of collections of Accounts and Inventory in the ordinary course of business) or other transaction or

event (other than proceeds of collections of Accounts), including, without limitation, any Prepayment Event;

(ii)      the then contents of each DDA (excluding proceeds of collections of Accounts and Inventory in the ordinary course of business) (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained); and

(iii)     the then entire ledger balance of each Blocked Account (excluding proceeds of collections of Accounts and Inventory in the ordinary course of business) (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank).

(g)      The Concentration Accounts shall at all times be under the sole control of the Administrative Agent and the Prepetition Term Loan Agent. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Accounts, (ii) the funds on deposit in the Concentration Accounts shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Accounts shall be applied to the Obligations and the obligations under the Prepetition Term Loan Credit Agreement as provided in this Agreement and/or the Prepetition ABL Intercreditor Agreement, as applicable. In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Administrative Agent and the Prepetition Term Loan Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the applicable Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent and the Prepetition Term Loan Agent in their Permitted Discretion.

(h)      Upon the request of the Administrative Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Administrative Agent, not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(i)      At no time shall the Loan Parties and their Subsidiaries permit the Consolidated Cash Balance to exceed $2,000,000.

(j)      For the avoidance of doubt, and notwithstanding any provision to the contrary in this Section 6.13, the Loan Parties shall not be required to enter into a Blocked Account Agreement with respect to any Excluded Account.

**6.14      Information Regarding the Collateral**. Furnish to the Administrative Agent at least fifteen (15) days prior written notice of any change in: (i) any Loan Party's name; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.

**6.15      Physical Inventories.**

(a)     Cause not less than two (2) periodic cycle counts, in each case consistent with practices of the Loan Parties in effect on the date hereof, conducted by such inventory takers as are reasonably satisfactory to the Administrative Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be reasonably satisfactory to the Administrative Agent, so long such cycle counts result in at least one (1) physical inventory of each retail Store location in each consecutive twelve (12) month period.  The Administrative Agent and its representatives, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party with respect to up to ten percent (10%) of all Stores, in any consecutive twelve (12) month period.  The Lead Borrower, within thirty (30) days following the completion of such inventory, shall provide the Administrative Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)     Permit the Administrative Agent, in its discretion, if any Event of Default exists, to cause additional such inventories to be taken as the Administrative Agent determines (each, at the expense of the Loan Parties).

**6.16    Environmental Laws.**

(a)     Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, underlined provided, underlined however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17    Further Assurances.**

(a)     Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence reasonably satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)     If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof and other than any Excluded Property), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17(b) waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.17(b) if such transaction

was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)     Upon the request of the Administrative Agent use commercially reasonable effort to cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Administrative Agent may reasonably require.

(d)     Upon the request of the Administrative Agent use commercially reasonable efforts to cause any of its landlords to deliver a Collateral Access Agreement to the Administrative Agent in such form as the Administrative Agent may reasonably require.

**6.18     Lender Meetings**.  Upon the request of the Administrative Agent, the Loan Parties and their advisors (including financial advisors, investment bankers and attorneys, as applicable) shall participate in periodic telephone calls and meetings with the Administrative Agent and Lenders, such telephone calls and/or meetings to be no less frequently than quarterly (in all cases, at reasonable times and on reasonable prior notice), and shall provide the Administrative Agent and Lenders with such non-privileged information as the Administrative Agent may reasonably request.

**6.19     Material Contracts**.  (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it where commercially desirable to do so, (b) maintain each such Material Contract in full force and effect where commercially desirable to do so, (c) enforce each such Material Contract in accordance with its terms, where commercially desirable to do so, (d) take all such action and to such end as may be reasonably requested by the Administrative Agent in its Permitted Discretion, and (e) cause each of its Subsidiaries to do the foregoing.

**6.20     Post-Closing Obligations**.  Take such actions set forth on Schedule 6.20 on or before the respective dates specified for such actions (or such later dates as the Administrative Agent may agree), it being understood and agreed that all representations, warranties and covenants of the Loan Documents, and all eligibility requirements governing assets that may be included in the Borrowing Base, with respect to the taking of such actions are qualified by the non-completion of such actions until such time as they are completed or required to be completed in accordance with this Section 6.20.

**6.21     Financial Advisor Engagement**.  The Loan Parties shall continue to retain and employ [FAAN Advisors Group Inc.] or another financial advisor reasonably acceptable to the Administrative Agent, as financial advisor in the Loan Parties Chapter 11 Cases (hereinafter, the "F/A"), to assist the Loan Parties, among other things, in the formulation and presentation to Administrative Agent and Lenders of the Approved Budget and updates thereto, variance reporting in accordance with the terms of this Agreement.  The Loan Parties shall not terminate or materially modify the terms of the F/A's engagement absent the prior written consent of Administrative Agent, in its reasonable discretion.  In connection with the foregoing, the Loan Parties hereby:

(a)     authorize Administrative Agent to communicate directly with the F/A regarding all matters relating to the services to be rendered by the F/A to the Loan Parties, including, without limitation, to discuss all financial reports, business information, findings and recommendations of the F/A, and concerning the Loan Parties' ongoing implementation of any operating, capital enhancement, and restructuring strategies;

(b)     authorize and direct the F/A to communicate directly with Administrative Agent regarding all matters relating to the services to be rendered by the F/A to the Loan Parties, including, without limitation, to discuss all financial reports, business information, the Loan

Parties' business plan, and all findings, and recommendations of the F/A, and to provide Administrative Agent with copies of all reports and other information prepared or reviewed by the F/A, and the Loan Parties covenant and agree that Administrative Agent may rely on any information provided by the F/A as if provided directly by the Loan Parties.

**6.22    Approved Budget**.

(a)    The use of proceeds of the Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted under this Section 6.22) and the terms hereof.  The initial Approved Budget shall depict, on a weekly basis, cash receipts, operating disbursements, operating cash flow, debt payments, bankruptcy related disbursements, net cash flow, inventory levels, beginning and ending cash and debt balances, excess availability, borrowing base calculations and the other items set forth therein, for the first thirteen (13) week period from the [Closing Date] (it being acknowledged and agreed that the initial Approved Budget attached hereto as Annex A is approved by and satisfactory to the Administrative Agent and the Required Lenders).  The Borrowers may request from time to time that the then effective Approved Budget be updated, modified or supplemented (each, a "Budget Modification").  Any Budget Modification must be in form and substance satisfactory to the Required Lenders, and no Budget Modification shall be effective without the prior written consent (which may be provided via email transmission) of the Required Lenders; provided, however, that in the event the Required Lenders, on the one hand, and the Borrowers, on the other hand, cannot agree as to any proposed Budget Modification, the then existing Approved Budget shall continue in effect.  Each Budget Modification request delivered to the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent and the Required Lenders.  Upon the Required Lenders' written consent to any Budget Modification, the Approved Budget shall be deemed updated to include the update, modification and/or supplements described in such Budget Modification. The Approved Budget and each Budget Modification thereto shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable at the time made.

(b)    For the initial three (3) Cumulative Periods, the Borrowers shall not permit Actual Cash Receipts for the most recently ended Cumulative Period to be less than 85.0% of the Budgeted Total Receipts for such Cumulative Period, and for each subsequent Cumulative Period, the Borrower shall not permit Actual Cash Receipts to be less than 90.0% of the Budgeted Total Receipts for such Cumulative Period.

(c)    For each Cumulative Period, the Borrowers shall not permit aggregate Actual Cash Disbursements in the Approved Budget for the most recently ended Cumulative Period to be greater than 110.0% of the Budgeted Total Disbursements (excluding any Unbudgeted Credit Party Expenses) for such Cumulative Period.

(d)    The Borrowers shall deliver to the Administrative Agent and the Prepetition Term Loan Agent on or before 12:00 p.m. on Wednesday (or such later time as approved by the Administrative Agent in its sole discretion) of every week, commencing on second week following the Petition Date, a Budget Compliance Certificate, which shall include such detail as is satisfactory to the Administrative Agent, signed by a Responsible Officer of the Lead Borrower  (i) certifying that (A) the Borrowers are in compliance with the covenant contained in clause (b) of this Section 6.22, and (B) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (ii) attaching an Approved Budget Variance Report.

(e)     The Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Orders regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

(f)     The Lead Borrower shall deliver to the Administrative Agent and the Prepetition Term Loan Agent by no later than 12 p.m. on Wednesday after the end of each Cumulative Period (commencing on Wednesday that is two weeks following the Petition Date), a rolling 13-week cash flow forecast for the Loan Parties and their Subsidiaries, commencing with such week, consistent with the form and level of detail set forth in the Approved Budget.

**6.23     Required Milestones**.  The Loan Parties shall comply with each of the covenants contained on Schedule 6.23 upon the terms and at the times provided for therein (as such times may be extended by the Administrative Agent and the Prepetition Term Loan Agent up to five (5) Business Days, or longer with the consent of the Required Lenders).

**6.24     Orders**.  Notwithstanding anything herein to the contrary, no portion or proceeds of the Loans or the Collateral, and no disbursements set forth in the Approved Budget, shall be used for the payments or purposes which would violate the terms of the Orders.

**6.25     Debtor-In-Possession Obligations**.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules, and any other order of the Bankruptcy Court.

**6.26     Administrative Agent's Advisors**.  The Administrative Agent, on behalf of itself and the Lenders, shall be entitled to retain or to continue to retain (either directly or through counsel) any financial advisor, auditor or any other consultant as it may deem reasonably necessary (collectively, the "Administrative Agent's Advisors") to provide advice, analysis and reporting for the benefit of the Administrative Agent and the Lenders.  The Loan Parties shall pay all reasonable and documented fees and expenses of each Administrative Agent's Advisor and all such reasonable and documented fees and expenses shall constitute Obligations and be secured by the Collateral.  The Loan Parties and their advisors shall grant access to, and cooperate with, the Administrative Agent, the Lenders, the Administrative Agent's Advisors, and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no claim has been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01     Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary

thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.  Notwithstanding anything in this Section 7.01 to the contrary, in no event shall Accounts or Inventory be pledged as collateral to secure any Indebtedness other than the Obligations hereunder and under the Prepetition Revolving Credit Agreement or, subject to the Prepetition ABL Intercreditor Agreement, the BBBy Intercreditor Agreement, the Orders, the Prepetition Term Loan Obligations and the Second Lien Obligations.  Further, the prohibition for in this Section 7.01 specifically includes any effort by any Debtor, an official committee in any Chapter 11 Case or any other party in interest in the Chapter 11 Cases, as applicable, to prime or create pari passu to any claims, Liens or interests of (A) the Administrative Agent and the Lenders or (B) until the indefeasible payment in full in cash of the Prepetition Revolving Obligations, the Prepetition Revolving Agent and the Prepetition Revolving Lenders, any Lien, in each case, other than as set forth in the applicable Order and irrespective of whether such claims, Liens or interests may be "adequately protected".

