```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 23-10576 (TMH)
 4   CHRISTMAS TREE,             .
     SHOPS, LLC, et al.,         .  (Jointly Administered)
 5                               .
                                 .  Courtroom No. 4
 6                               .  824 Market Street
                Debtors.         .  Wilmington, Delaware 19801
 7                               .
                                 .  Thursday, June 29, 2023
 8   . . . . . . . . . . . . .   .  2:02 p.m.

 9                 TRANSCRIPT OF HYBRID ZOOM HEARING
                BEFORE THE HONORABLE THOMAS M. HORAN
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:            Evelyn J. Meltzer, Esquire
                                 TROUTMAN PEPPER HAMILTON
13                                 SANDERS, LLP
                                 Hercules Plaza
14                               1313 Market Street
                                 Suite 5100
15                               Wilmington, Delaware 19801

16   For Loomis Armored
     US, LLC:                    Garvan F. McDaniel, Esquire
17                               HOGAN MCDANIEL
                                 1311 Delaware Avenue
18                               Wilmington, Delaware 19806

19   (APPEARANCES CONTINUED)

20   Audio Operator:             Nolley Rainey, ECRO

21   Transcription Company:      Reliable
                                 The Nemours Building
22                               1007 N. Orange Street, Suite 110
                                 Wilmington, Delaware 19801
23                               Telephone: (302)654-8080
                                 Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For the Debtors:           Harold B. Murphy, Esquire
                               MURPHY & KING, PROFESSIONAL
3                                 CORPORATION
                               28 State Street
4                              Suite 3101
                               Boston, Massachusetts 02109
5
    For Hilco Merchant
6   Resources, LLC; Restore
    Capital (CTS), LLC; and
7   Restore Capital, LLC:      Gregg M. Galardi, Esquire
                               ROPES & GRAY, LLP
8                              1211 Avenue of the Americas
                               New York, New York 10036
9
    For the Official
10  Committee of
    Unsecured Creditors:       Warren J. Martin Jr., Esquire
11                             PORZIO, BROMBERG & NEWMAN, P.C.
                               100 Southgate Parkway
12                             Morristown, New Jersey 07962

13  For Vickerry Realty Co.
    Trust and North Conway
14  Plaza, LLC:                Douglas B. Rosner, Esquire
                               GOULSTON & STORRS, P.C.
15                             400 Atlantic Avenue
                               Boston, Massachusetts 02110
16
    For Acadia Realty
17  Limited Partnership:       Laurel D. Roglen, Esquire
                               BALLARD SPAHR, LLP
18                             919 North Market Street
                               11th Floor
19                             Wilmington, Delaware 19801

20  For Blumenfeld
    Development Group,
21  Ltd.; Brookfield
    Properties Retail,
22  Inc.; and Kite Realty
    Group, LP:                 Robert L. LeHane, Esquire
23                             KELLEY DRYE & WARREN, LLP
                               3 World Trade Center
24                             175 Greenwich Street
                               New York, New York 10007
25

1                                INDEX

2   MOTIONS:                                                   PAGE

3   Agenda
    Item 1:    Motion by Debtors for Entry of a Supplemental      5
4              Order to the Final Order Pursuant to 11 U.S.C.
               §§ 105, 361, 362, 363, 364, 503 and 507 (I)
5              Authorizing the Debtors to Obtain Senior
               Secured Superpriority Post-petition Financing;
6              (II) Granting (A    ) Liens and Superpriority
               Administrative Expense Claims and (B) Adequate
7              Protection to Certain Prepetition Lenders;
               (III) Authorizing Use of Cash Collateral; (IV)
8              Modifying the Automatic Stay; and (V) Granting
               Related Relief (Filed 6/26/23; Docket No. 296)
9
               Court's Ruling:                                   68
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               INDEX

2   WITNESSES CALLED
    BY THE LENDERS:                                   PAGE
3

4        MARC SALKOVITZ

5        Direct examination by Mr. Galardi            25

6        Cross-examination by Ms. Roglen             34

7        Cross-examination by Mr. Rosner             37

8        Cross-examination by Mr. LeHane             44

9        Cross-examination by Mr. McDaniel           45

10       Redirect examination by Mr. Galardi         47

11

12                             EXHIBITS

13  DEBTORS' EXHIBITS:                               PAGE

14  1) Court transcript, May 31, 2023                24

15

16  DECLARATIONS:                                    PAGE

17  1) Declaration of Marc Salkovitz                 24

18

19  Transcriptionists' Certificate                   75

20

21

22

23

24

25

1       (Proceedings commenced at 2:03 p.m.)

2           THE COURT:  Good afternoon, this is Judge

3  Silverstein and we're here in the Christmas Tree Shops case,

4  Number 23-10576.

5           And as the parties know, this was an emergency

6  motion.  Judge Horan is not available, so I am handling it.

7           Let me turn it over to Ms. Meltzer.

8           MS. MELTZER:  Good afternoon, Your Honor.  Evelyn

9  Meltzer of Troutman Pepper, on behalf of the -- the Christmas

10 Tree Shops and its affiliated debtors.

11          Your Honor, we wanted to thank you very much for

12 making time to hear this emergency motion today.  We filed

13 about 45 minutes ago, a notice that attached a proposed,

14 revised order that's at Docket 319.  We apologize to Your

15 Honor for getting that filed so late; we had a lot of people

16 trying to work out issues and we've been working as

17 diligently as we can.

18          The good news, Your Honor, is I think that among

19 the debtors, the Committee, and the DIP lender, we are close.

20 There may be a few minor changes to the order.  I understand

21 that the landlord's objection is still going forward.

22          And so, with that, Your Honor, realizing that you

23 are new to this case, my plan is to turn it over to my co-

24 counsel, Mr. Murphy, and he's going to give you some

25 background and then Mr. Galardi, who represents the DIP

1  lenders, is going to walk Your Honor through the proposed,

2  revised order.

3          THE COURT:  Thank you.

4          Mr. Murphy?

5          MS. MELTZER:  Thank you, Your Honor.

6          MR. MURPHY:  Good afternoon, Your Honor.  Thank

7  you, as well, for your time.  At this time of the year, it's

8  very busy.

9          Let me just give you a quick background on the

10 significant events in this approximately two-month-old

11 bankruptcy case, Your Honor.  Christmas Tree Shops was

12 acquired by the present ownership in 2020 from Bed Bath &

13 Beyond.  At the time of the filing on May 5th, it operated 82

14 stores in 20 states, selling seasonal products, housewares,

15 food products, and sundries.  The company had operated very

16 well for the first couple of years.  In 2022, they ran into

17 problems and that led to the filing in May of 2023.

18          Among the first and second day orders entered by

19 Judge Horan was a DIP financing, a first interim order and a

20 final order, and secondly, a store closing order that

21 authorized the debtor to shut down two underperforming stores

22 and, second, set in place a procedure, by which the debtor

23 could add additional stores as the circumstances required.

24          The DIP, the case was set because it's a retail

25 case and there are limitations on the extension of assumption

1  and assignment of leases, Your Honor.  The DIP order contains

2  some aggressive milestones that the debtor, to date, has met

3  in terms of trying to get the case moving and getting a plan

4  confirmed.

5         The DIP order required that a plan and disclosure

6  statement acceptable to the lenders be filed by June 7th.

7  That was done and a hearing on approval of the disclosure

8  statement was scheduled for July 7th.  Unfortunately,

9  circumstances, has resulted in plan really not being able to

10  go forward because, quite simply, the debtor doesn't

11  vaccinate time, nor the money to go forward with the plan.

12         At the end of May, the company retained SSG with

13  the approval of the Court to look for money to fund the plan.

14  The plan projected that we needed approximately $25 million

15  of new capital to refinance the business and to fund an exit,

16  a bankruptcy exit or, alternatively, to find a buyer.  And

17  SSG, Your Honor, has worked very diligently and has reported,

18  if you will, regularly to both, not only the debtor, but the

19  Committee, which has been very active in the case, and the

20  DIP lenders who are obviously very closely monitoring the

21  debtors' performance.

22         The debtor ran into problems, Your Honor, in late,

23  well, early June, I guess it was, when we started having

24  problems refilling the shelves.  We just couldn't replenish

25  the inventory fast enough to keep up with the sales.  Not

1  that we were exceeding our sales, but we had projected

2  certain sales based upon certain inventory levels.

3          Your Honor, the debtors' stores is about 3,000

4  separate kinds of products sold in a Christmas tree store

5  [sic] and I guess part of the experience and the uniqueness

6  of the store, it's a bit of a treasure hunt.  And what brings

7  people in, if they're looking for X, they hopefully leave the

8  store with the whole alphabet of multiple items.

9          And what happens when the inventory is thin, the

10  customers just buy one or two items, as opposed to five or

11  six and sales declined and we initially triggered a default,

12  which the DIP lenders did not pursue; instead, they reserved

13  their right, in early June.

14          Following that, we did the best we could, but we

15  triggered another default in June 21, and that's when the

16  lenders sent a second notice of default and a trigger event.

17  And the trigger event resulted in the cessation of funding of

18  the debtors' business if not remedied within five days and

19  set in into place, a discussion that has taken place between

20  June 21st and up to this morning, Your Honor, when we finally

21  reached an agreement, subject, of course, to Your Honor's

22  approval, for our financing and a path forward either in

23  terms of a going-concern sale, if not, to GOB, unfortunately.

24          And in that motion, there's the order that was

25  presented to the Court today, it provides for funding of the

1   carve-out that was created in the initial order.  It provides

2   for funding for a GOB if we have to go that way.  And it

3   provides funding for the professional fees associated with

4   the, if you will, winding-down the case.

5          The negotiated order, I'm going to leave to

6   Mr. Galardi to speak to, but it was a three-way negotiation,

7   Your Honor, and the Committee took a major role in those

8   discussions.  Because under the first DIP order, the final

9   DIP order, Your Honor, there was a challenge period for the

10  Committee to challenge not only the ABL lender, which is the

11  predecessor of the DIP lender, but also a junior lienholders

12  and there was a time frame to do so.

13         So there was a bargain struck between the DIP

14  lenders and the Committee that Mr. Galardi will report on

15  that results in the waiver of an agreement that the Committee

16  receives -- the estate receives certain benefits in

17  consideration of release of the ABL/DIP lenders and retaining

18  their rights against any other party, Your Honor.

19         Unless Your Honor has any questions, I'll turn it

20  to Mr. Galardi to pick up the details of the order itself.

21         THE COURT:  I think he said, Mr. Murphy, that the

22  milestones reflect either a going-out-of-business or a store-

23  closing sale.  But as I'm looking at the most recent, it

24  appears to be just a store-closing sale.