**7.02    Investments**.  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock.**

(a)    Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue Disqualified Stock.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, divide, consolidate with or into another Person, except that:

(a)    any domestic wholly-owned Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties; provided, that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b)    any domestic wholly-owned Subsidiary which is a Loan Party may merge into any other domestic wholly-owned Subsidiary which is a Loan Party; provided, that in any merger involving a Borrower, such Borrower shall be the continuing or surviving Person;

(c)    [reserved];

(d)    any Loan Party which is a limited liability company may divide into two or more limited liability companies so long as each of the resulting Persons shall remain jointly and severally liable for the Obligations, and each resulting Person remains and, as applicable, is joined as a Loan Party hereunder; and

(e)    any Subsidiary of Parent that is not a Loan Party may dissolve or liquidate.

**7.05    Dispositions**.  Make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, except that:

(a) each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party (other than to Parent, unless the proceeds of such Restricted Payment to Parent are used contemporaneously to make an Investment permitted under Section 7.02 in another Loan Party) and each Subsidiary of a Loan Party which is not a Loan Party may make Restricted Payments to any other Subsidiary of a Loan Party which is not a Loan Party;

(b) the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person;

(c) the Loan Parties may make Restricted Payments constituting Tax Distributions;

(d) [reserved];

(e) [reserved];

(f) the Loan Parties and each Subsidiary may pay, and the Subsidiaries of Parent may declare or make Restricted Payments to Parent at such times and in such amounts as shall be necessary to permit Parent to pay, salary and related compensation to Marc Salkovitz and Pamela Salkovitz;

(g) [reserved];

(h) [reserved]; and

(i) [reserved].

**7.07  Prepayments of Indebtedness**.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness for borrowed money (other than the Committed Revolving Loans), or make any payment in violation of any subordination terms of any Subordinated Indebtedness, except (a) regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of Permitted Indebtedness (other than Subordinated Indebtedness and other than Indebtedness under the Prepetition Term Loan Credit Agreement), (b) [reserved], (c) Permitted Term Prepayments, (d) conversions, exchanges, redemptions, repayments or prepayments of such Indebtedness into, or for, Equity Interests of the Parent (or any parent entity thereof), (e) Permitted Refinancings of any such Indebtedness and (f) [any refinancing of the Term Obligations so long as such refinanced Term Obligations are subject to the Prepetition ABL Intercreditor Agreement]; provided, however, that other than prepayments of the Obligations, any such payments and prepayments shall be expressly permitted by the Approved Budget.

**7.08  Parent; Change in Nature of Business.**

(a) In the case of the Parent, engage in any business or activity other than (i) the direct or indirect ownership of all outstanding Equity Interests in the other Loan Parties, (ii) maintaining its limited liability company existence, (iii) participating in tax, accounting and other administrative activities as the parent of the other Loan Parties, (iv) the execution and delivery of the Loan Documents and Term Loan Documents to which it is a party and the performance of its obligations thereunder, (v) as expressly permitted by this Agreement, and (vi) activities incidental to the businesses or activities described in clauses (i) through (v) of this Section 7.08(a).

(b) In the case of Holdings, engage in any business or activity other than (i) the direct or indirect ownership of all outstanding Equity Interests in the Lead Borrower and its Subsidiaries and Nantucket HK and its Subsidiaries, (ii) maintaining its limited liability company existence, (iii)

participating in tax, accounting and other administrative activities as the parent of the other applicable Loan Parties, (iv) the execution and delivery of the Loan Documents and Term Loan Documents to which it is a party and the performance of its obligations thereunder, (v) as expressly permitted by this Agreement, and (vi) activities incidental to the businesses or activities described in clauses (i) through (v) of this <u>Section 7.08(b)</u>.

(c)     In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto or a reasonable extension thereof.

**7.09     Transactions with Affiliates**.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) (i) a transaction between or among the Loan Parties (or any entity that becomes a Loan Party as a result of such transaction), or a transaction between or among Subsidiaries of the Parent that are not Loan Parties, (b) [transactions described on <u>Schedule 7.09</u> hereto][1], (c) [reserved], (d) the issuance of Equity Interests in Holdings or the Parent to any officer, director, employee or consultant of the Parent or any of its Subsidiaries, (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Parent or any of its Subsidiaries in the ordinary course of business (but, in the case of compensation and employment benefit arrangements, other than to Marc Salkovitz and Pamela Salkovitz, which payments shall be governed by <u>Sections 7.06(e)</u> and <u>(f)</u>), (f) the payments of indemnification (and advances in respect thereof) provided for the benefit of current or former directors, officers or employees of the Parent or any of its Subsidiaries in the ordinary course of business, (g) any issuances of securities of Holdings or the Parent (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in Holdings or the Parent) of the Parent or any of its Subsidiaries, (h) the exercise by Pathlight Capital Fund I L.P. (or any other holder) of its rights under the Warrant Documents (as defined in the Existing Credit Agreement as in effect as of the date hereof), (i) any Investment permitted by <u>Section 7.02</u>, any Indebtedness permitted by <u>Section 7.03</u>, any Restricted Payment permitted by <u>Section 7.06</u> or any prepayment, redemption, purchase, defeasance or satisfaction of Indebtedness permitted by <u>Section 7.07</u>, (j) transactions by the Parent and its Subsidiaries with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Parent and its Subsidiaries, as determined in good faith by the board of directors or the senior management of the relevant Person, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party, and (k) [reserved]; provided, however, that any payment contemplated by this <u>Section 7.09</u> shall be expressly permitted by the Approved Budget.

**7.10     Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than the Prepetition Term Loan Documents, this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary

---

[1] NTD: to be confirmed.

to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness, or in connection with Liens permitted under clause (y) of Permitted Encumbrances, in any case, solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness or Lien, as applicable; (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person; provided further that the restrictions and conditions of this Section shall not apply to the following: (i) restrictions and conditions imposed by applicable Laws, (ii) restrictions and conditions existing on the Closing Date (to the extent not incurred in contemplation thereof) or in any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement materially expands the scope of any such restriction or condition (as determined in good faith by the Lead Borrower), (iii) restrictions and conditions contained in agreements relating to the sale of Equity Interests of a Subsidiary or a joint venture or of any assets or property of Parent, a Subsidiary of Parent or a joint venture, in each case pending such sale, provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder or is conditioned on obtaining consent of the Lenders pursuant to the terms hereof, (iv) customary provisions in leases, licenses and other contracts restricting the assignment, subletting or transfer thereof, (v) restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary; provided that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to any other Subsidiary, (vi) customary provisions in joint venture agreements and applicable solely to such joint venture or non-wholly-owned Subsidiary and the Equity Interests issued thereby, (vii) any restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business, (viii) any restrictions regarding licensing or sublicensing by Parent and its Subsidiaries of Intellectual Property in the ordinary course of business to the extent not materially interfering with the business of Parent or such Subsidiaries taken as a whole and otherwise permitted under this Agreement, or (ix) customary negative pledges incurred or provided in favor of any holder of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness and do not interfere with the Agent's ability to use such assets in connection with the exercise of its rights and remedies under the Loan Documents or materially affect the value of the Collateral.

7.11    **Use of Proceeds**.  Use the proceeds of any Credit Extension, whether directly or indirectly, (a) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock, to refund Indebtedness originally incurred for such purpose or for any purpose that violates the provisions of Regulation T, U or X of the FRB; (b) to make any payments to a Sanctioned Entity or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available in a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Loan Party; (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws, or (d) for purposes other than those permitted under this Agreement.

7.12    **Amendment of Material Documents**.  Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, (b) any Material Contract, or (c) the Prepetition Term Loan Credit Documents (other than in connection with the incurrence of Permitted Financing thereof); provided, however, that no amendment, amendment and restatement, modification or change of any term or condition of the Prepetition Term Loan Documents permitted by, and made in accordance with the Prepetition ABL Intercreditor Agreement shall be prohibited by this Section 7.12.

**7.13** **Fiscal Year**. Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties (including reclassifying any Inventory under the Borrowing Base), except as required by GAAP.

**7.14** **Deposit Accounts; Credit Card Processors**. Open new DDAs or Blocked Accounts or Concentration Accounts unless the Loan Parties shall have delivered to the Administrative Agent appropriate DDA Notifications (to the extent requested by Administrative Agent pursuant to the provisions of Section 6.13 hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise reasonably satisfactory to the Administrative Agent.

**7.15** **Financial Covenants**.

(a) <u>Minimum Availability</u>. Permit Availability at any time to be less than $3,000,000.