25         MR. MURPHY:  I don't believe so, Your Honor.  And

1  it may have been hard to read with the -- all the blackline

2  that was there, but there is a date -- a provision, I

3  believe, on the blackline, Your Honor, on the -- well,

4  paragraph 7 -- I'm not sure what version -- they call it "new

5  case milestones," Your Honor, and romanette (ii) is on or

6  before July 5th, 2023.  The debtors provides a revised

7  budget -- I'm sorry -- I'm missing that myself, Your Honor.

8          MR. GALARDI:  Your Honor, if I may take that

9  question up?  I'm happy to answer it.

10          MR. MURPHY:  Okay.  Maybe I misread it,

11  Mr. Galardi.

12          MR. GALARDI:  Your Honor, it is the agreement of

13  the lenders.  There is SSG and the back-and-forth; I don't

14  believe it's in the order.

15          But the reason that the July 6th date was chosen

16  for commencement of going-out-of-business sales it's because

17  prior to that date, we have required that SSG provide us, the

18  lenders, with a sale process that if they have a buyer for

19  that process, they will present it to us.  So, there is

20  still -- SSG is doing their work to try to find the going-

21  concern sale.

22          And if they do so, then we may change course;

23  again, there is some skepticism here, but that is still a

24  live possibility and we understand the debtors' fiduciary

25  duty to look for that up until you actually start the GOB

1  sales.

2          THE COURT:  Okay.  Mr. Murphy or Mr. Galardi,

3  whoever wants to answer, what was the nature of the defaults

4  that triggered the termination notice?

5          MR. GALARDI:  Mr. Murphy, do you want to answer it

6  or --

7          MR. MURPHY:  Go ahead, Mr. Galardi.

8          MR. GALARDI:  There were minimum liquidity

9  covenants.  There were minimum, I believe, revenue defaults.

10 There was a series of defaults.

11         And, Your Honor, before we get to sort of the

12 order, there is an evidentiary matter that I do want to do,

13 which may help Your Honor with some of your questions, as

14 well.

15         THE COURT:  Okay.  Well, let's -- let me ask

16 before we get to evidentiary matters, is there any other

17 party that would like to say anything, then, by way of

18 opening or background that they think I should be aware of?

19         MR. MARTIN:  Your Honor, Warren Martin on behalf

20 of the Committee of Unsecured Creditors.

21         We support the resolution that has been reached,

22 that is embodied in the form of order that is being presented

23 to Your Honor.  It was heavily negotiated.  I understand

24 there are a number of other interests that have to be

25 considered, but certainly from the Committee's perspective,

1  we are very supportive of this process.

2          THE COURT:  Thank you.

3          I see Mr. LeHane.

4          MR. LEHANE:  Good afternoon, Your Honor.  Robert

5  LeHane, Kelley Drye & Warren, on behalf of various landlords.

6          Your Honor, this puts you in a very difficult

7  situation.  The case is in a very difficult situation.  What

8  hasn't really been mentioned or spoken of is an agreement in

9  a provision that you may have noticed that there was some

10 funding reserves that were being set aside to fund the stub

11 rent.

12         And the approximate amount of stub rent in this

13 case is in the range of $4 million and it's a significant

14 amount compared to the other dollars that are being talked

15 about here.  And during the entire period, the debtors'

16 lender's collateral was being sold.  The lenders' affiliate

17 Restore was selling its consigned goods and all to the

18 benefit of the lender and the consignor, its affiliate.

19         And the agreement that was reached in the final

20 DIP hearing, based on Judge Horan's ruling that he would not

21 grant the 506(c) waiver if there was not some agreement and

22 some adequate protections for the payment of stub rent.  So

23 we reached an agreement that provided for some reserve

24 funding that would obviously terminate according to the

25 agreement and the transcript has been -- I believe, will be

1   admitted into evidence.

2              And as it turns out, there were termination events

3   and defaults that may have already occurred at the time that

4   the agreement was being reached and are now being triggered.

5   And so now we're in a very difficult position because,

6   obviously, the case -- we would like to see the case

7   continue.  The landlords were supportive of trying to see the

8   company survive and have a tenant that can survive.  And we

9   certainly want to see, at a minimum, the company be able to

10   liquidate or sell inventory for as long as it can.

11              On the other hand, it's very troubling that we

12   could be put in a position where there's $4 million of unpaid

13   stub rent.  We understand the Committee has worked hard to

14   try to get some set aside for creditors and for unsecured

15   creditors, but based on the scale of the numbers here, all of

16   that, that has been set aside would have to be used to pay

17   these administrative claims, which really should be costs

18   that the lenders and the consignor should be funding because

19   they were incurred during the Chapter 11 case.  They're

20   clearly costs and expenses of this Chapter 11 estate.

21              And so we're in a very difficult position.  I

22   think this puts you in a very difficult position.  And if

23   this is entered as another final order, it makes it, you

24   know, very, very difficult for any recovery, absent the fact

25   that, you know, landlords are entitled to adequate protection

1   under 363(e) and, clearly, the premises were used during the

2   stub period of May for the benefit of the estate and adequate

3   protection could not include just an administrative claim.

4   The Bankruptcy Code is also very clear about that.

5          So, the basis of the agreement that was reached

6   was to provide that adequate protection and it appears that

7   that may or may not be available, depending on what your

8   rulings are today and whether we have some funding going

9   forward.  But whatever may happen, we're still entitled to

10  some adequate protection and, you know, we would like to see

11  what that is.

12         And we don't think the unsecured creditors should

13  just be, all of the hard work that the Committee has done

14  should go to fund the stub rent, when, clearly, what that

15  stub rent is, was the occupancy during a full time when the

16  lenders and the consignor were using the premises to sell

17  their goods and/or to sell their inventory.

18         So, you know, obviously, the lenders and

19  Mr. Galardi and his clients have their view of the agreement

20  and what was reached, but I think it's important for Your

21  Honor to consider, you know, the total context and here, the

22  scale of the unpaid stub rent, and just look at the case for

23  what it is, right.  It is a, what has turned out to look more

24  and more like it's just a liquidation of inventory and that

25  in Chapter 11 cases in Delaware, that is an obligation that

1  the estate and the lenders typically must fund.

2         That's a discussion we had at length before Judge

3  Horan and he agreed that, you know, that would be the result

4  here.  If they were going to get a 506(c) waiver, they had to

5  do something with respect to the stub rent.

6         So, I'll pause.  That's my opening for this, Your

7  Honor.  I'll certainly let anybody else chime in.

8         THE COURT:  Thank you.

9         MS. ROGLEN:  Your Honor, if I may be heard?

10        THE COURT:  Ms. Roglen?

11        MS. ROGLEN:  Good afternoon, Your Honor.  Laurel

12  Roglen of Ballard Spahr, on behalf of Brixmor Operating

13  Partnership and a number of other landlord clients with a

14  total of 10 of the debtors' locations.

15         I just want to briefly expand on Mr. LeHane's

16  remarks, which we, of course, agree with.  And with respect

17  to the final DIP hearing, there was no resolution that was

18  reached on the stub rent issue and the budget in advance of

19  the final DIP hearing.  So the parties filed fulsome

20  objections and Judge Horan heard full arguments on the

21  budget, the 506(c) waiver, and landlord adequate protection

22  issues at that hearing.

23         And after hearing all of those arguments, he held,

24  as Mr. LeHane noted, he believe it's the universal rule in

25  this district and he would not permit a 506(c) waiver where

1  there was no provision and budget for payment of stub rent.

2  And that was his ruling on the DIP, after which, the parties

3  went out into the hall and negotiated the agreement that was

4  proposed and incorporated into paragraph 5.29 of the final

5  DIP order, as well as a revised, approved DIP budget, which

6  set a specific weekly minimum stub rent reserve funding,

7  beginning in the weekend June 3rd, which would then

8  incorporate it into the budget and would have been paid out

9  to landlords with monthly rents after the reserve hit a

10  certain threshold.

11       And by the time the debtors had hoped to emerge

12  from bankruptcy, that only would have resulted in the payment

13  of about half of the $4.7 million of estimated stub rent.

14  But based on the adequate protection provided by that minimum

15  reserve funding and the agreement of the parties to it, only

16  then did the Court enter an order incorporating that

17  agreement and granting the 506 waiver.

18       As Mr. Galardi had noted at that final DIP hearing

19  on the record, those revisions to the budget and agreement

20  providing the landlords with adequate protection was

21  expressly in exchange for the 506(c) waiver.  And the

22  language in paragraph 5.29 also makes clear that if there's a

23  DIP default, they no longer need to continue funding those

24  payments.

25       But that was also discussed on the record and

1  Mr. Galardi noted that if there is a DIP default, we may have

2  to be back at the table with landlords.  And, unfortunately,

3  here we are.  But we really have not been back at the table

4  with the lenders.

5       We found out through the debtors' filing of the

6  supplemental motion on Monday that there had been a default

7  under the DIP financing and that the lenders no longer

8  intended to fund the stub rent reserve or provide any funding

9  for a budget for stub rent.

10       And this morning we had a discussion with the

11  lenders asking them what they were going to provide for stub

12  rent and, really, the answer was nothing.  So, we don't think

13  we are back at the table.

14       If the default was the only thing that had

15  transpired, alone, in a vacuum, I would understand the

16  lender's position, that they no longer need to fund the stub

17  rent reserve under paragraph 5.29, because if that was the

18  only thing that had happened here, then the debtors would

19  have no funding, no use of cash collateral, and this would

20  probably be a conversion hearing.

21       But that isn't the case.  Instead, the debtors and

22  the lenders are here seeking approval of a proposed

23  supplemental DIP order, which we saw for the first time last

24  night without a budget attached.  And the budget we have now

25  is just illustrative, but not approved and it completely

1 eliminates the stub rent reserve that constituted the

2 adequate protection provided to the landlords under the final

3 DIP order, in exchange for the 506(c) waiver.

4        The latest version of the proposed order that was

5 just filed also now adds a provision at the end of

6 paragraph 6 explicitly stating that the DIP lenders do not

7 have to fund any administrative expenses of the estate, any

8 of them.  So that could even be construed to apply to go-

9 forward rent for July.

10        This is an end-run around the Court's ruling and

11 eliminates the benefit of the landlords' bargain by using the

12 DIP default by the debtors to get a new supplemental order

13 that strips the adequate protection provided to landlords

14 under the previously approved final order.

15        And for the landlords, nothing has changed since

16 the final DIP hearing, or at least not in a good way.  The

17 debtors defaulted under the DIP and although we just heard a

18 little bit about the default, we don't know the precise

19 nature of those defaults.  And we don't have a full budget to

20 compare to see what the cash differences are versus the

21 previously approved DIP budget and the current budget.