(b) <u>Minimum Inventory</u>. Permit the Borrowers' Inventory levels (excluding the ReStore Consigned Inventory), at any time, to be less than 10% of the Inventory level set forth in the Approved Budget as of the applicable date of determination.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01** **Events of Default**. Any of the following shall constitute an Event of Default:

(a) <u>Non-Payment</u>. The Borrowers or any other Loan Party fails to pay, (i) any amount of principal of any Loan when and as required to be paid herein, or (ii) any interest on any Loan, or any fee due hereunder, when and as required to be paid herein and such failure shall continue unremedied for a period of two (2) Business Days, or (iii) any other amount payable hereunder or under any other Loan Document when and as same shall become due and payable and such failure shall continue unremedied for a period of three (3) Business Days; or

(b) <u>Specific Covenants</u>. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03(a) or (b), 6.05 (solely with respect to the existence of each Loan Party), 6.07, 6.10, 6.11, 6.12, 6.13 or 6.14, [6.20], 6.21, 6.22, 6.23, 6.24, 6.25 or Article VII; or

(c) <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days after the earlier to occur of (i) receipt by any Loan Party of written notice thereof from the Administrative Agent or (ii) a Responsible Officer of any Loan Party becomes aware thereof; or

(d) <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate), or in completing any request for a Borrowing via ABLSoft, shall be false or incorrect in any material respect when made or deemed made (or, with respect to any representation, warranty, certification or statement of fact qualified by materiality, incorrect or misleading in any respect); or

(e) <u>Cross-Default</u>. There occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to

which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $5,000,000; provided that this paragraph (e) shall not apply to (A) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement), (B) Indebtedness which is convertible into Equity Interests that converts to Equity Interests in accordance with its terms or (C) any breach or default that (x) is remedied by the applicable Loan Party or the applicable Subsidiary within the applicable grace period or (y) waived (including in the form of amendment) by the requisite holders of such Indebtedness, prior to the acceleration of all the Loans pursuant to this Section 8.01; or

(f)     [Reserved].; or

(g)     [Reserved].; or

(h)     Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $250,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)     ERISA.  (i) An ERISA Event occurs which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount in excess of $250,000 or which would reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount with any other unpaid installment payments to a Multiemployer Plan in excess of $250,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)     Invalidity of Loan Documents.  (i) Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party, any Subsidiary thereof or any Governmental Authority contests in any manner the validity or enforceability of any material provision of any Loan Document (including the Facility Guaranty); or any Loan Party denies that it has any or further liability or obligation under any material provision of any Loan Document, or purports to revoke, terminate or rescind any material provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party, any Subsidiary thereof or any Governmental Authority not to be, a valid and perfected Lien on any Collateral with a fair market value in excess of $1,000,000, with the priority required by the applicable Security Document (other than as a result of the Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or to duly file any UCC financing statements, continuation statements or other similar filings); or

(k)     Change of Control.  There occurs any Change of Control; or

(l)     Cessation of Business.  Except as otherwise expressly permitted hereunder, (i) any Loan Party shall take any action, or shall make a determination, whether or not yet formally approved by any Loan Party's management or board of directors, to (A) suspend the operation of all or substantially all of its business in the ordinary course, (B) suspend the payment of any material obligations in the ordinary course or suspend the performance under material contracts in the ordinary course, (C) other than with the consent of the Administrative Agent, solicit proposals for the liquidation of, or undertake to liquidate, all or substantially all of its assets or Store locations, or (D) other than with the consent of the Administrative Agent and the other than pursuant to the Store Closing Motion, solicit proposals for the employment of, or employ an agent or other third party to conduct a program of closings, liquidations, or "Going-Out-Of-Business" sales of substantially all of its Store locations; or (ii) an injunction or court order or other order from a Governmental Authority preventing the Loan Parties from continuing to conduct their Business (or substantially all of the Loan Parties' business affairs) in the ordinary course of business; or

(m)     Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(n)     Credit Card Agreements.  Any Credit Card Issuer or Credit Card Processor that is material to the business of Borrowers ceases to make or suspends payments to a Borrower or Borrowers of amounts due or to become due to such Borrower or Borrowers, or shall terminate its arrangements with such Borrower or Borrowers as a result of any event of default under such arrangements, which continues for more than the applicable cure period, if any, with respect thereto, unless (i) such Borrower or Borrowers shall have entered into arrangements with another credit card issuer or credit card processor, as the case may be, within sixty (60) days after the date of notice of any such termination or event of default or such Credit Card Issuer or Credit Card Processor shall rescind such termination and reinstate such arrangement or otherwise resume such arrangements within such sixty (60) day period or (ii) such cessation, suspension or termination does not result in a Material Adverse Effect; or

(o)     Subordination.  (i) The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, or provisions of any Intercreditor Agreement entered into by Administrative Agent after the date hereof (any such provisions being referred to as the "Subordination Provisions"), shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Indebtedness (in each case, other than as expressly permitted under the terms of such Subordination Provisions); or (ii) any Borrower or any other Loan Party shall, directly or indirectly, (A) make any payment on account of any Subordinated Indebtedness, except to the extent that such payment is permitted by the terms of the Subordination Provisions applicable to such Subordinated Indebtedness or (B) disavow or contest in any manner the effectiveness, validity or enforceability of any of the Subordination Provisions or any Intercreditor; or

(p)     Indictment.  The indictment or institution of any legal process or proceeding against any Loan Party or any Subsidiary thereof under any federal, state, municipal or other criminal statute, rule, regulation, order or other requirement having the force of law for a felony;

(q)     Chapter 11 Defaults.  The occurrence of any of the following in the Chapter 11 Cases:

(i)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties in the Chapter 11 Cases: (A) to obtain additional financing under section 364(c) or section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to Section 7.01 upon or affecting any Collateral; (C) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral of the

Administrative Agent and the other Secured Parties under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent; or (D) any other action or actions materially adverse to the Administrative Agent and the Lenders or their rights and remedies hereunder, under any other Loan Document, or their interest in the Collateral;

(ii)     the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and the Prepetition Revolving Obligations, or by any other Person to which the Administrative Agent and the Required Lenders do not consent, or any of the Loan Parties or their Subsidiaries, to seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order;

(iii)    the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that (A) is not reasonably acceptable to the Administrative Agent and the Required Lenders, or (B) does not contain a provision for termination of the commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement and the indefeasible payment in full in cash of all of the Prepetition Revolving Obligations on or before the effective date of such plan of reorganization;

(iv)    the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or the expiration of any Loan Party's exclusive right to file a plan of reorganization;

(v)     (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of the Administrative Agent and the Required Lenders or the filing of a motion by the Loan Parties or their Affiliates for reconsideration with respect to the Interim Order or the Final Order without the prior written consent of the Administrative Agent, or the Interim Order or the Final Order shall otherwise not be in full force and effect without the prior written consent of the Administrative Agent and the Required Lenders or (B) any Loan Party or any Subsidiary shall fail to comply with any Order in any material respect;

(vi)    the payment of, or application for authority to pay, any Prepetition claim without the Administrative Agent's prior written consent unless in accordance with the Approved Budget or pursuant to an order of the Bankruptcy Court;

(vii)   the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases, in each case, with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties;

(viii)  the sale without the Administrative Agent's and the Required Lenders' consent of all or substantially all of the Debtors' assets or all or substantially all of the Collateral, either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement and all obligations under the Prepetition Revolving Credit Agreement at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable;

(ix)     the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code in each case, without the prior written consent of the Administrative Agent;

(x)     any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the Automatic Stay (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral not approved by the Administrative Agent, (B) approving any settlement or other stipulation not approved by the Administrative Agent with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral not approved by the Administrative Agent to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim that could have a Material Adverse Effect on the Debtors or their estates or (D) permit other actions that could have a Material Adverse Effect on the Debtors or their estates;

(xi)     except for a Challenge Proceeding (as defined in the Interim Order and including any Challenge Proceeding by the Committee), the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against the Administrative Agent or any Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for twenty (20) days after service thereof on the Administrative Agent or such Lender, that asserts or seeks by or on behalf of a Loan Party, any state or federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any Chapter 11 Cases, a claim or any legal or equitable remedy that would (A) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Loan Documents to any other claim, or (B) have a material adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Loan Document or the collectability of all or any portion of the Obligations;

(xii)     except for a Challenge Proceeding (as defined in the Interim Order and including any Challenge Proceeding by the Committee), the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or any other Loan Document or the Prepetition Revolving Obligations owing under the Prepetition Revolving Credit Agreement or any other Prepetition Revolving Loan Document;

(xiii)     except for the Carve Out, the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents or as otherwise permitted under the applicable Loan Documents or permitted under the Orders or as otherwise subsequently agreed to by the Administrative Agent, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (B) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent and the Required Lenders);

(xiv)     the Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Administrative Agent and the Required Lenders;

(xv)     an order in the Chapter 11 Cases shall be entered charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Administrative Agent, the Secured Parties or with respect to any Collateral (including, without limitation, an allowance of any claim thereunder), or the commencement of any other action that is materially adverse to the Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents;

(xvi)     any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations;

(xvii)     without the Administrative Agent's prior written consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto or otherwise permitted under the Prepetition ABL Intercreditor Agreement) seeking, (A) approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders or BBBy that is inconsistent with the Orders, (B) authority to use any cash proceeds of any of the Collateral in a manner inconsistent with the Loan Documents without the Administrative Agent's prior written consent or (C) to obtain any financing under section 364 of the Bankruptcy Code other than the financing under the Loan Documents without the Administrative Agent's prior written consent;

(xviii)     any Loan Party or any Person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral outside the ordinary course of business and not otherwise permitted hereunder (including under the Approved Budget) and without the Administrative Agent's prior written consent not to be unreasonably withheld, conditioned or delayed;

(xix)     any Loan Party files or supports a motion in the Bankruptcy Court providing for a change of venue with respect to any of the Chapter 11 Cases;

(xx)     any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (A) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior, equal or subordinate to the Administrative Agent's liens and security interests; or (B) to modify or affect any of the rights of the Administrative Agent and the Lenders, under any Order or any Loan Document by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

(xxi)     the failure of any Loan Party to perform any of its material obligations under, or the occurrence of an event of default under or as defined in, the Interim Order or the Final Order;

(xxii)     the occurrence of a DIP Termination Event (as defined in the Orders); or

(xxiii)   failure to comply with any of the Required Milestones (other than solely by reason of the unavailability of the Bankruptcy Court on any applicable date requiring entry of an order or approval of a motion or any other matter by the Bankruptcy Court.

**8.02    Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, subject to the Orders (including the Remedies Notice Period and related notice provisions) and the terms thereof and notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion, hearing before, or order to the Bankruptcy Court, the Administrative Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)      at the request of the Lenders, declare the Commitments of each Lender to make Loans to be terminated, whereupon such Commitments and obligations shall be terminated;

(b)      at the request of the Lenders, declare the unpaid principal amount of all Loans, and all interest accrued and unpaid thereon, and any other Obligations related to the Loans, to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)      at the request of the Required Lenders, whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

(d)      declare that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice (as defined in the Orders) to the Lead Borrower;

(e)      subject to the Remedies Notice Period, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral (subject to the Orders) on terms and conditions acceptable to the Administrative Agent pursuant to section 363, section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral (subject to the Orders) to the Administrative Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code); and/or

(f)      subject to the Remedies Notice Period and,  to the extent applicable, the Prepetition ABL Intercreditor Agreement (i) exercise on behalf of itself and the Secured Parties all rights and remedies available to it and the Secured Parties under the Loan Documents or applicable Law or (ii) take any and all actions described in the Orders, including, without limitation, those actions specified in the Orders.