22        But I'd imagine that there is less money here now

23 and not more money here now, and that would leave the

24 debtors' prospect of administrative solvency even worse off

25 than they were at the final DIP hearing where their failure

1  to budget for the post-petition stub rent was enough for

2  Judge Horan to refuse to grant the 506(c) waiver.

3          And yet, here, under these worse and deteriorating

4  facts, the lenders and the debtors are asking the Court to

5  enter a supplemental DIP order that eviscerates the

6  specifically negotiated adequate protection of the landlord.

7  We understood that following an event of default, the parties

8  would be back at the drawing board, but that isn't where we

9  are here.

10          Instead, the lenders are holding on to the

11 portions of the DIP that they find favorable, such as

12 the 506(c) waiver, among other things, and stripping away the

13 protections that were given to landlords at a time when those

14 protections are only more critical.

15          The debtors continue to operate in our client's

16 premises, continue to use the premises to store and liquidate

17 the lender's collateral, and continue to operate to support

18 their ongoing sale process.  So, the landlords' position is

19 that the Court should not approve an order today for further

20 financing, use of cash collateral, and various protections

21 and benefits for the landlords and other parties, based on a

22 budget that does not provide for the administrative solvency

23 of these cases and that fails to provide for the negotiated,

24 and statutorily required adequate protection for landlords.

25          This is a "pay to play" jurisdiction and the

1   debtors have to pay the freight of these cases.  What I will

2   diplomatically call the "risk of administrative insolvency"

3   should not be borne by the landlords here and we think that

4   to do so would contravene the applicable law and Judge

5   Horan's prior ruling.  Thank you.

6           THE COURT:  Thank you.

7           Mr. Rosner?

8           MR. ROSNER:  Good afternoon, Your Honor.  Douglas

9   Rosner for Vickerry Realty Co. Trust and North Conway

10  Plaza, LLC.

11          I'm going to echo what has already been argued by

12  landlords' counsel.  We're in agreement.  We were at the

13  June 5th hearing, as well, and what's very troubling, and I

14  imagine troubling to the Court, is what we're hearing today

15  is that when we were all negotiating the DIP financing at the

16  June 5th hearing, the debtors were already in default and

17  that the entire stub rent resolution that was negotiated,

18  where the DIP lenders would fund up to the point of what was

19  defined as a DIP termination event, we were negotiating

20  without knowing what, obviously, they may have already known,

21  and that is that those events had already occurred.

22          And so, it's -- the whole -- the circumstances

23  that we're hearing about are very troubling at so many

24  levels, you know with respect to rent, stub rent, the path of

25  this case, the idea that there's going to be a so-called

1  going-concern sale with only two business days to get it

2  papered and get a -- have a buyer found, get a document, and

3  have a deposit entered.  I mean, this is -- it's becoming

4  almost borderline ludicrous, what we're hearing.

5           And I'm -- we're really troubled by it.  We're

6  troubled by the fact that we thought we had an agreement

7  based on budgets and representations that were being made at

8  the June 5th hearing.  And it did not occur to us that

9  within, well, days before, there were already defaults and

10 within a few days after, actual termination event notices

11 were given.  I mean, that is very troubling and there should

12 be -- the lenders should continue to fund, as they're now

13 agreeing to do and the stub rent should continue to be

14 funded, per the agreement, since, I mean, to the extent there

15 was a termination event that's already been argued, that

16 termination event is being, whether it's deferred or waived

17 or whatever term you want to use, in order to keep the lights

18 on.  And the only party benefiting from all of this will be

19 the lenders.

20           Because what's going to happen, or what appears to

21 be the case, is that we will likely go into some type of

22 store-closing process and the store-closing process is in

23 order to monetize the collateral of the DIP lenders for them

24 to get repaid.  I mean, that's the point of the process.

25 We're going to be carrying the baggage as the landlords.

1  While they do that, there needs to be some protection for us,

2  too.

3          And it might mean we have to re(indiscernible) or

4  renegotiate what was done at the June 5th hearing because now

5  we know what apparently was happening and the circumstances

6  at that time.  So, there should be an opportunity to do that.

7          And then, secondly, or thirdly, prior to the

8  June 5th hearing, the Committee filed an objection to the DIP

9  financing and in their objection, they raised a whole bunch

10  of issues about how the affiliated parties are acting as DIP

11  lender, ABL lender, liquidators, and holder of rights of

12  first refusal.

13          Now, the Committee ended up resolving their

14  objections, but they painted this doomsday approach that the

15  lenders can just trigger a default early on in the case and

16  start liquidating the inventory and look at all the money the

17  lenders and the liquidator make by doing that.  And so it

18  becomes even more troubling that this doomsday scenario that

19  they painted in their objection, and then resolved, those --

20  the predicates for that were in place when we were all

21  negotiating the terms of the DIP.

22          And so that's what I wanted to explain to the

23  Court.  Thank you.

24          THE COURT:  Thank you.

25          Okay.  What do we expect by way of evidence?

1          MR. GALARDI:  Your Honor, it's Gregg Galardi.

2          I would do the following, and I'll give the

3   expectation.  One is, I would incorporate into this hearing,

4   the first day declaration of Mr. Salkovitz.  He is on the

5   phone today.  It had been admitted at the final DIP hearing

6   and so I think much of what Mr. Murphy said is in that first

7   day declaration, so I would submit that into evidence.

8          I would also, with respect to -- and we can do it

9   any number of ways.  Mr. Salkovitz is on the phone.

10  Mr. Murphy made representations to the Court regarding events

11  subsequent to the DIP hearing, which the second day DIP

12  hearing was 5/31/23, so I would ask Mr. Salkovitz to affirm

13  the statements made by Mr. Murphy.  That may be the fastest

14  way, as if it were a proffer.

15         And then, third, I would ask to ask Mr. Salkovitz,

16  I think it's three questions, which I think goes to a lot to

17  what the landlords are saying about when the DIP default,

18  what actually occurred and the timing.  Because I do think it

19  is important for Your Honor to hear when that DIP default

20  actually occurred and what was done between the final DIP

21  hearing and the actual submission of the final DIP order.

22         And that would be the extent of the testimony that

23  I would put on for today's hearing.

24         THE COURT:  Okay.  Well, I will -- is there any

25  objection to the admission of the first day declaration?

1     (No verbal response)

2         THE COURT:  I do not hear any.

3         It's admitted.

4     (Salkovitz Declaration received in evidence)

5         THE COURT:  I'm --

6         MR. GALARDI:  Your Honor, I hate to interrupt, but

7  I forgot one thing.

8         I'd also admit the, and I think it's already been

9  referred to, the transcript of the 5/31/23 hearing.  That is

10 the final DIP hearing.  I think people have made reference to

11 it and I think it's helpful and I think it's been provided to

12 Your Honor.

13        THE COURT:  Is there any objection -- I'm not sure

14 if it should come in or not -- but is there any objection to

15 the transcript?

16    (No verbal response)

17        THE COURT:  I don't hear any.

18        It's admitted.

19    (Exhibit 1 received into evidence)

20        THE COURT:  In terms of anything further, I think

21 it should be questioning of the witness.  I wasn't treating

22 Mr. Murphy's statements as some kind of proffer.  I don't

23 think I -- I wrote things down, but not by way of witness.

24 So if you want testimony, it needs to come in by a witness,

25 subject to cross-examination.

1            MR. GALARDI:  That's fine, Your Honor.

2            And then I would call Mr. Salkovitz.

3            And Mr. Murphy, if you want to call Mr. Salkovitz,

4    I'm fine with that, for your statements; however you want to

5    handle it.

6            MR. MURPHY:  Go ahead, Mr. Galardi.

7            THE COURT:  Okay.  I need to see Mr. Salkovitz.

8            MR. SALKOVITZ:  I think my video is on.

9            THE COURT:  Yes, it is now.

10            MR. SALKOVITZ:  Thank you, Your Honor.

11            THE COURT:  It is now.  Thank you.

12            Mr. Salkovitz, I need to swear you in.  Can you

13    raise your right hand, please.

14            MR. SALKOVITZ:  Yes, Your Honor.

15        MARC WILLIAM SALKOVITZ, LENDERS' WITNESS, AFFIRMED

16            THE WITNESS:  I do.

17            THE COURT:  Please state your full name and spell

18    your last name for the record.

19            THE WITNESS:  Mark William Salkovitz, S-a-l-k-o-v-

20    i-t-z.

21            THE COURT:  Okay.  Thank you.

22            Mr. Galardi?

23                         DIRECT EXAMINATION

24    BY MR. GALARDI:

25    Q    Mr. Salkovitz, could you tell Her Honor and the Court

1  your position with the company.

2  A     I'm the executive chairman.

3  Q     And Mr. Salkovitz, are you also the person responsible

4  for overseeing those people that do the DIP budgets and the

5  13-week cash flow budgets for the company?

6  A     I am.

7  Q     And Mr. Salkovitz, at the time of the DIP hearing and

8  the entry of the DIP order, you were present at that final

9  DIP hearing, correct?

10  A     Yes.

11  Q     And at the time of that DIP hearing, you and Mr. Murphy

12  expressed concerns about the DIP budget because you knew that

13  there might be a default that could occur a week or two after

14  that hearing; is that correct?

15  A     Yes.

16  Q     And Mr. Salkovitz, as a result of that, did the lenders

17  allow you and your -- the professionals working for you, to

18  revise that DIP budget?

19  A     Yes.

20  Q     And did you revise that DIP budget to a budget that you

21  believed would be able to avoid future defaults?

22  A     We did.

23  Q     And you did that after back-and-forth with your

24  financial advisor, correct?

25  A     I have to think about that for a second.  We did not

1  use a financial advisor at that time.

2  Q    Okay.  And you did -- but you used your internal

3  treasury persons --

4  A    Correct.

5  Q    -- and other financial people?

6  A    Correct.

7  Q    And that is how you --

8  A    Oh, sorry, Mr. Galardi.  You are correct, we did, yes.

9  Q    Okay.  So let's just clean up the record.

10       Who is your financial advisor?

11 A    SAM Advisory.

12 Q    And you used them, as well as internal people to re-

13 project the 13-week cash flows, correct?

14 A    Yes.

15 Q    And you did that, so that you believed you would meet

16 the covenants, the upcoming covenants, not only for June, but

17 for July and into what you hoped would be a plan of

18 reorganization process, correct?

19 A    Yes.

20 Q    And at the time that the final DIP order was submitted,

21 you believed that that budget accurately reflect the

22 projected performance of the company for the months of

23 July -- June, July, and I think into August, correct?

24 A    Correct.

25 Q    Okay.  Now, Mr. Salkovitz, did there come a time after

1  you submitted the final DIP budget that you -- that the

2  company came into default?