Subject to the Orders, the automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to permit the Administrative Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable Law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

**8.03    Application of Funds**.

(a)    After the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable), subject to any Intercreditor Agreement then in effect, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under <u>Article III</u>) payable to the Administrative Agent;

<u>Second</u>, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to the extent not previously reimbursed by the Revolving Lenders, to payment to the Administrative Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Revolving Overadvances;

<u>Fourth</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Revolving Loans and other Obligations, and fees (including any Revolving Credit Early Termination Fees);

<u>Fifth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Committed Revolving Loans, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause <u>Fifth</u> held by them;

<u>Sixth,</u> to the extent required by Administrative Agent, to cash collateralize one hundred and three percent (103%) of the aggregate outstanding Letter of Credit Balance and such cash collateral shall be available to the Administrative Agent, for its benefit and the benefit of each L/C Issuer and the Revolving Lenders (other than Defaulting Lenders), to reimburse payments of drafts drawn under such Letters of Credit and pay any fees and expenses related, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause <u>Sixth</u> payable to them;

<u>Seventh</u>, to payment of all other Obligations owed to the Revolving Lenders (including without limitation, the cash collateralization of unliquidated indemnification obligations) ratably among the Revolving Lenders in proportion to the respective amounts described in this clause <u>Seventh</u> held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

(b)    Solely as between the Administrative Agent and any applicable Revolving Lender, the provisions of this <u>Section 8.03</u> are expressly subject to the terms of the AAL.

## ARTICLE IX
## THE ADMINISTRATIVE AGENT

**9.01    Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints Eclipse Business Capital LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Interim Order and the Final Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and any statutory committees appointed pursuant to sections 327 and 1103 of the Bankruptcy Code.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

**9.02    Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Administrative Agent and the terms "Revolving Lender" or "Revolving Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent, hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent, hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Applicable Lenders, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent any of their respective Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Applicable Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent by the Loan Parties or a Lender. Upon the occurrence of a Default or Event of Default, the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Administrative Agent shall have received such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent believes that its compliance with such directions would be unlawful.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**9.04    Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties**.  The Administrative Agent may perform any and all of their respective duties and exercise their respective rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent, and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

**9.06    Resignation**.  The Administrative Agent may at any time give written notice of its resignation of such position to the Lenders and the Lead Borrower. Upon receipt of any such notice of resignation from the Administrative Agent, the Required Lenders shall have the right, in consultation with the Lead Borrower (and, unless a Specified Event of Default has occurred and is continuing, with the Lead Borrower's consent (such consent not to be unreasonably withheld or delayed and shall be deemed given if the Lead Borrower has not responded to a request for such consent within ten (10) Business Days)), to

appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders, as applicable, and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders (in the case of the Administrative Agent), appoint a successor Administrative Agent, meeting the qualifications set forth above; provided, that if the Administrative Agent shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent, as applicable, shall instead be made by or to each Lender directly, until such time as the Applicable Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Administrative Agent's resignation hereunder (including pursuant to Section 8.02(b) and this Section 9.06) and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting in such capacity hereunder.

9.07    **Non-Reliance on Administrative Agent and Other Lenders**.    Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.12, the Administrative Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Administrative Agent.

9.08    **[Reserved]**.

9.09    **Administrative Agent May File Proofs of Claim**.    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Obligations that are owing and unpaid and to file such

other documents as may be necessary or advisable in order to have the claims of the Lenders, the Administrative Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the Administrative Agent and such Credit Parties under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

        (b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, administrator, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.10**    **Collateral and Guaranty Matters.**    The Credit Parties irrevocably authorize the Administrative Agent, at its option and in its discretion,

        (a)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

        (b)      to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

        (c)      to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Administrative Agent at any time, the Applicable Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Administrative Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

**9.11**    **[Reserved]**.

**9.12**    **Notice of Transfer**.    The Administrative Agent may deem and treat a Lender party to this

Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in <u>Section 10.06</u>.

**9.13    Reports and Financial Statements**.  By signing this Agreement, each Lender:

(a)    is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Administrative Agent (collectively, the "<u>Reports</u>");

(b)    expressly agrees and acknowledges that the Administrative Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d)    agrees to keep all Reports confidential in accordance with the provisions of <u>Section 10.07</u> hereof; and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Administrative Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Administrative Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.14    Agency for Perfection**.  Each Lender hereby appoints the Administrative Agent and each other Lender as agent for the purpose of perfecting Liens for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession.  Should the any Lender (other than the Administrative Agent) obtain possession of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

**9.15    Indemnification of Administrative Agent**.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Administrative Agent and any Related Party, as the case may be, to the extent not reimbursed by the Loan Parties, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Administrative Agent and its Related Parties in connection therewith; provided, that no Lender shall be

liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.16    Relation among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Administrative Agent) authorized to act for, any other Lender.

**9.17    Defaulting Lenders**.

(a)    Notwithstanding the provisions of Section 2.14 hereof, the Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrowers to the Administrative Agent, for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Administrative Agent shall transfer any such payments (i) first, to each Non-Defaulting Lender ratably in accordance with their Revolving Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Committed Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (ii) second, to the ABL Agent Concentration Account, the proceeds of which shall be retained by the Administrative Agent and may be made available to be re-advanced to or for the benefit of the Borrowers (upon the request of the Lead Borrower and subject to the conditions set forth in Section 4.02) as if such Defaulting Lender had made its portion of the Loans (or other funding obligations) hereunder, and (iii) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender.  Subject to the foregoing, the Administrative Agent may hold and, subject to Section 4.02 in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Applicable Percentages in connection therewith) and for the purpose of calculating any unused line fees payable under the Fee Letter, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 10.01(a) through (c).  The provisions of this Section 9.17 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Administrative Agent and the Borrowers shall have waived, in writing, the application of this Section 9.17 to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Administrative Agent, all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Administrative Agent provides adequate assurance of its ability to perform its future obligations hereunder.  The operation of this Section 9.17 shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers, at their option, upon written notice to the Administrative Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to the Administrative Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (including all interest, fees (except any Commitment Fees or Letter of Credit Fees not due to such Defaulting Lender in accordance with the terms of this Agreement), and other amounts that may be

due and payable in respect thereof); <u>provided</u>, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Credit Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this <u>Section 9.17</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 9.17</u> shall control and govern.

(b)     [Reserved]

**9.18     [Reserved]**.

**ARTICLE X**
**MISCELLANEOUS**

**10.01     Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than Swap Contracts), and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Administrative Agent, with the consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)     increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.02</u>) without the written consent of such Lender (it being understood and agreed that the waiver of any Default or Event of Default shall not constitute an increase or extension of a Commitment);

(b)     as to any Lender, postpone or change any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Revolving Commitments hereunder or under any other Loan Document without the written consent of such Lender (it being understood and agreed that, in all cases, the waiver of any Default or Event of Default shall not constitute an extension of any maturity date);

(c)     as to any Lender, reduce the principal of (it being understood and agreed that the waiver of any Default or Event of Default shall not constitute reduction of principal) or the rate of interest specified herein on, any Loan held by such Lender, or any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written consent of such Lender; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(d)     change, modify or waive <u>Section 2.13</u> or <u>Section 8.03</u> (or any provision of the Loan Documents that would have the effect of changing, modifying or waiving such Sections) in a manner that would alter the pro rata sharing or priority of payments required thereby without the written consent of such Lender;

(e)     change any provision of this Section or the definition of "Applicable Lenders", "Required Lenders", "consent" or any other provision hereof specifying the number, identity or percentage

of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(f)      except as expressly permitted hereunder on the date hereof or under any other Loan Document, release, or limit the liability of, any Loan Party without the written consent of each Lender;

(g)      except for Permitted Dispositions (as defined on the date hereof), release all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender;

(h)      increase the Aggregate Revolving  Commitments without the written consent of each Lender;

(i)      change the definition of the term "Borrowing Base" or any component definition thereof if, as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written consent of each Lender; provided that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves;

(j)      modify the definition of "Permitted Revolving Overadvance" so as to increase the maximum amount thereof or, except as provided in such definition, the time period for which any Permitted Revolving Overadvance may remain outstanding without the written consent of each Lender;

(k)      modify the definition of "Availability" or "Availability Period" or, in each case, any component definition thereof without the written consent of each Lender;

(l)      change or modify Section 10.01 (or any provision of the Loan Documents that would have the effect of waiving or modifying such Section);

(m)      waive or modify Section 7.15 (or any provision of the Loan Documents that would have the effect of waiving or modifying such Section) or waive any Default or Event of Default under Section 7.15 without the written consent of each Lender;

(n)      subordinate or change the ranking the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written consent of each Lender;

(o)      waive any Default of Event of Default or forbear from any Default or Event of Default arising from the nonpayment of principal, premium, fees or interest without the written consent of each affected Lender;

(p)      any amendment, waiver or modification of the Loan Documents that affects any Lender or subset of the Lenders in a manner different from the other Lenders shall require the consent of each Lender (other than by reason of the nature of any Lender's priority reflected in the AAL); and

(q)      any amendment, waiver or modification of the Fee Letter shall require the consent of the Administrative Lender and each Lender affected by such amendment, waiver or modification.

If any Lender does not consent (a "Non-consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders, the Lead Borrower may replace such Non-consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected

as a result of the assignment contemplated by such Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph).

**10.02    Notices; Effectiveness; Electronic Communications**.

(a)      <u>Notices Generally</u>.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)      if to the Loan Parties or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(ii)      if to any other Lender, to the address, telecopier number, or electronic mail address specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)      <u>Electronic Communications</u>.  Notices and other communications to the Loan Parties, and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      <u>The Platform</u>.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the

Administrative Agent or any of their Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc.  Each of the Loan Parties and the Administrative Agent may change its address, electronic mail address or telecopier for notices and other communications hereunder, or, solely with respect to communications, may change its telephone number, by notice to the other parties hereto.  Each other Lender may change its address or telecopier number for notices and other communications hereunder by notice to the Lead Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including, without limitation, all Requests for Credit Extensions) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Administrative Agent and each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties (including, without limitation, pursuant to any Requests for Credit Extensions).  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**10.03    No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04    Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses.  The Borrowers shall pay all Credit Party Expenses.