3  A      Yes.

4  Q      And what were the natures to the defaults into which

5  the company -- what are some of the defaults that the

6  companies had?

7  A      Primarily, we missed the sales budget, which caused us

8  to miss the inventory goals that were put into the budget

9  that you received, that the lenders received.

10 Q      And as a result of missing the sales covenants, you

11 missed the revenue, correct?

12 A      Correct.

13 Q      And as a result of missing revenue, you also failed to

14 make certain timely payments, including administrative claims

15 and claims to the consignment vendors; is that correct?

16 A      Correct.

17 Q      Okay.  And the lenders, somewhere in the first week of

18 July, provided a notice of that default, correct?

19 A      Correct.

20 Q      And -- but they agreed to forbear during that period of

21 time, correct?

22 A      Correct.

23 Q      And it was your opinion, and the reason the lenders

24 forebeared, was it your opinion, with you and your advisors,

25 that you believed you would be able to rectify that because

1  you were getting inventory and the revenue sales would go up;

2  is that correct?

3  A     Correct.

4  Q     And so the lenders didn't act, at that time, because

5  they wanted to give you an opportunity to, in fact, meet the

6  budget?

7  A     Correct.

8  Q     And they would have waived those defaults had you met

9  that budget, correct?

10 A     I believe so, yes.

11 Q     And they -- okay.

12        And then, subsequent to that week, did the company

13 continue to meet its sales forecasts?

14 A     We did not.

15 Q     You did not meet your sales forecasts, right?

16 A     Correct.

17 Q     I'm sorry, I don't --

18 A     Correct.

19 Q     Okay.  And you continued to fail to make your, some of

20 your administrative expense payments, correct?

21 A     We made them late, yes.

22 Q     Okay.  And, eventually, it came -- the lenders advised

23 you, again, that there was another continuing default,

24 correct?

25 A     Yes.

1  Q      And, eventually, they advised you that they gave a

2  notice -- what we call a "trigger notice."

3         And you're familiar with what a trigger notice is?

4  A      Yes.

5  Q      Okay.  And that notice was delivered to you somewhere

6  around June 22nd, correct?

7  A      Correct.

8  Q      And notwithstanding that trigger notice, the company

9  came to the lenders and asked the lenders to allow SSG

10 additional time to try to find a buyer for the company,

11 correct?

12 A      Correct.

13 Q      And SSG, although not yet formally retained, has been

14 working for the company ever since the final DIP hearing,

15 correct?

16 A      Correct.

17 Q      And they have been out soliciting offers for a sale of

18 the whole company, correct?

19 A      Yes.

20 Q      And SSG has actually brought in, at least, I think

21 maybe -- well, let me ask you:  How many letters of intent or

22 initial interest had SSG brought to the company by the week

23 of June 21st?

24 A      Can you ask that in a slightly different way, because I

25 don't know that -- I don't understand the question, right.

1  Q     So, Mr. Salkovitz, you were on a call with the

2  Committee, the debtors' professionals, and the lenders the

3  week of -- well, it was probably earlier this week -- let me

4  just make sure -- earlier this week regarding the defaults

5  and the trigger notice, correct?

6  A     Yes.

7  Q     And in that meeting, SSG represented that they believed

8  that they had -- represented to the debtors and to the

9  Committee that they believed they had at least five

10 interested parties and a potential sale of the company,

11 correct?

12 A     Yes.

13 Q     Okay.  And in that process, SSG also represented that

14 much of this would be dependent upon those five parties

15 finding financing, correct?

16 A     Yes.

17 Q     Okay.  And although Eclipse was not prepared to provide

18 financing to those parties, two of those parties, at least

19 according to SSG as they've advised the Committee, the

20 debtors, have advised you that there is still some hope,

21 though fleeting, that two of those parties may, in fact, be

22 able to get to a proposal by July 5th; is that correct?

23 A     Yes.

24 Q     And as a result of that, the parties are negotiating

25 the deadline of July 5th by which SSG has to bring a deal to

1  the lenders that would have to be acceptable to the lenders

2  to avoid the store-closing sales, correct?

3  A    Correct.

4  Q    And Mr. Salkovitz, in the calls that you had, one of

5  the -- isn't it true that one of the concerns that the

6  lenders have had is that absent a sale -- absent a GOB or a

7  sale of the company, the company will not have the liquidity

8  to pay landlord payments for the month of September, correct?

9  A    Correct.

10 Q    And that's, roughly, a $5 million payment, correct?

11 A    Yes.

12 Q    And what is your understanding of why the lenders have

13 asked for the store-closings to start no later than

14 September 7th, 2023?

15 A    Mr. Galardi, I believe you mean July 7th, correct?

16 Q    Oh, I'm sorry.  I do mean it, and thank you for the

17 correction.

18 A    It is so that we do not -- we don't have to pay

19 September rents, because we would be done and out of those

20 stores by the end of August.

21 Q    And it's your understanding that the liquidators have

22 told you that that's the minimum time necessary to make sure

23 you can actually close those stores, correct?

24 A    Correct.

25 Q    And in the budget from -- for the period of July

1  through the store-closing sale conclusion date, the budget

2  includes normal rent payments to all of the landlords for the

3  period -- well, not only for June, but for July and August;

4  is that correct?

5  A     It is, yes.

6  Q     And it also includes additional administrative expenses

7  that need to be paid to continue this case from July -- from

8  July 1st through to the July -- through August 30th, correct?

9  A     Correct.

10 Q     Okay.  Mr. Salkovitz, with respect to when you did

11 testify at one of the hearings, you came into these cases --

12 the debtors came into these cases hoping that you could do a

13 plan of reorganization, correct?

14 A     Correct.

15 Q     And what is your view of the support that has been

16 provided by the lenders to give you the opportunity to, in

17 fact, pursue a plan of reorganization and now a sale of the

18 company?

19 A     It's been relatively cooperative.

20 Q     Okay.  And it's always been concerned about them being

21 able to collect on their collateral, correct?

22 A     Correct.

23 Q     But they have provided you additional financing for the

24 purpose to explore both of those possibilities?

25 A     Under the formula, correct.

1   Q     Under the formula, correct.

2         MR. GALARDI:  I think that is all and I apologize

3 for more than five questions, but I wanted to cover

4 Mr. Murphy's points, as well.

5         THE COURT:  Okay.  Thank you.

6         Cross-examination, who would like to start?

7         MS. ROGLEN:  Your Honor, Laurel Roglen of Ballard

8 Spahr.  I have a couple of questions for the witness.

9         THE COURT:  Ms. Roglen.

10                 CROSS-EXAMINATION

11 BY MS. ROGLEN:

12   Q    First, I believe you testified with respect to a budget

13 that you said contained normal rent payments for July and

14 August, correct?

15   A    Correct.

16   Q    What budget are you referring to?

17   A    The original budget that was submitted prior to the

18 final DIP notice has payments in there for July and August.

19   Q    So you're relying on the DIP budget that was attached

20 to the final DIP order?

21   A    Correct.  I believe it's in there and there's an

22 order -- there's a revised, two-week budget that was

23 submitted, I think, today, and it does show July.  We did

24 not -- that doesn't go out until August.

25   Q    Yes.  That's where I'm going next.

1       So you are familiar with the two-week, illustrative

2  budget that was filed today at Docket 319?

3  A    Yes.

4  Q    And did you create that budget?

5  A    I did not.

6  Q    Who created the budget?

7  A    It was created by our advisors, with the help of our

8  CFO.

9  Q    Okay.  And are you aware of -- backing up, the budget

10 covers two weeks; the first week ending July 1st, this week,

11 and next week, ending July 8th, correct?

12 A    Correct.

13 Q    Are you aware of how much money is being swept out to

14 the lenders in the week ending July 1st?

15 A    I am not.

16 Q    Do you have a copy of --

17 A    I don't have that budget in front of me.  I'm sorry.

18 Q    Okay.  Is there a way that you could look at a copy of

19 the budget?

20 A    I'm not positive, but I think so.  Hold on.

21      (Pause)

22 A    Okay.  I have the two-week -- I have a PDF that I think

23 is the same one that you have.

24 Q    Okay.  The one that I have is pulled directly from the

25 docket at 319.  I think it's Exhibit 1.

1   A       Okay.

2   Q       Looking at that abundantly, can you tell me how much

3   money is being swept out by the lenders in the week ending

4   July 1st.

5   A       It shows receipts of 50 -- $5.5 million.

6   Q       That's being swept out, correct?

7   A       Correct.

8   Q       And how much is being swept out in the week ending

9   July 8th under that budget?

10  A       Another $5.5 million.

11  Q       Does this budget contemplate the minimum stub rent

12  reserve that was part of the final DIP order?

13  A       I believe it does.  I know it's here.  Hold on.

14          (Pause)

15  A       I believe it's in "other," but I'm not 100 percent

16  positive.  I would need FAAN's assistance to answer that

17  question.

18  Q       Okay.  Are you aware of how much money is currently in

19  the minimum stub rent reserves?

20  A       I personally am not.  I know we were reserving what we

21  had -- what you guys had agreed to in court.

22  Q       Right.  And I believe at this point, it was $50,000 per

23  week was supposed to be going into the stub rent reserve

24  until about the middle of July, where there was a larger

25  deposit.

1      Does that sound correct?

2  A    Yes.

3  Q    And are you aware of how much would be funded into the

4  stub rent reserve under the final DIP order for the week

5  ending July 1st?

6  A    I thought it was still $50,000 a week.  I thought it

7  grew at the end of the month.

8  Q    I think that's correct.

9      And so, you think the same would be true for the week

10 of July 8th?

11 A    Yes.

12 Q    And I don't see anywhere in this budget, funding the

13 $50,000 a week ending July 1st or the week ending July 8th.

14     Do you see it in there?

15 A    I -- it could be under "other," but I'm not positive.

16 Q    Okay.

17         MS. ROGLEN:  That's all the questions I had.

18 Thank you.

19         THE COURT:  Thank you.

20         Mr. Rosner?

21         MR. ROSNER:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. ROSNER:

24 Q    Mr. Salkovitz, thank you.

25     So, can we go back through some of the testimony based

1  on the questions that Mr. Galardi was asking.  Can you just

2  elaborate a little bit about what you testified to at the DIP

3  financing hearing.  And I guess it was May 31st.