(b)    Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), any issuer of any Letter of Credit, each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and

disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, any transactions or occurrences relating to the issuance of any Letter of Credit, or, in the case of the Administrative Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan, issuance of a Letter of Credit, or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee (or any of such Indemnitee's Affiliates or any of its or their respective officers, directors, and employees of any of the foregoing, and, solely to the extent acting on behalf of, or at the express instructions of, such Indemnified Party, agents, advisors or other representatives of any of the foregoing), (y) a material breach of the material obligations of such Indemnitee or any of such Indemnitee's Affiliates or of any of its or their respective officers, directors, employees of any of the foregoing, and, solely to the extent acting on behalf of, or at the express instructions of, such Indemnitee, agents, advisors or other representatives of any of the foregoing under the Loan Documents or (z) any investigation, litigation or proceeding or preparation of a defense in connection therewith (other than any such investigation, litigation or proceeding against the Administrative Agent acting pursuant to the Loan Documents or in its capacity as such or of any of its Affiliates or its or their respective officers, directors, employees, agents, advisors and other representatives and the successors of each of the foregoing acting in such capacity) solely between or among Indemnitees not arising from any act or omission by any Loan Party or any of their Subsidiaries or their respective Affiliates. This Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)     Reimbursement by Lenders.  Without limiting their obligations under Section 9.14 hereof, but subject to the last sentence of this Section 10.04(c), to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or

actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments.  All amounts due under this Section shall be payable on demand therefor.

(f)     Survival.  The agreements in this Section shall survive the resignation of the Administrative Agent, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside**.  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its Applicable Percentage (without duplication) of any amount relating to the Revolving Commitments or the Committed Revolving Loans so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns.**

(a)     Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void *ab initio*).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a

portion of its Commitment(s) and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts:

(A)     In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, unless each of the Administrative Agent and, and, so long as no Specified Event of Default has occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed and shall be deemed given if the Lead Borrower has not responded to a request for such consent within five (5) Business Days); <u>provided</u>, <u>however</u>, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)     <u>Required consents</u>.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Lead Borrower shall be required unless (1) a Specified Event of Default has occurred and is continuing at the time of such assignment (such consent not to be unreasonably withheld or delayed and shall be deemed given if the Lead Borrower has not responded to a request for such consent within five (5) Business Days) or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     the consent of the Administrative Agent and each L/C Issuer (such consents not to be unreasonably withheld or delayed) shall be required for any assignment in respect of the assignment of any Revolving Commitment and/or Committed Revolving Loans.

Notwithstanding anything to the contrary set forth herein, in no event may any Lender assign, or grant a participation in, any of its rights and/or obligations under the Loan Documents to a Disqualified Institution without the prior written consent of the Lead Borrower.

(iv)     Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.05, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register. The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations. Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Administrative Agent, sell participations to any Person (other than a natural person or a Disqualified Institution) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant;

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as administrative agent) shall have no responsibility for maintaining a Participant Register.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent and only to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. A Participant shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Sections 3.01(e), 3.07 and 10.13 as though it were a Lender.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     [Reserved].

**10.07   Treatment of Certain Information; Confidentiality**. Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any

other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08    Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Lead Borrower and the Administrative Agent promptly after any such setoff and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Interest Rate Limitation**.   Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").   If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate,

and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10    Counterparts; Integration; Effectiveness**.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival.**  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.  Further, the provisions of <u>Sections 3.01</u>, <u>3.05</u>, and <u>10.04</u> and <u>Article IX</u> shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Administrative Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under <u>Section 10.04</u>.

**10.12    Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13    Replacement of Lenders**.  If any Lender requests compensation under <u>Section 3.05</u>, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender is a Defaulting Lender or a Non-consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender, The Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrowers shall have paid to the Administrative Agent the assignment fee specified in <u>Section 10.06(b)</u>;

(b)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)      in the case of any such assignment resulting from a claim for compensation under Section 3.05 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)      such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc**.

(a)      GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)      SUBMISSION TO JURISDICTION.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)      WAIVER OF VENUE.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AS THE ADMINISTRATIVE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15    Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the

extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17    Patriot Act; Due Diligence**. Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act and, as applicable, the Canadian Anti-Money Laundering & Anti-Terrorism Legislation and Canadian Economic Sanctions and Export Control Laws, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act and, as applicable, the Canadian Anti-Money Laundering & Anti-Terrorism Legislation or Canadian Economic Sanctions and Export Control Laws. In addition, Administrative Agent and each Lender shall have the right to periodically conduct due diligence on all Loan Parties, their senior management and key principals and legal and beneficial owners. Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Administrative Agent shall constitute Lender Group Expenses hereunder and be for the account of Borrowers.

**10.18    Reserved.**

**10.19    Foreign Asset Control Regulations**. Neither the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.20    Time of the Essence**. Time is of the essence of the Loan Documents.

**10.21    Press Releases.**

(a)    Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Administrative Agent or its respective Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Administrative Agent and without the prior written consent of the Administrative Agent, unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Administrative Agent before issuing such press release or other public disclosure.

(b)    Each Loan Party consents to the publication by the Administrative Agent, any Lender or their respective representatives of advertising material, including any "tombstone," press release or comparable advertising, on its website or in other marketing materials of Administrative Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Administrative Agent or such Lender shall provide a draft reasonably in advance of any advertising material, "tombstone" or press release to the Lead Borrower

for review and comment prior to the publication thereof. The Administrative Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.22    Additional Waivers.**

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Administrative Agent or any other Credit Party.

(b)    The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the payment in full in cash of all the Obligations after the termination of the Commitments).

(c)    To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the payment in full in cash of all the Obligations and the termination of the Commitments. The Administrative Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been paid in full in cash and the Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)    Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby

subordinated in right of payment to the prior payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**10.23   No Strict Construction**. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.24   Attachments**. The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.25   Acknowledgment and consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)   the effects of any Bail-in Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge

institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

**10.26    Intercreditor Agreements**.

(a)    EACH LENDER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT LIENS SHALL BE CREATED ON THE COLLATERAL PURSUANT TO THE LOAN DOCUMENTS, WHICH LIENS SHALL BE SUBJECT TO TERMS AND CONDITIONS OF EACH INTERCREDITOR AGREEMENT.    PURSUANT TO THE EXPRESS TERMS OF EACH INTERCREDITOR AGREEMENT, IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF SUCH INTERCREDITOR AGREEMENT AND ANY OF THE LOAN DOCUMENTS, THE PROVISIONS OF SUCH INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

(b)    EACH LENDER AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO EACH INTERCREDITOR AGREEMENT (AND ANY OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT TO THE EXTENT CONTEMPLATED BY THE TERMS HEREOF) ON BEHALF OF THE LENDERS, AND TO TAKE ALL ACTIONS (AND EXECUTE ALL DOCUMENTS) REQUIRED (OR DEEMED ADVISABLE) BY THE ADMINISTRATIVE AGENT IN ACCORDANCE WITH THE TERMS OF SUCH INTERCREDITOR AGREEMENT (OR SUCH OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT).    THE PARTIES HERETO ACKNOWLEDGE THAT EACH INTERCREDITOR AGREEMENT OR SUCH OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT IS BINDING UPON THEM.    EACH LENDER HEREBY AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF ANY INTERCREDITOR AGREEMENT OR ANY OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT ENTERED INTO PURSUANT TO THE IMMEDIATELY PRECEDING SENTENCE.

(c)    THE PROVISIONS OF THIS <u>SECTION 10.26</u> ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF ANY INTERCREDITOR AGREEMENT. REFERENCE MUST BE MADE TO EACH INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF EACH INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER ADMINISTRATIVE AGENT NOR ANY OF THE ADMINISTRATIVE AGENT'S AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN ANY INTERCREDITOR AGREEMENT.

(d)    Notwithstanding anything to the contrary, the parties hereto acknowledge and agree that (x) no Lender consent shall be required to effect any amendment or supplement to any Intercreditor Agreement (A) that is solely for the purpose of adding holders of Debt incurred or issued pursuant to a Permitted Refinancing of the Prepetition Term Loan Credit Agreement (or any agent or trustee of such holders) as parties thereto, as contemplated by the terms of the Prepetition ABL Intercreditor Agreement and permitted under clause (v) of the definition of "Permitted Indebtedness (it being understood that any such amendment or supplement may make such other changes to any Intercreditor Agreement as, in the good faith determination of the Administrative Agent, as required to effectuate the foregoing and provided that such other changes are not adverse to the interests of the Lenders), or (B) that is expressly

contemplated by the Prepetition ABL Intercreditor Agreement with respect to a Permitted Refinancing Debt of the Prepetition Term Loan Credit Agreement permitted under clause (v) of the definition of "Permitted Indebtedness") (or the comparable provisions, if any, of any successor intercreditor agreement with respect to a Permitted Refinancing of the Prepetition Term Loan Credit Agreement permitted under clause (v) of the definition of "Permitted Indebtedness"); provided that no such agreement or supplement shall, pursuant to this paragraph, amend, modify or otherwise effect the rights or duties of the Administrative Agent hereunder or under any other Loan Document unless in writing and signed by the Administrative Agent.

**10.27    Erroneous Payments**.

(a)    Each Lender and any other party hereto hereby severally agrees that if (i) the Administrative Agent notifies (which such notice shall be conclusive absent manifest error) such Lender (or the Lender which is an Affiliate of a Lender) or any other Person that has received funds from the Administrative Agent or any of its Affiliates, either for its own account or on behalf of a Lender (each such recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) or (ii) any Payment Recipient receives any payment from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, or (z) that such Payment Recipient otherwise becomes aware was transmitted or received in error or by mistake (in whole or in part) then, in each case, an error in payment shall be presumed to have been made (any such amounts specified in clauses (i) or (ii) of this Section 10.27(a), whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise; individually and collectively, an "Erroneous Payment"), then, in each case, such Payment Recipient is deemed to have knowledge of such error at the time of its receipt of such Erroneous Payment; provided that nothing in this Section shall require the Administrative Agent to provide any of the notices specified in clauses (i) or (ii) above. Each Payment Recipient agrees that it shall not assert any right or claim to any Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(b)    Without limiting the immediately preceding clause (a), each Payment Recipient agrees that, in the case of clause (a)(ii) above, it shall promptly notify the Administrative Agent in writing of such occurrence.