4          MR. ROSNER:  I was looking at the order, Your

5  Honor, that was dated June 5th and that was the confusion.

6  BY MR. ROSNER:

7  Q    According to the testimony, you testified, if I'm

8  correct, that there may be defaults occurring soon; is that

9  what you were stating today?

10         And this is based on your testimony back on May 31st.

11  A    Correct.  We were not making the sale budget.  We were

12  not making the revenue budget.

13  Q    And did you know that on May 31st?

14  A    No, we really -- we actually had had a very good

15  weekend over Memorial Day weekend, but we were getting very

16  concerned because the inventory wasn't flowing as rapidly as

17  we had hoped and so we -- in a look forward, we started to

18  get concerned after that date.  We started to look at what

19  was happening after Memorial Day weekend.

20  Q    Okay.  And so, did the -- were there changes made to

21  the budget attached to the debtor -- the final debtor-in-

22  possession financing order to reflect those concerns?

23  A    I don't know the answer to that right now.

24  Q    When did you first -- when did you first learn whether

25  yourself or through somebody else, that the company, that the

1  debtors missed the budget forecast?

2  A     I believe it was in early June.

3  Q     And what does that mean?  Just -- does it mean before

4  June 5th?

5  A     I don't recall.  I would have to look at the dates.  I

6  honestly don't recall.

7  Q     When did you first hear from the lenders that the

8  debtors were not in compliance with the budget attached to

9  the DIP financing order?

10 A     As we're talking, I'm trying to think of some of the

11 dates.  So we had 30 days before the variance would really be

12 tested.  And that variance, we were within the variance for

13 the first four weeks leading us up to a little bit after

14 June 5th.  So it would be after June 5th that our sales

15 revenues started to decrease much more than we had

16 anticipated; meaning, more than 10 percent.

17 Q     And what -- did the debtors give you -- when was the

18 first date the debtors sent you a written notice of a so-

19 called trigger event?

20           MR. GALARDI:  Objection.

21           THE COURT:  The lenders?

22           MR. GALARDI:  Yes.

23           THE COURT:  I think you said, "When was the first

24 date the debtors sent you" --

25 //

1  BY MR. ROSNER:

2  Q     No.  I'm sorry, what was the first date that the DIP

3  lenders sent the company, the debtors a notice of a so-called

4  trigger event?

5  A     The trigger event was noticed last -- maybe the 22nd of

6  June.

7  Q     So that was the first written notice?

8  A     Of the trigger, correct.

9  Q     So, can you then elaborate.  I think you were

10 testifying earlier about the lender advising that there were

11 defaults and the lender forbearing and giving the company an

12 opportunity.

13       So, were those all oral conversations?

14 A     No, there was a default letter the week before.

15 Q     The week before what?

16 A     The 22nd.

17 Q     So, somewhere around the 15th?

18 A     Correct.

19 Q     And was that a default and a reservation of rights

20 or --

21 A     Yes.

22 Q     Did the lenders continue to provide advances after that

23 date?

24 A     They did.

25 Q     Did they continue to provide advances after the company

1 first realized that the company missed the budget

2 projections?

3 A     Yes.

4 Q     After the trigger notice was received on June 22nd,

5 have the lenders made any advances?

6 A     Yes.

7 Q     When was the last -- well, let me -- are the advances

8 weekly or daily?

9 A     Daily.

10 Q     So --

11 A     (Indiscernible), because it varies.

12 Q     Did the debtors receive an advance today?

13 A     Yes.

14 Q     Do you have -- do you know what the current borrowing

15 base looks like under the debtor-in-possession financing?

16 A     Yes, in general.

17 Q     Can you tell us what it is?

18 A     Are you looking for the balance due?

19 Q     I'm looking for what the company believes is the value

20 of the inventory and what the loan balance is today.

21 A     I can get that for you, just one moment.

22       I believe the loan balance -- I can answer it that way

23 quicker -- the loan balance is somewhere around

24 $14.8 million.  The inventory, I don't have the inventory

25 valuation here as of the last borrowing base, which was

1  submitted yesterday.  It's hard to tell.  Somewhere around

2  $33 million, off the top of my head.

3  Q     And that's at cost?

4  A     Correct.

5  Q     Can you elaborate on your testimony about if the

6  company does not start going-out-of-business sales by

7  July 6th or 7th -- I believe July 7th, you said, there would

8  not be enough liquidity to pay rent in September?

9  A     Correct.  We would be in an overadvanced situation

10 beginning next week and we would -- I don't know where we

11 would go from there.  As you know, the lender has no

12 responsibility to fund an overadvance.

13 Q     Okay.  And next week, meaning the week beginning

14 July 3rd?

15 A     Correct.  The week ending July 8th, because we look at

16 it a little differently.

17 Q     Thank you.

18       Are you familiar with what the sale -- what the current

19 sale -- what's happening right now with the sale process

20 being run by SSG?

21 A     I know small parts of it because it's still being

22 pushed along and it's a process.

23 Q     And is it true that there were five written offers?

24 A     That is incorrect.  To the best of my knowledge, there

25 are five interested parties.

1  Q      Are there any written offers?

2  A      Not to the best of my knowledge.

3  Q      Is one of the interested parties an affiliate of any of

4  the debtor-in-possession or ABL lenders?

5  A      No.

6  Q      Is one of the interested parties Hilco?

7  A      No.

8  Q      Are any of the interested parties liquidators?

9  A      I don't have knowledge to that effect.

10 Q      Has SSG made any statements to you about the viability

11 of a written asset purchase agreement being entered into on

12 or before July 5th?

13 A      Can you say the first part of that again, please?

14 Q      Yeah, "viability" wasn't the right word.

15        Has SSG made any statements to you about the

16 probability of a written signed asset purchase agreement

17 being entered into between the debtors and a buyer on or

18 before July 5th?

19 A      Yes, they have.

20 Q      And what have they sold?

21 A      It would be extremely difficult.

22        MR. ROSNER:  Your Honor, I think that's all I have

23 for now.

24        THE COURT:  Thank you.  Any other cross-

25 examination?

1    MR. LEHANE:  Your Honor, if I may, just a few
2 questions.
3        THE COURT:  Yes, Mr. LeHane.
4                  CROSS-EXAMINATION
5 BY MR. LEHANE:
6 Q    Mr. Salkovitz, Bob LeHane of Kelley Drye.  Just a few
7 questions.
8        Mr. Salkovitz, could you refer back to the budget that
9 Ms. Roglen had you run through?
10 A    Yes.
11 Q    I just want to ask you about the line for occupancy
12 costs.
13 A    Yes.
14 Q    Is it correct that that reads $5,335,000?
15 A    Correct.
16 Q    Is that the approximate monthly occupancy costs for the
17 company?
18 A    Yes.
19 Q    And to your knowledge, what portion of the monthly
20 occupancy costs were paid for the month of May?
21 A    I thought all of May was made -- oh, I'm sorry, wait, a
22 very tiny portion of May was paid; very small.
23 Q    Correct.  So, when you say "a very tiny portion" is it
24 safe to say that 90 percent of that amount remains unpaid?
25 A    Yes.  I think its $4.7 millionish or $4.5 million that

1  was not paid.

2  Q     Okay.  $4.5 million for the whole month?

3  A     Correct.

4  Q     And the company filed for bankruptcy on May 5th?

5  A     Correct.

6  Q     And are you familiar with the concept of stub-rent,

7  that being the rent arising from the 5th of May, the first

8  day of the case, through the last day of the month, May 31st?

9  A     Yes.

10 Q     And that we can do the math and determine what portion

11 of that $4.5 million is unpaid, is it actually the stub-rent?

12 A     Yes.

13           MR. LEHANE:  Thank you.  No further questions, Mr.

14 Salkovitz.

15           THE COURT:  Thank you.  Anyone else for cross-

16 examination?  Mr. McDaniel.

17           MR. MCDANIEL:  Good afternoon, Your Honor.  Garvan

18 McDaniel for Loomis US Armored Car.

19                      CROSS-EXAMINATION

20 BY MR. MCDANIEL:

21 Q     Are you familiar with what services Loomis provides the

22 debtor?

23 A     On a limited basis, yes.

24 Q     Is it true Loomis provides transportation services

25 picking up money, bringing money to the debtor?

1  A     Yes.

2  Q     It provides cash management services to the debtor, is

3  that correct?

4  A     Yes.

5  Q     And it provides safes at the debtor's locations, is

6  that correct?

7  A     I believe so.

8  Q     Does the budget reflect payments to Loomis that we were

9  just looking at?  Is that their occupancy costs or where

10 would it reflect the payments?

11 A     I don't have knowledge of that specific line item.

12 Q     Who would have knowledge of that at the debtor?

13 A     Our accounts payable people.

14 Q     Do you know if you are current on a post-petition basis

15 with Loomis?

16 A     I don't have knowledge of that.

17 Q     Is the debtor currently using Loomis's services at

18 store locations?

19 A     I believe so.  As I'm thinking this through that is

20 part of other.  You have been paid current to the best of my

21 knowledge.

22          MR. MCDANIEL:  That's all the questions I have,

23 Your Honor.

24          THE COURT:  Thank you.  Anyone else?

25       (No verbal response)

1             THE COURT:  Any redirect, Mr. Galardi?

2             MR. GALARDI:  Very briefly, Your Honor.

3                     REDIRECT EXAMINATION

4  BY MR. GALARDI:

5  Q    Mr. Salkovitz, because I think part of the record is

6  unclear, do you remember a conversation after the final DIP

7  hearing with yourself, me, Mr. Murphy, and perhaps others

8  about the fact that you were projecting changes, potential

9  DIP defaults in mid-June and, therefore, a budget needs to be

10 revised?

11 A    Yes.

12 Q    And is it your understanding, though you may not know

13 the details, that the budget actually attached to the final

14 DIP order is revised from the budget that was submitted with

15 the final DIP order as of, I have it, May 31st, 2023?

16 A    I believe you are correct.

17            MR. GALARDI:  No further questions, Your Honor.

18            THE COURT:  Mr. Salkovitz, were any of those

19 discussions, did they also include, or were there separate

20 discussions with the landlords about that?

21            THE WITNESS:  Not with me included, Your Honor.

22 So, I am unaware of any other discussions that may have

23 happened.

24            THE COURT:  Okay.  Thank you.  You are excused

25 from your testimony.  Thank you.

1           THE WITNESS:  Thank you, Your Honor.

2       (Witness excused)

3           THE COURT:  Any other evidence?  Any other

4  witnesses?

5           MR. GALARDI:  Nothing further from me, Your Honor.

6           MR. ROSNER:  Your Honor, Douglas Rosner for two of

7  the landlords.