(c)    In the case of either clause (a)(i) or (a)(ii) above, such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and upon demand from the Administrative Agent such Payment Recipient shall (or, shall cause any Person who received any portion of an Erroneous Payment on its behalf to), promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (c), from any Lender that is a Payment Recipient or an Affiliate of a Payment Recipient (such unrecovered amount as to such Lender, an "<u>Erroneous Payment Return Deficiency</u>"), then at the sole discretion of the Administrative Agent and upon the Administrative Agent's written notice to such Lender (i) such Lender shall be deemed to have made a cashless assignment of the full face amount of the portion of the Loans owing to it (but not its Commitments) with respect to which such Erroneous Payment was made (the "<u>Erroneous Payment Impacted Loans</u>") to the Administrative Agent or, at the option of the Administrative Agent, the Administrative Agent's applicable lending affiliate (such assignee, the "<u>Agent Assignee</u>") in an amount that is equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of such Advances (but not Commitments) of the Erroneous Payment Impacted Loans, the "<u>Erroneous Payment Deficiency Assignment</u>") plus any accrued and unpaid interest on such assigned amount, without further consent or approval of any party hereto and without any payment by the Agent Assignee as the assignee of such Erroneous Payment Deficiency Assignment.  Without limitation of its rights hereunder, following the effectiveness of the Erroneous Payment Deficiency Assignment, the Administrative Agent may make a cashless reassignment to the applicable assigning Lender of any Erroneous Payment Deficiency Assignment at any time by written notice to the applicable assigning Lender and upon such reassignment all of the Advances assigned pursuant to such Erroneous Payment Deficiency Assignment shall be reassigned to such Lender without any requirement for payment or other consideration.  The parties hereto acknowledge and agree that (1) any assignment contemplated in this clause (d) shall be made without any requirement for any payment or other consideration paid by the applicable assignee or received by the assignor, (2) the provisions of this clause (d) shall govern in the event of any conflict with the terms and conditions of <u>Section 10.06</u> and (3) the Administrative Agent may reflect such assignments in the Register without further consent or action by any other Person.

(e)     Each party hereto hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent (1) shall be subrogated to all the rights of such Payment Recipient and (2) is authorized to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Payment Recipient from any source, against any amount due to the Administrative Agent under this <u>Section 10.27</u> or under the indemnification provisions of this Agreement, (y) the receipt of an Erroneous Payment by a Payment Recipient shall not for the purpose of this Agreement be treated as a payment, prepayment, repayment, discharge or other satisfaction of any Obligations owed by the Borrowers or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrowers or any other Loan Party for the purpose of making for a payment on the Obligations and (z) to the extent that an Erroneous Payment was in any way or at any time credited as payment or satisfaction of any of the Obligations, the Obligations or any part thereof that were so credited, and all rights of the Payment Recipient, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received.

(f)     Each party's obligations under this <u>Section 10.27</u> shall survive the resignation or replacement of the Administrative Agent or any transfer of right or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

(g)     The provisions of this <u>Section 10.27</u> to the contrary notwithstanding, (i) nothing in this <u>Section 10.27</u> will constitute a waiver or release of any claim of any party hereunder arising from any Payment Recipient's receipt of an Erroneous Payment and (ii) there will only be deemed to be a recovery

of the Erroneous Payment to the extent that the Administrative Agent has received payment from the Payment Recipient in immediately available funds the Erroneous Payment Return, whether directly from the Payment Recipient, as a result of the exercise by the Administrative Agent of its rights of subrogation or set off as set forth above in clause (e) or as a result of the receipt by an Agent Assignee of a payment of the outstanding principal balance of the Advances assigned to such Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment, but excluding any other amounts in respect thereof (it being agreed that any payments of interest, fees, expenses or other amounts (other than principal) received by such Agent Assignee in respect of the Advances assigned to such Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment shall be the sole property of such Agent Assignee and shall not constitute a recovery of the Erroneous Payment).

**10.28    Parties Including Trustees; Bankruptcy Court Proceedings**.  This Agreement, the other Loan Documents, and all Liens created pursuant to any Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee or successor in interest of any Loan Party in any Chapter 11 Case or any Successor Case or under any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent or any Lender file financing statements or otherwise perfect its security interests or Liens under applicable Law.

[Signature Pages to Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**CHRISTMAS TREE SHOPS, LLC**

By: _____
Name:
Title:

**HANDIL, LLC**

By: _____
Name:
Title:

**HANDIL HOLDINGS, LLC**

By: _____
Name:
Title:

**SALKOVITZ FAMILY TRUST 2, LLC**

By: _____
Name:
Title:

**NANTUCKET DISTRIBUTING CO., LLC**

By: _____
Name:
Title:

**CHRISTMAS TREE SHOPS OF MASSACHUSETTS, LLC**

By: _____
Name:
Title:

[Signature Page to Credit Agreement]

**ECLIPSE BUSINESS CAPITAL LLC,**
as Administrative Agent


By: _____
Name:
Title:

**ECLIPSE BUSINESS CAPITAL SPV, LLC,**
as a Lender


By:_____
Name:
Title:


**RESTORE CAPITAL, LLC,**
as a Lender


By:_____
Name:
Title:

**Schedule 6.02**

**Financial and Collateral Reporting**

The Administrative Agent, for distribution to each Lender, shall be provided with each of the documents set forth below at the following times, each in form and detail reasonably satisfactory to the Administrative Agent, related to the Borrowing Base and other collateral reporting:

| | |
|---|---|
| Weekly (no later than the 3rd Business Day of each week), if a weekly Borrowing Base Certificate is then required to be delivered pursuant to <u>Section 6.02(b)</u> | (a) A Credit Card Accounts Receivable report demonstrating details from which ineligibles and reserves will be derived (delivered electronically in a format consistent with that delivered at close). <br><br> (b) A detailed Inventory perpetual report demonstrating inventory details from which ineligibles and reserves will be derived (delivered electronically in a format consistent with that delivered at close). <br><br> (c) A detailed In-Transit Inventory report demonstrating details from which ineligibles and reserves will be derived (delivered electronically in a format consistent with that delivered at close). <br><br> (d) A summary accounts payable report aged by vendor (delivered electronically in a format consistent with that delivered at close). |
| Monthly (no later than or 25th days after the end of each month) | (e) Without duplication of monthly Borrowing Base Certificates provided under Section 6.02(b), a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the Fiscal Month, accompanied by all necessary supporting files (delivered electronically in a format consistent with that delivered at close). <br><br> (f) A detailed month-end Inventory report demonstrating inventory details by location and category (delivered electronically in a format consistent with that delivered at close). <br><br> (g) A detailed month-end In-Transit Inventory report demonstrating details by age and shipment (delivered electronically in a format consistent with that delivered at close). <br><br> (h) A summary month-end accounts payable report aged by vendor (delivered electronically in a format consistent with that delivered at close). <br><br> (i) A reconciliation of such month-end Credit Card Accounts Receivable and Inventory to the general ledger and monthly financial statements including any book reserves related to each category. |

# **EXHIBIT B**

## **Budget**

**Christmas Tree Shops 13 Week Cashflow Projections**

| | MAY | MAY | MAY | MAY | JUNE | JUNE | JUNE | JUNE | JUNE | JULY | JULY | JULY | JULY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Weekly Cash Flow Forecast - Detail** | | | | | | | | | | | | | |
| **Week Ending** | 5/6/2023 Forecast | 5/13/2023 Forecast | 5/20/2023 Forecast | 5/27/2023 Forecast | 6/3/2023 Forecast | 6/10/2023 Forecast | 6/17/2023 Forecast | 6/24/2023 Forecast | 7/1/2023 Forecast | 7/8/2023 Forecast | 7/15/2023 Forecast | 7/22/2023 Forecast | 7/29/2023 Forecast |
| **Cashflow Week** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** |
| **$'000** | | | | | | | | | | | | | |
| **Operating Activity** | | | | | | | | | | | | | |
| **Product Margin TY** | | | | | | | | | | | | | |
| **Product Margin LY** | | | | | | | | | | | | | |
| 2023 vs. 2021 % | -66% | -54% | -50% | -42% | -37% | -14% | -15% | -13% | -11% | -5% | 1% | -7% | -10% |
| 2021 Receipts | 13,274 | 13,463 | 13,378 | 14,187 | 13,975 | 12,470 | 12,420 | 12,108 | 11,821 | 11,589 | 10,419 | 10,872 | 9,882 |
| 2023 vs. 2022 % | -44% | -37% | -32% | -27% | -17% | -11% | -5% | -3% | 1% | 0% | -7% | 5% | 0% |
| 2022 Receipts | 10,912 | 11,470 | 11,323 | 12,357 | 11,685 | 12,124 | 11,236 | 11,048 | 10,584 | 11,054 | 11,243 | 9,707 | 8,990 |
| **Receipts (CTS)** | **4,350** | **5,200** | **5,450** | **5,950** | **6,050** | **6,050** | **5,600** | **5,600** | **5,600** | **5,400** | **5,400** | **5,400** | **4,500** |
| **Receipts (ReStore)** | **1,750** | **2,050** | **2,250** | **3,100** | **3,600** | **4,700** | **5,100** | **5,100** | **5,100** | **5,600** | **5,100** | **4,750** | **4,500** |
| **Total** | **6,100** | **7,250** | **7,700** | **9,050** | **9,650** | **10,750** | **10,700** | **10,700** | **10,700** | **11,000** | **10,500** | **10,150** | **9,000** |
| **Add'l Receipts** | | | | | | | | | | | | | |
| Merchandise | (500) | (1,750) | (2,250) | (2,500) | (2,750) | (3,500) | (3,750) | (4,000) | (4,000) | (2,000) | (4,000) | (3,000) | (3,750) |
| Employee Costs | (310) | (3,200) | (200) | (3,250) | (200) | (3,250) | (200) | (3,300) | (200) | (3,300) | (300) | (3,300) | (300) |
| Occupancy Costs | - | - | - | - | (5,521) | - | - | - | - | (5,175) | - | - | - |
| Insurance | (475) | (180) | (50) | (25) | (425) | (130) | - | - | (425) | (130) | - | - | (425) |
| Financing (Interest) | (1,969) | - | - | | (375) | | | | (400) | - | - | - | - |
| Closing Fees | - | - | - | (100) | (100) | (100) | (100) | (50) | - | - | - | - | - |
| ReStore Consignment Fees | (963) | (963) | (1,128) | (1,238) | (1,705) | (1,980) | (2,585) | (2,805) | (2,805) | (2,805) | (3,080) | (2,805) | (2,613) |
| Other | (500) | (700) | (500) | (500) | (500) | (500) | (500) | (550) | (550) | (550) | (550) | (550) | (550) |
| Legal Fees - Debtor Lead Counsel | - | (75) | (75) | (75) | (75) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) |
| Legal Fees - Debtor Local Counsel | | (75) | (75) | (75) | (75) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) |