8           If I could just ask Mr. Galardi, I'm not sure if

9  he has to go offline to get the answer, is he able to

10 represent to the Court how much has already been funded into

11 the stub-rent account?

12          MR. GALARDI:  I was trying to do that, Mr. Rosner.

13 As you remember, the DIP budget for the first two weeks after

14 the final hearing nothing was put in, but I believe there is

15 $50,000.  And I believe the way in which, and we can argue it

16 later, I think there is, at least, 50, but there may be 100.

17 I don't know the actual answer.

18          We did take reserves and our intention is to

19 provide that money over to, as contemplated by the DIP

20 lender, the debtors.  So, as per the agreement they would be

21 distributing that with the rent payment as was set forth in

22 the DIP order.  That I can represent.  Whatever there is it

23 will be moved because the lenders did take a reserve.

24          THE COURT:  Okay.  So, 50 or 100,000 is the

25 answer?

1          MR. GALARDI:  Yeah, I can't remember the number of

2     weeks.  Maybe one of the people can send me an email.

3          MR. ROSNER:  Whether it's 50 or 100 Your Honor has

4     already explained, I think, by one of the other counsel the

5     stub-rent is $4 or $5 million.

6          THE COURT:  I don't think it's material.

7          MR. ROSNER:  It doesn't move the needle much.

8          THE COURT:  I don't think it moves the needle.

9          MR. ROSNER:  Yes.

10          THE COURT:  Okay.  So, that is the conclusion of

11     the evidentiary hearing, evidentiary portion of the hearing.

12     Let me hear argument.  I did read the transcript of the final

13     and I do have the final order in front of me.

14          So, Mr. Galardi.

15          MR. GALARDI:  Your Honor, I would -- and I'm going

16     to focus primarily on the stub-rent issue because I think

17     that that is the critical one.  And I know Your Honor read

18     it, but I think it's important for the record.  If Your Honor

19     read the Judge's ruling, which is on Page 47 of that

20     transcript, Lines 19 through 24, I would like to start there.

21          The Judge ruled in denying the 506(c) waiver that

22     we were asking on a final basis, he says:

23          "I am not going to require stub-rent be paid under

24     this budget; however, as I believe it to be the universal

25     rule in this district, I am not going to remit the 506(c)

1  when there is no provision in the budget for payment of stub-

2  rent.  So, that is my ruling."

3         At which point we took a break to address the

4  issue.  Now I would like to turn page -- and I would say

5  reading probably from 57 on, but I am going to highlight

6  where it really starts.  On Page 57 you will see, Your Honor,

7  that I provided the DIP budget that was at the hearing for

8  that day and I directed the Court's attention to, I think

9  it's, Page 6 of 7.  I am reading at Lines 3 to 5.  Actually,

10 just cross-column it was the revolver base, less availability

11 covenant.  And I noted to His Honor at that point that that

12 budget would have to be modified.

13        If you go to Page 58, Lines 8, 9, 10.

14 Mr. Galardi, so I said we're talking about whether its cash

15 to the debtor or its going to be a line item that we reserve

16 it, at least 50 a week.  It's 50 a week for the next -- for

17 the week of June 3rd, 10th, 17th, 24th, July 1st and July 8th

18 the 50,000 would be dedicated to the stub-rent.  So, that was

19 the agreement that I was putting on the record.  So, again, I

20 may be wrong about the numbers. It's still going to be

21 minimal whether it's 50, 100, or 150, I think it's still very

22 much not the $4 million.

23        Then on Line 16 of Page 59 I read into the record

24 we have now put in a line item for the stub-rent.  And so, no

25 one -- everyone is clear we are not because the first two

1   weeks are very thin.  We have agreed, the lenders have agreed

2   that there won't be a covenant breach if they don't get

3   the -- if they fail below the minimum liquidity line because

4   we did express exactly the concern that we did not, and we

5   made it clear on the record that we were not going to do a

6   gotcha.

7          I think Mr. Rosner brought this out, this was the

8   testimony and we wanted to make it clear to His Honor that

9   this was already tight at that time.  So, we made that clear

10  that we weren't going to call the breach in the first two

11  weeks because they were thin.

12         So, again, I am going to be clear with the Court

13  that this is an exchange for a 506(c) waiver.  And what was

14  it?  It was an exchange.  It was to put the stub-rent reserve

15  line item into the budget.  And going back to what His Honor

16  said, he is not approving it, he is not requiring it be paid,

17  he required that it be put into the budget.  Then if there

18  are defaults that is not a guarantee that these rent payments

19  are going to be made as we talked about. If there's a

20  default, we will call a default, there's a DIP default.

21         We may have to go back at the table with the

22  landlords, and I will explain that conversation, but we will

23  have gotten again these two weeks, a final 506(c) waiver.  If

24  Your Honor is agreeable that we will have a 506(c) waiver now

25  for extending that and putting in these line items, very

1  good.  So, that was the description.  The commitment was to

2  put it into the budget in exchange for a final 506(c) waiver.

3         Ms. Heilman, who is not here today, she confirms

4  that accurately reflected the negotiations.  You can see that

5  all from Lines 12 through 25.  Mr. Rosner himself said,

6  Lines 14 to 15, it gives us some protection going into this

7  Chapter 11.  Mr. Murphy made a comment and then the Court, on

8  Page 62, I believe it is, Lines 11 to 15:

9         "Okay.  Well based upon the comments of counsel I

10 do find that the objections of the landlords to the 506(c)

11 waiver issue have been addressed, and I am prepared to enter

12 the DIP order including the 506(c) waiver that was

13 requested."

14        That was the final DIP hearing order.  Now, Your

15 Honor, I would like to go to the DIP order which, again, as

16 Mr. Rosner pointed out, was five days later because we

17 understood that the debtor had to put in a budget and no one

18 wanted to put in a budget that was defaulted.  So, let's go

19 through just a few of the provisions of that order which I

20 think are critical.

21        Starting on Page 20 of that order there is a

22 finding.  I am moving as fast as I can, Your Honor, I'm

23 sorry.  Its finding 4(f), I believe it is.  506 and 552.  I

24 don't need to read it in, but it's clear that there was a

25 finding that as a condition to the finding the lenders would

1  have a waiver of both 506(c) and 552(b).  The landlords were

2  given this order and did negotiate the order as we will get

3  back.  So, we have a 506(c) waiver.  That was to continue the

4  fund at that point.

5         Moving now to Page 63, Section 511 of the DIP

6  order.  Here again 511, part of a final order. I will just

7  note that none of these provisions say anything about stub-

8  rent being a condition or somehow the 506 waiver goes away,

9  and I think Ms. Roglen has conceded that.  It says no cost of

10  admissions may be incurred in these cases.  You can read it

11  yourself, Your Honor, but it is a fairly standard paragraph

12  about the 506(c) waiver and no conditionality to that

13  provision.

14         Turning now to 5.24, and I'm probably going to do

15  what Your Honor never wants.  You have it in so many places,

16  but maybe for times like this, this is why lenders do it.

17  Again, subject to Paragraph 4.1 is subject to the carve-out,

18  but its irrevocable and any monies we receive, including the

19  paydown, to receive free and clear of any claims, charges and

20  any liability indirectly or directly including 506 and

21  552(b).  So, again, no qualifications of that.

22         THE COURT:  Which paragraph is that?  I'm sorry,

23  Mr. Galardi, which paragraph is that?

24         MR. GALARDI:  5.24. I apologize, it's on Page 71.

25         THE COURT:  Okay. Got it.

1        MR. GALARDI:  Now, finally, on Page 73,

2   unfortunately, just one more page, 529 is actually the

3   provision that we negotiated with the landlords.  It's part

4   of the consensual resolution of the landlords objections they

5   are authorized and directed to reserve, the stub-rent, in the

6   weekly amounts set forth in the approved budget, which was

7   attached to the order which, again, I there was a confusion,

8   but I think if you compared the budget you could take notice

9   that the budget was, in fact revised by the debtors and

10  submitted with the final order.

11       It shall be exclusively for the direct benefit of

12  the landlords.  And it goes onto say very critically that it

13  had to be deposited in the minimum rent reserve as the date

14  of the occurrence.  So, the DIP secured parties shall not be

15  obligated to fund any portion of the minimum stub-rent

16  reserve after the occurrence of a DIP termination event

17  provided that any and all funds already deposited in or

18  credited to the minimum stub-rent reserve as of the date of

19  the occurrence of a DIP determination event shall be remain

20  available for distributions, notwithstanding the occurrence.

21  It goes on, and Your Honor can read it, even after the

22  occurrence of a Chapter 7 that is the rent reserve.

23       So, Your Honor, I will say two things about the

24  issue being raised.  First, of all, I think it's an improper

25  collateral attack on the final DIP order; don't think they

1   can do that.  Second, Your Honor, I'm not making any -- I

2   think there may be confusion, so I want to be, again, as

3   clear as I thought I was at the final DIP hearing.  There is

4   no, notwithstanding what Mr. Salkovitz may have thought,

5   intention to continue to fund the rent reserve, as used in

6   this phrase, going forward after the event and there is no

7   obligation to do so.

8           We understand the landlord's argument, and if they

9   want to make an adequate protection motion there is a time

10  and place for that, but that is not this motion.  The

11  provision said we had no further obligation is really the

12  same as the DIP order.  We did not have an obligation to fund

13  the stub-rent.

14          I want to then go to, well, let's assume we didn't

15  get this order today.  Where are we.  We are basically not

16  going to be paying -- you know, we will, whether Your Honor

17  dismisses, whether Your Honor goes to Chapter 7 we don't

18  think that is in anybody's interest.  Ms. Roglen saw the

19  paydowns.  I know the committee has looked at it.  We hope to

20  provide a recovery and we think there's a sale of

21  substantially all the assets.

22          Yes, it is a hope more than it is a likelihood.

23  We are prepared to consider it and handle it.  If it is a

24  store closing, we think the creditors actually do much better

25  because administrative case payments during this period of

1   time, from this through the end of store closings, and we can

2   make it express that the rent reserve will be paid during

3   that time.  No one is intending to use those facilities for

4   July 1st through -- June 1st through July 31st without paying

5   the rent.  That is in the budget.

6           We are paying those expenses, ordinary course

7   administrative expenses.  We just don't believe that there is

8   any obligation at this point, under the final DIP order or

9   otherwise, to fund the stub-rent payments for the May period.

10  We believe that we have the benefit of the bargain that there

11  is no 506(c) waiver and, therefore, that we cut the deal that

12  the Judge required us to cut to put it into the budget.