**Christmas Tree Shops 13 Week Cashflow Projections**

| Week Ending | 5/6/2023 Forecast | 5/13/2023 Forecast | 5/20/2023 Forecast | 5/27/2023 Forecast | 6/3/2023 Forecast | 6/10/2023 Forecast | 6/17/2023 Forecast | 6/24/2023 Forecast | 7/1/2023 Forecast | 7/8/2023 Forecast | 7/15/2023 Forecast | 7/22/2023 Forecast | 7/29/2023 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cashflow Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| FA - Debtor | (75) | (30) | (30) | (30) | (30) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) |
| FA - Banker | (50) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) |
| Committee Professional Fees | | (38) | (38) | (38) | (38) | (38) | (38) | (38) | (38) | (38) | (38) | (38) | (38) |
| Lender Professional Fees | | (300) | - | - | - | (350) | - | - | - | - | (250) | - | - |
| Noticing Agent Fees | (50) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) |
| Audit Fees | | | | | | | | | | | | | |
| UST Fees | - | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) |
| Store Closing Expenses | - | (148) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | - | - | - | - |
| Utilities | (120) | - | - | - | (320) | (250) | (210) | (201) | (311) | (230) | (184) | (201) | (311) |
| Utilities Deposits (2 weeks) | | | (400) | (100) | | | | | | | | | |
| IT Expenses (all critical) | (76) | (42) | (72) | (7) | (180) | (35) | (65) | - | (165) | (35) | (35) | - | (165) |
| Sales Tax | - | (50) | (1,285) | (100) | - | (50) | (1,656) | (100) | - | - | (50) | (2,421) | (100) |
| Total Disbursements | (5,089) | (7,609) | (6,201) | (8,136) | (12,392) | (10,386) | (9,307) | (11,247) | (9,097) | (14,426) | (8,651) | (12,479) | (8,415) |
| **Net Operating Cashflow** | **1,011** | **(359)** | **1,499** | **914** | **(2,742)** | **364** | **1,393** | **(547)** | **1,603** | **(3,426)** | **1,849** | **(2,329)** | **585** |
| | | | | | | | | | | | | | |
| **Cash balance, opening** | **(308)** | **(296)** | **(305)** | **(306)** | **(341)** | **(334)** | **(320)** | **(327)** | **(374)** | **(371)** | **(398)** | **(348)** | **(327)** |
| Receipts | 6,100 | 7,250 | 7,700 | 9,050 | 9,650 | 10,750 | 10,700 | 10,700 | 10,700 | 11,000 | 10,500 | 10,150 | 9,000 |
| Draws from revolver | 5,100 | 7,600 | 6,200 | 8,100 | 12,400 | 10,400 | 9,300 | 11,200 | 9,100 | 14,400 | 8,700 | 12,500 | 8,400 |
| Disbursements | (5,089) | (7,609) | (6,201) | (8,136) | (12,392) | (10,386) | (9,307) | (11,247) | (9,097) | (14,426) | (8,651) | (12,479) | (8,415) |
| Sweeps to revolver | (6,100) | (7,250) | (7,700) | (9,050) | (9,650) | (10,750) | (10,700) | (10,700) | (10,700) | (11,000) | (10,500) | (10,150) | (9,000) |
| **Cash balance, closing** | **(296)** | **(305)** | **(306)** | **(341)** | **(334)** | **(320)** | **(327)** | **(374)** | **(371)** | **(398)** | **(348)** | **(327)** | **(342)** |
| | | | | | | | | | | | | | |
| **Revolver Balance, Opening** | **24,282** | **23,282** | **23,632** | **22,132** | **21,182** | **23,932** | **23,582** | **22,182** | **22,682** | **21,082** | **24,482** | **22,682** | **25,032** |
| Revolver Draws | 5,100 | 7,600 | 6,200 | 8,100 | 12,400 | 10,400 | 9,300 | 11,200 | 9,100 | 14,400 | 8,700 | 12,500 | 8,400 |
| Revolver Sweeps | (6,100) | (7,250) | (7,700) | (9,050) | (9,650) | (10,750) | (10,700) | (10,700) | (10,700) | (11,000) | (10,500) | (10,150) | (9,000) |
| **Revolver Balance, Closing** | **23,282** | **23,632** | **22,132** | **21,182** | **23,932** | **23,582** | **22,182** | **22,682** | **21,082** | **24,482** | **22,682** | **25,032** | **24,432** |
| **Revolver Availability** | **3,314** | **764** | **1,690** | **2,716** | **61** | **230** | **2,198** | **2,743** | **4,804** | **2,951** | **3,574** | **2,393** | **3,469** |

| Revolver Borrowing Base Schedule | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $'000 | 6-May-23 | 13-May-23 | 20-May-23 | 27-May-23 | 3-Jun-23 | 10-Jun-23 | 17-Jun-23 | 24-Jun-23 | 1-Jul-23 | 8-Jul-23 | 15-Jul-23 | 22-Jul-23 | 29-Jul-23 |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| CF Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| **Credit Card Accounts Receivable** | | | | | | | | | | | | | |
| Receivable | 3,200 | 2,900 | 3,080 | 3,620 | 3,860 | 4,300 | 4,280 | 4,280 | 4,280 | 4,400 | 4,200 | 4,060 | 3,600 |
| Processor fees | (49) | (45) | (47) | (56) | (59) | (66) | (66) | (66) | (66) | (68) | (65) | (63) | (55) |
| Credit reconciling items | | | | | | | | | | | | | |
| Net Eligible Credit Card Receivable | 3,151 | 2,855 | 3,033 | 3,564 | 3,801 | 4,234 | 4,214 | 4,214 | 4,214 | 4,332 | 4,135 | 3,997 | 3,545 |
| *Advance Rate* | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| **Credit Card Receivable Availability** | **2,836** | **2,570** | **2,729** | **3,208** | **3,421** | **3,810** | **3,793** | **3,793** | **3,793** | **3,899** | **3,722** | **3,598** | **3,190** |
| **Inventory** | | | | | | | | | | | | | |
| In-transit inventory | 2,000 | 2,250 | 2,250 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,750 | 2,750 | 2,750 | 2,750 |
| In-transit duties and freight | 440 | 495 | 495 | 550 | 550 | 550 | 550 | 550 | 550 | 605 | 605 | 605 | 605 |
| Total in-transit inventory | 2,440 | 2,745 | 2,745 | 3,050 | 3,050 | 3,050 | 3,050 | 3,050 | 3,050 | 3,355 | 3,355 | 3,355 | 3,355 |
| In-Transit Ineligible | (300) | (340) | (340) | (380) | (380) | (380) | (380) | (380) | (380) | (410) | (410) | (410) | (410) |
| On-hand inventory | 41,997 | 40,497 | 39,622 | 38,997 | 38,572 | 38,547 | 39,497 | 40,947 | 42,647 | 44,447 | 44,247 | 46,047 | 47,297 |
| Re-Store Inventory (Memo) | 12,031 | 13,506 | 15,381 | 16,831 | 18,531 | 19,681 | 19,631 | 19,831 | 19,781 | 18,481 | 18,931 | 19,556 | 19,306 |
| Total Reported Inventory (Excludes Restore) | 44,137 | 42,902 | 42,027 | 41,667 | 41,242 | 41,217 | 42,167 | 43,617 | 45,317 | 47,392 | 47,192 | 48,992 | 50,242 |
| **Inventory Reserves** | | | | | | | | | | | | | |
| Closed stores | | | | | | | | | | | | | |
| Supplies inventory | (496) | (496) | (496) | (496) | (496) | (496) | (496) | (496) | (600) | (600) | (600) | (600) | (600) |
| Shrink reserve | (936) | (1,009) | (1,086) | (1,176) | (1,273) | (1,380) | (1,487) | (1,594) | (1,701) | (1,811) | (1,916) | (2,018) | (2,108) |
| Pop Up Store Inventory | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Credit reconciling items | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OH Inventory Reserve | (1,432) | (1,505) | (1,582) | (1,672) | (1,769) | (1,876) | (1,983) | (2,090) | (2,301) | (2,411) | (2,516) | (2,618) | (2,708) |
| **Eligible Inventory** | | | | | | | | | | | | | |
| Net eligible on-hand inventory | 40,565 | 38,992 | 38,040 | 37,325 | 36,803 | 36,671 | 37,514 | 38,857 | 40,346 | 42,036 | 41,731 | 43,429 | 44,589 |
| Eligible in-transit inventory | 2,140 | 2,405 | 2,405 | 2,670 | 2,670 | 2,670 | 2,670 | 2,670 | 2,670 | 2,945 | 2,945 | 2,945 | 2,945 |