13          As I've said, I think it's simply not true that we

14  did not do everything.  We didn't hide defaults.  We told

15  them there were issues.  We modified the budget.  We told

16  them that it was thin.  We cut the deal and I was very

17  express on that record that there was no guarantee of

18  payments and they negotiated a provision that says no more

19  minimum stub-rent reserve if we have a DIP termination event

20  which, unfortunately, we have had.

21          THE COURT:  Thank you.  Okay, let me hear whose

22  going to go first on the argument for the landlords.

23          MS. ROGLEN:  Your Honor, this is Laurel Roglen

24  from Ballard Spahr.  I will be brief because I gave a lot of

25  argument in my opening and, frankly, I don't think much has

1  occurred since then that changes any of that.

2          You heard Mr. Galardi say that they were not

3  intending with the final DIP order and the very shortly

4  thereafter called default to do a gotcha.  That is exactly

5  what has transpired here.  And all we have to go on for this

6  supplemental order is a two-week illustrative budget.

7          Now, I do not disagree or dispute any of

8  Mr. Galardi's readings of the final DIP order that was

9  entered or the statements that were made on the record at the

10  final DIP hearing.  I agree with all of that, but we are no

11  longer operating under the final DIP order if the debtors and

12  the lenders get their relief that they are requesting here

13  today.

14          They are seeking entry of a supplemental final DIP

15  order to modify the terms of the final DIP order and the

16  previously approved budget.  What we are suggesting is that

17  that order should not be entered and that budget should not

18  be approved because they are eviscerating the adequate

19  protection and the bargain that was reached in connection

20  with the final DIP order to the detriment of the landlords.

21          All we have here is -- also, backing up, whether

22  the debtors obtain entry of this order today or not they are

23  already telling you that they are not paying the

24  administrative freight of these cases and that the budget

25  does not include all of the administrative expenses of this

1  case because all we have here is a two-week illustrative

2  budget that does not demonstrate administrative solvency.

3         And there is nothing in that budget that provides

4  for the unpaid more than $4 million in stub-rent.  And

5  whether there's $50,000 that is remaining in the minimum

6  stub-rent reserve right now or whether there is $200,000 in

7  that reserve at this point doesn't really change the

8  calculous much against $4.7 million of stub-rent.

9         So, we would ask that Your Honor not approve entry

10 of an order unless it continues to honor and provide for the

11 adequate protection it was previously provided under the

12 final DIP order and that should not be eviscerated through a

13 supplemental DIP order.

14        Thank you.

15        THE COURT:  So, let me ask you this question. In

16 terms of the fact that there could be, and I think likely

17 will be, some unpaid administrative expense claims, how is

18 that different then the situation at the end of the final DIP

19 hearing with a $50,000 a week, plus a million dollars, I

20 think, at some point.  But you were going to be short anyway.

21 The debtor was going to be short anyway.  So, how is this

22 different then at the end of the hearing?

23        MS. ROGLEN:  Your Honor, you're right.  The debtor

24 was going to be short.  We were not going to be paid the

25 false rent amount before the end of the cases, but as the

1  payment schedule extended through when the debtors had hoped

2  to emerge from confirmation we were going to reach about half

3  of the stub-rent amount.

4          So, again, it was not a full provision, but it

5  was, at least, enough to get us comfortable that we were

6  adequately protected and the landlord's interests were

7  adequately protected.  Again, we weren't even requiring full

8  reserves for it, but over the course of the case it would get

9  us to about half.

10          THE COURT:  Okay.  And --

11          MR. LEHANE:  Your Honor?

12          THE COURT:  -- what should I do with the part of

13  Paragraph 5.29 that says that the DIP secured party shall not

14  be able to -- shall not be obligated to fund any portion of

15  the minimum stub-rent reserve after the occurrence of a DIP

16  termination event.  That is pretty clear.  So, what do I do

17  with that?

18          MS. ROGLEN:  It is, Your Honor, and I think what

19  all the parties contemplated is that following a DIP

20  termination event the funding would have been pulled, cash

21  collateral would have been cut off and, really, we would be

22  looking at a conversion.  But the DIP lenders have agreed to

23  continue funding these cases, have agreed to the continued

24  use of cash collateral and are seeking a supplemental order

25  from this Court to do so. An entry of that order on the terms

1  and with the budget as provided by the lenders and the

2  debtors here today does not provide the adequate protection.

3  　　　　MR. LEHANE:  Your Honor, can I just make one

4  point?

5  　　　　THE COURT:  Not yet.  You will have your

6  opportunity to argue.

7  　　　　I will be honest, one concern I do have is that

8  when a landlord and a lender make an agreement that then ends

9  up in an order entered by the Court that this Court should

10  enforce that agreement.  I am not sure quite what I hear you

11  saying.

12  　　　　I do hear you saying, I think, this is an

13  interesting question and I can, at an appropriate time, ask

14  Mr. Galardi.  What you are saying, and I think it's right,

15  is, well, we're not operating under the final DIP anymore.

16  Essentially, now we're starting over again.  Maybe that is

17  correct.

18  　　　　So, what I am trying to figure out is whether I

19  should -- is what positions I should put the parties back in.

20  the 506(c) waiver is clearly gone.  That is fine, it

21  happened.  I don't hear you asking for that to be undone.

22  You are just suggesting that on a go-forward basis,

23  notwithstanding Paragraph 5.29, that there should be another

24  requirement for a reserve.

25  　　　　MS. ROGLEN:  That's correct, Your Honor.  For the

1  next two weeks, if this order is only -- it's not entirely

2  clear to me whether this order is intended to only be

3  applicable for the next two weeks since that is the only

4  budget that we have seen, but over the next two weeks all we

5  are talking about to continue funding that reserve is $50,000

6  in the week ending July 1st and $50,000 in the week ending

7  July 8th.

8           THE COURT:  Well, I have considered making this an

9  interim order and putting this back on Judge Horan because he

10  knows what he meant when he entered this order and what he

11  thought about the arrangement.  I only have, and I don't even

12  have a final budget, two week exemplary, if you will, budget.

13  So, that is all I've got.

14           Okay.  Let me hear from Mr. LeHane.  Thank you.

15           MR. LEHANE:  Your Honor, I don't want to add too

16  much to it.  Just to respond to Mr. Galardi's point that a

17  request for adequate protection is not appropriate now. I

18  disagree with that.  I think the text of the code at 363(e)

19  is very, very clear on this:

20           "Notwithstanding any other provision of this

21  section at any time, on request of an entity that has an

22  interest in property used, sold, or leased, or proposed to be

23  used, sold or leased the Court, with or without a hearing,

24  shall prohibit or condition such use as is necessary to

25  provide adequate protection."

1          Your Honor, I also, like Ms. Roglen said, don't

2    disagree with what most of Mr. Galardi said. The order says

3    what it says and the transcript says what it says.  The fact

4    is it's a significant gotcha.  We were working hard to be

5    reasonable and we felt like we had done that.  Now we are

6    operating under a different order.  They are asking for a

7    supplemental order.  And I believe the code is clear that we

8    are -- if 506(c) is gone we are still entitled to some

9    adequate protection and that could be some reserve as it was

10   before.  It could be almost anything else other than just

11   being left in the position with an administrative claim.

12          It is only a two-week period. I think an interim

13   order does make sense to move this back to Judge Horan.  As I

14   said, this puts you in a terrible position.  I think, based

15   on that, we are still entitled to some adequate protection

16   and I think the transcript is also clear that the idea was we

17   will be back at the table with the landlords, but we really

18   haven't been there and we would like to have a more serious

19   conversation, but I do believe we are entitled to adequate

20   protection because the debtors, and the lenders, and ReStore

21   have used the property to sell their collateral down and

22   there is significant paydowns happening as evidenced by the

23   budget and the discussions today on the record.

24          Thank you, Your Honor.

25          THE COURT:  Mr. Rosner.

1        MR. ROSNER:  Thank you, Your Honor.  Douglas

2   Rosner for two of the landlords.

3        Starting with the stub-rent issue, which seems to

4   be the focus of the discourse, I think where the ambiguity is

5   you have a DIP termination event, maybe.  I mean what we head

6   today that the lender believes there occurred a DIP

7   termination event. I think the debtor, in one of their

8   papers, did agree to that.

9        Where the ambiguity is, though, that funding

10  continued.  It seems to be fundings continued just normal

11  ordinary course.  So, I think there is some ambiguity there.

12  I will speculate that the lenders will counter that saying

13  that after a DIP termination event they can elect to advance

14  what they choose to advance in order to maximize value of

15  their collateral, but it appears to me from what I was

16  hearing through the testimony is that the daily advances and

17  sweeps were taking place pretty much ordinary course even as

18  of today.

19        So, I do think that there is some play in when the

20  stub-rent payments should stop and if they really were

21  intended to stop under these circumstances at this point in

22  time and then if we are now supplementing and continuing

23  financing under a new budget and maybe under different

24  circumstances, you know, is that what was intended by we're

25  all going to have to sit down and figure this out.

1      So, I think the Court's suggestion of an interim

2  order makes sense in that context because that gives us the

3  week to try to figure that out before appearing again in

4  front of the Court.  So, I wanted to make that point.

5      So, there are some findings in this order that

6  would impact that type of consideration.  Those findings are

7  in Paragraph 2 and maybe they're in the intro as well, but I

8  think it's Paragraph 2 about termination events having

9  occurred and things like that.  You know, that type of --

10  those types of findings might be, at least, for today's

11  purposes be without prejudice to continue consideration of

12  whether the stub-rent reserves should be continuing through

13  this process.

14      I was also somewhat troubled by the 506(c) waiver

15  in this context along with the language at the end of

16  Paragraph 6 of the proposed form of order which says that the

17  lenders will not be liable for any administrative expenses.

18  If we are going into a going out of business sale or store

19  closing sale phase of the case, and Mr. Galardi did

20  represent, and I appreciate that, that the lenders are going

21  to fund rent for -- well, they funded June already, but they

22  are going to fund July as well, but we don't have a budget

23  past the first week of July.

24      We also heard testimony that the intention is to

25  run the sales through the end of August and I don't want to

1 be in another gotcha situation where you enter an order that

2 says they are not responsible for paying any administrative

3 expenses based on an exemplary budget and we don't get July

4 rent, or we don't get August rent.

5        So, I think there needs to be some -- and whether

6 that fits under the rubric of adequate protection under 363,

7 whether it fits under 365(d)(3) that rent does have to be

8 paid and there is a store closing order that actually says

9 that, there needs to be some -- we can't just -- I don't

10 think it's the right answer to have a blanket sentence that

11 says lenders aren't obligated to do anything.