| Revolver Borrowing Base Schedule | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $'000 | 6-May-23 | 13-May-23 | 20-May-23 | 27-May-23 | 3-Jun-23 | 10-Jun-23 | 17-Jun-23 | 24-Jun-23 | 1-Jul-23 | 8-Jul-23 | 15-Jul-23 | 22-Jul-23 | 29-Jul-23 |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| CF Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Net eligible inventory | 42,705 | 41,397 | 40,445 | 39,995 | 39,473 | 39,341 | 40,184 | 41,527 | 43,016 | 44,981 | 44,676 | 46,374 | 47,534 |
| *NOLV* | *85.6%* | *85.6%* | *85.6%* | *85.6%* | *86.4%* | *86.4%* | *86.4%* | *86.4%* | *84.6%* | *84.6%* | *84.6%* | *84.6%* | *84.6%* |
| *In-transit Advance Rate* | | | | | | | | | | | | | |
| *On-hand Advance rate* | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| On-hand Inventory Availabilty | 31,251 | 30,040 | 29,306 | 28,755 | 28,618 | 28,515 | 29,171 | 30,215 | 30,719 | 32,006 | 31,774 | 33,067 | 33,950 |
| In-transit Inventory Availabililty - Cap at $20M (as of | 1,649 | 1,853 | 1,853 | 2,057 | 2,076 | 2,076 | 2,076 | 2,076 | 2,033 | 2,242 | 2,242 | 2,242 | 2,242 |
| Total Inventory Availability | 32,900 | 31,893 | 31,159 | 30,812 | 30,694 | 30,591 | 31,247 | 32,291 | 32,752 | 34,248 | 34,016 | 35,309 | 36,193 |
| Total Gross Availability | 35,735 | 34,462 | 33,888 | 34,020 | 34,115 | 34,402 | 35,040 | 36,084 | 36,545 | 38,147 | 37,738 | 38,907 | 39,383 |
| Gift cards | (1,813) | (1,813) | (1,813) | (1,813) | (1,813) | (1,813) | (1,882) | (1,882) | (1,882) | (1,882) | (1,882) | (1,882) | (1,882) |
| Sales & use tax | (460) | (1,332) | (1,332) | (1,332) | (1,332) | (1,800) | (1,800) | (1,800) | (1,800) | (1,800) | (2,568) | (2,568) | (2,568) |
| Rent | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) | (1,327) |
| Freight/duty on in-transit inventory | (440) | (495) | (495) | (550) | (550) | (550) | (550) | (550) | (550) | (605) | (605) | (605) | (605) |
| Term loan push down reserve | | | | | | | | | | | | | |
| Total Reserves | (4,040) | (4,967) | (4,967) | (5,022) | (5,022) | (5,490) | (5,559) | (5,559) | (5,559) | (5,614) | (6,382) | (6,382) | (6,382) |
| Total Borrowing Base | 31,696 | 29,496 | 28,922 | 28,998 | 29,093 | 28,912 | 29,480 | 30,525 | 30,986 | 32,533 | 31,356 | 32,525 | 33,001 |
| Less: Availability Covenant | | | | | | | | | | | | | |
| Maximum Loan Amount | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Revolving Loan Cap | 31,696 | 29,496 | 28,922 | 28,998 | 29,093 | 28,912 | 29,480 | 30,525 | 30,986 | 32,533 | 31,356 | 32,525 | 33,001 |
| Revolver Opening Balance | 24,282 | 23,282 | 23,632 | 22,132 | 21,182 | 23,932 | 23,582 | 22,182 | 22,682 | 21,082 | 24,482 | 22,682 | 25,032 |
| Letter of Credit (memo) | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 |
| Sweeps | (6,100) | (7,250) | (7,700) | (9,050) | (9,650) | (10,750) | (10,700) | (10,700) | (10,700) | (11,000) | (10,500) | (10,150) | (9,000) |
| Draw | 5,100 | 7,600 | 6,200 | 8,100 | 12,400 | 10,400 | 9,300 | 11,200 | 9,100 | 14,400 | 8,700 | 12,500 | 8,400 |
| Revolver Balance | 23,282 | 23,632 | 22,132 | 21,182 | 23,932 | 23,582 | 22,182 | 22,682 | 21,082 | 24,482 | 22,682 | 25,032 | 24,432 |
| Gross Excess Availability | 6,314 | 3,764 | 4,690 | 5,716 | 3,061 | 3,230 | 5,198 | 5,743 | 7,804 | 5,951 | 6,574 | 5,393 | 6,469 |

| Revolver Borrowing Base Schedule | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $'000 | | 6-May-23 | 13-May-23 | 20-May-23 | 27-May-23 | 3-Jun-23 | 10-Jun-23 | 17-Jun-23 | 24-Jun-23 | 1-Jul-23 | 8-Jul-23 | 15-Jul-23 | 22-Jul-23 | 29-Jul-23 |
| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | CF Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Less: Availability Covenant | | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) |
| Excess Availability | | 3,314 | 764 | 1,690 | 2,716 | 61 | 230 | 2,198 | 2,743 | 4,804 | 2,951 | 3,574 | 2,393 | 3,469 |

Christmas Tree Shops

Inventory Forecast - Disbursements an

| | MAY 18 | MAY 19 | MAY 20 | MAY 21 | JUNE 22 | JUNE 23 | JUNE 24 | JUNE 25 | JUNE 26 | JULY 27 | JULY 28 | JULY 29 | JULY 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inventory Forecast - Disbursements and Receipts** | | | | | | | | | | | | | |
| **$'000** | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | 7/1/2023 | 7/8/2023 | 7/15/2023 | 7/22/2023 | 7/29/2023 |
| Opening Inventory | 43,322 | 41,997 | 40,497 | 39,622 | 38,997 | 38,572 | 38,547 | 39,497 | 40,947 | 42,647 | 44,447 | 44,247 | 46,047 |
| Inventory Receipts | 750 | 1,000 | 1,750 | 2,250 | 2,500 | 2,750 | 3,500 | 3,750 | 4,000 | 4,000 | 2,000 | 4,000 | 3,000 |
| Freight | 100 | 100 | 100 | 100 | 100 | 250 | 250 | 500 | 500 | 500 | 500 | 500 | 500 |
| Adjustment | | | | | | | | | | | | | |
| COGS | (2,175) | (2,600) | (2,725) | (2,975) | (3,025) | (3,025) | (2,800) | (2,800) | (2,800) | (2,700) | (2,700) | (2,700) | (2,250) |
| **Ending CTS Inventory** | 41,997 | 40,497 | 39,622 | 38,997 | 38,572 | 38,547 | 39,497 | 40,947 | 42,647 | 44,447 | 44,247 | 46,047 | 47,297 |
| **Inventory including Hilco** | | | | | | | | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Re-Store** | | | | | | | | | | | | | |
| **$'000** | | | | | | | | | | | | | |
| **Starting Inventory** | 11,306 | 12,031 | 13,506 | 15,381 | 16,831 | 18,531 | 19,681 | 19,631 | 19,831 | 19,781 | 18,481 | 18,931 | 19,556 |
| Receipts | 1,600 | 2,500 | 3,000 | 3,000 | 3,500 | 3,500 | 2,500 | 2,750 | 2,500 | 1,500 | 3,000 | 3,000 | 2,000 |
| COGS | (875) | (1,025) | (1,125) | (1,550) | (1,800) | (2,350) | (2,550) | (2,550) | (2,550) | (2,800) | (2,550) | (2,375) | (2,250) |
| **Ending Inventory** | 12,031 | 13,506 | 15,381 | 16,831 | 18,531 | 19,681 | 19,631 | 19,831 | 19,781 | 18,481 | 18,931 | 19,556 | 19,306 |
| | | | | | | | | | | | | | |
| | 54,028 | 54,003 | 55,003 | 55,828 | 57,103 | 58,228 | 59,128 | 60,778 | 62,428 | 62,928 | 63,178 | 65,603 | 66,603 |

| **In-Transit Inventory Forecast** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **$'000** | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | 7/1/2023 | 7/8/2023 | 7/15/2023 | 7/22/2023 | 7/29/2023 |
| On-Hand Inventory | 41,997 | 40,497 | 39,622 | 38,997 | 38,572 | 38,547 | 39,497 | 40,947 | 42,647 | 44,447 | 44,247 | 46,047 | 47,297 |
| In-Transit as a % of On-Hand | 4.8% | 5.6% | 5.7% | 6.4% | 6.5% | 6.5% | 6.3% | 6.1% | 5.9% | 6.2% | 6.2% | 6.0% | 5.8% |
| **In-Transit Inventory** | **2,000** | **2,250** | **2,250** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,750** | **2,750** | **2,750** | **2,750** |

# EXHIBIT C

## Milestones

| Event | Date |
|---|---|
| Entry of Interim DIP Order acceptable to Required DIP Lenders | May 9, 2023 |
| File proposed Disclosure Statement and Plan acceptable to Required DIP Lenders | June 2, 2023 |
| Entry of Final DIP Order acceptable to Required DIP Lenders | June 2, 2023 |
| Entry of Order approving the Store Closing Motion | June 2, 2023 |
| Entry of Order approving the motion to assume the Consignment Agreement on a final basis | June 2, 2023 |
| Entry of an Order approving the Disclosure Statement and solicitation of the Plan | July 7, 2023 |
| Entry of an Order approving extension of the § 365(d)(4) period to 210 days | July 7, 2023 |
| Entry of Confirmation Order acceptable to Required DIP Lenders | August 16, 2023 |
| Effective Date of Plan | August 31, 2023 |

# EXHIBIT D

## Lien and Superpriority Claim Priority

| Order of Priority | Prepetition ABL Priority Collateral | Prepetition Term Priority Collateral | Non-Lender Encumbered Assets constituting ABL Priority Collateral | Non-Lender Encumbered Assets constituting Term Priority Collateral |
|---|---|---|---|---|
| 1 | Permitted Liens under Prepetition ABL Loan Documents | Permitted Liens under Prepetition Term Loan Documents | Non-Lender Existing Liens | Non-Lender Existing Liens |
| 2 | Carve Out | Prepetition Term Loan Liens | Carve Out | Prepetition Term Loan Liens |
| 3 | DIP Liens | Prepetition Term Loan Adequate Protection Liens | DIP Liens | Prepetition Term Loan Adequate Protection Liens |
| 4 | Prepetition ABL Liens | Carve Out | Prepetition ABL Adequate Protection Liens | Carve Out |
| 5 | Prepetition ABL Adequate Protection Liens | DIP Liens | Prepetition Term Loan Liens | DIP Liens |
| 6 | Prepetition Term Loan Liens | Prepetition ABL Liens | Prepetition Term Loan Adequate Protection Liens | Prepetition ABL Liens |
| 7 | Prepetition Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens | BBBy Liens | Prepetition ABL Adequate Protection Liens |
| 8 | BBBy Liens | BBBy Liens | BBBy Adequate Protection Liens | BBBy Adequate Protection Liens |
| 9 | BBBy Adequate Protection Liens | BBBy Adequate Protection Liens | | |

| Order of Priority | Unencumbered Assets constituting ABL Priority Collateral[8] | Unencumbered Assets constituting Term Priority Collateral | Superpriority Claims from proceeds of property constituting ABL Priority Collateral | Superpriority Claims from proceeds of property constituting Term Priority Collateral |
|---|---|---|---|---|
| 1 | Carve Out | Prepetition Term Loan Adequate Protection Liens | Carve Out | Prepetition Term Loan Adequate Protection Claim |
| 2 | DIP Liens | Carve Out | DIP Superpriority Claim | Carve Out |
| 3 | Prepetition ABL Adequate Protection Liens | DIP Liens | Prepetition ABL Adequate Protection Claims | DIP Superpriority Claim |
| 4 | Prepetition Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens | Prepetition Term Loan Adequate Protection Claim | Prepetition ABL Adequate Protection Claims |
| 5 | BBBy Adequate Protection Liens | BBBy Adequate Protection Liens | BBBy Adequate Protection Claim | BBBy Adequate Protection Claim |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |

Includes, inter alia, subject to a Final Order, Avoidance Proceeds