12       So, those would be my arguments based on or my

13 closing arguments based on the testimony.  I would add there

14 is also a motion pending that's going to be heard next week

15 which is a 365(b)(4) motion to extend the time to assume or

16 reject.  The debtors want to extend the time to December.  We

17 are now hearing all of this new information.  The deadline to

18 object is today.  So, I would ask that the parties also

19 consider extending that deadline a day or two because it may

20 not make sense and we may be very prejudiced by that.

21       THE COURT:  Your objection is filed.

22       MR. ROSNER:  Yes.

23       THE COURT:  I noticed that too.  I noticed that

24 the order also says, in Paragraph 9, the debtors and the DIP

25 secured parties shall have ceased funding and/or reserving

1   for stub-rent as of the week ending June 9th, the date on

2   which this first DIP termination event occurred.

3           MR. GALARDI:  Your Honor, if I may address that

4   because I did get an email in the meantime.  I have actually

5   been corrected.  It's probably going to be on that because

6   its $200,000 is the lease reserve.  So, we are happy to

7   modify the order so that its, at least, 200 of the reserve so

8   that everybody knows and not screw around with the dates and

9   the ambiguity.  As long as that number is correct, I believe

10  it is, and I think we can resolve that before the entry of

11  the order.  I don't want anybody to think we haven't reserved

12  nor that that money is not available for the landlords.

13          THE COURT:  Okay.  Let me ask you this question,

14  Mr. Galardi.  The DIP lenders and the debtors are here

15  seeking a supplemental, what they are calling a supplemental

16  order.  They are not relying on the original final DIP order.

17  They are seeking different relief, new milestones, new

18  termination events, perhaps new adequate protection.

19          So, you are seeking new relief.  So, maybe the

20  final DIP order didn't require the lenders -- the final DIP

21  order didn't require the lenders to put in a reserve after

22  the termination event happened or was declared.  Now you seek

23  new relief. If you want to proceed under the old order and

24  continue to advance funds and lend on what you had then maybe

25  you can, but why can't there be a new requirement consistent

1  with the final DIP order that requires the funding of the

2  reserve?

3          MR. GALARDI:  Your Honor, I expected that question

4  so let me start with two answers.  The first part of the

5  answer is I do not have an objection if Your Honor is more

6  comfortable with an interim order today.  As Your Honor will

7  see in the order, we have to do a final budget and I am, in

8  fact, sympathetic to the landlords that they have to see a

9  final budget.  There is no promises that they may like that

10 budget because it probably will not provide stub-rent unless

11 Your Honor requires it.

12         Second, Your Honor, and Mr. LeHane is right that

13 at any time Your Honor can order adequate protection for the

14 use of the property.  Here is the problem with the argument,

15 and I would actually like to brief it and have them brief it

16 for the hearing on the 7th because adequate protection is for

17 the diminution in value.  Failure to pay stub-rent is for the

18 diminution in value of the collateral.  They got this as an

19 adequate protection payment under 363(e).

20         There is no evidence and I would love the

21 landlords to put on the evidence that they are getting a

22 diminution in the value of their property from the date of

23 the DIP termination event through the date of the hearing

24 justifying stub-rent as adequate protection.

25         Now I am not saying there has to be a one on one.

1  And I am not even going to require that they put on a motion,

2  but the fact of the matter is I don't believe there is any

3  testimony, nor was there before, but I understand their

4  argument before when we went through the first period.  But

5  for the continued use of those properties to sell inventory,

6  which ultimately may mean unsecured creditor recoveries I

7  think they have to put on a showing that there will be a

8  diminution in the value of their leased properties by our

9  continued use.

10         It will also allow us to put on a budget for that

11  same year that shows them that their rent payments for the

12  July and August period will be in those payments so that we

13  don't have to have, well, it's only two weeks, its eight, and

14  if people don't want to hear my representations that is the

15  intention.  So, I think that would be the best way to deal

16  with the interim at a final and their 363.

17         Now Your Honor may say I want to give them

18  adequate protection now, but I would ask Your Honor to make

19  findings what has been shown as the diminution in the value

20  of their collateral between now and July 7th.

21         THE COURT:  I think this resolution in 5.29 wasn't

22  an adequate protection resolution, it was a 506(c)

23  resolution.  That is how I read it.  And I understand the

24  argument you are making, okay, but I think it was a 506(c)

25  resolution.  You got the waiver of the 506(c), but you are

1  not proceeding here, again, under this final DIP order.  You

2  are asking for a new order.

3          So, I don't know what you want to call it, but

4  here is my inclination, the only objection I'm getting is

5  to -- well, I'm getting another objection too, which I think

6  is probably fair as well, which is this finding of no admin

7  costs when I have no clue about 365(d)(3), and rent, and all

8  of that.  So, I don't think that is appropriate and I don't

9  have a budget, not even a final budget for two weeks.

10         So, I think I am inclined to say to approve

11 something on an interim basis that requires the funding of

12 the $50,000 a week.  Judge Horan wants to change that back.

13 He can take it back and he can have a full hearing.  But I

14 think there was an exchange there, a *quid pro quo*, if you

15 will, the 506(c) waiver for the stub-rent resolution.

16         What also concerns me, and I think the testimony

17 was less then clear today, is the timing of when the debtor

18 knew that they would be in default or were likely to be,

19 whether that was discussed or told to the landlords.  The

20 delay between the termination notice -- now I'm getting the

21 wrong term here, but the delay between the DIP termination

22 event notice.

23         A DIP termination event first occurred on June 9th

24 and before anything was put on this Court it was a couple of

25 weeks later so that parties were in the dark that this

1  reserve didn't have to be reserved, at least, and couldn't

2  take any action with respect to that because they didn't know

3  if, in fact, that is the case.  If there were communications

4  there were communications, but I have a concern about that as

5  well.

6           Certainly, and I don't think this was the

7  testimony today, but it wasn't the clearest testimony.  This

8  was an emergency hearing.  It wasn't the clearest testimony

9  that at the time this order was submitted with, I guess, a

10 revised budget that the debtors weren't pretty sure that

11 there could be a default.  That concerns me, but I don't know

12 what communications were had and there could probably be

13 perhaps better testimony on that issue.

14          So, I am inclined to enter an interim order

15 because the debtors have shown, through their testimony, that

16 they clearly need funds to continue to go through the likely

17 liquidation process and a highly unlikely proposition that

18 SSG is going to come up with anybody, but go Mr. Victor.

19          I am going to require, as part of this interim

20 order, which I think may just happen to be in place for a

21 week, that the lenders fund one more week, this week or

22 during the interim order, during the term of the interim

23 order, $50,000 a week while those issues get sorted out.

24          I am going to also -- again, the only other

25 provision that someone has pointed out to me that is an issue

1  is the paragraph that says absolves the lender of

2  responsibility for administrative expenses.  I can't do that

3  for the reasons we have discussed.  I don't have a budget,

4  etc.  Yeah, I think on an interim basis it's okay that it

5  says the revised budget shall constitute the, in effect,

6  approved budget because either a subsequent budget is going

7  to be approved or it's not going to be approved.

8          Does anybody else see any other provision of this

9  order that creates an issue?  What I am trying to do is

10  permit the funding to go forward, the debtor gets its new

11  trigger dates -- I mean, the lender gets its new trigger

12  dates.  That is just the way it is, these milestones.

13          I had a question about the challenge period, but I

14  take it that that was negotiated with the committee?

15          MR. GALARDI:  Yes, Your Honor.  And we gave up

16  certain things.  Mr. Martin can discuss from the committee.

17          THE COURT:  I thought the order was submitted

18  yesterday or the day, it still had provisions subject to the

19  challenge period, the release.

20          MR. MARTIN:  The challenge deadline is July 17th,

21  Your Honor, and this was a combined facility with Pathlight

22  on the term loan side and the ABL lenders on the revolver

23  side.  This is a settlement solely on the revolver side which

24  is the Eclipse as agent and Eclipse and ReStore as lenders.

25          So, this does affect a release of the committee's

1  challenge period early in return for, you know, a pile of the

2  consideration that's laid out in Paragraph 11, I believe, of

3  the order.  That was something that the committee very

4  carefully considered.  We have a very active seven-person

5  committee.  I think a good number of them with their own

6  bankruptcy counsel as well.

7          So, we considered that very carefully.  We are

8  prepared to let it go as to this DIP lender, ABL lender, but

9  certainly not as to the term lender.  We are going to, you

10 know, go out to our full challenge period there.

11         THE COURT:  Okay.  Thank you.

12         MR. GALARDI:  Your Honor, may I interrupt just one

13 thing.  As you have made this an interim order and, again,

14 because I have been accused of gotcha's, which it's not, I

15 don't think the challenge period should expire until the

16 entry of the final order just like our giving up of a lien on

17 proceeds. So, the order will have to be revised to reflect

18 that many of these agreements now are simply interim. For

19 example, the increase in the carve-out.

20         All of those provisions I understand Your Honor is

21 going to make it an interim order, but I didn't want anybody

22 to understand that we will waive today, because we do have,

23 pursuant to the final order, a lien on the proceeds of

24 various things.  We do have, what I call, the early

25 termination fee.  We don't intent to renegotiate that, but

1  that will be subject to the entry of a final order which I

2  think is a fair *quid pro quo* for what Your Honor is saying

3  will be an interim order and with the requirement that we

4  reserve stub-rent.

5          THE COURT:  I think that is appropriate, yes.

6          MR. MARTIN:  Agreed.

7          THE COURT:  It's an interim. Anything else that I

8  can address in an interim fashion?

9      (No verbal response)

10          THE COURT:  Okay.  Thank you.  I appreciate your

11  patience with me today in terms of getting up to speed. I

12  will certainly let Judge Horan know what I have done to his

13  case, hopefully not too much harm.  I am glad that he will be

14  back and available next week to handle your hearing.  I wish

15  everyone good luck with your case.

16          MS. MELTZER:  Your Honor, Evelyn Meltzer.  I would

17  just say, Your Honor, we will work to revise the order

18  appropriately and have it filed under certification of

19  counsel and uploaded for your signature.  I don't know if the

20  parties think that is something that will get done this

21  afternoon or tomorrow, but we will work as quickly as

22  possible.

23          THE COURT:  I am here.  So, just simply when you

24  do that, obviously, make sure you keep Ms. Johnson in the

25  loop on that since I don't get things that go to Judge

1   Horan's Chambers.

2              MS. MELTZER:  Understood.  Thank you, Your Honor.

3              THE COURT:  Thank you very much.  We're adjourned.

4         (Proceedings concluded at 3:51 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>CERTIFICATION</u>

2          We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    <u>/s/ William J. Garling</u>              June 30, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   <u>/s/ Mary Zajaczkowski</u>              June 30, 2023

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25